1  Trenton H. Norris (California State Bar No. 164781)
   Sarah Esmaili (California State Bar No. 206053)
2  ARNOLD & PORTER LLP
   90 New Montgomery Street, Suite 600
3  San Francisco, CA 94105
   Telephone: (415) 356-3000
4  Facsimile: (415) 356-3099
   Email: trent.norris@aporter.com
5  Email: sarah.esmaili@aporter.com

6  Peter L. Zimroth (*pro hac vice* admission pending)
   Kent A. Yalowitz (*pro hac vice* admission pending)
7  Nancy G. Milburn (*pro hac vice* admission pending)
   ARNOLD & PORTER LLP
8  399 Park Avenue
   New York, NY 10022
9  Telephone: (212) 715-1000
   Facsimile: (212) 715-1399
10 Email: peter.zimroth@aporter.com
   Email: kent.yalowitz@aporter.com
11 Email: nancy.milburn@aporter.com

12 Attorneys for Plaintiff
   CALIFORNIA RESTAURANT ASSOCIATION

13

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16

17 CALIFORNIA RESTAURANT              )
   ASSOCIATION,                       )   Case No. _____ 08          3247
18                                    )
                  Plaintiff,          )
19                                    )   NOTICE OF MOTION AND
        v.                            )   PLAINTIFF'S MOTION FOR
20                                    )   DECLARATORY RELIEF AND A
   THE CITY AND COUNTY OF SAN         )   PRELIMINARY INJUNCTION;
21 FRANCISCO and THE SAN FRANCISCO    )   MEMORANDUM OF POINTS AND
   DEPARTMENT OF PUBLIC HEALTH,       )   AUTHORITIES IN SUPPORT
22                                    )   THEREOF
                  Defendants.         )
23                                    )   Date:    September 4, 2008
                                      )   Time:    9:30 a.m.
24                                    )   Dept:    TBD
                                      )   Judge:   TBD
25

26

27

28

ORIGINAL FILED

JUL - 3 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

1

## NOTICE OF MOTION AND MOTION

2      PLEASE TAKE NOTICE that, at 9:30 a.m. on September 4, 2008, or as soon thereafter as

3  this matter may be heard, in the San Francisco Division of the United States District Court for the

4  Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, in

5  the Courtroom of the Judge to be assigned to this action by the Court, Plaintiff California Restaurant

6  Association ("Plaintiff" or "CRA") will move, and hereby moves, for an order granting Plaintiff a

7  declaratory judgment and preliminary injunction in Plaintiff's action pursuant to 42 U.S.C. § 1983

8  enjoining the San Francisco Department of Public Health from enforcing Ordinance 40-08 on

9  grounds of federal preemption, state preemption and violation of the right to freedom of speech

10  guaranteed by the First Amendment of the United States Constitution and article I, section 2 of the

11  California Constitution of those restaurants within the purview of the Ordinance.

12      This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and

13  Authorities submitted in support of the Motion, the supporting Declaration of Sarah Esmaili and the

14  exhibits thereto, the papers and pleadings on file in this action and upon such further briefs,

15  evidence, and oral argument as may be presented to the Court in connection with this Motion.

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# **TABLE OF CONTENTS**

**Page**

STATEMENT OF THE ISSUES ....................................................................................1

STATEMENT OF FACTS ............................................................................................1

    A.  Nutritional Information in Restaurants ............................................................1

    B.  San Francisco Ordinance 40-08 .......................................................................2

    C.  No Evidentiary Support for Ordinance 40-08 ..................................................3

LEGAL STANDARD....................................................................................................5

ARGUMENT ................................................................................................................6

I.    The Court Should Grant a Declaratory Judgment and Preliminary Injunction that Federal Law Preempts Ordinance 40-08....................................................................6

    A.  Overview of the Nutrition Labeling and Education Act of 1990 .........................6

    B.  Under the NLEA, Statements Describing the Amount of Calories Are "Claims"...............7

    C.  Under FDA Regulations, Statements Describing the Amount of Calories Are "Claims"....................................................................................................7

    D.  Restaurants Have Flexibility in Disclosing Nutritional Information ...................8

    E.  The NLEA Preemption Provision Applies to Ordinance 40-08............................9

    F.  Theories Advanced in *NYSRA* Are Inconsistent with the NLEA and the FDA's Regulatory Definition of "Claim"....................................................................10

        1.  NLEA and FDA Regulations Do Not Distinguish Between Qualitative and Quantitative Statements ...............................................................11

        2.  Definition of "Claim" Does Not Distinguish Between Voluntary and Mandatory Statements..................................................................13

        3.  21 U.S.C. § 343(r)(1) Does Not "Carve Out" Certain Claims from the Reach of That Provision..................................................................14

    G.  Plaintiff's Interpretation Harmonizes Requirements of the NLEA.....................20

II.    The Court Should Grant a Declaratory Judgment and Preliminary Injunction that the California Retail Food Code Preempts Ordinance 40-08 .......................................21

III.    The Court Should Grant a Preliminary Injunction to Protect the First Amendment Rights of Plaintiff's Members..................................................................................22

    A.  Ordinance 40-08 Will Cause Irreparable Harm by Impermissibly Compelling Speech.........................................................................................................22

    B.  Plaintiff Is Likely to Succeed on the Merits....................................................24

        1.  Ordinance 40-08 Fails Under *Central Hudson* ....................................25

**Page**

      a.  Ordinance 40-08 Does Not Advance the City's Asserted Interest in
Preventing Obesity in a "Direct and Material Way"...............................................25

      b.  Ordinance 40-08's Infringement on Speech Is More Extensive Than
Necessary to Serve the City's Asserted Interest .......................................27

    2.  Ordinance 40-08 Fails Under *United Foods* ..............................................28

    3.  Rational Basis Review Is the Wrong Standard ...........................................29

IV.  The Court Should Grant a Preliminary Injunction to Protect the Free Speech Rights of
Plaintiff Guaranteed by Article I, Section 2 of the California Constitution...............................32

- ii -

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Alaska Trojan Partnership v. Gutierrez,*
425 F.3d 620 (9th Cir. 2005)..................................................................... 8, 15

*Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n.,*
461 U.S. 375 (1983)....................................................................................... 22

*ARP Pharmacy Servs., Inc. v. Gallagher Bassett Servs., Inc.,*
138 Cal. App. 4th 1307 (2d Dist. (Div. 4) 2006) ................................. 33, 34

*Bad Frog Brewery, Inc. v. New York State Liquor Authority,*
134 F.3d 87 (2d Cir. 1998)........................................................................... 27

*Central Hudson Gas & Electric Corp. v. Public Serv. Commission of New York,*
447 U.S. 557 (1980) ............................................................................... passim

*Christensen v. Harris County,*
529 U.S. 576 (2000) ...................................................................................... 15

*Cincinnati v. Discovery Network, Inc.,*
507 U.S. 410 (1993) ...................................................................................... 27

*Crown Pac. v. Occupational Safety & Health Review Comm'n,*
197 F.3d 1036 (9th Cir. 1999)...................................................................... 15

*Downey v. Crabtree,*
100 F.3d 662 (9th Cir. 1996)........................................................................ 15

*Edenfield v. Fane,*
507 U.S. 761 (1993).................................................................... 25, 26, 30, 31

*Elrod v. Burns,*
427 U.S. 347 (1976)....................................................................................... 22

*English v. General Electric Co.,*
496 U.S. 72 (1990) .......................................................................................... 6

*Environmental Defense Center, Inc. v. EPA,*
344 F.3d 832 (9th Cir. 2003)........................................................................ 31

*Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,*
458 U.S. 141 (1982)......................................................................................... 6

*Gerawan Farming, Inc. v. Kawamura,*
33 Cal. 4th 1 (2004) ............................................................................... 32, 33

*Gerawan Farming, Inc. v. Lyons,*
24 Cal. 4th 468 (2000) ................................................................................. 33

*Glickman v. Wileman Brothers & Elliott, Inc.,*
521 U.S. 457 (1997)....................................................................................... 31

*Greater New Orleans Broad. Ass'n v. United States,*
527 U.S. 173 (1999)................................................................................. 26, 27

- iii -

**Page(s)**

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
515 U.S. 557 (1995) .................................................................................................. 23

*International Dairy Foods Ass'n v. Amestoy,*
92 F.3d 67 (2d Cir. 1996) ..................................................................................... 23, 24

*Johanns v. Livestock Mktg. Ass'n,*
544 U.S. 550 (2005) .................................................................................................. 33

*Jones v. Rath Packing Co.,*
430 U.S. 519 (1977) .................................................................................................... 6

*Kasky v. Nike, Inc.,*
27 Cal. 4th 939 (2002) ......................................................................................... 32, 33

*Lorillard Tobacco Co. v. Reilly,*
533 U.S. 525 (2001) .................................................................................................. 27

*McDermott v. Wisconsin,*
228 U.S. 115 (1913) .................................................................................................... 6

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992) .................................................................................................... 6

*National Electric Manufacturers Ass'n v. Sorrell,*
272 F.3d 104 (2d Cir. 2001) ................................................................................. 29, 31

*New York State Restaurant Ass'n v. New York City Board of Health,*
509 F. Supp. 2d 351 (S.D.N.Y. 2007) ............................................................ 8, 10, 13

*New York State Restaurant Ass'n v. New York City Board of Health,*
No. 08 Civ. 1000, 2008 WL 1752455 (S.D.N.Y. Apr. 16, 2008) ...................... 10, 13, 29

*Pacific Gas & Electric Co. v. Public Utilities Comm'n of California,*
475 U.S. 1 (1986) ................................................................................................. 23, 28

*Paramount Land Co. LP v. California Pistachio Comm'n,*
491 F.3d 1003 (9th Cir. 2007) .................................................................................... 5

*Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.,*
204 F.3d 867 (9th Cir. 2000) .................................................................................. 5, 6

*Public Citizen, Inc. v. Shalala,*
932 F. Supp. 13 (D.D.C. 1996) .................................................................................. 19

*Riley v. National Federation of the Blind of N.C., Inc.,*
487 U.S. 781 (1988) .................................................................................................. 23

*Rubin v. Coors Brewing Co.,*
514 U.S. 476 (1995) ............................................................................................. 26, 27

