DENNIS J. HERRERA, State Bar #139669
City Attorney
WAYNE SNODGRASS, State Bar #148137
FRANCESCA GESSNER, State Bar #247553
TARA M. STEELEY, State Bar #231775
Deputy City Attorneys
1 Dr. Carlton B. Goodlett Place
City Hall, Room 234
San Francisco, California 94102-4682
Telephone:      (415) 554-4762
Facsimile:      (415) 554-4699
E-Mail:         francesca.gessner@sfgov.org


Attorneys for Defendant
CITY AND COUNTY OF SAN FRANCISCO


UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION,<br><br>                    Plaintiff,<br><br>        vs.<br><br>THE CITY AND COUNTY OF SAN FRANCISCO AND THE SAN FRANCISCO DEPARTMENT OF PUBLIC HEALTH,<br><br>                    Defendants. | Case No. C08-3247 CW<br><br>**DEFENDANT CITY AND COUNTY OF SAN FRANCISCO'S OPPOSITION TO PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY INJUNCTION**<br><br>Hearing Date:      September 4, 2008<br>Time:              2:00 p.m.<br>Place:             Ctrm 2, 4th Floor |

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... iii

STATEMENT OF THE ISSUES ..................................................................................1

FACTUAL BACKGROUND ........................................................................................2

    I.      ORDINANCE 40-08 WAS ENACTED TO COMBAT THE GROWING
          OBESITY EPIDEMIC ...............................................................................2

    II.     LEADING SCIENTIFIC EXPERTS AND THE BEST AVAILABLE
          EVIDENCE SUPPORT MENU LABELING REQUIREMENTS AT
          RESTAURANTS ........................................................................................3

    III.    THE SOUTHERN DISTRICT OF NEW YORK REJECTED A SIMILAR
          CHALLENGE TO THE ONLY MENU LABELING ORDINANCE IN
          EFFECT ......................................................................................................5

ARGUMENT ................................................................................................................6

    I.      FEDERAL LAW DOES NOT PREEMPT ORDINANCE 40-08 ..........................6

        A.     A Strong Presumption Against Preemption Applies In This Case .............7

        B.     The NLEA Explicitly Preserves The Authority Of Local Governments
             To Mandate Labeling Of Restaurant Foods.................................................7

             1.     The Purpose And Structure Of The NLEA....................................7

             2.     The NLEA's Express Preemption Provisions Preserve Local
                  Authority To Require Restaurants To Provide Nutrition
                  Information ....................................................................................8

             3.     Ordinance 40-08 Does Not Regulate "Claims" Within The
                  Meaning Of § 343(r) ...................................................................11

                  a.     Q-Type Nutrition Information v.  R-Type Claims.............11

                        i.     Section 343(r)(1)'s "Carve Out" Identifies Q-
                            Type Information That Is Not A Claim ................12

                        ii.    CRA's Reading Of The Carve Out Is Erroneous ...13

                        iii.   Section 101.13(b)(1) Does Not Mean That All
                            Statements Describing The Amount Of Calories
                              Are § 343(r) "Claims" ...........................................13

                  b.     Mandatory/Voluntary Distinction......................................14

                  c.     Location Of Nutritional Labeling ......................................16

              4.     CRA's Argument That Ordinance 40-08 Regulates "Claims"
                   Does Not Harmonize The Provisions Of The NLEA ...................18

    II.     ORDINANCE 40-08 IS NOT PREEMPTED BY THE CALIFORNIA
          RETAIL FOOD CODE..........................................................................................19

III.    ORDINANCE 40-08 DOES NOT VIOLATE THE FIRST AMENDMENT ....... 22

    A.    *Zauderer's* Rational Basis Test Provides The Proper Standard Of Review For Ordinance 40-08 .................................................................... 22

        1.    *Zauderer* Is Controlling Because Ordinance 40-08 Requires Disclosure Of Purely Factual Commercial Information ............... 22

        2.    *Zauderer* Is Not Limited To Laws Necessary To Prevent Consumer Deception ..................................................................... 24

        3.    *United Foods* Is Inapplicable Because Ordinance 40-08 Does Not Compel Restaurants To Subsidize Or Voice A Message With Which They Disagree ......................................................... 26

        4.    *Central Hudson* Is Inapplicable Because Ordinance 40-08 Does Not Restrict Speech ...................................................................... 28

    B.    Ordinance 40-08 Is Constitutional Under Either *Zauderer* Or *Central Hudson* ................................................................................................. 29

        1.    Ordinance 40-08 Is Constitutional Under *Zauderer* ..................... 29

        2.    Ordinance 40-08 Is Constitutional Under *Central Hudson* ........... 29

            a.    The Ordinance Directly Advances The City's Interest In Public Health ..................................................................... 29

            b.    The Ordinance Is Not More Extensive Than Necessary To Serve The City's Interest .............................................. 32

IV.    CRA'S CLAIM UNDER ARTICLE I OF THE CALIFORNIA CONSTITUTION ALSO FAILS .................................................................. 33

    A.    The Reasonable Relationship Test Applies Under Article I Of The California Constitution ..................................................................... 33

    B.    Although Intermediate Scrutiny Does Not Apply, Ordinance 40-08 Survives Under That Test As Well ........................................................ 34

CONCLUSION ................................................................................................. 35

1

## TABLE OF AUTHORITIES

2

**Federal Cases**

*Am. Acad. of Pain Mgmt. v. Joseph*
3      353 F.3d 1099 (9th Cir. 2004) ...................................................................32

4
*Ass'n of Nat'l Advertisers, Inc. v. Lungren*
       44 F.3d 726 (9th Cir. 1994) ....................................................................29
5

6
*Auer v. Robbins*
       519 U.S. 452 (1997)...............................................................................17
7

*Bassiri v. Xerox Corp.*
8      463 F.3d 927 (9th Cir. 2006) ..................................................................17

9
*Bates v. Dow Agrosciences LLC.*
10     544 U.S. 431 (2005).................................................................................7

11
*Central Hudson Gas & Elec. Crop. v. Pub. Serv. Comm'n of N.Y.*
       447 U.S. 557 (1980).............................................................23, 28, 29, 32
12

13
*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*
       467 U.S. 837 (1984).................................................................................10
14

*Christensen v. Harris County*
15     529 U.S. 576 (2000)..........................................................................10, 13

16
*CSX Transp., Inc. v Easterwood*
       507 U.S. 658 (1993).................................................................................9
17

18
*Duncan v. Walker*
       533 U.S. 167 (2001)...............................................................................18
19

*Envtl. Def. Ctr., Inc. v. E.P.A.*
20     344 F.3d 832 (9th Cir. 2003) ....................................................23, 24, 27, 28

21
*Exxon Mobil Corp. v. E.P.A.*
       217 F.3d 1246 (9th Cir. 2000) ...................................................................7
22

23
*Ft. Funston Dog Walkers v. Babbitt*
       96 F. Supp. 2d 1021 (N.D. Cal. 2000) .....................................................33
24

*Hale v. Dep't of Energy*
25     806 F.2d 910 (9th Cir. 1986) ..................................................................33

26
*Hurley v. Irish-American Gay, Lesbian And Bisexual Group Of Boston*
       515 U.S. 557 (1995).................................................................................26
27

*In re R.M.J.*
28     455 U.S. 191 (1982).................................................................................23

*Johanns v. Livestock Mktg. Ass'n*
 544 U.S. 550 (2005)..................................................................................26

*Medtronic, Inc. v. Lohr*
 518 U.S. 470 (1996)..............................................................................7, 19

*N. Y. State Rest. Ass'n v. New York City Bd. of Health*
 2008 WL 1752455 (S.D.N.Y. April 16, 2008) ................................. *passim*

*N. Y. State Rest. Ass'n v. New York City Bd. of Health*
 509 F. Supp. 2d 351 (S.D.N.Y. 2007) .........................................5, 7, 18

*N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*
 08-1892-cv (June 16, 2008)..........................................................................6

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*
 272 F.3d 104 (2d Cir. 2001) ....................................22, 23, 24, 25, 28, 34

*Newman v. Sathyavaglswaran*
 287 F.3d 786 (9th Cir. 2002) .................................................................7

*Pelman v. McDonald's Corp.*
 237 F. Supp. 2d 512 (S.D.N.Y. 2003) .....................................................11

*Pharm. Care Mgmt. Ass'n v. Rowe*
 429 F.3d 294 (1st Cir. 2005)..................................................................23

*Riegel v. Medtronic, Inc.*
 128 S. Ct. 999 (2008).............................................................................17

*S.E.C. v. Phan*
 500 F.3d 895 (9th Cir. 2007) ...............................................................17

*Skidmore v. Swift & Co.*
 323 U.S. 134 (1944).............................................................................10

*United States v. Edge Broadcasting*
 509 U.S. 418 (1993)..............................................................................32

*United States v. Schiff*
 379 F.3d 621 (9th Cir. 2004) ..........................................................23, 27

*United States v. United Foods, Inc.*
 544 U.S. 405 (2001)..................................................................24, 25, 26

*Zauderer v. Office of Disciplinary Counsel*
 471 U.S. 626 (1985).......................................................................... *passim*

*Zurich American Ins. Co. v. Whittier Properties, Inc.*
 356 F.3d 1132 (9th Cir. 2004) .............................................................17

**State Cases**

*Arnett v. Dal Cielo*
   14 Cal. 4th 4 (1996) ..................................................................22

*Baldwin v. County of Tehama*
   31 Cal. App. 4th 166 (1995) ....................................................22

*Big Creek Lumber Co. v. County of Santa Cruz*
   38 Cal. 4th 1139 (2006) ...........................................................19

*Bravo Vending v. City of Rancho Mirage*
   16 Cal. App. 4th 383 (1993) .........................................1, 21, 22

*California Rifle & Pistol Ass'n, Inc. v. City of West Hollywood*
   66 Cal. App. 4th 1302 (1998) ..................................................19

*Envtl. Law Found. v. Laidlaw Transit Servs.*
   2008 WL 2157672 (Cal. Super. Ct. January 8, 2008) ..............34

*Fisher v. City of Berkeley*
   37 Cal. 3d 644 (1984) ..............................................................21

*Gerawan Farming, Inc. v. Kawamura*
   33 Cal. 4th 1 (2004) ................................................................34

*Great Western Shows, Inc. v. County of Los Angeles*
   27 Cal. 4th 853 (2002) ............................................................19

*Kasky v. Nike, Inc.*
   27 Cal. 4th 939 (2002) ............................................................33

*O'Connell v. City of Stockton*
   27 Cal. Rptr. 3d 696 (2005) .....................................................22

*O'Connell v. City of Stockton*
   41 Cal. 4th 1061 (2007) ..........................................................19

*People v. Anderson*
   235 Cal. App. 3d 586 (1991) ...................................................33

*People v. Teresinski*
   30 Cal. 3d 822 (1982) ..............................................................33

**Federal Statutes, Regulations and Other Authorities**

15 U.S.C.
    § 78 1 .................................................................................................24
    § 1333 .............................................................................................22, 24

21 U.S.C.
    § 6(c)(1) ...............................................................................................7
    § 301 ....................................................................................................1
    § 343 .................................................................................................1, 22
    § 343(q) ........................................................................................ *passim*
    § 343(r) ........................................................................................ *passim*
    § 343-1 ..............................................................................................1, 7
    § 343-1(a)(4) ................................................................................. *passim*
    § 343-1(a)(5) ................................................................8, 11, 14, 18

21 C.F.R.
    § 101.10 ..............................................................................................18
    § 101.13 ....................................................................................... *passim*
    § 101.45 ..........................................................................................16, 18
    §§ 101.54-101.69 ................................................................................12
    § 101.9(c) ............................................................................................13
    § 202.1 ................................................................................................24

136 Cong. Rec. S16607-02, S 16611
(Oct. 24, 1990) (Sen. Hatch) .............................................................9

136 Cong. Rec. S16607-02, S16608
(Oct. 24, 1990) (Sen. Metzenbaum) ..................................................9

64 Fed. Reg. 62745-62758
(Nov. 17, 1999) ................................................................................14

H.R. Rep. No. 538, 101st Cong., 2d Sess. 7 (1990)
*reprinted in* 1990 U.S.C.C.A.N. 3336, 3337 ....................................8, 15

Pub. L. No. 101-535, § 6(c)
104 Stat. 2535, 2364 ..........................................................................7