*Sammartano v. First Judicial District Court, in & for County of Carson City,*
303 F.3d 959 (9th Cir. 2002) ..................................................................................... 22

*Sherwin-Williams Co. v. City of Los Angeles,*
4 Cal. 4th 893 (1993) ................................................................................................ 22

- iv -

**Page(s)**

*United States v. Haggar Apparel Co.,*
    526 U.S. 380 (1999) ........................................................................................ 8

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) ........................................................................................ 8

*United States v. Schiff,*
    379 F.3d 621 (9th Cir. 2004) ........................................................................ 31

*United States v. United Foods, Inc.,*
    533 U.S. 405 (2001) ............................................................................... passim

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ...................................................................................... 23

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,*
    471 U.S. 626 (1985) ............................................................................... passim

**Statutes, Rules and Other Administrative Materials:**

Nutrition Labeling & Education Act, Pub. L. No. 101-535, 106 Stat. 4501 (1990) ........ passim

21 U.S.C. § 321(k) .......................................................................................... 18, 19

21 U.S.C. § 321(m) .............................................................................................. 19

21 U.S.C. § 343 ................................................................................................. 1, 6

21 U.S.C. § 343(q) ................................................................................... 7, 16, 19, 20

21 U.S.C. § 343(r) .......................................................................................... passim

21 U.S.C. § 343-1(a) ................................................................................... 6, 7, 9, 20

21 C.F.R. § 101.9 ........................................................................................... passim

21 C.F.R. § 101.10 .......................................................................................... passim

21 C.F.R. § 101.13 .......................................................................................... passim

21 C.F.R. § 101.45 ........................................................................................... 9, 18

38 Fed. Reg. 2125 (Jan. 19, 1973) ............................................................................. 6

41 Fed. Reg. 51001 (Nov. 19, 1976) ........................................................................... 6

58 Fed. Reg. 2302 (Jan. 6, 1993) ......................................................................... 12, 13

61 Fed. Reg. 40320 (Aug. 2, 1996) ........................................................................... 19

Cal. Const. art. I, § 2 ................................................................................. 1, 32–34

Cal. Const. art. XI, § 7 ...................................................................................... 21

Cal. Health & Safety Code § 113703 ...................................................................... 1, 21

Cal. Health & Safety Code § 113705 .......................................................................... 21

NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**Page(s)**

Cal. Health & Safety Code § 114089...................................................................... 21

San Francisco Health Code §§ 468-468.8 (as amended by Ordinance 40-08). ............... passim

**Other:**

*The Keystone Forum on Away-From-Home Foods: Opportunities for Preventing Weight Gain and Obesity, Final Report,* The Keystone Center, Washington, D.C. (May 2006)...................................................................................................... 3, 4

NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF THE ISSUES

1.    Is Plaintiff entitled to declaratory and injunctive relief because the City and County of San Francisco's Ordinance 40-08 is expressly preempted by the Nutrition Labeling and Education Act of 1990, 21 U.S.C. §§ 301, 343, 343-1, and regulations promulgated thereunder by the federal Food and Drug Administration?

2.    Is Plaintiff entitled to declaratory and injunctive relief because Ordinance 40-08 is preempted by the California Retail Food Code, Cal. Health & Safety Code § 113703 *et seq.*?

3.    Is Plaintiff entitled to declaratory and injunctive relief because Ordinance 40-08 violates the First Amendment?

4.    Is Plaintiff entitled to declaratory and injunctive relief because Ordinance 40-08 violates article I, section 2 of the California Constitution?

### STATEMENT OF FACTS

**A.    Nutritional Information in Restaurants**

There are more than 5,000 restaurants in San Francisco. Most of them publish no nutrition information at all about their food. The City and County of San Francisco (the "City") does not wish to alter that fact. Instead, it has targeted the roughly 278 restaurants that are affiliated with large chains—many of which have, for years, published comprehensive nutrition information about their food in brochures available at the restaurants, on posters, on packaging, on tray liners, and on websites.[1] The City wants to alter the way in which these few targeted restaurants convey nutrition information and has passed a new law requiring them to display statements showing calories on their menu boards and, in some cases, calories, saturated fat, carbohydrates and sodium on their menus.

---

[1] *See, e.g.,* Exhibit A ("Andres Decl.") to the Declaration of Sarah Esmaili in Support of Plaintiff's Motion for Declaratory Relief and a Preliminary Injunction, dated July 3, 2008 ("Esmaili Decl.") ¶ 4; Exhibit B ("Demuth Decl.") to the Esmaili Decl. ¶¶ 4, 7, 10; Exhibit C ("Quirantes Decl.") to the Esmaili Decl. ¶¶ 6-12.

1    These restaurants strongly disagree with the City's approach. They question the efficacy of

2    the ordinance in reducing obesity—the City's stated goal in passing the new law. They believe that

3    there are better ways to communicate with their customers about health and nutrition, and that the

4    new law may be counterproductive, with an overemphasis on a limited number of nutrients that can

5    interfere with a healthy, balanced diet. *See, e.g.,* DeMuth Decl. ¶ 11. The restaurants' views are

6    earnestly held and well grounded.

7    **B.    San Francisco Ordinance 40-08**

8    Ordinance 40-08 amends the San Francisco Health Code §§ 468-468.8 to require chain

9    restaurants with 20 or more establishments in the State of California to make statements showing

10    select nutritional information on menu boards and menus in the precise manner prescribed by the

11    law. For menu boards, these restaurants must make statements showing calorie content next to or

12    beneath each menu item, using a font and format that is at least as prominent in size and appearance

13    as the name or price of the menu item. S.F. Health Code § 468.3(c). For menus, these restaurants

14    must make statements showing calorie content, saturated fat, carbohydrates and sodium in a clear

15    and conspicuous manner, next to or beneath each menu item. *Id.* § 468.3(b). Menus must further

16    include a clear and conspicuous statement of the recommend daily limits for both saturated fat and

17    sodium in a 2,000 calorie daily diet. *Id.*[2] Failure to make these disclosures subjects restaurants to

18    governmental sanction. *Id.* § 468.6.

19    Ordinance 40-08 has established an inflexible regime. The new law rigidly requires

20    prominent display of calories on menu boards and calories, saturated fat, carbohydrates and sodium

21    on menus. It applies equally to customized and combination offerings. In such cases, the new law

22    requires the restaurants' statements to show a "range," minimum to maximum, of the possible

23    calories. These "range" postings have been criticized as not useful to customers.

24    _____

[2] Ordinance 40-08 further requires the targeted restaurants to make statements about calories,
25    protein, carbohydrates, total fat, saturated fat, trans fat, cholesterol, fiber and sodium in the set
manner prescribed by the regulation. This nutrition information must be presented on a poster no
26    smaller than 18 by 24 inches located either at the point of sale or in the areas surrounding the
entrance to the restaurant. S.F. Health Code § 468.4(c).

27

28

1

**C.    No Evidentiary Support for Ordinance 40-08**

2       In its *amicus* brief filed in support of a similar regulation adopted in New York, the City

3   admitted that "there are no studies as of yet showing the actual impact of widespread mandatory

4   nutrition disclosure in major chain restaurants." Brief of *Amici Curiae* City and County of San

5   Francisco *et al.* at 18, *New York State Restaurant Ass'n v. New York City Bd. of Health*, No. 08-

6   1892-cv (2d Cir. May 14, 2008).  That admission was correct.  No one knows how to reverse the

7   trend of increasing obesity in the United States.  Even on subjects as seemingly simple as the

8   communication of nutrition information and how (or whether) consumers use the information, there

9   are questions but no answers.  After more than a decade of comprehensive nutrition labeling on

10  packaged foods mandated by federal law, the incidence of obesity continues to rise.  With respect to

11  the much more complicated issue of foods sold by the variety of restaurants in the United States,

12  one recent government-sponsored report concluded that there is no public health consensus on how

13  consumers use nutrition information in restaurants or whether such information could help reduce

14  the incidence of obesity:

15              There is a clear need for more research regarding how the provision
16          of nutrition information, claims (such as "low calorie"), and symbols
            influence consumer preference and choice for away-from-home food
17          consumption situations.  Of particular concern is how, when, and why
            consumers use nutrition information and claims during their decision-
18          making processes.  More specifically, a better understanding is
            needed of the types of factors that moderate consumers' responses to
19          the provision of nutrition information and claims for away-from-home
            foods.
20

21  *The Keystone Forum on Away-From-Home Foods: Opportunities for Preventing Weight Gain and*

22  *Obesity, Final Report*, The Keystone Center, Washington, D.C. (May 2006), at 13 ("Keystone

23  Report"), attached hereto as Appendix Exhibit F.

24      The Report suggests many unanswered questions:  What type of information should be

25  provided?  How and where should information be provided, given the goals for providing such

26  information?  At point of sale, before sale, after sale for future purchases?  Via menu board,

27

28

- 3 -

NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1  brochure, table tent, poster, kiosk?  If the information is accessed, how is it used?  Under what

2  circumstances is current behavior influenced and under what circumstances is future behavior

3  influenced?  For example, if consumers consume an extra 100 calories at lunch, will they eat a

4  lighter dinner?  Or, if they consume 100 fewer calories at lunch, will they replace these calories at

5  other meals or between meals?  Will they exercise more, or less?  Is information on the caloric

6  content of food items more likely to be used by the consumer when presented alone or when

7  embedded in general nutrition content information?  *See* Keystone Report 84.

8        The Report also explains:

9
10       Better and more timely information is needed regarding: the choices
        consumers are making regarding foodservice venues and foods, the
11       values and motivations driving those choices, the factors that motivate
        changes in behaviors and attitudes, the potential value of nutrition
12       information and other specific interventions, and the best ways to
        promote changes in products or menus that are relevant to weight
13       management.

14                      * * *

15       Evidence regarding how and why consumers use nutrition
        information is limited.  Outstanding questions include how consumers
16       process and use such information, what measurable contribution the
        information can make to the goal of managing weight gain and
17       obesity, where the point of decision-making is for away-from-home-
        foods consumers, and what effect information may have on consumer
18       choice, eating behavior, and store revenue.  Likewise lacking are data
        with regard to whether one format or another alters the rate of
19       consumer usage of the information.