**California Constitutional Provisions**

CAL. CONST.
    art. I, § 2 ........................................................................................33, 34

CAL. CONST.
    art. XI, § 7 ..........................................................................................19

**State Statutes & Codes**

Cal. Health & Safety Code

§ 110660 *et seq.* .................................................................................................21

§ 113700 *et seq.* ................................................................................1, 19, 20, 22

§ 113705 ................................................................................................................20

§ 114089 ................................................................................................................21

§ 25250.25(a)(3) ...................................................................................................34

Cal. Pub. Res. Code

§ 15013(b) .............................................................................................................34

Cal. Uniform Retail Food Facilities Law

§ 27501 ..................................................................................................................20

**San Francisco Ordinances**

Health Code

§ 468.1 .............................................................................................................25, 30

§ 468.3 ..........................................................................................................*passim*

**FDA Policy Statements**

FDA, *Counting Calories: Report of the Working Group on Obesity* (2004)................................10

FDA, *Food Labeling: Questions and Answers, Volume II, "A Guide for Restaurants and Other Retail Establishments"* (August 1995) ................................10

FDA, *Labeling Guide for Restaurants and Other Retail Establishments Selling Away-From-Home Food* (April 2008)................................10

**Other References**

INSTITUTE OF MEDICINE

PREVENTING CHILDHOOD OBESITY: HEALTH IN THE BALANCE (Jeffrey P. Coplan et al. eds., 2004)................................4

Lenore Skenazy

*Snacking Delusions Destroyed By NYC Calorie-Posting Law*

ADVERTISING AGE, July 7, 2008

http://adage.com/print?article_id=128146 ................................31

Roni Caryn Rabin, *New Yorkers Try To Swallow Calorie Sticker Shock*

MSNBC.com, July 16, 2008

http://www.msnbc.msn.com/id/25464987/................................26, 31

Stephanie Saul

*Menu Fight Over Calories Leads Doctor to Reject Post*

NEW YORK TIMES http://www.nytimes.com/2008/03/04/business/04obese.html ................................31

**STATEMENT OF THE ISSUES**

This lawsuit stems from the unwillingness of chain restaurants and fast food giants such as McDonald's, Burger King and T.G.I. Friday's[1] to provide their customers with basic nutritional information about the food they serve in a manner that will enable customers to make healthier dietary choices. Rather than support San Francisco's efforts to reduce the obesity epidemic, the California Restaurant Association ("CRA") has chosen to bring this lawsuit, asserting claims that are based on a misinterpretation of operative law and that have already been rejected by other courts.

With regards to CRA's first argument – that San Francisco's menu labeling ordinance is preempted under the Nutrition Labeling and Education Act of 1990, 21 U.S.C. §§ 301, 343-343-1 ("NLEA") – both the U.S. Food and Drug Administration ("FDA") and the Southern District of New York have already rejected an identical preemption claim in a case challenging New York City's menu labeling law. As the FDA has repeatedly made clear, the NLEA leaves local governments free to impose nutritional disclosure requirements on restaurants. CRA's argument to the contrary ignores the balance Congress struck in the NLEA's express preemption clause between matters occupied by federal regulation and matters left to state and local governments. It also ignores the structure of the NLEA, which distinguishes between mandatory factual disclosure requirements and voluntary claims. Ordinance 40-08 concerns the former, which are not preempted under the NLEA for restaurant food.

CRA's claim under the California Retail Food Code, Cal. Health & Safety Code § 113703 *et seq.* ("CRFC"), similarly fails because it conflicts with the California Legislature's stated purposes in adopting that Code's preemption clause and with the CRFC's legislative history. CRA cannot overcome the presumption against preemption by merely pointing to a single code section concerning labeling of packaged foods and ignoring the regulatory scheme created by the CRFC. *See Bravo Vending v. City of Rancho Mirage*, 16 Cal. App. 4th 383, 400 (1993).

---

[1] Along with its motion, CRA has submitted a declaration from the Senior Director of T.G.I. Friday's, Scott Randolph. T.G.I. Friday's is not covered by Ordinance 40-08, however, because it does not have a restaurant located within the geographical boundaries of San Francisco. *See* http://www.tgifridays.com/storeLocator/FindUs.aspx . Thus, T.G.I. Friday's concerns about the Ordinance are irrelevant.

Finally, CRA's argument that Ordinance 40-08 violates the First Amendment and the California Constitution's free speech clause lacks any merit.  If it were otherwise, hundreds of legally mandated disclosure requirements, covering everything from cigarette warning labels to the ubiquitous "nutrition facts" panel on packaged foods, would be constitutionally suspect.  Assuming, *arguendo*, any First Amendment interests are implicated, Ordinance 40-08 is constitutional because it is rationally related to the City's interests in reducing consumers' inaccurate perceptions of the nutritional content of restaurant foods and in curbing the health problems associated with obesity. *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).

Because CRA cannot demonstrate a likelihood of success on the merits of any of its claims, and has not put forth sufficient evidence of irreparable harm, CRA's motion for declaratory relief and a preliminary injunction must be denied.

## FACTUAL BACKGROUND

## I.   ORDINANCE 40-08 WAS ENACTED TO COMBAT THE GROWING OBESITY EPIDEMIC

It is no secret that Americans are in the midst of an unprecedented epidemic of obesity.  This epidemic threatens the health of San Franciscans and also harms the City's fiscal health.  *See* Declaration of Dr. Mitchell H. Katz ("Katz Decl.") ¶¶ 5-7, 10-19.  Over 42% of San Franciscans are overweight or obese.  *Id.* ¶ 6.  Because overweight individuals are at increased risk for type 2 diabetes, heart disease, stroke, arthritis, gall bladder disease, osteoarthritis, sleep apnea, respiratory problems, depression, and numerous forms of cancer, being overweight currently ranks as the second leading cause of premature mortality among females, and the third leading cause among males, in San Francisco.  *Id.* ¶¶ 10-11.  The San Francisco Department of Public Health estimates that the obesity epidemic costs San Francisco $192 million per year in medical expenses, lost productivity, and workers' compensation.  *Id.* ¶ 19.

The rise in obesity rates has coincided with the increased consumption of food from restaurants, particularly chain restaurants.  *Id.* ¶¶ 25-28.  Today, Americans are spending around 46% of their total food dollars at restaurants, accounting for approximately 30% of Americans' caloric intake.  *Id.* ¶ 26.  Yet, unlike packaged foods that contain the FDA-mandated nutrition facts panel,

consumers know little to nothing about the content of the food they consume in restaurants.  Studies

show that consumers consistently underestimate the calorie content of menu items – a problem made

worse by the fact that restaurant meals, particularly those served by fast food and chain restaurants,

typically have larger portions and are higher in calories than home-prepared foods.  *Id.* ¶¶ 29-39.

To fight the obesity crisis, San Francisco adopted Ordinance 40-08, which amends Sections

468-468.8 of the San Francisco Health Code.  The Ordinance applies only to chain restaurants with

20 or more establishments in California.  Under the Ordinance, chain restaurants must disclose on

their menus the amount of calories, saturated fat, carbohydrates, and sodium in the food they serve in

a clear and conspicuous manner.  Health Code § 468.3(b).  Menus must also contain a statement

regarding the recommended daily limits for both saturated fat and sodium in a 2,000-calorie daily

diet.  *Id.* § 468.3(b)(3).  Chain restaurants that have menu boards must disclose the number of calories

found in each menu item on the menu board using a font that is at least as prominent in size and

appearance as the name or price of the menu item.  *Id.* § 468.3(c).  A chain restaurant violates

Ordinance 40-08 if: (1) it does not make disclosures as required by the Ordinance, (2) the nutritional

information disclosed is different from what the restaurant knows or believes to be accurate

information, or (3) the nutritional information "[d]eviates from what actual analysis or other reliable

evidence shows to be the average content of a representative sample of the Menu Item by more than

20%."  *Id.* § 468.3(g)(2).

## II.   LEADING SCIENTIFIC EXPERTS AND THE BEST AVAILABLE EVIDENCE SUPPORT MENU LABELING REQUIREMENTS AT RESTAURANTS

CRA asserts that there is "no evidentiary support for" or "public health consensus" regarding

menu labeling requirements.  But the conclusions of numerous leading health experts and scientific

studies, as well as New York City's recent experience implementing its first-in-the-nation menu

labeling law, belie CRA's assertion.  Katz Decl. ¶¶ 40-42, 46; Declaration of Dr. Mary Bassett

("Basset Decl.") ¶¶ 6-8.  In fact, the FDA, U.S. Surgeon General, American Medical Association,

National Academies' Institute of Medicine, American Diabetes Association, American Heart

Association, American Cancer Society, American Academy of Pediatrics, and American Public

Health Association have all recommended nutritional labeling of restaurant foods as a useful strategy

for combating obesity and its related illnesses.  Katz Decl. ¶ 56.

CRA asserts that "[n]o one knows how to reverse the trend of increasing obesity in the United States," and therefore concludes that cities like San Francisco should not even try.  *See* Pl. Mem. at 3. To support this argument, CRA's brief selectively quotes from the FDA-commissioned Keystone Report, which states that more research is needed on how consumers use nutrition information.  *Id*. These quotations are entirely misleading, however, for two reasons.  First, CRA fails to mention the Keystone Report's finding that restaurants "should provide consumers with calorie information in a standard format that is easily accessible and easy to use."  Keystone Report, Pl. Appendix Ex. F, at 12.  The Report expressed consensus "that information provided at the consumer's point of decision, wherever that might be, is most likely to be used and useful to the consumer."  *Id*. at 81.

Second, CRA omits the Report's conclusion that "while the knowledge base needs to be improved, enough is known to recommend many important actions. . . . [R]easonable strategies to assist consumers with healthy energy intake should be pursued *now*, and then augmented going forward as new information becomes available."  *Id*. at 29 (emphasis added).  The Institute of Medicine has echoed that conclusion: "The obesity epidemic is a serious public health problem calling for immediate reductions in obesity prevalence … actions should be based on the best *available* evidence—as opposed to waiting for the best *possible* evidence."  *See* INSTITUTE OF MEDICINE, PREVENTING CHILDHOOD OBESITY: HEALTH IN THE BALANCE at 3 (Jeffrey P. Coplan *et al*. eds., 2004) (emphasis in original).

The best available evidence demonstrates that menu labeling is likely to reduce obesity by influencing consumer choice and causing restaurants to reformulate their menu offerings.  Katz Decl. ¶¶ 40-42; Declaration of Margo G. Wootan ("Wootan Decl.") ¶¶ 17-18, 22-27.  Our nation's experience with labeling on packaged foods has shown that (1) three-quarters of American adults report using nutritional labels on packaged foods, (2) use of food labels is associated with eating more healthful diets, and (3) almost half of consumers report that nutrition information on food labels has caused them to change their minds about buying a food product.  Katz Decl. ¶ 40.  Other studies suggest that many customers use nutritional information posted on menu boards to make healthier choices.  *Id*. ¶ 41.  As a 2008 study by the Los Angeles County Department of Public Health shows, even if menu labeling laws lead only some consumers to use nutritional information, and those

consumers make only modest changes in their diet, the resulting reduction in obesity rates is likely to be enormous. *Id.* ¶ 42.

Perhaps most significantly, these studies are bolstered by early evidence coming out of New York City, the only city in the country to implement menu labeling to date. New York City's mandate that chain restaurants disclose calorie counts on menus and menu boards is causing restaurants to reformulate existing menu offerings and to offer new lower calorie options. Bassett Decl. ¶ 7. It is also leading New Yorkers to make healthier choices. *Id.* ¶ 8. These changes in both consumer behavior and restaurants' menu offerings support the conclusion that mandatory menu labeling will lead to reduced caloric consumption. *Id.* ¶ 9.

Ordinance 40-08 thus reflects a scientific consensus that menu labeling laws are likely to yield significant health and economic benefits by providing consumers with the information they need to decrease their risk for obesity. And although just a few months old, New York City's law is already providing concrete proof that menu labeling does in fact provide these benefits.