20
21  Keystone Report 46, 69; *see also* Keystone Report 22 ("The research base on obesity is incomplete

22  and imperfect regarding some aspects of the problem, such as the potential effectiveness of specific

23  interventions aimed at assisting consumers with managing their energy intake."); Keystone Report

24  65, 67 (listing as a "Basic Research Need" information on "What information, if any, regarding the

25  nutritional composition of menu items prompts consumers to take action and choose items to

26  manage weight?").

27

28

NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    Dr. David Allison, one of the country's leading authorities on obesity, echoed this

2   conclusion in analyzing the efficacy of a regulation similar to Ordinance 40-08 adopted by the New

3   York City Board of Health.  Dr. Allison concluded, based on an extensive review of the scientific

4   literature, that no evidence supported the hope that posting calories on menu boards would lead to

5   reduced obesity:

> [T]here is no body of data showing that implementation of R81.50
> [New York City's regulation] would affect actual behavior or weight
> either in the short-term or in the long-term nor is there any body of
> evidence that the specific manner in which the R81.50 would require
> provision of caloric information would lead to better results in the
> short-term or long-term than any other method.  **Thus, I conclude
> that there is not competent and reliable evidence that providing
> restaurant patrons with calorie information on menu items will
> reduce individual or population levels of obesity.  Nor is there
> evidence that the method of providing caloric information
> mandated by R81.50 will reduce levels of obesity more than the
> methods currently used by the affected restaurants to provide this
> information.**

15   Allison Decl. 29-30 (emphasis in original).  Dr. Allison went on to state that only "conjecture"

16   could be drawn from the existing research.  *Id.* at 33.

17    Given the current lack of knowledge about the topic, it comes as no surprise that the City of

18   San Francisco's Legislative Findings accompanying Ordinance 40-08 cannot and do not cite a

19   single study of any kind that shows an association between displays of nutrition information on

20   menus and weight loss.

## LEGAL STANDARD

22    A preliminary injunction is proper where "plaintiffs [can] demonstrate either (1) a likelihood

23   of success on the merits and the possibility of irreparable injury; or (2) serious questions going to

24   the merits and a balance of hardships strongly favoring the plaintiffs."  *Paramount Land Co. LP v.*

25   *California Pistachio Comm'n*, 491 F.3d 1003, 1008 (9th Cir. 2007).  These two tests "represent two

26   points on a sliding scale in which the required degree of irreparable harm increases as the

NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    probability of success decreases." *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*,

2    204 F.3d 867, 874 (9th Cir. 2000).

3                                          **ARGUMENT**

4    I.    **THE COURT SHOULD GRANT A DECLARATORY JUDGMENT AND PRELIMINARY**
5          **INJUNCTION THAT FEDERAL LAW PREEMPTS ORDINANCE 40-08**

6          The Supremacy Clause permits Congress to preempt any state law that conflicts with the

7    exercise of federal power. "Pre-emption fundamentally is a question of congressional intent and

8    when Congress has made its intent known through explicit statutory language, the courts' task is an

9    easy one." *English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990) (citation omitted).  Federal

10   regulations "have no less a pre-emptive effect than federal statutes." *Fidelity Fed. Sav. & Loan*

11   *Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  Enforcement of a preempted law imposes

12   irreparable harm. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

13         A.    **Overview of the Nutrition Labeling and Education Act of 1990**

14         The federal government has been regulating the labeling of foods in interstate commerce

15   since Congress enacted the Pure Food and Drug Act of 1906; and since that time there have been

16   state labeling laws that have been impliedly and expressly preempted by federal law. *See, e.g.,*

17   *McDermott v. Wisconsin*, 228 U.S. 115 (1913); *Jones v. Rath Packing Co.*, 430 U.S. 519, 540-43

18   (1977).  For many years, the FDA has regulated nutrition labeling for foods in interstate commerce,

19   including restaurant foods. *See* 38 Fed. Reg. 2125 (1973); 41 Fed. Reg. 51001 (1976).

20         In 1990, Congress enacted the Nutrition Labeling and Education Act ("NLEA").  21 U.S.C.

21   §§ 301, 343, 343-1.  The NLEA has two principal substantive provisions, each of which has a

22   corresponding preemption provision.  The provision relevant here requires the FDA to regulate

23   health and nutrition "claims" made about food.  21 U.S.C. § 343(r).  This power extends to all food

24   in interstate commerce, including restaurant food (with limited exceptions not applicable here).  21

25   U.S.C. § 343(r)(5)(B).  State laws about making nutrient content claims in the labeling of food—

26   including restaurant food—are preempted to the extent that they impose requirements that are not

27   identical to the federal regulatory regime.  21 U.S.C. § 343-1(a)(5).

28

- 6 -

1        Another provision of the NLEA sets forth detailed requirements for nutrition information

2    labels (*i.e.*, the familiar "Nutrition Fact Panel" on packaged food). 21 U.S.C. § 343(q). The NLEA

3    does not require restaurants to post nutrition information labels, and restaurant food is excluded

4    from operation of the corresponding express preemption provision. 21 U.S.C. §§ 343(q)(5)(A),

5    343-1(a)(4).

6        Thus, the dispositive preemption issue is this:  when restaurants post statements of

7    nutritional amount on their menus—*e.g.*, "100 calories"—are such statements "claims" within the

8    meaning of the NLEA and implementing regulations? *See* 21 U.S.C. § 343(r)(1); 21 C.F.R. §

9    101.13(b)(1).  If so, they are covered by the express preemption provision that corresponds to

10   subsection 343(r), and non-identical state laws are preempted. 21 U.S.C. § 343-1(a)(5).  If the

11   statements are not "claims" within the meaning of the statute, state laws about them are not

12   preempted by the NLEA's express preemption provisions. 21 U.S.C. § 343-1(a)(4).

    **B.**    **Under the NLEA, Statements Describing the Amount of Calories Are "Claims"**

14       Subsection (r) declares food "misbranded" if it bears a "claim" unless the claim comports

15   with applicable regulations. *See* 21 U.S.C. §§ 343(r)(1), (r)(2)(A)(i). The statute goes on to instruct

16   the FDA to promulgate regulations that "permit statements describing the amount and percentage of

17   nutrients in food which are not misleading and are consistent with the terms defined in [§ 343(r)]."

18   NLEA, Pub. L. No. 101-535, § 3(b)(1)(A)(iv), 106 Stat. 4501 (set out in Historical Notes to 21

19   U.S.C.A. § 343).  Thus, Congress specifically intended that the FDA promulgate regulations

20   governing "statements describing the amount" of calories and other nutrients—such as "100

21   calories."  Such statements are "claims" under the statute if they meet the FDA's regulatory

22   definitions of "claims."

    **C.**    **Under FDA Regulations, Statements Describing the Amount of Calories Are "Claims"**

    Consistent with these statutory directives, FDA regulations confirm that a statement

describing the amount of calories in numerical terms is a "claim" within the meaning of the statute

and regulations.  In 21 C.F.R. § 101.13(b)(1), the FDA defines an "expressed nutrient content

- 7 -

claim" as "any direct statement about the level (or range) of a nutrient in the food, e.g., 'low sodium' or '*__contains 100 calories__*.'" 21 C.F.R. § 101.13(b)(1) (emphasis supplied). Thus, the statement "contains 100 calories" is a claim. *See New York State Rest. Ass'n v. New York City Bd. of Health,* 509 F. Supp. 2d 351, 359-60 (S.D.N.Y. 2007) ("*NYSRA I*") ("[The definition in Section 101.13(b)(1)] appears to cover both an obvious characterization ('low sodium') as well as a simple statement about the amount of a nutrient in a food ('contains 100 calories')....Thus the FDA regulations treat a simple factual statement as to a nutrient amount as within the scope of § 343(r) and subject to (although expressly permitted by) FDA regulations.").

The FDA's regulations, promulgated after notice and comment, are of "controlling weight," *United States v. Haggar Apparel Co.*, 526 U.S. 380, 392 (1999), "binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001); *see Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 628 (9th Cir. 2005) ("When a statute or regulation defines a term, that definition controls, and the court need not look to the dictionary or common usage.").

### D.     Restaurants Have Flexibility in Disclosing Nutritional Information

The FDA has promulgated a special rule for nutrient content claims by restaurants. 21 C.F.R. § 101.10. The rule expressly grants restaurants flexibility to present accurate information concerning nutrient claims in any reasonable manner:

> Nutrition labeling in accordance with § 101.9 [specifying nutrition facts required on labels] shall be provided upon request for any restaurant food or meal for which a nutrient content claim . . . is made, except that information on the nutrient amounts that are the basis for the claim (e.g., "low fat, this meal provides less than 10 grams of fat") may serve as the functional equivalent of complete nutrition information as described in § 101.9. Nutrient levels may be determined by nutrient data bases, cookbooks, or analyses or by other reasonable bases that provide assurance that the food or meal meets the nutrient requirements for the claim. Presentation of nutrition labeling may be in various forms, including those provided in § 101.45 [concerning certain unprocessed foods] and other reasonable means.

- 8 -

1   21 C.F.R. § 101.10.  Thus, the FDA has given restaurants great flexibility to decide how to

2   communicate nutrient information to customers and how to determine nutrient levels.  For example,

3   a restaurant may communicate nutrition information through in-store signs, posters, brochures,

4   notebooks or charts, as contemplated in 21 C.F.R. § 101.45.  Restaurants also may communicate

5   nutrition claims through various "Nutritional Facts" formats set out in 21 C.F.R. § 101.9.

6   Section 101.10 allows restaurants to present nutrition information through "other reasonable means"

7   as well.

8        **E.**     **The NLEA Preemption Provision Applies to Ordinance 40-08**

9        The NLEA expressly preempts state laws like Ordinance 40-08, in which a state or local

10  entity "directly or indirectly" establishes any requirement respecting nutrition "claims" that is "not

11  identical to" the regulatory requirements of federal law.  21 U.S.C. § 343-1(a)(5).  Because

12  Ordinance 40-08 imposes requirements different from (*i.e.*, "not identical to") the federal

13  regulations, it is expressly preempted by the NLEA and void under the Supremacy Clause.