III. **THE SOUTHERN DISTRICT OF NEW YORK REJECTED A SIMILAR CHALLENGE TO THE ONLY MENU LABELING ORDINANCE IN EFFECT**

As the first city in the nation to promulgate menu-labeling requirements, New York faced a lawsuit similar to this one that was filed by the New York State Restaurant Association ("NYSRA"). New York's original calorie disclosure rule was struck down because it applied only to restaurants that already voluntarily disclosed nutrition information. *See N. Y. State Rest. Ass'n v. New York City Bd. of Health*, 509 F. Supp. 2d 351 (S.D.N.Y. 2007) ("*NYSRA I*"). But New York subsequently adopted a menu labeling law that, like Ordinance 40-08, imposes mandatory requirements on chain restaurants. In considering claims identical to those made by CRA here, the Southern District of New York concluded that New York's revised menu labeling law is "not preempted by NLEA because that statute explicitly leaves to state and local governments the power to impose mandatory nutrition labeling by restaurants." *N. Y. State Rest. Ass'n v. New York City Bd. of Health*, 2008 WL 1752455 * 1 (S.D.N.Y. April 16, 2008) ("*NYSRA II*"). The court also concluded that "the required disclosure of caloric information is reasonably related to the government's interest in providing consumers with

1    accurate nutritional information and therefore does not unduly infringe the First Amendment rights of

2    NYSRA members." *Id.*

3        New York City's menu labeling law took effect on April 30, 2008, shortly after the district

4    court's decision in *NYSRA II*.  NYSRA immediately appealed.  Although NYSRA sought a stay

5    blocking enforcement of the law pending the Second Circuit's ruling, the court refused to issue a stay,

6    and New York City began to impose fines for violations of the law on July 19, 2008.  *See* Order by

7    the Second Circuit Court of Appeals in *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 08-1892-cv

8    (June 16, 2008), attached here as Exhibit 1 to the Declaration of Tara M. Steeley ("Steeley Decl.");

9    Bassett Decl. ¶ 3.  As a result, many restaurants, including McDonald's and Burger King, are

10   currently complying with New York City's labeling requirements.  *See* Bassett Decl. ¶ 5.

11       At the request of the Second Circuit, the FDA submitted an amicus brief.  The FDA

12   concluded that the NLEA and FDA regulations do not preempt local governments from enacting

13   menu labeling requirements.  *See* Brief of the United States Food and Drug Administration As

14   Amicus Curiae in Support of Affirmance ("FDA Br."), attached here as Exhibit 2 to the Steeley Decl.

15   The case remains on appeal.

**ARGUMENT**

16
17   **I.    FEDERAL LAW DOES NOT PREEMPT ORDINANCE 40-08**

18       CRA argues that by requiring chain restaurants to post nutritional facts on menus and menu

19   boards, Ordinance 40-08 requires them to make "claims," and therefore falls within the NLEA's

20   express preemption provision.  CRA's argument rests almost entirely on an erroneous reading of a

21   single FDA regulation, and ignores the FDA's controlling contrary interpretation of that same

22   regulation. CRA's argument has already been rejected by both the FDA and the district court in

23   *NYSRA I* and *II*.  As explained below, the FDA and the Southern District of New York agree that (1)

24   Congress expressly preserved state and municipal authority to mandate disclosure of nutritional facts

25   for restaurant food under § 343-1(a)(4), and (2) mandatory disclosures of nutrient contents of

26   restaurant food are not "claims" within the meaning of § 343(r) of the NLEA.

27
28

## A.    A Strong Presumption Against Preemption Applies In This Case

Because this court's federal preemption analysis "begin[s] from the presumption that local police powers are not preempted," CRA bears a heavy burden in seeking a declaration that federal law preempts Ordinance 40-08.  *Exxon Mobil Corp. v. E.P.A.*, 217 F.3d 1246, 1255 (9th Cir. 2000); *see Bates v. Dow Agrosciences LLC.*, 544 U.S. 431, 449 (2005) (federal courts presume that state laws governing areas of "traditional state regulation" are not preempted).  Ordinance 40-08 falls squarely within the City's historic police power to protect public health.  *See Exxon*, 217 F.3d at 1255 (the broad police powers of the states includes "the power to protect the health of citizens in the state"); *Newman v. Sathyavaglswaran*, 287 F.3d 786, 799 (9th Cir. 2002) (improving the health of its citizens is "central to the state's core police powers").  Accordingly, as in the New York City case, the presumption against preemption "is clearly applicable to the present case, where the City regulation addresses concerns about the health of its citizens." *NYSRA I*, 509 F. Supp. 2d at 355.

Here, the presumption is strengthened by the express preemption clause in Section 6(c)(1) of the NLEA, in which Congress made clear that the statute "shall not be construed to preempt any provision of State law, unless such provision is expressly preempted" by the NLEA.  Pub. L. No. 101-535, § 6(c), 104 Stat. 2535, 2364 (21 U.S.C. § 343-1 note); *see also NYSRA I*, 509 F. Supp. 2d at 355 ("[T]he NLEA explicitly forecloses the possibility that state law would be impliedly preempted.").  As a result, this Court's only task is to determine whether Ordinance 40-08 falls within "the domain expressly pre-empted" by the NLEA.  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996).  And to the extent that there is more than one plausible reading of the statute – but there is not – this Court has "a duty to accept the reading that disfavors pre-emption." *Bates*, 544 U.S. at 449.  As explained below, CRA cannot overcome the strong presumption against preemption in this case.

## B.    The NLEA Explicitly Preserves The Authority Of Local Governments To Mandate Labeling Of Restaurant Foods

### 1.    The Purpose And Structure Of The NLEA

In 1990, Congress adopted the NLEA for two distinct but related purposes:  (1)"to clarify and to strengthen the Food and Drug Administration's legal authority to *require* nutrition labeling on foods," and (2) "to establish the circumstances under which claims *may be made* about nutrients in foods."  H.R. Rep. No. 538, 101st Cong., 2d Sess. 7 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3336,

3337 (emphasis added) ("House Report").  To achieve these dual purposes, the NLEA amended the Federal Food, Drug and Cosmetic Act by enacting two subsections: (1) Section 343(q), which mandates specific factual disclosures on food labels (the ubiquitous "nutrition facts" panel on packaged foods), and (2) Section 343(r), which regulates the descriptive claims that producers may make about the nutrient content of their foods (such as "low fat").[2]  In short, the first section (§ 343 (q)) tells food purveyors what *facts* they *must* disclose about nutrients in their food, whereas the second section (§ 343(r)) governs when and how purveyors *may* make descriptive *claims* characterizing the nutrient level of their food.  *NYSRA II*, 2008 WL 1752455 at * 2.

Crucially, Section 343(q), the section addressing mandatory nutrition disclosures, expressly exempts restaurant food from its nutrition labeling mandates.  *See* 21 U.S.C. § 343(q)(5)(A)(i).  Thus, under the NLEA, the FDA has no authority to require restaurants to provide the type of nutrition information that the statute requires for other foods.  Ordinance 40-08 fills in this gap by requiring restaurants to disclose § 343(q)-type information, namely the amount of calories, saturated fat, carbohydrates and sodium in menu items.  The only circumstance in which the NLEA regulates restaurant food is when restaurants make "claims," within the meaning of § 343(r), that "characterize" the nutrient levels in the foods they serve.[3]  The preemption question presented here, therefore, turns on whether Ordinance 40-08's disclosure requirements constitute mandatory nutritional labeling within the meaning of § 343(q), or "claims" within the meaning of § 343(r).

### 2.   The NLEA's Express Preemption Provisions Preserve Local Authority To Require Restaurants To Provide Nutrition Information

In adopting the NLEA, Congress carefully crafted two express preemption provisions, Sections 343-1(a)(4) and (a)(5).  Section 343-1(a)(4) addresses preemption for mandatory nutrition labeling under § 343(q), while Section 343-1(a)(5) does so for claims under § 343(r).  With regards to Section 343(r) claims, Section 343-1(a)(5) preempts any state regulation of "nutrient content claims,"

---

[2] As the legislative history makes clear, in enacting the latter section, § 343(r), Congress sought to address the proliferation of "unfounded health claims" being made by food companies about the nutrition and health effects of their foods. House Report at 3338-3339.

[3] The NLEA also regulates restaurants when they make "health-related claims," but that aspect of § 343(r) is not at issue in this case.  *See* 21 U.S.C. § 343(r)(1).

1    including claims made by restaurants.  21 U.S.C. § 343-1(a)(5).  But with regards to Section 343(q)'s

2    mandatory nutritional disclosures, Section 343-1(a)(4) exempts nutritional labeling requirements for

3    restaurant food from its preemptive scope, thereby allowing states and local governments to impose

4    such mandates on restaurants.  21 U.S.C. § 343-1(a)(4).  Specifically, Section 343-1(a)(4) preempts:

5        any requirement for nutrition labeling of food . . . *except a requirement for*
         *nutrition labeling of food which is exempt under sub-clause (i) . . . of [21*
6        *U.S.C. § 343(q)(5)(A)]*

7    21 U.S.C. § 343-1(a)(4) (emphasis added).  As explained earlier, 21 U.S.C. § 343(q)(5)(A) expressly

8    exempts restaurants from the mandatory nutritional disclosure requirements set forth in § 343(q).

9        Thus, the plain text of § 343-1(a)(4), combined with § 343(q)(5)(A)'s exemption for restaurant

10   food, makes clear that Congress intended to leave state and local governments free to require nutrition

11   labeling in restaurants.  *See CSX Transp., Inc. v Easterwood*, 507 U.S. 658, 664 (1993) ("[T]he plain

12   wording of [a preemption provision] necessarily contains the best evidence of Congress' preemptive

13   intent.").  This Court need look no further than the exception clause in § 343-1(a)(4) to conclude that

14   Congress sought to preserve local authority in this area, not override it.

15       While the statutory text is entirely unambiguous, this reading of Section 343-1(a)(4) is also

16   strongly supported by the legislative history.  As the NLEA's chief sponsor in the Senate explained

17   just minutes before the final vote on the legislation: "Because food sold in restaurants is exempt from

18   the nutrition labeling requirements of [the NLEA], the bill does not preempt any State nutrition

19   labeling requirements for restaurants."  136 Cong. Rec. S16607-02, S16608 (Oct. 24, 1990) (Sen.

20   Metzenbaum); *see also* 136 Cong. Rec. S16607-02, S 16611 (Oct. 24, 1990) (Sen. Hatch) (describing

21   preemption provisions as "limited in scope" and stating that "national uniformity in food labeling that

22   is set forth in the legislation has absolutely no effect on preemption of State or local requirements that

23   relate to such things as warnings about foods or components of food").

24       So, too, has the FDA consistently interpreted the NLEA to allow local governments to impose

25   menu nutrition labeling requirements on restaurants.  As early as 1995, the FDA included the

26   following question and answer in its publication "A Guide for Restaurants and Other Retail

27   Establishments":

28

> *Question*:  Can a State require restaurant foods to bear nutrition labeling even if the food is exempt under Federal requirements?
>
> *Answer*:  Yes . . . [B]ecause the act exempts restaurant foods that do not bear a claim from mandatory nutrition labeling, State requirements for the nutrition labeling of such foods would not be preempted.

*See* FDA, *Food Labeling: Questions and Answers, Volume II, "A Guide for Restaurants and Other Retail Establishments"* (August 1995) at ¶ R31, attached here as Exhibit 3 to the Steeley Decl. Similarly, in reports published in 2004 and 2006, the FDA again affirmed that states are *not* preempted from requiring labeling of restaurant food.  *See* Pl. Appendix F (FDA Keystone Report), at 74; FDA, *Counting Calories: Report of the Working Group on Obesity* (2004), at V.B, attached here as Exhibit 4 to Steeley Decl.

The recent menu labeling lawsuits have not changed the FDA's position.  In its June 2008 amicus brief before the Second Circuit in *NYSRA II,* the FDA stated that "municipal authority to impose nutrition labeling requirements on restaurants is undisturbed by the NLEA."  FDA Br. at 6; *see also* FDA, *Labeling Guide for Restaurants and Other Retail Establishments Selling Away-From-Home Food,* (April 2008) ("FDA Labeling Guide"), at question 106, attached here as Exhibit 5 to the Steeley Decl. ("[B]ecause the FD&C Act exempts restaurant foods that do not bear a claim from mandatory nutrition labeling, State requirements for the nutrition labeling of such foods would not be preempted.").