14       The preemption statute provides, in part:

15            no State or political subdivision of a State may directly or indirectly
16            establish under any authority or continue in effect as to any food in
              interstate commerce —

17                          * * *

18            (5) any requirement respecting any claim of the type described
              in section 343(r)(1) of this title, made in the label or labeling
19            of food that is ***not identical to*** the requirement of section
              343(r) of this title, except a requirement respecting a claim
20            made in the label or labeling of food which is exempt under
              section 343(r)(5)(B) [concerning certain kinds of claims by
21            restaurants about cholesterol, saturated fat and dietary fiber
              and nutrients determined by the FDA to increase the risk of
22            disease]....

23

24  21 U.S.C. § 343-1(a)(5) (emphasis supplied).

25       There can be no doubt that Ordinance 40-08 imposes requirements "respecting any claim of

26  the type described in section 343(r)(1)" because statements of the amount of calories, saturated fats,

27

28

1   carbohydrates and sodium *are* nutrient content "claims." And Ordinance 40-08 imposes

2   requirements not "identical" to those of the federal law and its accompanying regulations, 21 C.F.R.

3   § 101.10. In contrast to the significant flexibility afforded by § 101.10, the City purports to dictate

4   the content and presentation of nutritional claims.

5   **F.    Theories Advanced in *NYSRA* Are Inconsistent with the NLEA and the FDA's**

6        **Regulatory Definition of "Claim"**

7        Ordinance 40-08 is the second of its kind. New York City promulgated a similar regulation

8   in December 2006. After a federal district court struck down that regulation on preemption grounds

9   (*NYSRA I*, 509 F. Supp. 2d at 362-63), New York passed a revised version. The district court then

10  upheld the revised regulation. *See New York State Rest. Ass'n v. New York City Bd. of Health*, No.

11  08 Civ. 1000, 2008 WL 1752455 (S.D.N.Y. Apr. 16, 2008) ("*NYSRA II*"). The decision in *NYSRA*

12  *II* is on appeal to the Second Circuit. The City and County of San Francisco appeared as an *amicus*

13  in *NYSRA I* and *NYSRA II.*

14      In the *NYSRA* cases, New York City and its *amici* have advanced three theories against

15  preemption. These theories all center on the question whether a statement of nutritional amount—

16  *e.g.*, "100 calories"—is a "claim" within the meaning of the statute and regulations. *First*, New

17  York City argued that only *qualitative* statements (*e.g.* "low in fat") should be considered "claims"

18  and that *quantitative* statements (*e.g.*, "100 calories") should not be considered "claims" under the

19  statute. The District Court rejected that theory in *NYSRA I*. *Second*, New York City argued that

20  statements of nutrition "mandated" by a state or municipality are not "claims." Although the

21  District Court in *NYSRA II* adopted that theory, New York City effectively abandoned it on appeal.

22  *Third*, the Second Circuit invited the FDA to file an *amicus* brief. Although the FDA agreed that

23  these first two arguments are incorrect, the FDA offered a third argument against preemption: there

24  is a provision of the NLEA that excludes from the category of "claims" statements of nutrient

25  amounts that appear as part of Nutrition Fact Panels; and that provision should also apply to

26  statements on restaurant menus. (The Second Circuit has yet to rule on this theory.) We discuss

27  these theories below.

28

- 10 -

1    **1.    NLEA and FDA Regulations Do Not Distinguish Between Qualitative and Quantitative Statements**

2

3        The first theory offered by New York City was that the statement "100 calories" is not a

4    "claim" within the meaning of the NLEA because it is a "quantitative" statement rather than a

5    "qualitative" statement.  This theory ignores the FDA's controlling regulations.  The FDA defines

6    an "expressed nutrient content claim" as "***any direct statement*** about the level (or range) of a

7    nutrient in the food, e.g., 'low sodium' or '***contains 100 calories***.'" 21 C.F.R. § 101.13(b)(1)

8    (emphasis supplied).  "Any direct statement" is different from "any qualitative statement."

9        The FDA did not merely define "claim" to include "any direct statement" such as "contains

10   100 calories."  It also went on to add regulations governing what are permissible and what are

11   impermissible express and implied claims.  Subsection 101.13(i) thus provides that a label "may

12   contain a ***statement*** about the ***amount*** or percentage of a nutrient," so long as "[t]he statement does

13   not in any way implicitly characterize the level of the nutrient in the food [such implicit

14   characterizations being subject to other subparagraphs] and it is not false or misleading in any

15   respect (e.g., '***100 calories***' or '***5 grams of fat***')."  21 C.F.R. § 101.13(i)(3) (emphasis supplied).  In

16   short, the FDA regulations promulgated under authority of subsection (r) define a "claim" to include

17   "contains 100 calories" and expressly permit a claim of "100 calories."

18       Section 3(b)(1)(A)(iv) of the NLEA specifically instructed the FDA to promulgate such a

19   regulation—*i.e.*, one that would "permit statements ***describing the amount and percentage of***

20   ***nutrients*** in food which are not misleading and are consistent with the terms defined in [§ 343(r)]."

21   Pub. L. No. 101-535, § 3(b)(1)(A)(iv), 106 Stat. 4501 (emphasis supplied) (set out in Statutory Note

22   to 21 U.S.C.A. § 343).  This provision also instructs the agency that its regulations "shall identify

23   claims described in section [343(r)(1)(A)] which comply with section [343(r)(2)]."  *Id.* §

24   3(b)(1)(A)(i).

25       The FDA's notice of final rulemaking for these regulations confirms the agency's intent to

26   govern simple factual information like "100 calories."  During the notice and comment period, the

27

28

1  FDA was asked to *exclude* statements about "simple factual information" from the definition of

2  "nutrient content claim" on the theory that such a statement is not "a claim that 'characterizes the

3  level of any nutrient'" within the meaning of the statute.  58 Fed. Reg. 2302, 2303 (Jan. 6, 1993).

4  The comment argued that "a statement of the type contained in nutrition labeling—for example, that

5  a food contains 25 calories per serving…—is not a claim characterizing the level of the nutrient."

6  *Id.*  Based on the statutes discussed above, the FDA rejected that contention, embraced the view that

7  a quantitative factual statement about the amount of a nutrient is a "claim" that "characterizes the

8  level" of the nutrient within the meaning of the statute, and promulgated final and binding

9  regulations to that effect.  We reprint the relevant portion of the rulemaking below.  The FDA's

10  comments are dispositive.

> **The agency** advises that while it can agree that the terms "nutrient descriptor" and "nutrient descriptor claims" may be used to describe the claims subject to section 403(r)(1)(A) of the act and these regulations, it **does not agree that the scope of the statute and the regulations excludes statements of the amount of a nutrient in a food**.  The [distinction] the comment draws between "nutrient descriptors" and "nutrient content" claims is unpersuasive.  In fact, one of the sponsors of the 1990 amendments in the Senate specifically used the term "nutrition content claim" to refer to claims covered under section 403(r)(1)(A) (136 Cong. Rec. S16608 (October 24, 1990)).  Moreover, the statement in section 403(r)(1) of the act referred to by the comment as excluding from coverage statements of the type contained in nutrition labeling, in fact excludes "a statement of the type required by paragraph (q) that appears as part of the nutrition information required or permitted by such paragraph * * *."  **FDA stated in the general principles proposal (56 FR 60421 at 60424), that the legislative history of this provision specifically states that the identical information [i.e., the identical information that would be required in the nutrition fact panel required by subsection (q)] will be subject to the descriptor requirements if it is included in a statement in another portion of the label (136 Congressional Record H5841 (July 30, 1990))…. Furthermore, section 3(b)(1)(A)(iv) of the 1990 amendments provides that the mandated regulations "shall permit statements describing the amount and percentage of nutrients in food which * * * are consistent with the terms defined in section 403(r)(2)(A)(i) of such Act."**  Again, if statements of the amount and percentage of nutrients were not subject to section 403(r)(1)(A) of the act, there presumably

- 12 -

would have been no need for Congress to express its desire that such claims be permitted by the regulations. **Accordingly, FDA concludes that section 403(r)(1)(A) of the act and therefore these final regulations apply to statements of the amount of a nutrient in food as well as to statements of the level of a nutrient in food**.

58 Fed. Reg. at 2303-04 (emphasis supplied). The court in *NYSRA I* found these regulations dispositive on this argument. *NYSRA I*, 509 F. Supp. 2d at 359-60.

### 2. Definition of "Claim" Does Not Distinguish Between Voluntary and Mandatory Statements

In deciding *NYSRA I*, the district court suggested in *dicta* that the NLEA's definition of "claims" covers only "voluntary" statements, and that statements "mandated" by state law are not "claims." New York City altered its regulation as the *NYSRA I* court had suggested. In *NYSRA II*, the district court upheld the altered regulation. *NYSRA II*, 2008 WL 1752455, at *5.

The district court's decision in *NYSRA II* that only "voluntary" statements are "claims" under the NLEA ignores the FDA's regulatory definition of "claim" (which definition the district court correctly found controlling in *NYSRA I*). The "voluntary/mandatory" theory cannot be reconciled with the FDA's dispositive definition. The FDA's definition says that a "claim" is "***any*** direct statement." 21 C.F.R. § 101.13(b)(1). It does not say that a "claim" is "any ***voluntary*** direct statement." Furthermore, the FDA's regulations *do* use the word "voluntary" in another section. In permitting (but not mandating) certain statements on the nutrition information fact panel, section 101.9 specifies that those "permitted" statements on the nutrition panel are "voluntary." In each instance, the word appears as "VOLUNTARY" in capital letters. 21 C.F.R. § 101.9(c). In contrast, the word "voluntary" does *not* appear at all in the regulatory definition of claims, further emphasizing that "claim" is not limited to "voluntary" statements.[3]

---

[3] Section 101.9(c) of the FDA's regulations lists those statements that <u>must</u> be on the fact panel and those that are permitted but not mandated. The former include "calories." The latter (non mandatory) are: 21 C.F.R. § 101.9(c)(1)(iii) (calories from saturated fat), (2)(iii) (polyunsaturated fat), (2)(iv) (monounsaturated fat), (5) (potassium), (6)(i)(A) (soluble fiber), (6)(i)(B) (insoluble fiber), (6)(iii) (sugar alcohol), (6)(iv) (other carbohydrates).