As the agency authorized to administer the NLEA, the FDA's views are entitled to deference. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984); FDA Br. at 22-23. At a minimum, the FDA's interpretation of the NLEA as set forth in its Second Circuit amicus brief and in FDA publications is "entitled to respect" under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

Given that § 343-1(a)(4) expressly preserves local authority over mandatory nutritional labeling of restaurant foods, and that the legislative history and the FDA's interpretations affirm this reading, it is no surprise that every court to consider the matter has concluded that the NLEA does not preempt state or municipal menu labeling requirements.  *See NYSRA II*, 2008 WL 1752455 at * 4 (holding that because "food served in restaurants is explicitly exempt from § 343(q), state authority to impose mandatory nutrition labeling on restaurants is necessarily preserved"); *Pelman v. McDonald's*

1    *Corp.*, 237 F. Supp. 2d 512, 526 (S.D.N.Y. 2003) ("§ 343-1(a)(4) does not expressly bar [state-

2    mandated] nutrition labeling on restaurant foods either directly or . . . indirectly").

3          This Court should join the FDA and every court to have considered the question and conclude

4    that local menu labeling requirements such as Ordinance 40-08 are not preempted under the NLEA.

**3.    Ordinance 40-08 Does Not Regulate "Claims" Within The Meaning Of § 343(r)**

6          In an attempt to get around the fact that Congress expressly preserved state and municipal

7    authority to impose nutrition labeling for restaurant food in § 343-1(a)(4), CRA argues that Ordinance

8    40-08 regulates "claims," and therefore falls within the preemption provision for claims, § 343-

9    1(a)(5).  But CRA's definition of a "claim" is based on an unduly expansive reading of 21 C.F.R.

10   § 101.13 that ignores the plain text of the NLEA, conflicts with the FDA's controlling interpretation

11   of its own regulations, and renders § 343-1(a)(4) superfluous.

12         CRA attempts to confuse this Court with three supposedly competing "theories" as to whether

13   mandatory nutrition disclosures like Ordinance 40-08 constitute "claims" under the NLEA.  Pl. Mem.

14   at 10.  According to CRA, the theories involve whether a statement (1) is qualitative vs. quantitative,

15   (2) is mandatory vs. voluntary, and (3) meets the test set forth by the FDA in its Second Circuit

16   amicus brief.  Pl. Mem. at 10.  In fact, however, the three "theories" are best described as the factors

17   of a three part test.  The FDA, the Southern District of New York, and San Francisco all agree that

18   menu labeling laws like Ordinance 40-08 do not require "nutrient content claims" for two simple

19   reasons:  (1) such laws require disclosure of the "type" of nutrition information required by § 343(q),

20   *and* (2) they regulate mandatory disclosures rather than voluntary statements.  The FDA also points to

21   a third factor – the location of nutritional statements – that makes clear why Ordinance 40-08 does

22   not regulate "claims."  An analysis of these factors shows that Ordinance 40-08 requires labeling of

23   "nutrition information," not "claims," and is therefore not expressly preempted by the NLEA.

**a.    Q-Type Nutrition Information v.  R-Type Claims**

25         First, Ordinance 40-08 does not require restaurants to make "claims" because it mandates

26   statements "of the type required by" § 343(q), or "Q-type" factual information rather than "claims"

27   under § 343(r).  21 U.S.C. § 343(r)(1).

28

The NLEA's two sections – § 343(q) (mandating nutrition labeling) and § 343(r) (regulating claims) – serve two different purposes.  Section 343(q) mandates pure factual disclosures that are unadorned with any descriptive or qualitative assertions.  *See* 21 U.S.C. § 343(q)(1).  By contrast, a "claim" is a statement that "characterizes the level of any nutrient" in a food.  21 U.S.C. § 343(r).  The FDA's regulations provide an extensive list of terms that characterize nutrient levels – including "light," "high," "rich in," "excellent source of," "provides," "enriched," "added," or "extra."  21 C.F.R. §§ 101.54-101.69.  As these terms suggest, § 343(r) regulates statements that are expressly or implicitly qualitative in nature.  Thus, as the FDA's regulations explain, a statement that "does not in any way implicitly characterize the level of the nutrient in the food and is not false or misleading in any respect (*e.g.* '100 calories' or '5 grams of fat')," is not a claim.  21 C.F.R. § 101.13(i)(3).

### i. Section 343(r)(1)'s "Carve Out" Identifies Q-Type Information That Is Not A Claim

If the statutory structure of the NLEA left any doubt, its text includes a specific "carve out" within § 343(r)(1) that makes clear the distinction between Q-type factual disclosures of nutrition information required under § 343(q), and R-type claims.  Section 343(r)(1) provides:

> A statement of the type required by paragraph (q) that appears as part of the nutrition information required or permitted by such paragraph is not a claim which is subject to [§ 343(r)] . . . .

21 U.S.C. § 343(r)(1); *see also* 21 C.F.R. § 101.13(c) ("information that is required … to be declared in nutrition labeling, and that appears as part of the nutrition label, is not a nutrient content claim").  On its face, this provision states that statements of the type required on nutrition labeling under § 343(q) are not claims subject to § 343(r).  As the FDA makes clear, and as CRA concedes, *see* Pl. Mem. at 15,[4] the disclosures required by Ordinance 40-08 are "statement[s] of the type required by" § 343(q), because the number or amount of calories, saturated fat, carbohydrates and sodium are all

---

[4] Although CRA concedes that "100 calories" is "a statement of the type required by (q)", Pl. Mem. at 15, it points to 21 C.F.R. § 101.13(c), for the proposition that the § 343(r)(1)'s carve out only applies to nutrition labeling that meets the serving size, content, and formatting requirements of § 101.9.  *See* Pl. Mem. at 17-18.  Under CRA's reading, the only nutrition labeling allowed for restaurant foods would be labeling that is identical to the Nutrition Facts Panel.  Pl. Mem. at 19-20.  As discussed further below, there is simply no support for this narrow reading of § 101.13(c) and it has been rejected by the FDA.  *See* FDA Br. at 19.

facts that § 343(q) requires be provided on the nutrition facts panel.  *See* § 343(q)(1)(C), (D);  21 C.F.R. § 101.9(c).  Accordingly, the FDA has concluded that menu disclosures like Ordinance 40-08 require Q-type statements.  *See* FDA Br. at 14-15 (the calorie statements required by New York City's menu labeling law are "of the type" required by § 343(q)).

### ii.    CRA's Reading Of The Carve Out Is Erroneous

Contrary to the FDA's persuasive interpretation, *see* FDA Br. at 14-16, CRA attempts to contort the one-sentence carve out in § 343(r)(1) into a two-pronged test, asserting that in order to escape preemption, the nutritional statement must (1) be "of the type required by [§ 343(q)]" *and* (2) "appear[] as part of the nutrition information required or permitted by" § 343(q).  *See* Pl. Mem. at 15-16.  There is no support for CRA's interpretative approach.  The FDA correctly analyzes § 343(r)(1)'s carve out as a single requirement, with the clause that begins "that appears" merely describing the "type" of statement covered under § 343(q).  *See* FDA Br. at 14-16.  The FDA's interpretation of the statute is entitled to respect from this Court.  *Christensen*, 529 U.S. at 587.

Moreover, CRA's reading of § 343(r)(1)'s carve-out would render the statute's phrase "of the type" superfluous.  The use of the phrase "of the type" makes clear that the carve-out includes statements *beyond* those expressly mandated or permitted by § 343(q).  The FDA shares this interpretation.  *See* FDA Labeling Guide, at question 106 (stating that § 343-1(a)(4) "provide[s] that State requirements *of the type* required by § 343(q) (nutrition labeling) . . . would not be preempted for foods that are exempted from the Federal requirements." (emphasis added)).

### iii.   Section 101.13(b)(1) Does Not Mean That All Statements Describing The Amount Of Calories Are § 343(r) "Claims"

CRA also points to the FDA's definition of "claim" in 21 C.F.R. § 101.13(b)(1)[5] for the proposition that every statement of the amount of calories is *always* a "claim."  The FDA recognizes that, under 21 C.F.R. § 101.13(b)(1), factual quantitative statements "*may in certain circumstances …  constitute a nutrient content claim,*" but such statements are not always claims.  FDA Br. at 16 (emphasis added).  The FDA states that "100 calories" would qualify as a "claim" *if* it were made "on

---

[5] § 101.13(b)(1) defines a claim as "any direct statement about the level (or range) of a nutrient in the food, e.g., 'low sodium' or 'contains 100 calories.'"  21 C.F.R. § 101.13(b)(1).

the front of a package next to the product name," even though the exact same information appearing as part of mandatory nutrition labeling under § 343(q) would not be a claim.  FDA Br. at 16; *see* 21 C.F.R. § 101.13(c).[6]  Thus, according to the FDA, whether "100 calories" is a claim depends on the context in which the statement is made, *i.e.* whether it is made as part of mandatory nutrition labeling or as voluntary advertising for a product.

There is no support in the statute or the regulations, however, for CRA's contention that the statement "100 calories" is *always* a claim, regardless of context, and therefore is preempted under § 343-1(a)(5).  *See* Pl. Mem. at 7-8.  As the FDA explained in its amicus brief, "nothing in any of the authorities cited requires that *any* quantitative statement of nutrient content will *always* be a nutrient content claim, even when part of mandated nutrition labeling."  FDA Br. at 17 (emphasis in original).  Such a reading would over-ride the language of § 343-1(a)(4), which expressly exempts nutrition labeling requirements of restaurant food from preemption, and would render the statutory scheme nonsensical.  Where, as here, the statement "100 calories" is posted as part of *mandated nutrition labeling*, the FDA and the Southern District of New York agree that it is not a § 343(r) claim.  Rather, such a statement is the "type of" information required by § 343(q), and is exempt from preemption under § 343-1(a)(4).  *See* § 343(r)(1); FDA Br. 16-17; *NYSRA II*, 2008 WL 1752455 at * 4.

Given the FDA's recognition that statements like "100 calories," can, in some circumstances, constitute a "claim," it is important to consider the second factor – whether a statement is made voluntarily or pursuant to a governmental mandate – to determine whether Ordinance 40-08 regulates "claims" within the meaning of § 343(r)(1) or nutrition information within the meaning of § 343(q).

### b.    Mandatory/Voluntary Distinction

The second factor that separates "claims" from Q-type nutrition information is whether they are mandated.  As the FDA has explained, "[n]utrient content claims are *voluntary statements* ...."  64 Fed. Reg. 62745-62758 (Nov. 17, 1999) (emphasis added).  The fact that Ordinance 40-08 imposes

---

[6] Of course, the FDA's hypothetical is irrelevant to the present case because the hypothetical involves a (1) voluntary, (2) qualitative statement (3) on the front of a package – none of these factors are implicated by Ordinance 40-08, which involves mandatory nutrition labeling.

1    mandatory nutrition labeling requirements, and does not regulate "voluntary statements," is the

2    second reason that Ordinance 40-08 does not regulate "claims."

3        CRA contends that the mandatory/voluntary distinction does not appear within the text of the

4    statute or the regulations.  But as the Southern District of New York explained:

> By its very terms, . . . subsection (q) identifies specific information that *must*
> appear on food labels while subsection (r) simply does not apply unless a
> nutritional claim is first made by a food purveyor.  This obvious reading of the
> statute is consistent with Congress's stated purpose 'to clarify and to strengthen
> the Food and Drug Administration's legal authority to *require* nutrition labeling
> on food, and to establish the circumstances under which claims *may* be made
> about nutrients in food.'

9    *NYSRA II*, 2008 WL 1752455 at * 2 (quoting H.R. Rep. No. 101-538, at 7 (1990), *reprinted in* 1990

10   U.S.C.C.A.N. 3336, 3337) (first emphasis added).

11       The FDA agrees that the mandatory/voluntary distinction is relevant to the preemption

12   analysis.  *See* FDA Br. at 20.  The FDA acknowledged a possibility – which is not presented in this

13   case – that a mandatory statement "*may*" fall within § 343(r)'s definition of a "claim" under certain

14   circumstances.  *Id*. at 12.  As the FDA explained in its amicus brief, if the City were to require

15   restaurants to display qualitative statements such as "low in fat" next to menu items, that requirement,

16   though mandatory, may constitute a "claim" because it would fail the qualitative/quantitative factor

17   described above.  *Id*.  But just because there is a hypothetical scenario under which a mandated

18   statement *could* constitute a "claim," does not mean that Ordinance 40-08's disclosure requirements

19   *do* constitute "claims."  Ordinance 40-08 does not require restaurants to make descriptive

20   characterizations like "low in fat"; instead, it requires them to disclose Q-type quantitative nutritional

21   information, which is expressly exempted from § 343(r)'s definition of a claim.  *See* 21 U.S.C.