1    Further, the purpose of a preemption statute is to preclude state mandates. If the

2  "voluntary/mandatory" distinction were accepted, the very thing the preemption statute is designed

3  to prevent—state mandates—would be removed from the coverage of the statute by the very fact

4  that the state mandates it. A federal statute that expressly prohibits non-identical state mandates

5  would become ineffective by the very fact that a locality adopts a non-identical state mandate. That

6  is not a sensible way to read a preemption statute.

7    Finally, the "voluntary/mandatory" distinction would lead to an anomalous conflict between

8  state and federal law with regard to statements that all agree are "claims" under the NLEA. Under

9  the "voluntary/mandatory" theory, states or localities could mandate sellers of packaged foods to

10  "disclose" on the front label the number of calories (or any other nutrient). Similarly, if a state or

11  locality were to "mandate" labeling of "low sodium" foods, the preemption statute would not apply

12  because the statements would not be "voluntary" and thus would not be "claims" under the

13  "voluntary/mandatory" distinction. Yet it is beyond dispute that "low sodium" is a "claim" under

14  the NLEA—one of the very examples used in the definition of expressed nutrient "claims" in

15  section 101.13(b)(1) of the FDA's regulations.

16      **3.      21 U.S.C. § 343(r)(1) Does Not "Carve Out" Certain Claims from the**
17               **Reach of That Provision**

18    At the request of the Second Circuit, the FDA submitted an *amicus* brief in the appeal of

19  *NYSRA II*. The FDA rejected the two theories advanced by New York City. However, it came up

20  with a third theory against preemption. The FDA argued that the statement "100 calories" on a

21  menu is not a "claim" because a portion of the statute "carves [it] out of the scope of nutrient

22  content claims." Brief of *Amicus Curiae* Food and Drug Administration at 12, *New York State*

23  *Restaurant Ass'n v. New York City Bd. of Health*, No. 08-1892-cv (2d Cir. May 29, 2008) ("FDA

24  Br."). According to the *amicus* brief, the carve-out appears in the unnumbered portion of section

25  343(r)(1), which provides, in part:

NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1

[1] A statement of the type required by paragraph (q) **[2]** that appears
as part of the nutrition information required or permitted by such
paragraph is not a claim....

2

3     21 U.S.C. § 343(r)(1).

4          To come within the carve-out, the statement must meet both portions of the statutory

5     sentence. It is true that a statement such as "100 calories" is "[a] statement of the type required by

6     paragraph (q)." But such a statement, in isolation on a menu does not "appear as part of the

7     nutrition information required or permitted by such paragraph." In its Second Circuit brief, the

8     FDA argued (incorrectly) that a statement of calories on the menu in a restaurant "appears as part of

9     the nutrition information required or permitted by such paragraph [(q)]" (21 U.S.C. § 343(r)(1))—

10    and is therefore "not a claim"—on the theory that a menu is "a place appropriate for such

11    information at the point of purchase." FDA Br. 12. The FDA's *amicus* brief warrants no deference,

12    as it does not comport with the statute or the FDA's regulations and it was not "arrived at after, for

13    example, a formal adjudication or notice-and-comment rulemaking." *See Christensen v. Harris*

14    *County*, 529 U.S. 576, 587 (2000); *see also Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 628,

15    630 (9th Cir. 2005) ("[a]n agency's interpretation of a regulation must 'conform with the wording

16    and purpose of the regulation'"; rejecting agency's interpretation of regulatory term as it created

17    internal inconsistency within the regulation as a whole) (citation omitted); *Crown Pac. v.*

18    *Occupational Safety & Health Review Comm'n*, 197 F.3d 1036, 1038-40 (9th Cir. 1999) ("we need

19    not defer to the Secretary [of Labor]'s interpretation where an 'alternative reading is compelled by

20    the regulation's plain language'"; declining to defer in the case before it, as the Secretary's

21    construction "stretches the plain language of the regulation beyond its 'plain and natural' meaning")

22    (citation omitted); *Downey v. Crabtree*, 100 F.3d 662, 666 (9th Cir. 1996) (where Bureau of

23    Prison's program statements "are not subject to the 'rigors of the Administrative Procedure Act,'"

24    they are, "only 'entitled to some deference'"; rejecting agency's interpretation of statutory term

25    because, "[w]hen the Bureau's 'interpretation is...in conflict with the plain language of the statute,

26    deference is [not] due'") (citations omitted; alteration to text in original).

27

28

- 15 -

1    Contrary to the FDA's *amicus* brief theory, the statute does not say "appears in a place

2  appropriate for such information at the point of purchase." It says "appears as part of the nutrition

3  information required or permitted by such paragraph [(q)]." 21 U.S.C. § 343(r)(1). An isolated

4  statement of nutritional amount does not "appear[] as part of the nutrition information required or

5  permitted by [subsection (q)]." Subsection (q) does not require or permit such isolated statements.

6  Rather, it requires a comprehensive and uniform set of nutrition information, requiring the

7  presentation of *complete* nutrition information and permitting the inclusion of certain optional

8  nutrients (*e.g.*, potassium). Subsection (q) reads, in part: "nutrition information that provides—the

9  serving size, * * * the number of servings...per container, * * * the total number of calories...in

10 each serving, * * * the amount of the following nutrients: [t]otal fat, saturated fat, cholesterol,

11 sodium, total carbohydrates, complex carbohydrates, sugars, dietary fiber, and total protein

12 contained in each serving, * * * [and] any vitamin, mineral, or other nutrient required [or permitted

13 by regulation]." 21 U.S.C. § 343(q)(1); *see* NLEA, Pub. L. No. 101-535, § 2(b)(1)(C) (1990) (set

14 out in historical notes after 21 U.S.C.A. § 343). Isolated statements of calories or other nutrients do

15 not "appear as part" of the comprehensive nutrition information demanded by subsection (q).

16 Rather, they highlight the importance of limited aspects of the food.

17    Following enactment of the NLEA, the FDA promulgated a regulation implementing the

18 statutory text quoted above. 21 C.F.R. § 101.13(c). The regulation represents the FDA's

19 interpretation of the statute and was promulgated after notice and comment. That regulation

20 contains three elements controlling when the "carve out" applies and when it does not. The

21 regulation provides:

> **[1]** Information that is required or permitted by § 101.9...to be
> declared in nutrition labeling, and **[2]** that appears as part of the
> nutrition label, is not a nutrient content claim and is not subject to the
> requirements of this section. **[3]** If such information is declared
> elsewhere on the label or in labeling, it is a nutrient content claim and
> is subject to the requirements for nutrient content claims.

- 16 -

21 C.F.R. § 101.13(c) (emphasis supplied). Ordinance 40-08 does not satisfy any of these three elements.

1.    Section 101.13(c) makes clear that the "carve out" applies only to "[i]nformation that is required or permitted by § 101.9…to be declared in nutrition labeling." 21 C.F.R. § 101.13(c) (element [1] quoted above). The FDA promulgated section 101.9 under instructions from Congress that the agency ensure that the public can understand the "relative significance [of the information] in the context of a total daily diet." NLEA, § 2(b)(1)(A) (set out in Historical and Statutory Notes to 21 U.S.C.A. § 343). Section 101.9 thus specifies that the "nutrition information" to be declared in "nutrition labeling" must reflect uniformly determined serving sizes (§ 101.9(b)), must declare a uniform and comprehensive set of information (§ 101.9(c)), and must appear in specified formats (§ 101.9(d)).

Ordinance 40-08 fails to meet these requirements. To begin, Ordinance 40-08 does not apply "per serving," but instead requires total number of calories, total number of grams of saturated fat, total number of grams of carbohydrates and total number of milligrams of sodium. S.F. Health Code § 468.3(a). Ordinance 40-08 requires menus to list the gross number of nutrition information of any menu item—even an item intended to be shared.

In addition, Ordinance 40-08 requires only selected statements of nutritional amount, not the uniform set of nutrition information demanded in 21 C.F.R. § 101.9(c). Section 101.9(c) states that "nutrition information" in nutrition labels and nutrition labeling "shall contain" a uniform set of nutrition information required by subsection (q) of the statute. The required nutrients are: calories, calories from fat, fat, saturated fat, trans fat, cholesterol, sodium, carbohydrate, dietary fiber, sugars, protein, vitamins and minerals. 21 C.F.R. § 101.9(c). The regulation also specifies that "[n]o nutrients or food components other than those listed in this paragraph as either mandatory or voluntary may be included within the nutrition label." *Id.*

1    Finally, section 101.9(d) sets out the formatting requirements for the presentation of the

2    "[n]utrient information specified in paragraph (c) of this section."  21 C.F.R. § 101.9(d)(1).  The

3    regulations include a "sample label [that] illustrates the provisions of paragraph (d) of this section":



14    21 C.F.R. § 101.9(d)(12).  The regulations also specify a format for "nutrition labeling information"

15    for certain multiple items.  Such information "may be presented in charts with horizontal or vertical

16    columns or as a compilation of individual nutrition labels."  21 C.F.R. § 101.45(a)(3).  Restaurants

17    may present nutritional information in conformity with section 101.45.  *See* 21 C.F.R. § 101.10.

18    Ordinance 40-08 is different from these formatting requirements.  It requires statements of

19    nutritional amount "next to or beneath" each menu item.

20    Thus, Ordinance 40-08 fails to meet the first element of section 101.13(c).  It does not

21    mandate "information that is required or permitted by § 101.9…to be declared in nutrition

22    labeling," because it does not meet the serving size, uniform content, or formatting requirements of

23    section 101.9.

24    **2.**    Ordinance 40-08 fails to meet the second element of section 101.13(c):  the

25    statement must "appear as part of the nutrition label."  The statute defines "labels" and "labeling."

26    The statute defines a "label" as any "display of written, printed, or graphic matter ***upon the***

27

28    - 18 -

1   ***immediate container*** of any article." 21 U.S.C. § 321(k) (emphasis supplied).  In contrast, it

2   defines "labeling" more broadly—as "all labels ***and*** other written, printed, or graphic matter (1)

3   upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C.