22   § 343(r)(1).

23       In sum, the FDA and the Southern District of New York agree that under the present

24   circumstances where (a) the required statements are nutritional facts "of the type" required by

25   § 343(q) nutrition labeling, and (b) the statements are mandatory, the City is not regulating a "claim"

26   within the meaning of § 343(r)(1), but instead falls under § 343-1(a)(4)'s exception from preemption.

27   *See NYSRA II*, 2008 WL 1752455 at * 4 (stating that under § 343(r), a statement as to a nutrient

28   amount is not a claim when it is a mandated disclosure).

c.    **Location Of Nutritional Labeling**

The FDA states that the location of a mandated nutritional disclosure should also be considered in determining whether the statement is Q-type nutrition information that falls within § 343-1(a)(4)'s exemption from preemption.  In the FDA's view, to avoid preemption, "a state or local regulatory authority must require the [nutritional] statement to be disclosed with regard to restaurant food *as part of nutrition labeling* (and the information must be disclosed pursuant to that authority)."  FDA Br. at 15 (citing 21 U.S.C. § 343-1(a)(4); § 343(q)(5)(A)(i); 21 C.F.R. § 101.13(c)) (emphasis added).

Relying on § 343(r)(1)'s carve out clause, CRA complains that nutritional disclosures on menus and menu boards do not satisfy the FDA's test because they do not "appear as part of the nutrition information required or permitted by" § 343(q).  Pl. Mem. at 16.  But the FDA has rejected this theory.  Ordinance 40-08 requires chain restaurants to disclose nutritional information next to or below each menu item, using a size and type face that is clear and conspicuous.  S.F. Health Code § 468.3(b)(1).  Similarly, restaurants using menu boards must provide calorie information next to or beneath each menu item.  *Id.* § 468.3(c)(1).  As the FDA explains, this placement on menus "is consistent with FDA regulations regarding the placement of nutrition labeling information for foods without labels."  FDA Br. at 16; 21 C.F.R. § 101.45 (providing that nutrition information "should be displayed *at the point of purchase* by an appropriate means such as by a label affixed to the food or through labeling including shelf labels, signs posters, brochures, notebooks, or leaflets that are readily available or in close proximity to the foods") (emphasis added).  The City's Ordinance simply implements this "point of purchase" requirement in the context of restaurant menus and menu boards.

In an attempt to get around the plain meaning of § 343(r)(1), CRA once again advocates a narrow reading of the FDA's own regulations that has been rejected by the FDA.  CRA points to 21 C.F.R. § 101.13(c) for the proposition that a nutrition disclosure must appear "as part of the nutrition *label*" in order to fall within the carve out, and argues that a menu is not a "label."  Pl. Mem. at 18-19.  The FDA, however, interprets its own regulation differently.  According to the FDA:

> [S]ection 101.13(c) should be read in tandem with the statute and consistent with the overall regulatory scheme to mean that a quantitative statement of the amount of a nutrient in a food is not a nutrient content claim when it is part of nutrition labeling consisting of the types of statements required or permitted

1

> under 21 U.S.C. § 343(q), and when it appears, for packaged foods, in the nutrition information section of the food label or, for non-packaged foods that bear no label, as part of the nutrition information for the food in a place appropriate for such information at the point of purchase.

2

3

FDA Br. at 19.  In other words, the FDA interprets the term "nutrition label" as used in 21 C.F.R.

4

§ 101.13(c) to include, in the context of restaurant food, nutrition information whose disclosure is

5

required to be placed on menus or menu boards.  *Id*.

6

As the Supreme Court recently re-affirmed, under *Auer v. Robbins*, 519 U.S. 452 (1997), the

7

FDA's interpretation of its own regulations is controlling unless plainly erroneous or inconsistent with

8

the regulation.  *Riegel v. Medtronic, Inc.*, 128 S. Ct. 999, 1010 (2008); *see also S.E.C. v. Phan*, 500

9

F.3d 895, 904 (9th Cir. 2007) ("We owe substantial deference to an agency's published interpretation

10

of its own regulations"); *Bassiri v. Xerox Corp.*, 463 F.3d 927, 930-31 (9th Cir. 2006) (explaining the

11

distinction between *Skidmore* deference for statutory interpretations and *Auer* deference for

12

regulatory interpretations).  The fact that the FDA's interpretation is set forth in a legal brief does not

13

"make it unworthy of deference" so long as it reflects the agency's "fair and considered judgment on

14

the matter in question" and is not a "post hoc rationalization."  *Auer*, 529 U.S. at 462 (internal

15

quotation marks omitted); *see also Zurich American Ins. Co. v. Whittier Properties, Inc.*, 356 F.3d

16

1132 (9th Cir. 2004) (fact that regulatory agency "communicated its interpretation in the form of an

17

amicus brief does not alter this high level of deference").

18

The FDA's interpretation of 21 C.F.R. 101.13 is not "plainly erroneous or inconsistent with

19

the regulation."  *Auer*, 519 U.S. at 461.  Rather, the FDA's reading comports with the text and

20

purpose of the statute and is the only reading that harmonizes the NLEA's requirements.[7]  *See Bassiri*,

21

463 F.3d at 933 ("When the agency has chosen a definition that comports with the text and purposes

22

of the governing statute and is not 'decidedly irrational,' it is not [this court's] place to second-guess

23

its judgment.").  Moreover, deference is particularly appropriate here because the FDA's view has

24

been consistent over the years as explained in I.B.2 *supra*.  *See id.* (special deference is due where

25

26

---

[7] If the Court were to adopt CRA's narrow interpretation of 21 C.F.R. § 101.13(c), the Court would have to conclude that the regulation is void.  As the FDA explained, CRA's interpretation would render § 101.13(c) inconsistent with the NLEA and therefore it would not be a valid regulation.  FDA Br. at 18.

27

28

agency's opinion "reflect[s] a consistent view over an extended period of time"). Because CRA's

entire preemption argument rests on its overly narrow reading of 21 C.F.R. § 101.13, the controlling

weight given to the FDA's interpretation of its own regulations is determinative in this case.

### 4. CRA's Argument That Ordinance 40-08 Regulates "Claims" Does Not Harmonize The Provisions Of The NLEA

As the foregoing makes clear, CRA's reading does not "harmonize" the statute. Rather, CRA's

cramped reading of the regulation is "contrary to both the plain text of the statute and its broader

purpose." FDA Br. at 19. Because § 343(q) removes the FDA's authority to require nutritional

labeling of restaurant foods, CRA effectively asks this Court to hold that in adopting the NLEA,

Congress created a regulatory vacuum in which neither the states nor the FDA are permitted to

require nutritional disclosures in restaurants. As the FDA and Southern District of New York

explained, however, this reading "would read out of existence the state authority preserved by § 343-

1(a)(4) and would result in the preemption under § 343-1(a)(5) of virtually all state regulations

requiring restaurants to provide nutrition information." *NYSRA I*, 509 F. Supp. 2d at 362; FDA Br. at

18 (restaurants' reading would exclude most restaurant food "from the reach of *all* governmental

authority to require nutrition labeling"). Nothing in the NLEA's legislative history suggests that

Congress intended to prevent *both* federal and state governments from requiring nutritional

information disclosures in restaurants.[8]

Because CRA's reading would render the exception clause in § 343-1(a)(4) superfluous,

CRA's interpretation violates the basic rule of statutory construction that every clause must have

meaning. *Duncan v. Walker*, 533 U.S. 167, 174 (2001). It also ignores "the obvious intent of

---

[8] CRA claims that its interpretation of the NLEA does preserve a "role for the states." Pl. Mem. at 20. But the "role for the states" it suggests is simply nonsensical. CRA asserts that a local law that (1) requires "full nutrition information labeling in accordance with subsection (q)," and (2) allows restaurants to post such labeling in a range of formats in accordance with 21 C.F.R. Sections 101.10 and 101.45, would not be preempted. Pl. Mem. at 20. But, by its plain terms, Section 101.10 only applies when restaurants make Section 343(r) claims: it provides the standards for nutrition labeling of restaurant food "for which a nutrient content claim … or health claim…is made." 21 C.F.R. § 101.10. Under § 101.10, when a restaurant makes a § 343(r) claim and thus has to present nutrition information, it may do so using the various forms allowed in § 101.45. Section 101.10 has no application where, as here, a local government requires the nutritional disclosures that are governed under § 343(q), not under § 343(r).

Congress in drafting § 343-1(a)(4), which explicitly preserves state authority to impose nutrition labeling requirements on restaurants." *NYSRA II*, 2008 WL 1752455 at * 5. "A far more persuasive reading," and the reading that this Court is required to adopt in light of the presumption against preemption, "is that Congress chose not to exercise [its power to require labeling in restaurants] and explicitly left it to the states to do so." *Id.* (citing 21 U.S.C. § 343(q) and § 343-1(a)(4)); *Medtronic*, 518 U.S. at 485 (Congress' intent to preempt state law must be "clear and manifest").

For these reasons, CRA cannot overcome the strong presumption against federal preemption in this case and is not entitled to declaratory or injunctive relief on this claim.

## II.    ORDINANCE 40-08 IS NOT PREEMPTED BY THE CALIFORNIA RETAIL FOOD CODE

CRA contends that Ordinance 40-08 is preempted by the express preemption clause contained within the California Retail Food Code ("CRFC"), Cal. Health & Safety Code § 113703 *et seq*. Local legislation is expressly preempted if it "enters an area 'fully occupied' by general law when the Legislature has expressly manifested its intent to fully occupy the area."[9] *Big Creek Lumber Co. v. County of Santa Cruz*, 38 Cal. 4th 1139, 1150 (2006). Under California law, a court analyzing a preemption claim must start with the presumption that the local law is valid. *Id.* at 1149. That presumption is particularly strong here, because "when local government regulates in an area over which it traditionally has exercised control, . . . California courts will presume, absent a clear indication of preemptive intent from the Legislature, that such regulation is *not* preempted by state statute." *O'Connell v. City of Stockton*, 41 Cal. 4th 1061, 1069 (2007) (emphasis in original); CAL. CONST. art. XI, § 7. Plaintiff's cursory and misleading analysis fails to satisfy this burden.

Ordinance 40-08 does not "enter into an area fully occupied by" the CRFC. *Big Creek Lumber*, 38 Cal. 4th at 1150. The CRFC is a food safety law that was enacted to "safeguard public health and provide to consumers food that is safe, unadulterated, and honestly presented through

---

[9] Municipal laws can also be preempted where they duplicate state law, are contradictory to state law, or where the legislature has "clearly indicate[d]" an intent to preempt the field addressed by the municipal law. *California Rifle & Pistol Ass'n, Inc. v. City of West Hollywood*, 66 Cal. App. 4th 1302, 1317 (1998); *Great Western Shows, Inc. v. County of Los Angeles*, 27 Cal. 4th 853, 862 (2002). CRA, however, relies exclusively on express preemption, and has not made any showing relevant to the other theories of preemption. Pl. Mem. at 21.

1  adoption of science-based standards."  Cal. Health & Safety Code § 113703 (2007); s*ee also*

2  Schwarzenegger Signing Statement concerning S.B. 144 (2006), attached here as Exhibit 8 to Steeley

3  Decl. (stating that CRFC's purpose is to "protect[ ] the safety of California's retail food").  To further

4  this purpose, the Legislature adopted uniform "health and sanitation standards" for restaurants and

5  preempted local regulations in this field to "assure the people of this state that the food will be pure,

6  safe, and unadulterated."  Cal. Health & Safety Code § 113705.  These statements of purpose by the

7  Legislature, which immediately precede the preemption language relied upon by CRA, demonstrate

8  that in enacting the CRFC, the Legislature understood the preempted "field" to relate to the purity,

9  safety, and adulteration of food.  Nothing in the CRFC's text or legislative history suggests that

10 "health and sanitation" encompasses nutrient content disclosures that allow the public to make

11 healthier choices when dining out.