4   § 321(m) (emphasis supplied).  Menus are not "labels," even though they are "labeling." *See Public*

5   *Citizen, Inc. v. Shalala,* 932 F. Supp. 13, 16-17 (D.D.C. 1996); Food Labeling; Nutrient Content

6   Claims and Health Claims; Restaurant Foods, 61 Fed. Reg. 40320, 40322–23 (Aug. 2, 1996).

7        The regulation chose the word "label" for its second element, and a menu is not a "label."

8   Because a menu is not part of a "label," a statement on a menu cannot be part of a "nutrition label."

9   (Of course, the result would be the same if the regulation used the phrase "appears as part of the

10  nutrition label or the nutrition labeling," because the regulations repeatedly refer to "nutrition

11  labeling" to encompass the gamut of requirements under section 101.9.)

12        **3.**    The third element of the regulation provides that if the information is "declared

13  elsewhere on the label or in labeling, it is a nutrient content claim." 21 C.F.R. § 101.13(c) (element

14  **[3]** quoted above).  In other words, if the statement appears anywhere other than in the nutrition

15  labels, it *is* a "claim."  Recently, sellers of some packaged foods have begun listing the number of

16  calories per serving on the front panel of their foods—particularly in "100 calorie" packages of

17  snack foods.  The FDA agrees that, under the NLEA and its implementing regulations, these

18  statements—"100 calories"—are "claims."  FDA Br. 16.  It makes no sense that the isolated

19  statement "100 calories" on the front of a package would be a "nutrient content claim" but the same

20  isolated statement "100 calories" on a menu in a restaurant would not be a claim.  That distinction

21  ignores the common-sense meaning of "claim" and the whole point of regulating claims.

22        The only time the statute and regulations carve out a quantitative statement from the

23  definition of "claim" is when that statement appears as part of the comprehensive nutrition

24  information containing the complete set of information contemplated by subsection (q) and

25  complying with section 101.9's requirements for serving size, content, and format.  That limitation

26  makes sense.  The nutrition information panel is uniform and consistent for all foods.  A statement

27

28

NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    within a nutrition information panel is not a "claim," because such a statement is not "claiming"

2    anything.  It is not a selective message about one aspect of the food, but is part of a comprehensive

3    statement about *all* the information.  An isolated statement about a single nutrient is different—such

4    a statement uses the isolated fact to communicate a specific message about the food.  This is true as

5    much for restaurants as it is for packaged foods.

6        **G.    Plaintiff's Interpretation Harmonizes Requirements of the NLEA**

7        Section 343-1(a)(5) permits a role for the states with respect to nutrition information

8    labeling in restaurants.  A state or local law that requires full nutrition information labeling in

9    accordance with subsection (q) and sections 101.9 and 101.10 of the FDA's regulations would not

10   be preempted.  Complete nutrition labeling falls within the unnumbered portion of section 343(r)(1),

11   which excludes from the definition of a "claim"—and thus from the preemptive scope of

12   section 343-1(a)(5)—a statement that "appears as part of the nutrition information required or

13   permitted by [paragraph (q)]."  21 U.S.C. § 343(r)(1) [unnumbered portion].  By operation of

14   section 101.10, a restaurant could comply with the formatting and presentation requirements of such

15   a law using "reasonable means."  21 C.F.R. § 101.10 ("Presentation of nutrition labeling may be in

16   various forms, including those provided in § 101.45 and other reasonable means.").  Under such a

17   law, restaurants would be required to disclose full nutrition information—something they are not

18   required to disclose by federal law.  But they would be afforded the flexibility that the FDA deemed

19   appropriate for restaurants.

20       Any other reading would subject restaurants to multiple, inconsistent local regulations about

21   both the content and format of nutrition information.  The FDA cannot force restaurants into the

22   comprehensive national regulatory regime, but states and localities require restaurants to comply

23   with the federal regime.  Allowing states and localities to pick and choose among the features of

24   subsection (q) would undermine the NLEA's goal of comprehensive, uniform nutrition information

25   and would impose the potential chaos and confusion of scores, hundreds, or even thousands of

26   localities with differing requirements for what has to be disclosed and how.

27

28

1

**II.    THE COURT SHOULD GRANT A DECLARATORY JUDGMENT AND PRELIMINARY INJUNCTION THAT THE CALIFORNIA RETAIL FOOD CODE PREEMPTS ORDINANCE 40-08**

2

3    Ordinance 40-08 is further preempted by the California Retail Food Code (CRFC).  Article

4  XI, section 7 of the California Constitution provides that "[a] county or city may make and enforce

5  within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with

6  general laws."  Cal. Const. art. XI, § 7.  When there is a conflict between a local law and state law,

7  the state law preempts the local law.

8    The CRFC, Cal. Health & Safety Code § 113703 *et seq.*, regulates the retail sale of food,

9  including food served at restaurants, on a statewide basis.  The CRFC provides that, with certain

10  exemptions not applicable here, "it is the intent of the Legislature to occupy the whole field of

11  health and sanitation standards for retail food facilities, and the standards set forth in this part and

12  regulations adopted pursuant to this part shall be exclusive of all local health and sanitation

13  standards relating to retail food facilities."  Cal. Health & Safety Code § 113705.

14    The "whole field" occupied by the CRFC includes the labeling of food in restaurants,

15  including nutrition information.  *See* Cal. Health & Safety Code § 114089(a), (b)(5).  The CRFC

16  does not call for statements of calories or other nutrition information on menus or elsewhere in

17  restaurants.  By contrast, Ordinance 40-08 requires that certain nutrition information be displayed

18  on menus and elsewhere within the restaurant.

19    The requirements of Ordinance 40-08 thus fall within the CRFC's fully occupied field of

20  "health and sanitation standards for retail food facilities."  The absence of a requirement under the

21  CRFC to display calories and other information on menus does not mean that localities are free to

22  impose it.  California's legislature addressed nutrition information in restaurants and chose not to

23  include menu labeling or the other requirements that San Francisco wishes to impose.  Last year, the

24  California state legislature passed a bill that would have imposed menu labeling requirements in

25

26

27

28

- 21 -

1    restaurants, but Governor Schwarzenegger vetoed it.[4]  The state's specific decision to forgo menu-

2    labeling regulation is preemptive.  *Sherwin-Williams Co. v. City of Los Angeles*, 4 Cal. 4th 893, 897

3    (1993) ("A conflict exists if the local legislation duplicates, contradicts, or enters an area fully

4    occupied by general law, either expressly or by legislative implication.") (internal quotations

5    omitted); *cf. Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 384 (1983)

6    (under the Supremacy Clause, "a federal decision to forgo regulation in a given area may imply an

7    authoritative federal determination that the area is best left *un*regulated, and in that event would

8    have as much preemptive force as a decision to regulate.")).

9    **III.    THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION TO PROTECT THE FIRST**
**AMENDMENT RIGHTS OF PLAINTIFF'S MEMBERS**
10

11          **A.    Ordinance 40-08 Will Cause Irreparable Harm by Impermissibly Compelling**
**Speech**
12

13          When a preliminary injunction is sought to prevent infringement of First Amendment rights,

14    a plaintiff "can establish irreparable injury sufficient to merit the grant of relief by demonstrating

15    the existence of a colorable First Amendment claim."  *Sammartano v. First Judicial District Court,*

16    *in and for County of Carson City*, 303 F.3d 959, 973 (9th Cir. 2002) (internal quotations and

17    citations omitted).  Even if the merits of a plaintiff's First Amendment claim are not clearly

18    established at the preliminary injunction stage of litigation, "the fact that a case raises serious First

19    Amendment questions compels a finding that there exists the potential for irreparable injury, or that

20    at the very least the balance of hardships tips sharply in [plaintiff's] favor."  *Id.* (internal quotations

21    and citations omitted).  For purposes of the issuance of a preliminary injunction "'[t]he loss of First

22    Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

23    injury.'"  *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

24

25    [4] Veto Message by Governor Schwarzenegger of California Senate Bill 120 (Oct. 14, 2007),
attached hereto as Appendix Exhibit G ("Inflexible mandates applied sporadically are not an
26    effective way to continue our progress in educating Californians about healthy living.").

27

28

NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Ordinance 40-08 infringes on the restaurants' First Amendment freedoms, causing them irreparable harm by compelling them to speak. The First Amendment guarantees "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The right to refrain from speaking "serves the same ultimate end as freedom of speech in its affirmative aspect." *Pacific Gas & Elec. Co. v. Public Utilities Comm'n of California*, 475 U.S. 1, 11 (1986) (citation and internal quotations omitted). Compelled speech, like bans on speech, violates "the fundamental rule of protection under the First Amendment," namely "that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 573 (1995).

The right not to speak "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573-74 (citations omitted); *see Riley v. National Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797-98 (1988) (refusing to distinguish earlier cases "simply because [these cases] involved compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech.").

This protection against compelled speech also extends to commercial speech. *See United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001); *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985) ("[U]njustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech."); *International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996) ("The right not to speak inheres in political and commercial speech alike....").

Ordinance 40-08 impermissibly compels speech in violation of the plaintiff's First Amendment rights. The fact that calories are statements of "fact" does not change the analysis. In requiring restaurants to present calorie counts on menu boards prominently next to the price, the city's ordinance forces restaurants to voice two different government viewpoints: (1) patrons *must* consider the caloric content of food when ordering in a restaurant; and (2) calories are the only

- 23 -

1    nutritional criterion that patrons must consider when making their food selections.  On menus, the

2    ordinance demands that customers focus only on the calories, saturated fat, sodium and

3    carbohydrates—not on the complete set of nutrients covered under federal law.

4         By design and effect, the ordinance forces customers to look at the number of calories in a

5    meal before they order food in a restaurant.  Under the ordinance, it will not be possible to buy a

6    meal in certain restaurants without being forced to look at calorie counts, regardless of whether the

7    individual wants to look at them or not.  Additionally, by forcing restaurants to post calories on their

8    menu boards, the city is requiring them to speak in a way that communicates the city's message

9    regarding the *significance* of calories.  Many restaurants affected by the ordinance already

10   voluntarily provide calorie information to their consumers side-by-side with other pertinent

11   nutritional information, as required by the FDA.  Calories stated in isolation, divorced from other

12   nutritional content, present a very different message, namely that calories should be the only

13   nutritional criterion that consumers should consider when making their food selection.  Plaintiff

14   strongly disagrees with this message.  In compelled-speech cases, the message triggering First

15   Amendment scrutiny may be the *significance* of the facts.  *See International Dairy*, 92 F.3d at 71-72

16   (striking down a law that required labeling to disclose the presence of rBST growth hormone in

17   milk and accepting plaintiff's argument that the law "compel[led] them 'to convey a message

18   regarding the **significance** of rBST use that is expressly contrary to their views.'") (emphasis

19   supplied; internal quotations omitted).