12         The CRFC's legislative history also makes clear that restaurant menu labeling requirements do

13 not fall within the field of "health and sanitation" as that field has been understood for decades.  The

14 express preemption provision relied upon by CRA originated in 1984 when the Legislature enacted

15 the California Uniform Retail Food Facilities Law ("CURFFL") to consolidate three prior food safety

16 codes, including the California Restaurant Act.  *See* CURFFL § 27501, attached here as Exhibit 6 to

17 the Steeley Decl.  The California Restaurant Act divided its provisions into "sanitation" requirements

18 and "health" requirements.  The provisions addressing "sanitation" listed food safety requirements

19 such as proper waste disposal, standards for washing utensils, and food storage.  The provisions

20 addressing "health" created food handling standards for restaurant employees, including hand

21 washing requirements, prohibitions on smoking tobacco while preparing food, and prohibitions on

22 allowing employees with communicable diseases to work in restaurants.  *See* California Restaurant

23 Act, attached as Exhibit 7 to the Steeley Decl.  Nothing in the California Restaurant Act or the

24 CURFFL suggested that the fields of "health" or "sanitation" concerned nutrition, food labeling,

25 consumer disclosures, or any matters other than those affecting purity, cleanliness and food borne

26 illness.  In short, the CRFC (and its predecessor statutes) are intended to prevent restaurant conditions

27 reminiscent of Upton Sinclair's "The Jungle."  This is far different from the intent of Ordinance 40-

28 08, which aims to help restaurant patrons avoid the experience depicted in the film "Super Size Me."

1    Despite the CRFC's statement of purpose and legislative history to the contrary, CRA asserts

2    that Ordinance 40-08 falls within the state's preempted "field of health and sanitation" because the

3    CRFC contains a single section that requires nutritional labeling on packaged foods to comply with

4    the requirements of the state's Sherman Food, Drug, and Cosmetic Law.[10]  Pl. Mem. at 21 (citing Cal.

5    Health & Safety Code § 114089 (a), (b)(5)).  This sole reference to packaged food labeling amidst the

6    CRFC's extensive requirements concerning food safety and purity does not show any legislative

7    intent to change the established understanding of the "field of health and sanitation" and preempt

8    nutrition labeling requirements for restaurants.  *See Bravo Vending,* 16 Cal. App. 4th at 400.  Much

9    less does it provide a "clear showing" of Legislative intent to preempt, as the case law requires.

10    In *Bravo Vending*, the court faced the task of construing an express preemption clause to

11    determine if it preempted a local ordinance that prohibited the sale of cigarettes through vending

12    machines.  Relying on a decision from the California Supreme Court, the court explained that "a

13    potentially preemptive field of state regulation is an area of legislation which includes that subject of

14    the local legislation, and is sufficiently logically related so that a court, or a local legislative body, can

15    detect a patterned approach to the subject." *Id.* (quoting *Fisher v. City of Berkeley*, 37 Cal. 3d 644,

16    707-08 (1984) (internal punctuation omitted)).  Because the state statute contained only a "solitary"

17    section that related to the sale of cigarettes through vending machines, the court concluded that the

18    statute did not "constitute . . . a pattern of regulation" concerning vending machine sales of cigarettes,

19    and thus the local regulation was not preempted.  *Id.*

20    The same reasoning applies here.  The CRFC contains only one reference to food labeling,

21    and that section applies only to packaged food, not food sold in restaurants.  That solitary reference

22    contrasts with the CRFC's voluminous food safety requirements addressing topics such as employee

23    health and hygiene; food service/storage temperature; cleaning and sanitizing of equipment; use and

24    storage of equipment, linens, and utensils; water, plumbing, and waste; physical facilities (including

25    vermin control, lighting, and toilet facilities), and other food safety issues.  *See* Cal. Health & Safety

26    _____

    [10] The Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 110660 *et seq.*,
27    requires that nutritional labeling on packaged foods comply with the requirements of the Federal
    Food, Drug and Cosmetic Act.

28

1  Code §§ 113700-114371 (2007).  The only "pattern of regulation" evident in the CRFC concerns food

2  purity, safety and adulteration, not nutritional disclosures.  *Bravo Vending*, 16 Cal. App. 4th at 400.

3  Ordinance 40-08 is not preempted by the California Retail Food Code.[11]

4  **III.    ORDINANCE 40-08 DOES NOT VIOLATE THE FIRST AMENDMENT**

5         CRA's claim that nutrition disclosure requirements violate restaurants' First Amendment rights

6  is completely contrary to settled law.  *NYSRA II*, 2008 WL 1752455 at *6-*11.  Indeed, under CRA's

7  reasoning, countless federal and state factual disclosure laws such as mandatory health warnings on

8  cigarette packages (Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1333) and the

9  "Nutrition Facts" panel on packaged foods (NLEA, 21 U.S.C. § 343), would constitute impermissible

10  compelled speech.  "Such a result is neither wise nor constitutionally required."  *Nat'l Elec. Mfrs.*

11  *Ass'n v. Sorrell*, 272 F.3d 104, 116 (2d Cir. 2001).

12         **A.    *Zauderer*'s Rational Basis Test Provides The Proper Standard Of Review For
                Ordinance 40-08**

13         To the extent that Ordinance 40-08 implicates First Amendment interests, *Zauderer v. Office*

14  *of Disciplinary Counsel*, 471 U.S. 626 (1985) provides the proper standard of review in this case.  *See*

15  *NYSRA II*, 2008 WL 1752455 at * 8 (applying *Zauderer* to New York City's calorie disclosure rule).

16  Under *Zauderer*, Ordinance 40-08 does not violate the First Amendment rights of restaurants because

17  it is reasonably related to the City's significant, and certainly legitimate, interest in curbing obesity

18  and its associated health risks.  *See id.*

19         **1.    *Zauderer* Is Controlling Because Ordinance 40-08 Requires Disclosure Of
                Purely Factual Commercial Information**

20         In *Zauderer*, the Supreme Court set forth the standard of review for government regulations

21  like Ordinance 40-08 that require disclosure of "purely factual and uncontroversial" commercial

22

23  _____

24         [11] Unable to establish preemption based on the CRFC, CRA makes the puzzling argument that
    Ordinance 40-08 is preempted because the state legislature recently passed a menu labeling bill that
    was subsequently vetoed by the Governor.  The Governor's veto, however, has no preemptive effect.
25  *See O'Connell v. City of Stockton*, 27 Cal. Rptr. 3d 696, 719 (2005) (rejecting inference about intent
    to preempt local regulation based on Governor's veto); *Baldwin v. County of Tehama*, 31 Cal. App.
26  4th 166, 181 (1995) (declining to read "legislative history tea leaves" based on Governor's veto of
    legislation and its later enactment with amendments); *see also Arnett v. Dal Cielo*, 14 Cal. 4th 4, 29
27  (1996) ("Unpassed bills, as evidences of legislative intent, have little value.") (internal quotations
    omitted).

28

1    information.  *Zauderer*, 471 U.S. at 651.  At issue in *Zauderer* was an Ohio disciplinary rule

2    requiring attorneys to disclose certain information relating to contingent-fee arrangements in their

3    advertising.  *Id.* at 633.  In reviewing that rule, the Court noted that disclosure requirements do not

4    prevent the speaker from "conveying information to the public" but rather merely "require[ ] them to

5    provide somewhat more information than they might otherwise be inclined to present."  *Id.* at 650.

6    The Court observed that the "constitutionally protected interest in not providing any particular factual

7    information . . . is minimal."  *Id.* at 651.  Thus, factual disclosure requirements "trench much more

8    narrowly . . . than do flat prohibitions on speech" and require a lower standard of review than the

9    intermediate scrutiny standard applied to restrictions on speech under *Central Hudson Gas & Elec.*

10   *Crop. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980).  *Id.*  Regulations requiring factual

11   disclosures will be sustained if they are "reasonably related" to the State's legitimate interest in

12   "dissipat[ing] the possibility of consumer confusion or deception."  *Id.* (quoting *In re R.M.J.*, 455

13   U.S. 191, 201 (1982)).

14           Following *Zauderer*, the Ninth Circuit has upheld government-mandated disclosures of

15   factual information very much like Ordinance 40-08.  *See, e.g. Envtl. Def. Ctr., Inc. v. E.P.A.*, 344

16   F.3d 832 (9th Cir. 2003) (upholding EPA rule requiring municipal operators of storm sewer systems

17   to provide educational materials to the public about the impact of storm water discharges and the

18   hazards of improper waste disposal); *United States v. Schiff*, 379 F.3d 621 (9th Cir. 2004) (upholding

19   court order requiring company to post preliminary injunction on its commercial website).  Other

20   circuits have similarly upheld factual disclosure requirements applying *Zauderer*'s reasonable

21   relationship test.  *See Sorrell*, 272 F.3d at 115 (upholding Vermont statute requiring manufacturers to

22   label products with mercury warnings as rationally related to the government's legitimate interest in

23   "protecting human health"); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294 (1st Cir. 2005)

24   (upholding requirement that pharmacy benefit managers disclose conflicts of interest and financial

25   arrangements with third parties).

26           Here, Ordinance 40-08 requires chain restaurants to disclose to their customers purely factual

27   information about the menu items they sell.  Specifically, it requires them to disclose the amount of

28   calories for each menu item on menu boards and the amount of calories, fat, carbohydrates and

sodium "next to or beneath" each menu item on menus.  Health Code § 468.3(a)-(c).  It also requires

that the menu state the federally recommended daily limits for calories, fat and sodium.  *Id.*

§ 468.3(b)(2).  Because it requires disclosure of purely factual information, Ordinance 40-08 is no

different than numerous other commercial disclosure requirements mandated by federal and state law,

including the NLEA's nutrition facts panel.  *See, e.g.*, 21 U.S.C. § 343(q)(1) (nutritional labeling); 15

U.S.C. § 78 l (securities disclosures); 15 U.S.C. § 1333 (tobacco labeling); 21 C.F.R. § 202.1

(disclosures in prescription drug advertisements).

Because Ordinance 40-08 requires the posting of "'purely factual and uncontroversial'

commercial information," the "reasonableness" standard set forth in *Zauderer* is the proper

framework to apply in determining whether Ordinance 40-08 violates the First Amendment.

*Zauderer*, 471 U.S. at 651.

## 2.    *Zauderer* Is Not Limited To Laws Necessary To Prevent Consumer Deception

CRA attempts to avoid application of *Zauderer*'s reasonable relationship test by claiming that

*Zauderer* is limited to factual disclosure requirements "necessary to prevent deception."  Pl. Mem. at

29-30.  Nothing in the Court's reasoning, however, limited the application of *Zauderer* to the state's

particular interest in that case of preventing consumer confusion or deception.  The Ninth Circuit and

other circuits have made clear that *Zauderer's* rational basis test can be satisfied by any legitimate

governmental interest, not only the specific rationale of consumer confusion or deception presented in

*Zauderer*.  *See, e.g., Envtl. Def. Ctr., Inc.*, 344 F.3d at 848 (applying *Zauderer* where the disclosure's

purpose was to inform the public about "the general public hazards associated with illegally

discharged and improper disposal of waste"); *Sorrell*, 272 F.3d at 115 (upholding required disclosure

regarding mercury-containing products even though it was not intended to prevent consumer

deception but rather "to better inform consumers about the products they purchase").

Plaintiff's claim that the Supreme Court's decision in *United States v. United Foods, Inc.*, 544

U.S. 405 (2001)*,* limited *Zauderer* to situations where the government seeks to counter actual

deception is also unavailing and was properly rejected by the district court in *NYSRA II*.  *See NYSRA*

*II*, 2008 WL 1752455 at * 10.  In its sole reference to *Zauderer,* the Court in *United Foods* noted that

while in *Zauderer* there was a concern regarding misleading consumers, in *United Foods* there was

no such concern. *See United Foods*, 533 U.S. at 416. This reference provides no support for the

notion that *United Foods* limited the scope of *Zauderer*. *See NYSRA II*, 2008 WL 1752455 at * 10;

*see also Sorrell,* 272 F.3d at 115.

Even if this Court were to accept Plaintiff's unfounded assertion that *Zauderer* is limited to

regulations aimed at protecting "consumers who might otherwise be misled," Pl. Mem. at 29,

Ordinance 40-08 satisfies this standard. Ordinance 40-08 aims not only to promote informed

consumer decision-making but also to "dissipate the possibility of consumer confusion or deception."