20        **B.    Plaintiff Is Likely to Succeed on the Merits**

21        For nearly 30 years, the Supreme Court has reviewed burdens on lawful and non-misleading

22   commercial speech by requiring the government to prove that its regulation will directly advance a

23   substantial public interest in a manner that is narrowly drawn to achieve the government's objective.

24   *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 564 (1980).

25   More recently, the Supreme Court has questioned whether this intermediate level of scrutiny is

26   adequate to protect commercial speech and has applied stricter scrutiny to laws that compel

27

28

- 24 -

1    commercial speech. *United Foods*, 533 U.S. at 409-11. Under either standard, the City's ordinance

2    cannot survive review.

3                    **1.     Ordinance 40-08 Fails Under *Central Hudson***

4            In *Central Hudson*, the Supreme Court articulated a four-part test for determining whether a

5    government restriction on commercial speech violates the First Amendment. *See Central Hudson*,

6    447 U.S. at 566. This test applies to all regulations on speech—speech that is restricted as well as

7    speech that is compelled. Under this test, a court must determine: (1) whether the regulated

8    expression concerns lawful activity and is not misleading; (2) whether the asserted governmental

9    interest is substantial; (3) whether the Regulation directly advances the asserted interest; and

10   (4) whether it is not more extensive than is necessary to serve that interest. *Id.*

11           The first two factors of the *Central Hudson* test cannot be disputed. The City cannot

12   contend that menu boards without calorie information are misleading or concern unlawful activity:

13   menus are speech plainly within the protection of the First Amendment. For its part, Plaintiff

14   agrees that the state has a substantial interest in public health. The City promulgated the ordinance

15   in order to further its public health goal of "preventing obesity, diabetes, and other avoidable

16   nutrition-related diseases." S.F. Health Code § 468. The city, however, is not able to satisfy the

17   last two factors of the *Central Hudson* test. It cannot demonstrate that the ordinance directly

18   advances public health to a material degree or that the ordinance is narrowly tailored to achieve its

19   stated goal.

20                   **a.     Ordinance 40-08 Does Not Advance the City's Asserted Interest
21                           in Preventing Obesity in a "Direct and Material Way"**

22           To survive scrutiny under *Central Hudson*, the City must prove that Ordinance 40-08

23   advances the government's asserted, substantial interest in a "direct and material way." *Edenfield v.*

24   *Fane*, 507 U.S. 761, 767 (1993). The burden of justifying a restriction on commercial speech rests

25   with the proponent of the restriction. *Id.* at 770. "[M]ere speculation or conjecture" will not suffice

26   to sustain this burden. *Id.* Rather, the City "must demonstrate that the harms it recites are real and

27

28

1    that its restriction will in fact alleviate them to a material degree." *Id.* at 771.  Otherwise, "'a State

2    could with ease restrict commercial speech in the service of other objectives that could not

3    themselves justify a burden on commercial expression.'"  *Rubin v. Coors Brewing Co.*, 514 U.S.

4    476, 487 (1995) (quoting *Edenfield*, 507 U.S. at 771); *accord Greater New Orleans Broad. Ass'n v.*

5    *United States*, 527 U.S. 173, 188 (1999).

6         Nowhere in the City's "findings" section, issued in conjunction with the ordinance, does the

7    City assert that requiring restaurants to post calorie, fat, carbohydrate, or sodium information will

8    have a direct effect on obesity rates or the health of its citizens.  In fact, in its *amicus* brief filed in

9    conjunction with the challenge to the New York City menu legislation, the defendant admitted that

10   "there are no studies as of yet showing the actual impact of widespread mandatory nutrition

11   disclosure in major chain restaurants."  Brief of *Amici Curiae* City and County of San Francisco *et*

12   *al.* at 18, *New York State Restaurant Ass'n v. New York City Bd. of Health*, No. 08-1892 (2d Cir.

13   May 14, 2008).

14        As Dr. David B. Allison of the University of Alabama stated, "**there is not competent and**

15   **reliable evidence that providing restaurant patrons with calorie information on menu items**

16   **will reduce individual or population levels of obesity**."  Allison Decl. pp. 29-30 (emphasis in

17   original).  Dr. Allison went on to state that the only things that could be drawn from current

18   knowledge are speculation and "conjecture."  *Id.* at 33.

19        If the Ordinance *were* supported by evidence, applying it to only 273 out of 5,000

20   restaurants would be a scandal.  Why limit a law that the City asserts will save lives to only 5% of

21   the City's restaurants?  Under the *Central Hudson* test, the Supreme Court has struck down laws

22   based in part on the fact that the government applied laws differently to different groups without

23   being able to put forth a cogent reason for the discrepancy.  For example, in *Greater New Orleans*,

24   the Court struck down a federal law that prohibited broadcasters from carrying advertising about

25   privately-operated commercial casinos but permitted advertising about tribal casinos and

26   government-operated casinos.  In holding that the law did not pass muster under the *Central*

27

28

- 26 -

1    *Hudson* test, the Court found that the government had failed to put forth a convincing reason for

2    "pegging its speech ban to the identity of the owners or operators of the advertised casinos." 527

3    U.S. at 191. As the court stated, "the Government presents no sound reason why such lines bear

4    any meaningful relationship to the particular interest asserted: minimizing casino gambling and its

5    social costs by way of a (partial) broadcast ban." *Id.* at 193. *Accord Cincinnati v. Discovery*

6    *Network, Inc.*, 507 U.S. 410, 425-28 (1993) (striking down law that banned newsracks containing

7    "commercial handbills" but permitted newsracks containing "newspapers," because city had not

8    established "reasonable fit" between its asserted interest in safety and esthetics and the means

9    chosen to serve that interest and because city had no logical basis for distinguishing between

10    "newspapers" and "commercial handbills" since newsracks containing either were "equally

11    unattractive."). Similarly, the City has no convincing reason why its ordinance hinges on whether

12    the restaurants are affiliated with chains.

       **b.    Ordinance 40-08's Infringement on Speech Is More Extensive
               Than Necessary to Serve the City's Asserted Interest**

15         Even when the government can demonstrate that the ordinance advances the state interest in

16    a "direct and material way," it must still employ a means "narrowly tailored to achieve the desired

17    objective." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) (internal quotations omitted);

18    *see Bad Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87, 100-01 (2d Cir. 1998)

19    ("*Central Hudson's* fourth criterion…requires consideration of whether the prohibition is more

20    extensive than necessary to serve the asserted state interest.") (citations omitted). A restriction on

21    speech is "more extensive than necessary" if "less intrusive" alternatives are available. *Rubin*, 514

22    U.S. at 491; *Bad Frog Brewery*, 134 F.3d at 101.

23         In this case, there are many alternatives for providing customers with caloric information in

24    restaurants that would not so heavily burden restaurants' First Amendment rights by co-opting their

25    most important communication tool and using it to convey a message with which they disagree.

26    These alternatives include signs directing consumers to comprehensive nutritional information at

27

28

NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    the restaurants, posters with complete nutritional information, food wrappers with such information,

2    counter mats with such information, stanchions and flip-charts with such information, and

3    prominently displayed brochures. All these alternatives are acceptable under the FDA's regulation

4    governing restaurants' claims. 21 C.F.R. § 101.10. Ordinance 40-08 requires restaurants to make

5    statements of the amount of calories on menu boards in the specific manner compelled by the

6    ordinance: "next to or beneath each Menu item on the Menu Board using a font and format that is

7    at least as prominent, in size and appearance, as that used to post either the name or price of the

8    Menu Item." S.F. Health Code § 468.3(c)(1).

9                    **2.      Ordinance 40-08 Fails Under *United Foods***

10            In *United Foods*, the Supreme Court held that a monetary assessment imposed on mushroom

11    growers pursuant to a federal act to fund advertisements of mushrooms violated the First

12    Amendment because it compelled certain growers to subsidize commercial speech with which they

13    disagreed. *United Foods*, 533 U.S. at 411-16. The government used the assessments to pay for

14    generic advertising to promote the sale of mushrooms. *Id.* at 408. The plaintiff objected because it

15    did not want to support a generic advertising campaign that promoted all mushrooms; it wanted to

16    convey a message that its mushrooms were superior to mushrooms grown by other producers. *Id.* at

17    411.

18            As the Supreme Court explained, even in the context of commercial speech, the government

19    simply may not force a private party to convey the *government's* message as if it were the private

20    party's message when the private party wishes to convey a different message or no message at all.

21    *Id.*; *accord Pacific Gas*, 475 U.S. at 15. Indeed, this is a stronger case of compelled speech than

22    *United Foods*. As the Court recognized in *United Foods*, forcing a party to speak is *worse* than the

23    injury in *United Foods*, where the plaintiff was "required simply to support speech by others, not to

24    utter the speech itself." 533 U.S. at 413. Here, the restaurants are being forced to convey the City's

25    message from their own signage, inevitably leading consumers to mistakenly assume that the

26    posting of calories conveys the restaurants' *own* point of view.

27

28

NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

In *United Foods*, the promotional material at issue was set out in an appendix to Justice

Breyer's dissent. It listed several recipes for dishes that included mushrooms (ginger-mushroom

stir-fry, mushroom Caesar salad, mushrooms Santa Fe and mushroom kebabs), gave tips for the

storage and preparation of mushrooms, and set out basic information about a few of the more

popular mushroom varieties. 533 U.S. at 431 (appendix). The Court had no difficulty concluding

that this constituted "speech with which [the plaintiffs] disagree." *Id.* at 411. The facts of *United

Foods* evince the Supreme Court's expansive definition of what constitutes impermissible

compelled commercial speech, and the present case falls well within that definition.

### 3.    Rational Basis Review Is the Wrong Standard

The Supreme Court has consistently applied either intermediate or heightened scrutiny to

restrictions on commercial speech. In contrast, rational basis review, a standard that is highly

deferential to government regulation, is rarely invoked in First Amendment analysis. The Supreme

Court has found that this weakest level of scrutiny can only be used in circumstances when there is

a need to protect consumers who might otherwise be misled. *See Zauderer v. Office of Disciplinary

Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). This case is not one of those

circumstances.