*Zauderer*, 471 U.S. at 651; Health Code § 468.1. As the *NYSRA II* court pointed out, the state's

interest in preventing deception "may include an interest in remedying consumers' ignorance or

misinformation regarding the products they purchase." *NYSRA II*, 2008 WL 1752455 at * 10.

Evidence demonstrates widespread consumer confusion and even deception regarding the

calorie content of chain restaurant meals. Katz Decl. ¶¶ 26-29, 74-76; Wootan Decl. ¶ 14-16. A

recent study found that calories in restaurant items are *two times* more than what consumers expect.

Katz Decl. ¶ 37. Even trained nutrition professionals consistently underestimate the calorie content

of restaurant foods by 200 to 600 calories. *Id.* ¶ 38. Moreover, as the Ordinance's Legislative

Findings explain: "[T]he fact that chain restaurants' serving sizes are so varied and large, and their

prices are so low, can mislead and even deceive the public regarding the amount of an actual serving

size and how many calories a portion contains." Health Code § 468.1. For example, at Burger King,

a seemingly more healthy option of a salad can have more calories than a Whopper with cheese. *Id.* ¶

39. An "individual size" pizza from Uno Chicago Grill contains 2,310 calories, more than the total

daily-recommended amount, and uses a deceptive serving size to obscure this fact from consumers.

*Id.* ¶ 76. Indeed, it is common for restaurant meals to contain two to three times more than what is

considered a standard serving size. Wootan Decl. ¶ 13.

In New York City, where its calorie-posting rule recently took effect, New Yorkers' "sticker

shock" demonstrates how deceptive menu offerings can be. Bassett Decl. ¶ 6. As reported by one

news outlet, a customer of T.G.I. Friday's was shocked to learn that a salad has 1,360 calories: "'That

surprised me the most because they market it as a healthy option,' she said. 'It's like false advertising.

You think it's better than the burger and the fries. It's misleading.' (The cheeseburger served with fries is … 1,290 calories.)."  Roni Caryn Rabin, *New Yorkers Try To Swallow Calorie Sticker Shock,* MSNBC.com, July 16, 2008, http://www.msnbc.msn.com/id/25464987/.

Thus, even if *Zauderer* were limited to regulations addressing consumer confusion or deception (which it is not), *Zauderer* would nonetheless control this case because evidence shows that consumers are confused and misled by menu offerings, portion sizes and corresponding pricing.

### 3. *United Foods* Is Inapplicable Because Ordinance 40-08 Does Not Compel Restaurants To Subsidize Or Voice A Message With Which They Disagree

CRA also claims that Ordinance 40-08 should be reviewed under the heightened scrutiny reserved for compelled speech in *United Foods* because it forces restaurants to "voice a message" with which they disagree.  Specifically, CRA contends that the Ordinance requires the covered restaurants to voice "two different government viewpoints": (1) that patrons must consider calories when ordering food, and (2) that calories are the only piece of nutritional information patrons should consider when ordering.  Pl. Mem. at 24.

CRA's argument ignores that the compelled speech doctrine does not apply to mandatory disclosures of "purely factual and uncontroversial information" in the commercial context.  *Hurley v. Irish-American Gay, Lesbian And Bisexual Group Of Boston*, 515 U.S. 557, 573 (1995) (quoting *Zauderer*, 471 U.S. at 651); *see also NYSRA II*, 2008 WL 1752455 at * 9 ("[M]andatory disclosure of factual and uncontroversial information is not the same, for First Amendment purposes, as the compelled endorsement of a viewpoint.") (internal quotation marks omitted).  The Supreme Court has recognized only two kinds of compelled speech cases: (1) true "compelled-speech" cases, in which "an individual is obliged personally to express a message he disagrees with," and (2) "compelled-subsidy" cases, in which an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity.  *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005).  *United Foods* concerned the latter, a federal mandatory assessment against mushroom producers that was used to fund "generic advertising of mushroom sales."  533 U.S. at 408.  In that case, the respondent disagreed with the advertisements promoting mushrooms generally, instead preferring to convey the message that its mushrooms were superior to others.  *Id*. at 411.  The Court

1    held that the compelled subsidy forced the respondent to subsidize the "message" that "mushrooms

2    are worth consuming whether or not they are branded," and thereby subsidize speech on one "side" of

3    a "debate." *Id*.

4        Ordinance 40-08 in no way resembles the compelled subsidy at issue in *United Foods*.  The

5    "City is simply requiring restaurants to report 'factual and uncontroversial' information – the number

6    of calories in its products;" it does not force restaurants to voice a "message" or "to take a position in

7    any ongoing debate." *NYSRA II*, 2008 WL 1752455 at * 9; *see also Envtl. Def. Ctr., Inc.*, 344 F.3d at

8    850 ("Informing the public about safe toxin disposal is non-ideological; it involves no 'compelled

9    recitation of a message' and no 'affirmation of belief.'"); *United States v. Schiff*, 379 F.3d at 631

10    (posting preliminary injunction on commercial website did not force company to "promote an

11    ideological position").

12        CRA's restaurant members do not disagree with the factual information that they are required

13    to post (*i.e.*, numbers or amounts of calories, fat, carbohydrates and sodium).  Rather, they disagree

14    with having to provide the information in the first place.  CRA complains that the restaurants believe

15    that "there are better ways to communicate with their customers about health and nutrition," and "an

16    overemphasis on a limited number of nutrients [] can interfere with a healthy, balanced diet."  Pl.

17    Mem. at 2.  But Ordinance 40-08 "does not require any statement, express or implied, regarding the

18    relative nutritional importance of calories or whether a food purchaser ought to consider this

19    information." *NYSRA II*, 2008 WL 1752455 at * 9.  In fact, the Ordinance expressly allows chain

20    restaurants to provide additional nutritional information.  *See* S.F. Health Code § 468.3(a).

21        Nor does Ordinance 40-08 "prevent any [C]RA member from contesting the City's views on

22    these issues" or voicing its own views about the relevance of these disclosures.  *NYSRA II*, 2008 WL

23    1752455 at * 8; *see also Envtl. Def. Ctr.*, 344 F.3d at 850 (observing that disclosure rule did not

24    prevent groups from "stating its own views").  And there is nothing to stop a restaurant from saying

25    on its menu or menu board that "an overemphasis on a limited number of nutrients [] can interfere

26    with a healthy, balanced diet," Pl. Mem. at 2, or that "its dissemination of [nutrition] information [i]s

27    required by [City] law." *Envtl. Def. Ctr., Inc.*, 344 F.3d at 850.

28

"Of course, it would be possible to recast any disclosure requirement as a compelled 'message' in support of the policy views that motivated the enactment of that requirement." *NYSRA II*, 2008 WL 1752455 at * 9. Indeed, under CRA's reasoning, "[i]nnumerable federal and state regulatory programs [that] require the disclosure of product and other commercial information" would be vulnerable "to searching scrutiny by unelected courts." *Sorrell*, 272 F.3d at 116 (citing numerous federal disclosure requirements). But, as discussed above, "the mandatory disclosure of 'factual and uncontroversial' information is not the same, for First Amendment purposes, as the compelled endorsement of a viewpoint." *NYSRA II*, 2008 WL 1752455 at * 9.

In sum, Ordinance 40-08 compels disclosures of purely factual information, not a message or a viewpoint. CRA's attempt to eliminate the distinction between compelled factual disclosures and compelled speech must be rejected as a matter of law.

### 4. *Central Hudson* Is Inapplicable Because Ordinance 40-08 Does Not Restrict Speech

Finally, CRA claims that if Ordinance 40-08 is not treated as "compelled speech" under *United Foods*, it should be analyzed under *Central Hudson*. Pl. Mem. at 32. As explained *supra*, *Central Hudson's* intermediate scrutiny test provides the standard of review for *restrictions* on commercial speech, while regulations that compel "purely factual and uncontroversial" commercial information are subject to more lenient review under *Zauderer*. *Zauderer*, 471 U.S. at 651 n.14; *Central Hudson*, 447 U.S. at 562-565; *NYSRA II*, 2008 WL 1752455 at * 9.

Ordinance 40-08 does not restrict speech. It does not prevent CRA's members from stating their own views about the relative importance of the nutritional components of their foods or about the merits of Ordinance 40-08. *See Envtl. Def. Ctr., Inc.*, 344 F.3d at 850 (observing that EPA rule does not prohibit operator "from stating its own views about the proper means of managing toxic materials, or even about the [] Rule itself"). Instead, Ordinance 40-08 is an "attempt to address a state policy interest by making information available to consumers, consistent with the First Amendment objective, with respect to commercial speech, of providing consumers with 'complete and accurate commercial information.'" *NYSRA II*, 2008 WL 1752455 at *8. Because Ordinance 40-08 does not suppress expression, *Central Hudson* is inapplicable.

**B.     Ordinance 40-08 Is Constitutional Under Either *Zauderer* Or *Central Hudson***

CRA does not even attempt to argue that Ordinance 40-08 fails the "reasonable relationship" test of *Zauderer* and therefore concedes that the City satisfies this standard.  *See* Pl. Mem. at 22-32. Instead, it argues that the Ordinance fails the more stringent *Central Hudson* test.  But under either test, Ordinance 40-08 does not violate the First Amendment.

**1.     Ordinance 40-08 Is Constitutional Under *Zauderer***

As CRA concedes, Ordinance 40-08 easily satisfies *Zauderer* because it is reasonably related to the City's legitimate interest in combating obesity.  Requiring nutrition disclosures in restaurants is "an entirely reasonable approach to the City's goal of reducing obesity."  *NYSRA II*, 2008 WL 1752455 at * 12.  Accordingly, if this Court concludes that *Zauderer* supplies the proper standard in this case, it is undisputed that the Ordinance does not violate the First Amendment.

**2.     Ordinance 40-08 Is Constitutional Under *Central Hudson***

Even if this Court were to conclude that *Central Hudson* applies – a point the City does not concede – Ordinance 40-08 would easily survive constitutional scrutiny under that standard as well. Under *Central Hudson*, courts must engage in the following inquiry:

> At the outset, we must determine whether the expression is protected by the First Amendment.  For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading.  Next, we must determine whether the asserted governmental interest is substantial.  If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566.  Although CRA claims that the City cannot satisfy the last two factors, Pl. Mem. at 25, the Ordinance directly advances public health and is narrowly tailored to achieve its goal.

**a.     The Ordinance Directly Advances The City's Interest In Public Health**

The third prong of *Central Hudson* asks "whether the regulation directly advances the governmental interest asserted."  *Central Hudson*, 447 U.S. at 566.  This prong "require[s] only that, in the commercial context, the speech-restrictive means chosen provide more than 'ineffective or remote support' for a legitimate governmental policy goal."  *Ass'n of Nat'l Advertisers, Inc. v. Lungren*, 44 F.3d 726, 732 (9th Cir. 1994) (quoting *Central Hudson*, 447 U.S. at 564).

1    There is clearly "more than ineffective or remote support" for the proposition that menu

2  labeling will lead restaurants to reformulate their menu offerings and at least some San Franciscans to

3  select lower calorie meals when eating at chain restaurants, thereby reducing the rate of obesity in the

4  City.  Katz Decl. ¶¶ 40-42, 46.  The dramatic rise in obesity throughout the United States in the last

5  25 years has coincided with a rapid rise in consumption of away-from-home foods.  *Id.* ¶¶ 25-28;

6  Health Code § 468.1.  As the FDA has concluded, "[e]ating out more frequently is associated with

7  obesity, higher body fatness, and higher body mass index."  *Id.* ¶¶ 29-35.  Even though Americans are

8  eating most of their meals away from home, they have little understanding of the contents of

9  restaurant food, and consistently underestimate the calories in restaurant food.  *Id.* ¶¶ 36-39.

10    Scientific research demonstrates that menu labeling leads consumers to make more healthful

11  choices.  Numerous studies show that when nutritional information is provided to consumers at the

12  point of purchase, they change their purchasing habits based on this information.  Health Code

13  § 468.1; Katz Decl. ¶¶ 40-43; Wootan Decl. ¶¶ 17-18.  And given that even modest changes in calorie

14  intake can affect weight, minor changes in behavior can have major impacts.  Katz Decl. ¶ 23.  As the

15  Los Angeles Department of Public Health study demonstrates, even if menu labeling leads consumers

16  to only reduce their daily calorie intake by 100 calories, that would result in a dramatic reduction in

17  the City's obesity rate.  *Id.* ¶ 42.  Another benefit of menu labeling is that it is likely to cause

18  restaurants to reformulate their menus to offer healthier options.  Katz Decl. ¶ 46; Wootan Decl. ¶ 21.

19    CRA complains that Ordinance 40-08 applies to only 273 of 5,000 restaurants in the City.  Pl.

20  Mem. at 26.  In fact, Ordinance 40-08 applies to approximately 372 of San Francisco's 4,500

21  restaurants, or approximately 12%.  Katz Decl. ¶ 27.  Given the correlation between eating at chain

22  restaurants and increased caloric intake, and the increased rate at which Americans are eating at chain

23  restaurants, focusing disclosure requirements on chain and fast food restaurants directly advances the

24  City's goal.  *Id.* ¶¶ 27-35, 59.  Moreover, as the Supreme Court has recognized, "[a]s a general matter,

25  governments are entitled to attack problems piecemeal …."  *Zauderer*, 471 U.S. 626, 651, n.14.

26    CRA also points to a declaration submitted in *NYSRA II* by Dr. David Allison which

27  concludes that there is not "competent and reliable evidence that providing restaurant patrons with

28  calorie information on menu items will reduce individual or population levels of obesity."  DeMuth

1  Decl. Exh. E (Allison Decl. at 29-30).[12]  But as the district court pointed out in *NYSRA II*, Dr. Allison

2  conceded that "it is reasonable to conjecture that providing calorie information at the point of

3  purchase in restaurants (especially in fast food restaurants) might be beneficial in reducing obesity

4  levels."  *NYSRA II*, 2008 WL 1752455 at * 12 (quoting Allison Decl. ¶¶ 14, 33).

5      Early evidence coming out of New York City's recent implementation of its calorie posting

6  law provides concrete proof that the benefits of menu labeling are not mere "conjecture."  New

7  Yorkers, shocked by the high calorie counts of their favorite menu items, are changing their daily

8  eating routines and picking more healthful alternatives.  Bassett Decl. ¶ 8.  Upon realizing the calorie

9  counts of Dunkin' Donuts baked goods and Starbucks pastries, consumers are switching to healthier

10  breakfast options and smaller sized beverages.  *See id.* ¶¶ 6, 8 (Starbucks customer describing picking

11  "low-fat coffee cake instead of the regular cake" because it is 150 calories less); Lenore Skenazy,

12  *Snacking Delusions Destroyed By NYC Calorie-Posting Law*, ADVERTISING AGE, July 7, 2008,

13  *available at* http://adage.com/print?article_id=128146; Roni Caryn Rabin, *New Yorkers Try To*

14  *Swallow Calorie Sticker Shock,* MSNBC.com, July 16, 2008, at

15  http://www.msnbc.msn.com/id/25464987/.  There is also evidence that New York City's menu

16  labeling law is causing chain restaurants to reformulate their menus to make offerings healthier.

17  Bassett Decl. ¶ 7.  Thus, in addition to the studies citied in Dr. Katz and Wootan's declarations, New

18  York City's recent experience provides real-world proof of how menu labeling directly advances the

19  City's interest in promoting public health and reducing obesity by encouraging informed decision-

20  making, healthier consumer choices, and menu reformulation.  *Id.* ¶ 7.

21

22

23

24  [12] Dr. Allison's declaration should not be accepted by this Court.  CRA was apparently unable to obtain a declaration from Dr. Allison that addresses Ordinance 40-08 or that takes into account

25  New York City's recent first-hand experience with menu labeling and other new evidence.  After serving as a paid declarant in *NYSRA II*, Dr. Allison resigned as incoming president of *The Obesity*

26  *Society*, an organization which supports menu labeling, as a result of the controversy that arose because the positions Dr. Allison took in his declaration "ran counter to the conventional thinking in

27  his field."  *See* Stephanie Saul, *Menu Fight Over Calories Leads Doctor to Reject Post*, NEW YORK TIMES, *available at* http://www.nytimes.com/2008/03/04/business/04obese.html.

28

### b. The Ordinance Is Not More Extensive Than Necessary To Serve The City's Interest

The fourth prong of the *Central Hudson* test is "whether [the law] is not more extensive than is necessary to serve [the governmental] interest." *Central Hudson*, 447 U.S. at 566. The Supreme Court has rejected the "least restrictive" approach to the regulation of commercial speech; instead, the City must demonstrate a "reasonable" fit. *United States v. Edge Broadcasting*, 509 U.S. 418, 429 (1993); *see also Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1111 (9th Cir. 2004) (requiring "reasonable fit" which "need not be perfect nor the single best to achieve those ends").

CRA claims that Ordinance 40-08 is more extensive than necessary because some chain restaurants currently disclose nutritional information on websites, brochures, tray liners, etc. and this voluntary regime is adequate to accomplish the City's goals. Pl. Mem. at 27-28. But evidence shows that the existing regime of voluntary disclosures advocated by CRA is ineffective. Katz Decl. ¶¶ 47-55; Wootan Decl. ¶¶ 31-38. In fact, at least half of chain restaurants do not currently make *any* nutritional information available *anywhere*. Katz Decl. ¶ 47. And while some restaurants may make nutritional information available through their websites or online, without information at the point of purchase, few consumers actually see this information or use it to make healthier choices. Katz Decl. ¶¶ 50-55; Bassett Decl. ¶ 4; Wootan Decl. ¶¶ 31-38.

Studies including those commissioned by the FDA show that nutritional information is most valuable, and most likely to be used by consumers in their decision-making when it is provided at the point of purchase. Katz Decl. ¶¶ 56-57; Wootan Decl. ¶ 28. That is because, as CRA admits, menus and menu boards are restaurants' "most prominent and valuable communications tool" with customers. Pl. Mem. at 32. And that is why the FDA, the Surgeon General, and countless public health organizations, support direct disclosures at restaurants as an effective means of reducing obesity. Katz Decl. ¶ 56. There is clearly a "reasonable fit" between Ordinance 40-08's disclosure requirements and the City's legitimate interest in reducing obesity.

In sum, Ordinance 40-08 directly advances the City's substantial interest in promoting public health by both reducing consumers' inaccurate perceptions about food sold in restaurants, enabling consumers to make healthier choices, and encouraging reformulation of menu offerings. Its focus on

menus and menu boards at fast food and chain restaurants is a "reasonable fit" for accomplishing this goal.  Where the government has adopted a reasonable regulation to protect public safety, the public interest weighs heavily against injunctive relief.  *Hale v. Dep't of Energy*, 806 F.2d 910, 918 (9th Cir. 1986); *see also Ft. Funston Dog Walkers v. Babbitt*, 96 F. Supp. 2d 1021, 1032 (N.D. Cal. 2000) (a strong showing is required for preliminary injunctive relief where a party seeks to enjoin "governmental action taken in the public interest pursuant to a statutory or regulatory scheme").

For all the foregoing reasons, this court should deny CRA's motion for preliminary injunctive relief on its First Amendment claim.

## IV.   CRA'S CLAIM UNDER ARTICLE I OF THE CALIFORNIA CONSTITUTION ALSO FAILS

For the same reasons that CRA's First Amendment claim fails, so too does its free speech claim under Article I, Section 2 of the California Constitution ("Article I").

### A.   The Reasonable Relationship Test Applies Under Article I Of The California Constitution

As in the First Amendment context, the reasonable relationship test from *Zauderer* applies to CRA's claim under the Article I of the California Constitution.  And as explained *supra*, Ordinance 40-08 easily passes that test.

The California Supreme Court has held that decisions of the United States Supreme Court "are entitled to respectful consideration []and ought to be followed unless persuasive reasons are presented for taking a different course."  *People v. Teresinski*, 30 Cal. 3d 822, 836 (1982) (citation omitted); *see also Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949-970 (2002) (applying United States Supreme Court decisions to both California and federal constitutional free speech claims).  Accordingly, like federal courts, California courts apply the *Zauderer* reasonable relationship test to factual commercial disclosure requirements.  *See People v. Anderson*, 235 Cal. App. 3d 586, 591 (1991) (citing *Zauderer* and applying reasonable relationship test to uphold mandatory disclosure requirement).

In a recent case directly on point, the San Francisco Superior Court rejected a school bus company's free speech challenge under the California Constitution to the state's Proposition 65 law which requires businesses to display a warning alerting the public to the presence of carcinogens or toxins in a location.  *Envtl. Law Found. v. Laidlaw Transit Servs.*, 2008 WL 2157672 (Cal. Super. Ct.

January 8, 2008).  Like CRA, the bus company argued that Proposition 65's mandatory warning was compelled speech requiring strict scrutiny analysis.  In rejecting this argument, the court applied the Second Circuit's reasoning in *Sorrell*:

> 'Regulations that compel purely factual and uncontroversial' commercial speech are subject to more lenient review than regulations that restrict accurate commercial speech and will be sustained if they are 'reasonably related to the State's interest in preventing deception of consumers.'

2008 WL 2157672 at * 2 (quoting *Sorrell*, 272 F.3d at 113).  Applying *Zauderer's* reasonable relationship test, the court upheld Proposition 65's disclosure requirements.  *Id*. at * 3.

In sum, as with its First Amendment claim, CRA's challenge under Article I of the California Constitution is analyzed under the reasonable relationship test of *Zauderer*.  And as explained *supra*, and as CRA does not dispute, Ordinance 40-08 clearly passes that test.

## B.  Although Intermediate Scrutiny Does Not Apply, Ordinance 40-08 Survives Under That Test As Well

CRA contends that intermediate scrutiny applies to its Article I claim because Ordinance 40-08 compels speech.  Pl. Mem. at 33.  As with CRA's First Amendment claim, were the court to accept CRA's compelled speech argument in the California context, countless California commercial labeling and disclosure requirements would be threatened.  *See, e.g*., Cal. Health & Safety Code § 110423 (requiring warning label on products containing ephedrine group alkaloids); Cal. Health & Safety Code § 25250.25(a)(3) (requiring warning statements on used oil containers); Cal. Pub. Res. Code § 15013(b) (requiring label on consumer products with removable or rechargeable batteries warning that battery "must be recycled or disposed of properly").

To support its argument, CRA cites a California Supreme Court case that addressed government compelled funding of generic advertising by plum manufacturers under the California Plum Marketing Program, *Gerawan Farming, Inc. v. Kawamura*, 33 Cal. 4th 1, 15 (2004) ("*Gerawan II*").  In that case, the Court held that the appropriate test for "compelled funding of generic advertising" is *Central Hudson*'s intermediate standard and not "the strictest scrutiny reserved for … compelled utterance of noncommercial speech."  *Id*. at 22.

*Gerawan II* set the standard of review for "compelled funding of commercial speech."  33 Cal. 4th at 22.  Nothing in that case remotely suggests that intermediate scrutiny, much less strict scrutiny,

1   is the standard to be applied to factual disclosure requirements like Ordinance 40-08.  As explained

2   *supra*, California courts apply the reasonable relationship test to factual commercial disclosure

3   requirements.  Moreover, as discussed *supra*, Ordinance 40-08 does not meet the definition of

4   "compelled speech": it neither compels restaurants to subsidize a message or voice a message with

5   which they disagree.  Rather, it compels them to disclose scientific facts about their products.

6   Although the restaurants disagree with the City's policy of having to disclose this product

7   information, they do not and indeed cannot disagree with the *fact* of the nutritional content of their

8   foods.  For these reasons, *Gerawan II*'s compelled speech analysis is inapposite.

9          Even if the Court were to conclude that *Gerawan II* somehow supplies the correct standard for

10  compelled factual disclosures, at most it would result in the application of the *Central Hudson* test.

11  And for the reasons set forth *supra*, Ordinance 40-08 meets that standard as well.

12         In sum, as with the CRA's First Amendment claim, its California free speech claim fails as a

13  matter of law.

                              **CONCLUSION**

14
15         For the reasons stated above, CRA's motion for declaratory relief and a preliminary injunction

16  should be denied.

17
18         Dated:  July 31, 2008

19                                          DENNIS J. HERRERA
                                            City Attorney
20                                          WAYNE SNODGRASS
                                            FRANCESCA GESSNER
21                                          TARA M. STEELEY
                                            Deputy City Attorneys
22
                                    By:  _____/s/_____
23                                          TARA M. STEELEY

24                                          Attorneys for Defendant
                                            CITY AND COUNTY OF SAN FRANCISCO
25
26
27
28