In *Zauderer*, the state required lawyers to disclose to contingency-fee clients that the clients

might have to pay litigation costs if their claims proved unsuccessful. 471 U.S. at 650. The Court

upheld the restriction, explaining that "an advertiser's rights are adequately protected as long as

disclosure requirements are reasonably related to the *State's interest in preventing deception of

consumers.*" 471 U.S. at 651 (footnote omitted; emphasis supplied).

In *NYSRA II*, the court applied the rational basis test, relying on *National Electric

Manufacturers Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001), a Second Circuit case which

dramatically extended *Zauderer* by stating that commercial disclosures mandated by the

government "ordinarily [do] not offend the important utilitarian and individual liberty interests that

lie at the heart of the First Amendment. The Amendment is satisfied, therefore, by a rational

NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

connection between the purpose of a commercial disclosure requirement and the means employed to

realize that purpose." 272 F.3d at 114-15. That is an incorrect reading of *Zauderer*, which does not

hold that *all* commercial disclosure requirements are subject to only a rational basis test. *Zauderer*

held that disclosure requirements can be mandated by the State when they further the "State's

interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651 (footnote omitted). In

the many years since *Zauderer*, the Supreme Court has never applied the rational basis standard to

non-misleading commercial speech. Indeed, in *United Foods*—decided 16 years after *Zauderer*—

the Court expressly rejected a wider application of rational basis review and limited the *Zauderer*

standard to laws necessary to prevent deception:

> Our conclusions are not inconsistent with the Court's decision in
> *Zauderer*..., a case involving attempts by a State to prohibit certain
> voluntary advertising by licensed attorneys. The Court invalidated
> the restrictions in substantial part but did permit a rule requiring that
> attorneys who advertised by their own choice and who referred to
> contingent fees should disclose that clients might be liable for costs.
> Noting that substantial numbers of potential clients might be misled
> by omission of the explanation, the Court sustained the requirement as
> consistent with the State's interest in "preventing deception of
> consumers." There is no suggestion in the case now before us that the
> mandatory assessments imposed to require one group of private
> persons to pay for speech by others are somehow necessary to make
> voluntary advertisements nonmisleading for consumers.

*United Foods*, 533 U.S. at 416 (citations omitted).

Moreover, the Supreme Court's commercial speech cases decided after *Zauderer* reflect an

increasing recognition that commercial speech is of vital importance to First Amendment values.

As the Supreme Court explained in *United Foods*, "[t]he subject matter of the speech may be of

interest to but a small segment of the population; yet those whose business and livelihood depend in

some way upon the product involved no doubt deem First Amendment protection to be just as

important for them as it is for other discrete, little noticed groups in a society which values the

freedom resulting from speech in all its diverse parts." 533 U.S. at 410. And in *Edenfield*, the

Court explained:

- 30 -

1

2

3

4

> The commercial marketplace, like other spheres of our social and
> cultural life, provides a forum where ideas and information flourish.
> Some of the ideas and information are vital, some of slight worth.
> But the general rule is that the speaker and the audience, not the
> government, assess the value of the information presented. Thus,
> even a communication that does no more than propose a commercial
> transaction is entitled to the coverage of the First Amendment.

5    507 U.S. at 767.

6    In *Environmental Defense Center, Inc. v. EPA*, the Ninth Circuit cited *Sorrell* in a footnote,

7    noting *Sorrell's* statement that commercial disclosures of factual information do not violate the First

8    Amendment. 344 F.3d 832, 851 n.27 (9th Cir. 2003). This, however, was not the holding of

9    *Environmental Defense*. In fact, the case did not even involve commercial speech. Rather, the case

10   concerned EPA regulations that required municipalities to provide education materials to the public

11   about the safe disposal of toxins. *Id.* at 848-49. In finding that the regulation did not violate

12   municipalities' First Amendment rights, the court stated that the regulation's "broad requirements

13   do not dictate a specific message. They require appropriate educational and public information

14   activities that need not include any specific speech at all." *Id.* at 849. The court held that "[e]ven if

15   such a loosely defined public information requirement could be read as compelling speech," the

16   regulation did not violate the First Amendment because the statutory provision was "consistent with

17   the regulatory goals of the overall scheme of the Clean Water Act, *cf. Glickman v. Wileman Bros. &*

18   *Elliott, Inc.*, 521 U.S. 457, 476 (1997)." *Id.* at 849-50. Thus, the holding of *Environmental Defense*

19   *Center, Inc. v. EPA* did not rely upon, and does not support, *Sorrell's* expansive interpretation of

20   *Zauderer*.[5]

21

22

23

24

25

26

27

28

---

[5] *United States v. Schiff*, 379 F.3d 621 (9th Cir. 2004), also does not support an expansive
interpretation of *Zauderer*. In this case, a defendant in a tax evasion scheme claimed that requiring
him to post a court-issued injunction on his website, which enjoined him from continuing his tax-
evasion business, violated his First Amendment rights. Here the court correctly applied *Zauderer*
and found that requiring the defendant to post the injunction did not offend his First Amendment
rights because "the government must be able to regulate content to prevent deception to
consumers." *Schiff*, 379 F.3d at 631.

NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    In this case, the analytical framework required by *Central Hudson* and its progeny is more

2    than adequate to balance the government's interests against the free-speech interests of plaintiff's

3    members. There is no reason to believe that other important disclosure requirements would be

4    jeopardized by continuing to apply *Central Hudson* as the Supreme Court has instructed, leaving

5    *Zauderer* to the field of misleading commercial speech. The most familiar commercial disclosure

6    requirements protect consumers from being misled. Others arise out of government findings,

7    following extensive study, that the products have a potential to cause harm, as with cigarettes or

8    alcohol. These disclosure requirements easily pass muster under *Central Hudson*. Unlike those

9    products, calories are not inherently dangerous. To the contrary, people cannot survive without

10   consuming calories. Disclosures concerning inherently dangerous products are fundamentally

11   different from what is happening here: the City is forcing only 5% of the city's vendors to highlight

12   prominently one aspect of their products (calories) that is not dangerous *per se* for the express

13   purpose of discouraging consumers from buying the product. Additionally, there is a vast

14   difference between a government-mandated label in a standardized format (which no one would

15   confuse as the vendor's own speech) and the government-mandated statements of calories here, on

16   the restaurants' most prominent and valuable communications tool—menu boards—in a format

17   designed to force customers to digest the government's message before they buy a meal.

18

19   **IV.    THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION TO PROTECT THE FREE
20          SPEECH RIGHTS OF PLAINTIFF GUARANTEED BY ARTICLE I, SECTION 2 OF THE
           CALIFORNIA CONSTITUTION**

21   The California Constitution guarantees the right for "[e]very person [to] freely speak, write

22   and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law

23   may not restrain or abridge liberty of speech or press." Cal. Const. art. I, § 2(a). "[A]rticle I's free

24   speech clause is "'broader' and 'greater'" than the First Amendment [to the U.S. Constitution]."

25   *Gerawan Farming, Inc. v. Kawamura*, 33 Cal. 4th 1, 15 (2004) ("*Gerawan II*"). The California

26   Constitution's protection of speech "on all subjects" extends without limitation to non-misleading

27

28
NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

commercial speech. *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 959 (2002). Article I, section 2

"comprises both a right to speak freely and also a right to refrain from doing so at all, and is

therefore put at risk both by prohibiting a speaker from saying what he otherwise would say and

also by compelling him to say what he otherwise would not say." *Gerawan Farming, Inc. v. Lyons*,

24 Cal. 4th 468, 491 (2000) ("*Gerawan I*").

   As described above, Ordinance 40-08 compels Plaintiff's members to speak a message,

dictated by the government, that they would rather not deliver and to say things they would not

otherwise say. Such a limitation on free speech triggers review under article I, section 2:

> [A]rticle I's right to freedom of speech, without more, would *not*
> allow compelling one who engages in commercial speech to say
> through advertising what he otherwise would not say, when his
> message is about a lawful product or service and is not otherwise false
> or misleading.

*Gerawan I*, 24 Cal. 4th at 509 (emphasis in original). In other words, lawful, non-misleading

commercial speech is protected by article I, section 2. *Id.* Restaurant food is a lawful product and

there is nothing misleading about a menu (i.e., "Hamburger, $1.99").

   Article I, section 2 affords *at least* intermediate scrutiny to cases implicating article I rights

of commercial speakers. In *Gerawan II*, the California Supreme Court specifically rejected the

argument that a compelled subsidy can "pass muster simply because it is rationally based." 33 Cal.

4th at 22. There, the California Supreme Court adopted the *Central Hudson* test as the standard for

evaluating compelled subsidies and struck down the law there at issue, even though it passed muster

under the First Amendment. *Id.*

   Compelled speech is more odious than compelled subsidization of speech. *See United

Foods*, 533 U.S. at 413 (complainant was "required simply to support speech by others, not to utter

the speech itself"); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005) (distinguishing

compelled speech cases in order to apply reduced scrutiny to a compelled subsidy). Therefore, the

standard for compelled speech is at least as strict as for a compelled subsidy. *See, e.g., ARP*

- 33 -

1  *Pharmacy Servs., Inc. v. Gallagher Bassett Servs., Inc.*, 138 Cal. App. 4th 1307, 1316 (2d Dist.

2  (Div. 4), 2006) (for a commercial reporting requirement, "[t]he constitutional validity of the

3  regulation of commercial speech is tested under an intermediate standard, articulated by the United

4  States Supreme Court in *Central Hudson*, and adopted by the California Supreme Court.").

5  Regardless whether the Ordinance survives under the First Amendment, it cannot survive under

6  article I, section 2, which requires—at a minimum—application of the *Central Hudson* test.

7

8

9  Dated: July 3, 2008                              ARNOLD & PORTER LLP

10

11

12                                        By:  _Trenton H. Norris / SE_

13                                             Trenton H. Norris
                                             Attorneys for Plaintiff
14                                        CALIFORNIA RESTAURANT
                                             ASSOCIATION

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY
INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF