1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  WAYNE SNODGRASS, State Bar #148137
   FRANCESCA GESSNER, State Bar #247553
3  TARA M. STEELEY, State Bar #231775
   Deputy City Attorneys
4  1 Dr. Carlton B. Goodlett Place
   City Hall, Room 234
5  San Francisco, California 94102-4682
   Telephone:      (415) 554-4762
6  Facsimile:      (415) 554-4699
   E-Mail:         francesca.gessner@sfgov.org

7

8  Attorneys for Defendant
   CITY AND COUNTY OF SAN FRANCISCO

9

10

11                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA
12

13  CALIFORNIA RESTAURANT            Case No. C08-3247 CW
    ASSOCIATION,
14                                   **DECLARATION OF TARA M.
                                     STEELEY IN SUPPORT OF SAN
15            Plaintiff,             FRANCISCO'S OPPOSITION TO
                                     PLAINTIFF'S MOTION FOR
16      vs.                          DECLARATORY RELIEF AND A
                                     PRELIMINARY INJUNCTION**
17  THE CITY AND COUNTY OF SAN
    FRANCISCO AND THE SAN            Hearing Date:    September 4, 2008
18  FRANCISCO DEPARTMENT OF          Time:            2 p.m.
    PUBLIC HEALTH,                   Place:           Ctrm 2, 4th Floor
19
              Defendants.
20

21

22

23

24

25

26

27

28

DECLARATION OF TARA M. STEELEY                    n:\govlit\li2008\090033\00499660.doc
CASE NO.  C08-3247 CW

I, Tara M. Steeley, declare as follows:

I am a Deputy City Attorney for the City and County of San Francisco.  I am a member in good standing of the bar of this Court.  I have personal knowledge of the matters stated herein, except for the those matters set forth on information and belief which I believe to be true, and if called to testify, I can and will testify competently as to all matters set forth herein.

1.     Attached as Exhibit 1 is a true and correct copy of the order by the United States Court of Appeals for The Second Circuit, dated June 16, 2008, in the case entitled *New York City Restaurant Association v. New York City Board of Health et al.*, 08-1892-cv.

2.     Attached as Exhibit 2 is a true and correct copy of the "Brief Of The United States Food And Drug Administration As Amicus Curiae In Support Of Affirmance," dated May 29, 2008, filed with the United States Court of Appeals for The Second Circuit, in the case of *New York City Restaurant Association v. New York City Board of Health et al.*, 08-1892-cv.

3.     Attached as Exhibit 3 is a true and correct copy of  FDA, Food Labeling: Questions and Answers, Volume II, "A Guide for Restaurants and Other Retail Establishments," dated August 1995, *available at* http://vm.cfsan.fda.gov/~frf/qatext2.html.

4.     Attached as Exhibit 4 is a true and correct copy of  FDA, Calories Count: Report of the Working Group on Obesity, dated 2004, *available at* http://vm.cfsan.fda.gov/~dms/owg-rpt.html.

5.     Attached as Exhibit 5 is a true and correct copy of FDA, Guidance for Industry: "A Labeling Guide For Restaurants and Other Retail Establishments Selling Away-From-Home Foods," dated April 2008, *available at* http://vm.cfsan.fda.gov/~dms/labrguid.html.

6.     Attached as Exhibit 6 is a true and correct copy of the California Uniform Retail Food Facilities Law ("CURFFL"), ch. 256, 1984 Cal. Reg. Session, S. B. No. 775 (repealed by the California Retail Food Code in 2006).

7.     Attached as Exhibit 7 is a true and correct copy of the California Restaurant Act, ch. 633, 1961 Cal. Stat. (repealed by CURFFL in 1984).

8.     Attached as Exhibit 8 is a true and correct copy of West's Ann. Cal. Health & Safety Code § 113700, containing Governor Schwarzenegger's signing message regarding Stats. 2006, c. 23 (S.B.144) (the California Retail Food Code).

1    I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and

2    correct to the best of my knowledge.

3

4    Executed on July 31, 2008

5

6    By:_____/s/_____

        Tara M. Steeley

7

        Attorneys for Defendant

8        CITY AND COUNTY OF SAN FRANCISCO

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



S.D.N.Y. - N.Y.C.
08-cv-1000
Holwell, J.

# United States Court of Appeals
### FOR THE
### SECOND CIRCUIT

---

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 16th day of June, two thousand eight,

Present:    Hon. Rosemary S. Pooler,
            Hon. Sonia Sotomayor,
                                *Circuit Judges,*
            Hon. Jane A. Restani,
                                *Judge.*

---

New York State Restaurant Association,

            *Plaintiff-Appellant,*

    v.                                          08-1892-cv

New York City Board of Health, *et al.,*

            *Defendants-Appellees.*

---

Appellant, through counsel, moves for an order maintaining the *status quo* pending a decision on the merits of this appeal – i.e. the continuation of a stay for a "no fine" period beyond July 18, 2008. When Appellant initially moved for this order on June 6, 2008, we denied the motion without prejudice to renewal at or after oral argument. At oral argument on June 12, 2008, appellant renewed its motion. Upon due consideration, it is hereby ORDERED that the motion is DENIED.


                    FOR THE COURT:
                    Catherine O'Hagan Wolfe, Clerk


            By:

# EXHIBIT 2

# 08-1892-cv

## United States Court of Appeals
### FOR THE SECOND CIRCUIT
### Docket No. 08-1892-cv

◄ ••• ►

NEW YORK STATE RESTAURANT ASSOCIATION,

*Plaintiff-Appellant,*

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF THE UNITED STATES FOOD AND DRUG ADMINISTRATION AS *AMICUS CURIAE* IN SUPPORT OF AFFIRMANCE

GREGORY G. KATSAS,
*Acting Assistant*
  *Attorney General,*
DOUGLAS N. LETTER,
MICHAEL E. ROBINSON,
*Attorneys, Appellate Staff,*
*Civil Division,*
*U.S. Department of Justice*
*Washington, D.C.*

THOMAS R. BARKER,
*Acting General Counsel,*
GERALD F. MASOUDI,
*Chief Counsel,*
*Food and Drug Division,*
KAREN E. SCHIFTER,
*Associate Chief Counsel,*
*Office of the General Counsel,*
*U.S. Dep't of Health and*
  *Human Services,*
*Rockville, Maryland*

MICHAEL J. GARCIA,
*United States Attorney for the*
*Southern District of New York,*
DAVID S. JONES,
JAMES L. COTT,
*Assistant United States Attorneys,*
  *Of Counsel.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2739

—v.—

NEW YORK CITY BOARD OF HEALTH, NEW YORK CITY DEPART-
MENT OF HEALTH AND MENTAL HYGIENE, THOMAS R.
FRIEDEN, In His Official Capacity as Commissioner of the New
York City Department of Health and Mental Hygiene,

*Defendants-Appellees.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement...................... 1

Issues Presented........................... 3

Statement of the Case...................... 4

    A.  Federal Statutory Scheme Governing
        Food Labeling....................... 4

    B.  Preemption Provisions in the NLEA...... 5

    C.  NLEA's Preservation of Other
        Statutes' Potentially Preclusive Effect..... 6

    D.  New York City's Initial Calorie
        Disclosure Regulation and Prior
        Litigation........................... 7

    E.  New York City's Modified Calorie
        Disclosure Regulation and This Action.... 8

    F.  Prior Proceedings in This Court........ 11

Summary of Argument...................... 11

ARGUMENT................................. 13

POINT I—NEW YORK CITY'S HEALTH CODE
    REGULATION 81.50 IS NOT EXPRESSLY
    PREEMPTED BY THE NLEA................. 13

ii

PAGE

A.  Subject to Limitations That Are Not
    Applicable Here, the NLEA Preserves
    State and Municipal Power to Mandate
    Labeling of Restaurant Foods. . . . . . . . . .  13

B.  Criteria for Exemption of Nutrition
    Information from Express Preemption
    Under the NLEA. . . . . . . . . . . . . . . . . . . .  14

C.  Whether a Statement is Mandatory or
    Voluntary Is Relevant But Not
    Dispositive. . . . . . . . . . . . . . . . . . . . . . . .  20

D.  FDA's Views Are Entitled to Deference. . .  22

POINT II—REGULATION 81.50 DOES NOT VIOLATE
    THE FIRST AMENDMENT. . . . . . . . . . . . . . . . . .  24

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

iii

TABLE OF AUTHORITIES

*Cases:*

*Auer v. Robbins,*
    519 U.S. 452 (1997)....................... 23

*Central Hudson Gas & Electric Corp. v.*
    *Public Serv. Commission of N.Y.,*
    447 U.S. 557 (1980).................... 24, 25

*Chevron U.S.A. Inc. v. Natural Resources*
    *Defense Council, Inc.,*
    467 U.S. 837 (1984)...................... 22

*International Dairy Foods Association v.*
    *Amestoy,*
    92 F.3d 67 (2d Cir. 1996). ................ 25

*National Electric Manufacturers Association*
    *v. Sorrell,*
    272 F.3d 104 (2d Cir. 2001). .......... 3, 24, 25

*New York State Restaurant Association v.*
    *New York City Board of Health,*
    509 F. Supp. 2d 351 (S.D.N.Y. 2007). ......... 8

*New York State Restaurant Association v.*
    *New York City Board of Health,*
    No. 08 Civ. 1000 (RJH), 2008 WL 1752455
    (S.D.N.Y. April 16, 2008). ......... 9, 10, 11, 24

*Schneider v. Feinberg,*
    345 F.3d 135 (2d Cir. 2003). ............... 23

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944)................... 23, 24

iv

PAGE

*Smiley v. Citibank (South Dakota), N.A.,*
    517 U.S. 735 (1996)...................... 22

*Sprietsma v. Mercury Marine, a Division of*
    *Brunswick Corp.,*
    537 U.S. 51 (2002)....................... 21

*Thomas Jefferson Univ. v. Shalala,*
    512 U.S. 504 (1994)..................... 23

*United States v. United Foods, Inc.,*
    533 U.S. 405 (2001)..................... 25

*Zauderer v. Office of Disciplinary Counsel,*
    471 U.S. 626 (1985).................... 24, 25


*Statutes, Regulations, and Legislative History:*

21 U.S.C. § 321........................... 18

21 U.S.C. § 343.......................... *passim*

21 U.S.C. § 343-1. ...................... *passim*

Nutrition Labeling and Education Act of 1990,
    Pub. L. No. 101-535, 104 Stat. 2353...... 4, 7, 21

21 C.F.R. § 101.9......................... 15, 18

21 C.F.R. § 101.10....................... 16, 18

21 C.F.R. § 101.13....................... *passim*

21 C.F.R. § 101.45....................... 16

56 Fed. Reg. 60421 (Nov. 27, 1991)............ 19

58 Fed. Reg. 2302 (Jan. 6, 1993)............ 19, 21

136 Cong. Rec. S16607 (Oct. 24, 1990). .......... 9

v

PAGE

H.R.Rep. No. 101-538 (1990), *reprinted in* 1990
U.S.C.C.A.N. 3336.. . . . . . . . . . . . . . . . . . . . .  4, 5

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket No. 08-1892-cv

———————

New York State Restaurant Association,

*Plaintiff-Appellant,*

—v.—

New York City Board of Health, New York City
Department of Health and Mental Hygiene,
Thomas R. Frieden, In His Official Capacity as
Commissioner of the New York City Department
of Health and Mental Hygiene,

*Defendants-Appellees.*

———————

## BRIEF OF THE UNITED STATES
## FOOD AND DRUG ADMINISTRATION AS
## *AMICUS CURIAE* IN SUPPORT OF AFFIRMANCE

———————

### Preliminary Statement

Pursuant to Rule 29(a) of the Federal Rules of
Appellate Procedure and the request of the Court
during the April 29, 2008 oral argument on appellant's
motion for a stay pending appeal, the United States
Food and Drug Administration ("FDA") respectfully
submits this *amicus curiae* brief in support of affirm-
ance of the district court's judgment.

2

For the reasons detailed below, New York City Health Code Regulation 81.50 is not expressly preempted by the Nutrition Labeling and Education Act of 1990, 21 U.S.C. §§ 343-1(a)(4), (5) (the "NLEA"). The NLEA expressly preempts any state "requirement for nutrition labeling of food that is not identical to the requirement of [section 343(q) of the Act], except a requirement for nutrition labeling of food which is exempt under [certain provisions of section 343(q)]." 21 U.S.C. § 343-1(a)(4). Because food served in restaurants is explicitly exempted from a specified provision of section 343(q), state and municipal authority to impose mandatory nutrition labeling on restaurants is necessarily preserved. The requirement in Regulation 81.50(c) that certain restaurants list the "total number of calories . . . for each menu item they list, . . . clearly and conspicuously, adjacent or in close proximity such as to be clearly associated with the menu item," does not require a "nutrient content claim," which would trigger express preemption. Rather, it compels the disclosure of "nutrition information," as that term is used in sections 343(q) and 343(r)(1), and accordingly is not expressly preempted under the NLEA.

In addition, Regulation 81.50 does not violate the First Amendment.* The Regulation implicates purely

---

* While the Court specifically requested FDA's views concerning the statutory preemption issue, this brief also addresses the First Amendment issue, which the Court must reach if it finds Regulation 81.50 not preempted by federal law. The issue is of great importance to the FDA and other federal agencies, because, as the Court itself has recognized, there are

3

commercial speech, and thus is subject to less stringent constitutional requirements than other forms of speech. Because the Regulation compels an accurate, purely factual disclosure of the calorie content of restaurant menu items, and addresses a legitimate state interest in preventing or reducing obesity among its citizens by making accurate calorie information available to consumers, there is a rational connection between the disclosure requirement and the City's purpose in imposing it such that the Regulation survives constitutional analysis.

**Issues Presented**

1. Whether New York City Regulation 81.50, which requires national chain restaurants to post statements showing the number of calories for each item on their menus and menu boards, is expressly preempted by the Nutrition Labeling and Education Act of 1990, 21 U.S.C. § 343-1(a)(4) or (5).

2. Whether Regulation 81.50's requirement that restaurants provide a purely factual statement of the calorie content of their menu offerings impermissibly infringes on the First Amendment rights of the members of plaintiff-appellant New York State Restaurant Association ("NYSRA").

---

"[i]nnumerable federal and state regulatory programs" that "require the disclosure of product and other commercial information." *National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 116 (2d Cir. 2001), *cert. denied*, 536 U.S. 905 (2002).

4

## Statement of the Case

### A. Federal Statutory Scheme Governing Food Labeling

The Federal Food, Drug, and Cosmetic Act (the "FDCA"), enacted in 1938, generally prohibits the misbranding of food. In 1990, Congress passed the Nutrition Labeling and Education Act (the "NLEA"), Pub.L. No. 101-535, 104 Stat. 2535 (1990), requiring nutrition labeling on most packaged foods and regulating certain claims concerning food. The House Report accompanying the bill described the dual purposes as follows: "[T]o clarify and to strengthen the Food and Drug Administration's legal authority to require nutrition labeling on foods, and to establish the circumstances under which claims may be made about nutrients in foods." H.R.Rep. No. 101-538, at 7 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3336, 3337.

The NLEA added two new sections to the Federal Food, Drug, and Cosmetic Act. *See* 21 U.S.C. §§ 343(q), (r). The first, 21 U.S.C. § 343(q), mandates specific, uniform disclosures that must be made on food labels, giving rise to the familiar "Nutrition Facts" panel on packaged foods that sets forth calories per serving, as well as the quantities of various nutrients, including fat, cholesterol, sodium, carbohydrates, protein, and select vitamins and minerals. The second provision, 21 U.S.C. § 343(r), gives the FDA broad authority to regulate when and how a food purveyor may make claims about the nutrient content or certain health benefits of its product.

The NLEA expressly exempts food "served in restaurants" from mandatory nutrition labeling. *See* 21 U.S.C.

5

§ 343(q)(5)(A)(i). By contrast, restaurants are not generally exempt from subsection (r) and are subject to FDA regulation if they make a nutrient content claim. *See* 21 C.F.R. § 101.13(q)(5) ("A nutrient content claim used on food that is served in restaurants . . . shall comply with the requirements of this section"). The difference between these two provisions is critical for this case. Subsection (r) applies to "a claim . . . made in the label or labeling of . . . food" that "expressly or by implication . . . characterizes the level of any nutrient." 21 U.S.C. § 343(r)(1)(A). Examples of such claims include "low sodium," "lite," or "high in oat bran." H.R. Rep. 101-538, at 19, 1990 U.S.C.C.A.N. at 3349. However, the statute provides that a "statement of the type required by paragraph (q) of this section that appears as part of the nutrition information required or permitted by such paragraph is not a claim." 21 U.S.C. § 343(r)(1).

## B.  Preemption Provisions in the NLEA

In enacting the NLEA, Congress added two express preemption provisions, 21 U.S.C. § 343-1(a)(4) and (a)(5), which address the scope of preemption for mandatory nutrition labeling requirements under § 343(q) and for nutrient content claim regulations under § 343(r).

Section 343-1(a)(4) expressly preempts any state or municipal "requirement for nutrition labeling of food that is not identical to the requirement of [§ 343(q)], except a requirement for nutrition labeling of food which is exempt under [certain provisions of § 343(q)]."

6

21 U.S.C. § 343-1(a)(4).* Because food served in restaurants is explicitly exempt from § 343(q) under a referenced provision, state or municipal authority to impose nutrition labeling requirements on restaurants is undisturbed by the NLEA.

Section 343-1(a)(5), on the other hand, expressly preempts states (or municipalities) from imposing any requirement on nutrient content claims made by a food purveyor "in the label or labeling of food that is not identical to the requirement of § 343(r)," "except a requirement respecting a claim made in the label or labeling of food which is exempt under section 343(r)(5)(B)." 21 U.S.C. § 343-1(a)(5). Although § 343(r)(5)(B) exempts from express preemption some claims regarding "food which is served in restaurants or other establishments in which food is served for immediate human consumption or which is sold for sale or use in such establishments," 21 U.S.C. § 343(r)(5)(B), this provision does not exempt claims regarding calories.

## C.  NLEA's Preservation of Other Statutes' Potentially Preclusive Effect

When enacting the NLEA, Congress provided that the statute "shall not be construed to preempt any provision of State law, unless such provision is ex-

_____

\*    Specifically, § 343-1(a)(4) exempts "food which is exempt under subclause (i) or (ii) of section 343(q)(5)(A) . . . ." Section 343(q)(5)(A)(i) applies to food "which is served in restaurants or other establishments in which food is served for immediate human consumption or which is sold for sale or use in such establishments."

7

pressly preempted under [§ 343-1] of the Federal Food, Drug, and Cosmetic Act." Pub. L. No. 101-535, § 6(c)(1), 104 Stat. 2535, 2364. However, Congress further provided that the NLEA should not be construed to affect express or implied preemption under other provisions of the Federal Food, Drug, and Cosmetic Act. *Id.* § 6(c)(3) ("The amendment made by subsection (a), the provisions of subsection (b) and paragraphs (1) and (2) of this subsection shall not be construed to affect preemption, express or implied, of any such requirement of a State or political subdivision, which may arise under the Constitution, any provision of the Federal Food, Drug, and Cosmetic Act not amended by subsection (a), any other Federal law, or any Federal regulation . . . ."). Thus, any state or local food labeling regulation, even if expressly exempted from preemption under the NLEA, that renders food labeling false or misleading would be impliedly preempted under 21 U.S.C. § 343(a) of the FDCA.

## D.  New York City's Initial Calorie Disclosure Regulation and Prior Litigation

In December 2006, the New York City Board of Health adopted a resolution amending Article 81 of the Health Code by adding a new § 81.50. The regulation was to become effective on July 1, 2007, and mandated that any food service establishment making calorie information publicly available on or after March 1, 2007, must post such information on its menus and menu boards. The New York State Restaurant Association ("NYSRA") brought suit in federal district court for the Southern District of New York challenging the regulation on preemption and First Amendment grounds. The district court held that Health Code

8

§ 81.50 as adopted was preempted by 21 U.S.C § 343-1(a)(5) because, to the extent it applied only to restaurants that had voluntarily provided calorie information, it regulated nutrient content claims and was therefore preempted by § 343-1(a)(5). *New York State Restaurant Ass'n v. New York City Board of Health*, 509 F. Supp. 2d 351, 361-63 (S.D.N.Y. 2007) (*NYSRA I*).

Although it found § 81.50 preempted because of the specific way this provision had been written, the district court affirmed the authority of local governments to mandate that restaurants disclose nutritional information: "By making its requirements contingent on a *voluntary* claim, Regulation 81.50 directly implicates § 343(r) and its corresponding preemption provision[, § 343-1(a)(5)]. New York City, although free to enact mandatory disclosure requirements of the nature sanctioned by § 343(q) (and proposed or enacted in other jurisdictions), has adopted a regulatory approach that puts it in the heartland of § 343(r) and has subjected its regulation to preemption under § 343-1(a)(5)." 509 F. Supp. 2d at 363 (emphasis in original; footnote omitted).

**E.   New York City's Modified Calorie Disclosure Regulation and This Action**

The City modified the regulation in accordance with the district court's opinion and did not thereafter pursue an appeal of the judgment in *NYSRA I*. Thus, the current version of Regulation 81.50 requires chain restaurants with 15 or more establishments nationally that sell standardized meals to post calorie content information in their menus and on their menu boards:

9

> All menu boards and menus in any
> covered food service establishment
> shall bear the total number of calories
> derived from any source for each menu
> item they list. Such information shall
> be listed clearly and conspicuously,
> adjacent or in close proximity such as
> to be clearly associated with the menu
> item . . . .

Reg. 81.50(c).

NYSRA again filed an action to declare the new Regulation 81.50 preempted by federal law and/or unconstitutional, and to enjoin its enforcement. *New York State Restaurant Ass'n v. New York City Board of Health*, No. 08 Civ. 1000 (RJH), 2008 WL 1752455, at *1 (S.D.N.Y. April 16, 2008) (*NYSRA II*). The district court concluded that the new Regulation 81.50 is not preempted by the NLEA because that statute explicitly leaves to state and local governments the power to impose mandatory nutrition labeling by restaurants. *Id.* at *4-*5. Section 343-1(a)(4), the court noted, preempts any state "requirement for nutrition labeling of food that is not identical to the requirement of [§ 343(q)], except a requirement for nutrition labeling of food which is exempt [from § 343(q)]." Since food served in restaurants is explicitly exempt from § 343(q), the district court determined that "state authority to impose mandatory nutrition labeling on restaurants is necessarily preserved." 2008 WL 1752455, at *4 (citing 136 Cong. Rec. S16607 (Oct. 24, 1990) (Sen. Metzen-baum) ("Because food sold in restaurants is exempt from the nutrition labeling requirements of [§ 343(q)],

10

the bill does not preempt any State nutrition labeling requirements for restaurants.")).

The district court rejected the argument that mandatory state disclosures are nevertheless preempted by 21 U.S.C. § 343-1(a)(5). As explained above, this section preempts states from regulating nutrient content claims made by a food purveyor, which claims are subject to FDA regulation under § 343(r). *See supra* at 6. The court determined that because the calorie disclosure was mandated by Regulation 81.50, it was not "a claim" made in the label or labeling of food that "expressly or by implication characterizes the level of any nutrient." 2008 WL 1752455, at *4. According to the district court, the term "claim" "carries the connotation of an assertion by a speaker that is voluntary in nature." *Id.* Therefore, the court determined that the mandated disclosure necessarily fell outside the scope of subsection (r), and that states retain the power to require restaurants to disclose nutrition information to consumers. *See id.* A contrary reading of the statute, the court held, "would also create a regulatory vacuum in which neither federal nor state authorities have the power to require restaurants to disclose nutrition information to consumers." A far more persuasive reading, the court found, was that "Congress chose not to exercise this power and explicitly left it to the states to do so." *Id.* at *5.

The district court also found that the required disclosure of calorie information is reasonably related to the City's interest in reducing obesity and providing consumers with accurate nutritional information. Therefore, the court held, Regulation 81.50 does not

11

unduly infringe the First Amendment rights of NYSRA members. *Id.* at *6-*12.

## F.   Prior Proceedings in This Court

NYSRA appealed to this Court and sought a stay pending appeal. On April 29, 2008, the Court heard oral argument on the stay application, and during the argument directed counsel for NYSRA to request FDA to submit an *amicus* brief within thirty days, *i.e.*, by May 29, 2008. *See* Letter from Kent A. Yalowitz, Counsel for NYSRA, to Gerald F. Masoudi, Chief Counsel, Food and Drug Division, United States Department of Health and Human Services (April 30, 2008), at 1 (copy docketed in this proceeding). Following the argument, the Court denied NYSRA's stay application, but set an expedited briefing schedule.

## Summary of Argument

The district court correctly held that Regulation 81.50 is not preempted under the NLEA. *See infra* Point I. However, the district court's reasoning—in essence, that *mandatory* disclosure by restaurants of the nutrient content of the foods they serve *could not* constitute a "claim" under section 343(r) and therefore is not expressly preempted—fails to recognize that some state or local regulations mandating disclosure of information about the nutrient content of restaurant foods would be preempted under the NLEA as a nutrient content claim. The reason Regulation 81.50 is not expressly preempted is that the listing of "total calories" is the type of information that is a component of *nutrition information* regulated under section 343(q) (rather than a nutrient content claim regulated under

-1000

12

section 343(r)), and the NLEA expressly exempts from preemption state or local requirements for restaurants to provide nutrition information of this type in the labeling of their foods. 21 U.S.C. § 343-1(a)(4). *See infra* Points I.A, I.B.

There are, however, circumstances when a locally mandated statement regarding calorie content, or the amount of another nutrient, may fall within the definition of a *nutrient content claim* under section 343(r), and would therefore be expressly preempted notwithstanding its mandatory nature. *See infra* Point I.C. For example, a statement such as "low in fat" would be a nutrient content claim whether the statement was voluntary or mandatory. Indeed, FDA regulations provide that even quantitative statements of nutrient amounts such as "contains 100 calories" may be nutrient content claims. *See* 21 C.F.R. § 101.13(b)(1). However, the NLEA carves out of the scope of nutrient content claims information that is properly included in required nutrition labeling. Because New York City is requiring the number of calories in foods sold at chain restaurants to be disclosed as mandatory nutrition labeling, and because the fact to be disclosed (quantitative calorie content) is properly included in nutrition labeling, the information to be provided under Regulation 81.50 is not a nutrient content claim and there is no express preemption under 21 U.S.C. § 343-1(a)(5). *See infra* Point I.B. The FDA's reasonable interpretation of the statute and regulations that it administers is entitled to deference. *See infra* Point I.D.

The district court also correctly rejected NYSRA's First Amendment challenge to Regulation 81.50. *See infra* Point II. Because the regulation requires disclo-

13

sure of accurate, purely factual information to consumers in the context of commercial speech, it need only be reasonably related to the governmental interest in protecting consumers. The regulation meets that test. *See id.*

## ARGUMENT

### POINT I

### NEW YORK CITY'S HEALTH CODE REGULATION 81.50 IS NOT EXPRESSLY PREEMPTED BY THE NLEA

#### A. Subject to Limitations That Are Not Applicable Here, the NLEA Preserves State and Municipal Power to Mandate Labeling of Restaurant Foods

As explained *supra* at 5-6, the NLEA expressly preempts any state, or political subdivision of a state, "requirement for nutrition labeling of food that is not identical to the requirement of [§ 343(q)], except a requirement for nutrition labeling of food which is exempt under [certain provisions of § 343(q)]." 21 U.S.C. § 343-1(a)(4). Because food served in restaurants is explicitly exempt from § 343(q) under a referenced provision, state and local authority to impose mandatory nutrition labeling on restaurants is necessarily preserved. The NLEA, however, does not exempt from preemption *nutrient content claims* made by restaurants. See 21 U.S.C. § 343-1(a)(5). The key question, then, is whether the requirement in Regulation 81.50(c) that certain restaurants list the "total number of calories . . . for each menu item they list, . . . clearly and

14

conspicuously, adjacent or in close proximity such as to be clearly associated with the menu item" constitutes "*nutrition information*," as to which New York City is exempted from express preemption under the NLEA, or instead a "*nutrient content claim*" that, under section 343-1(a)(5), is not exempted from preemption.

NYSRA argues in its brief that Regulation 81.50 requires nutrient content claims and so is preempted under 21 U.S.C. § 343-1(a)(5); and it argues that the district court's "voluntary/mandatory" distinction is unworkable. *See* NYSRA Br. at 23-35.* Although the district court was incorrect to view the "voluntary/mandatory" dichotomy as dispositive, NYSRA's preemption analysis itself is incorrect because Regulation 81.50 constitutes a requirement for labeling of nutrition information and, accordingly, is not expressly preempted by the NLEA.

## B.  Criteria for Exemption of Nutrition Information from Express Preemption Under the NLEA

A statement is nutrition information exempt from the NLEA's preemption provisions if two criteria are met. First, the statement must be "of the type required by [§ 343(q)] that appears as part of the nutrition information required or permitted by . . . paragraph

---

* NYSRA argues in its brief that "[b]ecause the [New York City Health] Board elected not to appeal *NYSRA I*, it is bound by the holding in that case that a quantitative statement about the amount of calories is a 'claim.'" NYSRA Br. at 24. FDA expresses no view on that contention.

15

[(q)]." 21 U.S.C. § 343(r)(1). Second, a state or local regulatory authority must require the statement to be disclosed with regard to restaurant food as part of nutrition labeling (and the information must be disclosed pursuant to that authority). *Id.* §§ 343-1(a)(4) (excepting from express preemption of specified state and local labeling requirements any "requirement for nutrition labeling of food which is exempt under subclause (i) or (ii) of section 343(q)(5)(A)"), 343(q)(5)(A)(i) (exempting from NLEA's labeling requirements food "which is served in restaurants . . . for immediate human consumption"); *see also id.* § 343(r)(1) (a statement that is part of nutrition information of the type required or permitted by § 343(q) to be in food labeling "is not a claim"); 21 C.F.R. § 101.13(c) ("[i]nformation that is required or permitted . . . to be declared in nutrition labeling, and that appears as part of the nutrition label, is not a nutrient content claim . . ."). The statement required by Regulation 81.50 satisfies these criteria.

First, section 343(q) explicitly requires as part of the nutrition information required or permitted by that paragraph "the total number of calories . . . in each serving size or other unit of measure of the food." *See* 21 U.S.C. § 343(q)(1)(C); *see also* 21 C.F.R. § 101.9(c)(1) ("The declaration of nutrition information on the label and in labeling of a food shall contain . . . [a] statement of the caloric content per serving."). The quantitative statement of the total number of calories for each menu item prescribed by Regulation 81.50 accordingly satisfies the first prong of the test for exemption from the express preemption provisions of the NLEA.

16

A statement of the number of calories in a food may in certain circumstances, however, constitute a nutrient content claim. For example, under FDA regulations, the statement "100 calories" on the front of a package next to the product name would be a nutrient content claim, even though the same information as part of nutrition labeling would not be. *See* 21 C.F.R. § 101.13(c) ("Information that is required by or permitted . . . to be declared in nutrition labeling, and that appears as part of the nutrition label, is not a nutrient content claim . . . [but] [i]f such information is declared elsewhere on the label or in labeling, it is a nutrient content claim and is subject to the requirement of nutrient content claims."). Therefore, it next must be determined whether Regulation 81.50(c) satisfies the second prong of the test for preemption exemption—*i.e.*, whether a state or local regulatory authority is requiring the statement to be disclosed as part of nutrition labeling.

As to the second criterion, Regulation 81.50 was issued by a local regulatory authority and it requires the calorie information to be "listed adjacent or in close proximity such as to be clearly associated with the menu item." Reg. 81.50(c). This placement is consistent with FDA regulations regarding the placement of nutrition labeling information for foods without labels. *See* 21 C.F.R. § 101.45 (nutrition information "should be displayed at the point of purchase by an appropriate means such as by a label affixed to the food or through labeling including shelf labels, signs, posters, brochures, notebooks, or leaflets that are readily available and in close proximity to the foods"); *see also* 21 C.F.R. § 101.10 (Nutrition labeling of restaurant foods) ("Presentation of nutrition labeling may be in various forms, including those provided in § 101.45 and other

17

reasonable means."). Thus, both criteria for the nutrition information exemption are satisfied, and there is no express preemption under 21 U.S.C. § 343-1(a)(5).

NYSRA quotes from FDA regulations and a preamble discussion for the proposition that quantitative statements of nutrient content may constitute nutrient content claims. *See* NYSRA Reply Br. at 9-10. FDA agrees with that assertion. However, nothing in any of the authorities cited requires that *any* quantitative statement of nutrient content will *always* be a nutrient content claim, even when part of mandated nutrition labeling. Such an assertion would be contrary to the express language of section 343(r)(1). In addition, NYSRA's objection that its members may be subject to multiple, inconsistent local regulations in the absence of federal preemption, *see* NYSRA Reply Br. at 15-17, simply states a natural consequence of the choice that Congress has made to permit localities to mandate restaurants to disclose nutrition information about the food they serve. The possible difficulties restaurants may have in complying with multiple localities' requirements, however, is not a permissible basis for this Court to reject that legislative determination.

Moreover, the conclusion that a statement is nutrition information exempt from preemption is not altered by the fact that, whereas the relevant statutory provision refers to disclosures that "appear[] as part of the nutrition information," 21 U.S.C. § 343(r)(1), the corresponding regulation refers to statements that "appear[] as part of the nutrition label." 21 C.F.R.

18

§ 101.13(c).* Much restaurant food does not have a
"label" that is "written, printed, or graphic matter upon
the immediate container of any article," 21 U.S.C.
§ 321(k), so that, as NYSRA observes, the regulation's
use of the term "label," if construed narrowly, could be
read to eliminate most restaurant food from the statu-
tory carve-out of certain "nutrition information" from
the scope of nutrient content claims.

Such a narrow reading, however, would be contrary
both to the broader statutory and regulatory scheme,
and to FDA policy. Indeed, the FDA regulations them-
selves elsewhere make clear that nutrition information
for non-packaged foods, when required, is to appear in
other forms of labeling (*e.g.*, a tag attached to the
product, or a sign or booklet at point of purchase) in the
absence of a label. *See* 21 C.F.R. §§ 101.9(a), 101.10,
101.45. Moreover, as noted above, the corresponding
provision in the NLEA uses the unambiguously broad
term "nutrition information." *See* 21 U.S.C. § 343(r)(1)
("appears as part of the nutrition information"). Be-
cause mandatory nutrition information on restaurant
food is excluded from federal regulation under the
NLEA, *see* 21 U.S.C. § 343(q)(5)(A)(i), reading the
regulation as NYSRA proposes would exclude most
restaurant food from state and local regulation of
labeling requirements, and therefore from the reach of
*all* governmental authority to require nutrition label-
ing, other than under the procedures by which states

---

\* Both the statute and the regulation provide that
the statements they describe are not "claims," which, as
discussed *supra* at 5-6, are subject to exclusive federal
regulation.

19

and their political subdivisions may petition for an exemption from federal preemption. *See* 21 U.S.C. § 343-1(b).

This reading, however, is contrary to the plain text of the statute and its broader purpose, and is not compelled by the regulation's text. There is no indication that the FDA intended or sought to use regulations to narrow the scope of the statute's preservation of local control over restaurant labeling; the preambles to the proposed and final rules that included this regulation contain no discussion of this issue, which strongly suggests a lack of any intent by FDA to so narrow the statutory definition of nutrition information, and thereby to essentially negate the exemption from the preemption provision of 21 U.S.C. § 343-1(a)(4). *See* 56 Fed. Reg. 60421, 60424 (Nov. 27, 1991) (proposed rule); *see also* 58 Fed. Reg. 2302 (Jan. 6, 1993) (final rule). Thus, section 101.13(c) should be read in tandem with the statute and consistent with the overall regulatory scheme to mean that a quantitative statement of the amount of a nutrient in a food is not a nutrient content claim when it is part of nutrition labeling consisting of the types of statements required or permitted under 21 U.S.C. § 343(q), and when it appears, for packaged foods, in the nutrition information section of the food label or, for non-packaged foods that bear no label, as part of the nutrition information for the food in a place appropriate for such information at the point of purchase. In other words, FDA interprets the term "nutrition label" as used in section 101.13(c) to include, in the context of restaurant food, nutrition information whose disclosure is required by a state or local regulatory body, whether it is placed somewhere that meets the narrow definition of 'label' advanced by NYSRA, or

20

whether it instead is placed, as here, in appropriate labeling. For restaurants, a menu or menu board is an entirely permissible means of such disclosure.

## C.  Whether a Statement is Mandatory or Voluntary Is Relevant But Not Dispositive

The district court's mandatory/voluntary dichotomy is relevant to the second prong of the analysis (whether a state or local regulatory authority requires the statement to be disclosed as part of nutrition labeling) but is not the sole criterion for distinguishing nutrition information (which cities and states are not expressly preempted from mandating be disclosed) from nutrient claims under section 343(r) (which are expressly preempted from local regulation). For example, if a state were to require qualitative statements regarding nutrient levels (*e.g.*, to describe certain foods as "low fat"), those statements would be nutrient content claims because they expressly "characterize the level of any nutrient," 21 U.S.C. § 343(r)(1), 21 C.F.R. § 101.13(b), and they are not "of the type required by [§ 343(q)]," to be in nutrition labeling, 21 U.S.C. § 343(r)(1), despite being mandated by the state.

Further, both the NLEA and FDA regulations indicate that placement of the statement in the place designated for nutrition information is part of the criteria for distinguishing nutrition information from nutrient content claims. Thus, § 343(r) provides: "A statement of the type required by paragraph (q) *that appears as part of the nutrition information* required or permitted by such paragraph is not a claim which is subject to this paragraph . . . ." 21 U.S.C. § 343(r)(1) (emphasis added); *see also* 21 U.S.C. § 343(q)(1)(A) (providing that the Secretary may by regulation

21

establish requirements for presentation of nutrition information). Similarly, FDA regulations provide that "information that is required by or permitted . . . to be declared in nutrition labeling, and that appears as part of the nutrition label, is not a nutrient content claim . . . [but] [i]f such information is declared elsewhere on the label or in labeling, it is a nutrient content claim and is subject to the requirement of nutrient content claims." 21 C.F.R. § 101.13(c); *see also* 58 Fed. Reg 2302, 2303 (Jan. 6, 1993) (noting that "identical information" could be nutrition information or a nutrient content claim depending on its placement on the label) (citing 136 Cong. Rec. H5841 (July 30, 1990) (statement of Rep. Waxman)).*

---

\*    Although neither the parties nor the district court have addressed the issue, certain local regulations mandating restaurant disclosures or statements could be impliedly preempted under the FDCA even though not expressly preempted by the NLEA. *See supra* at 6-7; *see also Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.,* 537 U.S. 51, 65 (2002) (inclusion of express preemption provision does not bar ordinary working of "conflict" or "implied" preemption principles). The NLEA provides that it should not be construed to preempt state laws, other than by virtue of the NLEA's express preemption provisions. Nutrition Labeling and Education Act of 1990, Pub. L. No. 101-535, § 6(c)(1), 104 Stat. 2353, 2364. The NLEA further provides, however, that the statute does not affect express or implied preemption under other provisions of the FDCA that were not amended by the NLEA. *Id.* § 6(c)(3). Thus, any state or local food labeling regulation, even if expressly exempted from

22

## D. FDA's Views Are Entitled to Deference

As the foregoing discussion makes clear, determining whether New York's Regulation 81.50 is expressly preempted under the NLEA requires consideration of a complex federal statutory and regulatory scheme whose interpretation and application are vested in the FDA. To the extent the Court finds more than one interpretation permissible under the NLEA's and federal regulations' plain meaning, the FDA's views are entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, if the statute is silent or ambiguous on the matter at issue, the courts will uphold the agency's interpretation if it is "based on a permissible construction of the statute." 467 U.S. at 843; *see also Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 739 (1996) ("It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering."). Courts give weight to the agency's interpretation of a statute it administers because of the "presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discre-

---

preemption pursuant to the NLEA, that renders food labeling false or misleading, for example, would be impliedly preempted under the FDCA, 21 U.S.C. § 343(a).

23

tion the ambiguity allows." *Smiley*, 517 U.S. at 740-41. Courts similarly accord deference to an agency's interpretation of its regulations. *Auer v. Robbins*, 519 U.S. 452, 461-62 (1997); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512-13 (1994).

As Regulation 81.50 has just taken effect, FDA necessarily has not had prior occasion to assess whether the regulation is consistent with, or preempted by, the NLEA and related FDA regulations. Rather, the FDA's views on these questions are set forth herein in response to the Court's request of April 29, 2008. The recency of the FDA's views on the precise question presented should have no effect on the deference due here, because there "is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Auer*, 519 U.S. at 462 (affording deference to agency interpretation first expressed in *amicus* brief in case before court). Accordingly, *Auer* dictates affording *Chevron* deference to the FDA's views here.

Even if the Court concludes that *Chevron* is not applicable, it should at a minimum defer to the agency's interpretation under the standards set forth in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See Schneider v. Feinberg*, 345 F.3d 135, 143 (2d Cir. 2003) ("Interpretive guidelines that lack the force of law but nevertheless 'bring the benefit of [an agency's] specialized experience to bear' on the meaning of a statute, are still entitled to 'some deference.'"). In *Skidmore*, the Supreme Court recognized that agency interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." 323 U.S. at 140. The Supreme Court there-

24

fore held that such agency interpretations are given "considerable and in some cases decisive weight," depending upon the "thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Id.*

## POINT II

## REGULATION 81.50 DOES NOT VIOLATE THE FIRST AMENDMENT

The district court was correct to hold that Regulation 81.50 does not violate the First Amendment rights of NYSRA or its members. *See* 2008 WL 1752455, at *6-*12. As the district court held, *id.* at *6, Regulation 81.50 implicates commercial speech, and regulations affecting commercial speech are subject to less stringent constitutional requirements than those that affect other forms of speech. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 562-63 (1980); *National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001), *cert. denied*, 536 U.S. 905 (2002). Furthermore, within the class of regulations affecting commercial speech, there are "material differences between [purely factual and uncontroversial] disclosure requirements and outright prohibitions on speech." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 650 (1985). Regulations that compel "purely factual and uncontroversial" commercial speech are subject to more lenient review than regulations that restrict accurate commercial speech, and will be sustained if they are "reasonably related to the State's interest" in protecting consumers. *Id.* at 651. As this Court has held, "[c]ommercial disclosure requirements

25

are treated differently from restrictions on commercial speech because mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests . . . ." *Sorrell*, 272 F.3d at 113-14.

Regulation 81.50 compels only disclosure of "purely factual and uncontroversial" commercial information—the calorie content of restaurant menu items. The regulation also addresses a state policy interest in attacking obesity among its citizens by making accurate calorie information available to consumers. Because there is a "rational connection" between the disclosure requirement and the City's purpose in imposing it, *see Sorrell*, 272 F.3d at 115, Regulation 81.50 passes constitutional muster.* *Cf. Zauderer*, 471 U.S. at 651 n.14 (rejecting the contention that the Court should subject disclosure requirements to a strict "least restrictive means" analysis under which they must be struck down if there are other means by which the State's purposes may be served, and distinguishing *Central Hudson*, 477 U.S. at 565).

---

\* This Court's decision in *Sorrell* is on all fours with the instant dispute, and thus controls the outcome here, notwithstanding NYSRA's argument that a different result is compelled by *United States v. United Foods, Inc.*, 533 U.S. 405 (2001), and *International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67 (2d Cir. 1996). *See* NYSRA Reply Br. at 24-27. *International Dairy* preceded *Sorrell* so by definition does not disturb it, and NYSRA has not identified any aspect of *United Foods* that undermines this Court's holding in *Sorrell*.

26

## CONCLUSION

Because Regulation 81.50(c) is not expressly pre-empted under the NLEA and is consistent with the First Amendment, the Court should affirm the district court's judgment.

Dated:    New York, New York
          May 29, 2008

                    Respectfully submitted,

                    MICHAEL J. GARCIA,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for U.S. Food and Drug*
                        *Administration as Amicus*
                        *Curiae.*

                    DAVID S. JONES,
                    JAMES L. COTT,
                    *Assistant United States Attorneys.*

GREGORY G. KATSAS,
*Acting Assistant Attorney General,*
DOUGLAS N. LETTER,
MICHAEL E. ROBINSON,
*Attorneys, Appellate Staff,*
*Civil Division,*
*U.S. Department of Justice.*

27

THOMAS R. BARKER,
*Acting General Counsel,*
GERALD F. MASOUDI,
*Chief Counsel, Food and Drug Division,*
KAREN E. SCHIFTER,
*Associate Chief Counsel,*
*Office of the General Counsel,*
*U.S. Department of*
   *Health and Human Services.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B). As measured by the word processing system used to prepare this brief, there are 6185 words in this brief.

MICHAEL J. GARCIA,
*United States Attorney for the*
*Southern District of New York*

By: DAVID S. JONES,
*Assistant United States Attorney*

**ADDENDUM**

Add. 1

## 21 U.S.C. § 343. Misbranded food

A food shall be deemed to be misbranded—

\*       \*       \*

(q) Nutrition information

(1) Except as provided in subparagraphs (3), (4), and (5), if it is a food intended for human consumption and is offered for sale, unless its label or labeling bears nutrition information that provides—

(A)(i) the serving size which is an amount customarily consumed and which is expressed in a common household measure that is appropriate to the food, or

(ii) if the use of the food is not typically expressed in a serving size, the common household unit of measure that expresses the serving size of the food,

(B) the number of servings or other units of measure per container,

(C) the total number of calories—

(i) derived from any source, and

(ii) derived from the total fat,

in each serving size or other unit of measure of the food,

(D) the amount of the following nutrients: Total fat, saturated fat, cholesterol, sodium, total carbohydrates, complex carbohydrates, sugars,

Add. 2

dietary fiber, and total protein contained in each serving size or other unit of measure,

(E) any vitamin, mineral, or other nutrient required to be placed on the label and labeling of food under this chapter before October 1, 1990, if the Secretary determines that such information will assist consumers in maintaining healthy dietary practices.

\*    \*    \*

(5)(A) Subparagraphs (1), (2), (3), and (4) shall not apply to food—

(i) which is served in restaurants or other establishments in which food is served for immediate human consumption or which is sold for sale or use in such establishments,

\*    \*    \*

(r) Nutrition levels and health-related claims

(1) Except as provided in clauses (A) through (C) of subparagraph (5), if it is a food intended for human consumption which is offered for sale and for which a claim is made in the label or labeling of the food which expressly or by implication—

(A) characterizes the level of any nutrient which is of the type required by paragraph (q)(1) or (q)(2) to be in the label or labeling of the food unless the claim is made in accordance with subparagraph (2), or

(B) characterizes the relationship of any nutrient which is of the type required by paragraph (q)(1) or (q)(2) to be in the label or labeling of the food

Add. 3

to a disease or a health-related condition unless the claim is made in accordance with subparagraph (3) or (5)(D).

A statement of the type required by paragraph (q) of this section that appears as part of the nutrition information required or permitted by such paragraph is not a claim which is subject to this paragraph and a claim subject to clause (A) is not subject to clause (B).

\*     \*     \*

(5)(B) Subclauses (iii) through (v) of subparagraph (2)(A) and subparagraph (2)(B) do not apply to food which is served in restaurants or other establishments in which food is served for immediate human consumption or which is sold for sale or use in such establishments.

## 21 U.S.C. § 343-1. National uniform nutrition labeling

(a) Except as provided in subsection (b) of this section, no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce—

\*     \*     \*

(4) any requirement for nutrition labeling of food that is not identical to the requirement of section 343(q) of this title, except a requirement for nutrition labeling of food which is exempt under subclause (i) or (ii) of section 343(q)(5)(A) of this title, or

Add. 4

(5) any requirement respecting any claim of the type described in section 343(r)(1) of this title, made in the label or labeling of food that is not identical to the requirement of section 343(r) of this title, except a requirement respecting a claim made in the label or labeling of food which is exempt under section 343(r)(5)(B) of this title.

## 21 C.F.R. § 101.9. Nutrition labeling of food

(a) Nutrition information relating to food shall be provided for all products intended for human consumption and offered for sale unless an exemption is provided for the product in paragraph (j) of this section.

\*        \*        \*

(2) When food is not in package form, the required nutrition labeling information shall be displayed clearly at the point of purchase (e.g., on a counter card, sign, tag affixed to the product, or some other appropriate device). Alternatively, the required information may be placed in a booklet, looseleaf binder, or other appropriate format that is available at the point of purchase.

\*        \*        \*

(c) The declaration of nutrition information on the label and in labeling of a food shall contain . . .

(1) "Calories, total," "Total Calories," or "Calories": A statement of the caloric content per serving. . . .

Add. 5

## 21 C.F.R. § 101.10. Nutrition labeling of restaurant foods

Nutrition labeling in accordance with § 101.9 shall be provided upon request for any restaurant food or meal for which a nutrient content claim (as defined in § 101.13 or in subpart D of this part) or a health claim (as defined in § 101.14 and permitted by a regulation in subpart E of this part) is made, except that information on the nutrient amounts that are the basis for the claim (e.g., "low fat, this meal provides less than 10 grams of fat") may serve as the functional equivalent of complete nutrition information as described in § 101.9. Nutrient levels may be determined by nutrient data bases, cookbooks, or analyses or by other reasonable bases that provide assurance that the food or meal meets the nutrient requirements for the claim. Presentation of nutrition labeling may be in various forms, including those provided in § 101.45 and other reasonable means

## 21 C.F.R. § 101.13. Nutrient content claims— general principles

(a) This section and the regulations in subpart D of this part apply to foods that are intended for human consumption and that are offered for sale, including conventional foods and dietary supplements.

(b) A claim that expressly or implicitly characterizes the level of a nutrient of the type required to be in nutrition labeling under § 101.9 or under § 101.36 (that is, a nutrient content claim) may not be made on the label or in labeling of foods unless the claim is

Add. 6

made in accordance with this regulation and with the applicable regulations in subpart D of this part or in part 105 or part 107 of this chapter.

(1) An expressed nutrient content claim is any direct statement about the level (or range) of a nutrient in the food, e.g., "low sodium" or "contains 100 calories."

(2) An implied nutrient content claim is any claim that:

(i) Describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (e.g., "high in oat bran"); or

(ii) Suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient (e.g., "healthy, contains 3 grams (g) of fat").

\*          \*          \*

(c) Information that is required or permitted by § 101.9 or § 101.36, as applicable, to be declared in nutrition labeling, and that appears as part of the nutrition label, is not a nutrient content claim and is not subject to the requirements of this section. If such information is declared elsewhere on the label or in labeling, it is a nutrient content claim and is subject to the requirements for nutrient content claims.

\*          \*          \*

Add. 7

**21 C.F.R. § 101.45. Guidelines for the voluntary nutrition labeling of raw fruits, vegetables, and fish**

(a) Nutrition labeling for raw fruits, vegetables, and fish listed in § 101.44 should be presented to the public in the following manner:

(1) Nutrition labeling information should be displayed at the point of purchase by an appropriate means such as by a label affixed to the food or through labeling including shelf labels, signs, posters, brochures, notebooks, or leaflets that are readily available and in close proximity to the foods. The nutrition labeling information may also be supplemented by a video, live demonstration, or other media.

\*        \*        \*

# ANTI-VIRUS CERTIFICATION

Case Name: NYS Rest. Assoc. v. NYC Bd. of Health

Docket Number: 08-1892-cv


I, Louis Bracco, hereby certify that the Amicus Brief submitted in PDF form as an e-mail attachment to **civilcases@ca2.uscourts.gov** in the above referenced case, was scanned using CA Software Anti-Virus Release 8.3.02 (with updated virus definition file as of 5/29/2008) and found to be VIRUS FREE.


_____
Louis Bracco
*Record Press, Inc.*


Dated: May 29, 2008

# EXHIBIT 3

U. S. Food and Drug Administration
Center for Food Safety and Applied Nutrition
August, 1995; Revised February, 1996

**This document has been superceded by <u>Guidance for Industry: A Labeling Guide for Restaurants and Other Retail Establishments Selling Away-From-Home Foods</u>, issued April 2008.**

# Questions and Answers
# VOLUME II

## A Guide for Restaurants and Other Retail Establishments
## U.S. Department of Health and Human Services
## Public Health Service
## Food and Drug Administration August, 1995

## PREFACE

The Nutrition Labeling and Education Act of 1990 (the NLEA) and the final regulations to implement the NLEA (January 6, 1993), provide for a number of fundamental changes in how food is labeled, including requiring that nutrition labeling be placed on most foods, requiring that terms that characterize the level of nutrients in a food be used in accordance with definitions established by FDA, and providing for the use of claims about the relationship between nutrients and diseases or health-related conditions. These changes apply to virtually all foods in the food supply, including, in large measure, to foods sold in restaurants. Following publication of the January 6, 1993, final rules, FDA issued technical amendments that correct unintended technical effects contained in several of the various rules in the **Federal Register** of August 18, 1993 (58 FR 44020). Nonetheless, a large number of questions have been raised by industry, consumers, and others concerning the interpretation of these various final rules. Consequently, the Office of Food Labeling (OFL)/Center for Food Safety and Applied Nutrition (CFSAN)/FDA developed the "Food Labeling, Questions and Answers" (August 1993) as an efficient way to provide answers to some of the more common questions that had been raised concerning the food labeling regulations. The agency is now issuing "Food Labeling: Questions and Answers, Volume II; A Guide for Restaurants and Other Retail Establishments" as part of a continuing effort to respond to concerns. In this Guide, FDA responds to questions raised since publication of the first guide, including questions related to the labeling of foods sold in restaurants. "Food Labeling: Questions and Answers, Volume II; A Guide for Restaurants and Other Retail Establishments" is intended only to be guidance to facilitate compliance with the new regulations. It does not bind the agency, nor does it create or confer any rights, privileges, or benefits for or on any person. While "Food Labeling: Questions and Answers, Volume II; A Guide for Restaurants and Other Retail Establishments" represents the best advice of OFL, it does not have the force and effect of law. The interpretations presented herein are obviously subject to the requirements of law both in the statute and in the regulations. The OFL plans to issue additional editions of "Food Labeling, Questions and Answers" as resources permit. Questions will be collected by OFL from correspondence and other inquiries that it receives. OFL will also consider specific submissions of questions for inclusion in future editions of "Food Labeling, Questions and Answers". Questions concerning the interpretation of the requirements of the food labeling regulations should be submitted to the Office of Food Labeling (HFS-150), Food and Drug Administration, 200 C St. S.W., Washington, DC 20204.

## Table of Contents

☞ EXEMPTIONS AND SPECIAL LABELING PROVISIONS
(21 CFR 101.9(j)) (Q R1 to Q R64)
Exemptions (Q R4 to Q R57)
- Small business exemption (## 101.9(j)(1) and 101.9(j)(18)) (Q R4 to Q R10)
- Foods which are served or sold in establishments in which foods are served for immediate consumption (# 101.9(j)(2)) (Q R11 to Q R31)
- Ready-to-eat foods not for immediate consumption (# 101.9(j)(3)) (Q R32 to Q R41)
- Foods sold from bulk containers (# 101.9(j)(16)) (Q R42 to Q R46)
- Voluntary nutrition labeling of raw fruits, vegetables and fish (# 101.9(j)(10) and #101.45) (Q R47 to Q R57)

Labeling (Q R58 to Q R64)
- Nutrition label format (# 101.9(d)) (Q R58 to Q R60)
- Gift packages (# 101.9(h)(3)) (Q R61 to Q R64)

☞ NUTRITION LABELING OF RESTAURANT FOODS
(# 101.10)B (Q R65 to Q R90)

☞ CONTEXT OF CLAIMS AND COVERAGE BY THE NLEA
(Q R91 to Q R153)
The Claim (Q R91 to Q R131)
- Nutrient content claims (Q R91 to Q R103)
- Health claims (Q R104 to Q R116)
- Dietary guidance (Q R117 to Q R127)
- Use of undefined terms and terms or symbols in a different context (#101.13(q)(5)(iii) (Q R128 to Q R131)
Criteria for Making a Claim (Q R 132)
Reasonable Basis Determination (Restaurant Foods) (Q R 132 to Q R145)
- Determining the nutrient content of a restaurant food (Q R132 to Q R 137)
- Adherence to the "reasonable basis" (Q R138 to Q R145)
Reference Amounts (Q R 146 to Q R149)
Reference Foods (Q R150 to Q R 153)

---

# QUESTIONS AND ANSWERS

## VOLUME II

### FOOD LABELING

*(for restaurants and other retail establishments)*

# EXEMPTIONS AND SPECIAL LABELING PROVISIONS
# (21 CFR 101.9(j))

**R1.**

*Question:* Do all foods need to bear nutrition labeling?

*Answer:* No. Exemptions (or special labeling requirements) are provided for:

1. Small businesses based on gross sales (after May 8, 1995, this exemption will apply only to retailers) (# 101.9(j)(1)).

2. Low volume food products (based on the average number of full time equivalent employees (FTE's) and the approximate units of food products sold in the United States) (# 101.9(j)(18)).
3. Foods served or sold in establishments that serve food for immediate consumption (e.g., restaurants, schools, cafeterias, trains, airplanes, and retail stores such as bakeries and deli's that have facilities for immediate consumption) or that are sold for use only in such establishments (# 101.9(j)(2)).
4. Ready-to-eat foods not for immediate consumption (e.g., restaurant-type foods sold by deli's and bakeries that do not have facilities for immediate consumption) that are primarily processed at the retail location or that are portioned and packaged to the consumer's specifications (# 101.9(j)(3)).
5. Foods of no nutritional significance (e.g., plain coffee or tea) (# 101.9(j)(4))
6. Bulk foods for further manufacturing (# 101.9(j)(9))
7. Raw fruits, vegetables, and seafood (covered by voluntary program for display at retail) (# 101.9(j)(10)).
8. Custom processed fish and game meat (# 101.9(j)(11)).
9. Small packages with less than 12 square inches of available label space, (e.g., a pack of gum (# 101.9(j)(13)), provided the label provides consumers with a way to obtain nutrition information for the food, (e.g., address, phone number). If a claim is made, nutrition labeling must be provided according to # 101.9(j)(13).
10. Food sold from bulk containers, provided that nutrition information is provided at point of sale (# 101.9(j)(16)).

Most of these exemptions are contingent on the food not bearing a nutrient content claim, health claim, or other nutrition-related information on its label or labeling. This set of Questions and Answers will focus primarily on the requirements for foods served or sold in establishments with facilities for immediate consumption (# 101.9(j)(2)) and for ready-to-eat foods sold by retail establishments that do not have facilities for immediate consumption (# 101.9(j)(3)). The other exemptions in # 101.9(j) will be discussed only as they apply to foods sold in these types of establishments. Additional information about the exemptions may be found in: Title 21 of the Code of Federal Regulations; Food Labeling, Questions and Answers (Volume I, August 1993); and in the Federal Register documents cited in the preface of this document.

**R2.**

*Question:* Would foods that are exempt from nutrition labeling under # 101.9(j) also be exempt from other labeling requirements?
*Answer:* The exemptions in # 101.9(j) apply only to nutrition labeling requirements when the food bears no claim or other nutrition information.

**R3.**

*Question:* Would food served or sold in carry-out boxes, doggie bags, or sanitary wrappers be considered "packaged food?"
*Answer:* Food sold in a restaurant or other retail establishment (e.g., a bakery or delicatessen) that is sold from behind a counter and placed in a wrapper, carry-out box, or other non-durable container whose sole purpose is to facilitate handling would not be considered "packaged food" and would not need to bear a net weight statement, ingredient declaration, or the other labeling required of packaged foods. However, if consumers make their selections based on the food in its packaged form, e.g., the food is wrapped or boxed by the retailer and sold from a self-service case in a corner of a restaurant, or across the aisle from an in-store deli, the food must bear all required information.

## Exemptions

## Small Business Exemption (## 101.9(j)(1) and 101.9(j)(18)).

**R4.**

*Question:* Does the small business exemption apply to retailers?
*Answer:* Yes. The small business exemptions based on dollar sales (# 101.9(j)(1)) and on low volume sales/number of employees (proposed # 101.9(j)(18)) both apply to retailers. When a retailer meets the criteria for a small business exemption under # 101.9(j)(1), all foods packaged by the small retailer would be exempt from nutrition labeling. A low volume food product sold by a retailer would be exempt under proposed # 101.9(j)(18) if the retailer meets the criteria for a small business (e.g., less than 100 full-time equivalent employees) and the food

packaged by the retailer is a low volume food (e.g., annual sales of less than 100,000 consumer units). However, if the food product bears nutritional claims or other nutrition-related information on its label or labeling, it is not eligible for either exemption.

### R5.

*Question:* A manufacturer who qualifies for a small business exemption sells his product to a large retailer who then repacks it in the deli and places it on self-service shelves. Is the product exempt from nutrition labeling if the retailer puts the small manufacturer's name on the product?

*Answer:* Yes. As long as the retailer is simply repacking the food into smaller containers and placing the small business's name and address on the packaged food (i.e., the package label bears no name or logo that would tie the product to the larger retailer), the food would retain any exemption it was eligible for under ## 101.9(j)(1) or (18).

### R6.

*Question:* In May of 1994, a small manufacturer was eligible for a small business exemption based on the gross sales criterion in # 101.9(j)(1). Can the manufacturer use the same criterion in determining whether product is exempt from nutrition labeling in May of 1995?

*Answer:* No. Since May 8, 1995, the exemption based on gross sales (# 101.9(j)(1)) applies only to retailers (i.e., persons who sell product directly to consumers), and the manufacturer's product would need to comply with the requirements for a low-volume product (# 101.9(j)(18)) for it to continue to be eligible for the exemption.

### R7.

*Question:* A small retailer purchases bulk product from a large manufacturer and repacks the product for retail sale using the retailer's name and logo. Is the product exempt from nutrition labeling?

*Answer:* If the retailer is eligible for the exemption in # 101.9(j)(1) (based on gross sales), product purchased from a large manufacturer but repacked by the retailer would be exempt from nutrition labeling, as long as the package label bears no name or logo that would tie the product to the manufacturer. However, to be eligible for the exemption in # 101.9(j)(18), the product must also meet the definition of low volume products (based on the total number of units of the product sold by the large manufacturer in the United States).

### R8.

*Question:* What are the requirements for the exemption from nutrition labeling for a low volume food product?

*Answer:* The exemption for low volume food products is based on the average number of full time equivalent employees (FTE's) and the number of units of product sold in the United States. Only those products listed with the Office of Food Labeling are eligible for the exemption. For products marketed prior to May 8, 1994, limits on FTE's and unit sales will be phased-in according to the following provisions:

| Compliance Period | FTE's | Units Sold |
| --- | --- | --- |
| 1995 | < 300 | < 400,000 |
| 1996 | < 200 | < 200,000 |
| 1997 | < 100 | < 100,000 |

Products initially introduced after May 8, 1994, must meet the 1997 levels, i.e., < 100 FTE's and < 100,000 units sold.

### R9.

*Question:* Do all firms need to file with FDA for the small business exemption?

*Answer:* No. Firms eligible for the exemption based on gross sales and firms with less than 10 FTE's and less than 10,000 units do not have to file with the FDA. However, such firms can choose to do so voluntarily in order to establish a record that they are claiming an exemption (attachment E). Also, all importers must file.

### R10.

*Question:* Does the small business exemption apply to restaurants?

*Answer:* There is a separate exemption from nutrition labeling for foods sold in restaurants of any size, provided

the food does not bear a claim (#101.9(j)(2)). These foods do not need the small business exemption. However, to the extent that a restaurant distributes food products for sale outside the restaurant (e.g., through grocery stores), such products may be eligible for an exemption from nutrition labeling under the small business exemption.

**Foods Which are Served or Sold in Establishments in Which Foods are Served for Immediate Consumption (# 101.9(j)(2)):**

**R11.**

*Question:* If a restaurant makes a claim for one item, does it need to provide nutrition information for all the foods it serves?

*Answer:* No. The exemptions in ## 101.9(j)(2)(I) through (iii) apply to individual food items that are served or sold in a restaurant or similar establishment, not to the establishment. A restaurant need only provide nutrition information for those items that bear a claim. The restaurant may voluntarily provide nutrition information for restaurant foods that do not bear a claim. It should be noted that the January 6, 1993 final regulations implementing the NLEA currently apply to all forms of restaurant labeling except for menus. Thus, a claim on a menu does not trigger FDA's nutrition labeling or claims requirements. However, States are not prohibited from enforcing these requirements with respect to menus (see Q **R31**). Furthermore, in the FEDERAL REGISTER of June 15, 1993 (58 FR 33055), FDA published a proposal to remove the exemption for claims on menus. Should the agency publish a final regulation deleting the menu exemption, the requirements discussed herein for non-menu labeling (e.g., signs, posters, placards, brochures, banners, etc.) will apply to all forms of labeling, including menus.

**R12.**

*Question:* Are foods sold to and used by restaurants in food preparation, but not served to consumers in the package in which they are received, exempt from nutrition labeling, even if claims are made?

*Answer:* Yes. The exemptions in # 101.9(j)(2)(iv) for foods sold for use only in restaurants but not served directly to consumers in the package received (e.g., large quantity containers) and in # 101.9(j)(2)(v) for foods sold by a distributor who principally sells food to such facilities are not conditional on the absence of claims as are the other exemptions under # 101.9(j)(2) because the consumer will not see these package labels. However, manufacturers, packers, or distributors may wish to place nutrition information on the label of the package or case, or in a flyer in each case of product, for the benefit of the food service operator who may need such information to support any claims made to consumers in the restaurant. Likewise, the restaurateur may require nutrient content information as a condition of purchase.

**R13.**

*Question:* How does FDA define "restaurants?"

*Answer:* "Restaurants" include conventional full service restaurants and other establishments that offer restaurant-type services. The term "restaurant" applies broadly to establishments where food is served or sold for immediate, on-site consumption (e.g., institutional food service establishments, such as schools, hospitals, and cafeterias; transportation carriers, such as trains and airplanes; delicatessens, and catering where there are facilities for immediate consumption on the premises). The definition of "restaurant" extends to establishments where foods are generally consumed immediately where purchased or while walking away (e.g., lunch wagons, cookie counters in a mall, and vending machines, including similar foods sold from convenience stores); and food delivery systems or establishments where ready-to-eat foods are delivered to homes or offices for immediate consumption.

**R14.**

*Question:* Are all foods that are sold in restaurants or from other facilities such as vending machines and that do not bear a claim exempt from nutrition labeling?

*Answer:* No. The exemptions in ## 101.9(j)(2)(I) through (iii) are limited to (1) ready-to-eat foods served in restaurants and in other establishments in which food is sold for immediate human consumption and (2) foods sold for sale or use <u>only</u> in such establishments. Commercially packaged foods such as soft drinks in cans, bags of potato chips, and candy bars that may be sold in restaurants and vending machines but that are also sold through other retail outlets(e.g., grocery stores) must bear nutrition labeling, regardless of whether or not they bear a claim

(subject, of course, to the low volume product and small business exemptions).

**R15.**

   *Question:* Are foods that are served aboard airlines required to have nutrition labeling?

   *Answer:* Food served aboard airplanes and other common carriers is exempt from nutrition labeling under # 101.9 (j)(2)(ii) provided it does not bear a claim.

**R16.**

   *Question:* A restaurant serves a salsa that was commercially manufactured under the restaurant's brand name. The restaurant also offers a bottled salsa for sale to patrons for later use. The food does not bear a claim. To be eligible for an exemption under # 101.9(j)(2), does it matter whether the food is served for immediate consumption or whether it is sold in packaged form?

   *Answer:* No. The exemptions in ## 101.9(j)(2)(I) through (iii) cover foods that are served or sold in restaurants and similar establishments, regardless of whether they are sold in packaged form provided their sale is limited to restaurant establishments. However, FDA strongly encourages that products such as the bottled salsa bear nutrition labeling when they are sufficiently standardized to do so.

**R17.**

   *Question:* A bottled salsa sold in a restaurant is also sold through conventional retail outlets. The food does not bear a claim. Must the food bear nutrition labeling?

   *Answer:* Yes. The exemption in # 101.9(j)(2)(iii) for foods sold in restaurants specifies that the food be sold only in restaurants. Because the sale of the salsa is not limited to restaurants, both products (i.e., restaurant and retail) must bear nutrition labeling under # 101.9. The exceptions to this requirement would be (1) foods that are packaged differently for use in restaurants compared to the food sold at other retail locations, e.g., catsup, soy sauce, and other condiments packed in decorative containers for table service, and (2) products covered by the small business or low volume products exemptions.

**R18.**

   *Question:* Would foods sold in a gift shop attached to a restaurant or food items sold from a counter across the aisle from the cash register in a truck stop be considered "restaurant foods?"

   *Answer:* If the retail area is located in close proximity to the restaurant, e.g., across the aisle from the area where food is served, and if it is not operated independently from the restaurant, it could be considered part of the restaurant establishment and the foods sold therein may qualify for the "restaurant food" exemption. However, any food item whose sale is not limited to restaurants would not be a restaurant food and, therefore, would not be eligible for the exemption in # 101.9(j)(2)(iii).

**R19.**

   *Question:* Could you elaborate on the types of foods sold in vending machines that are exempt from nutrition labeling?

   *Answer:* Foods that are prepared or dispensed by a vending machine (e.g., soda, coffee, soup, or popcorn that is dispensed into a cup) would be analogous to foods served in a restaurant and, therefore, would be exempt from nutrition labeling requirements provided the food does not bear a claim (# 101.9(j)(2)(ii)). Vending machine foods sold in packaged form (e.g., a salad or sandwich prepared in a commissary) that are similar to foods sold in restaurants are exempt from nutrition labeling requirements under # 101.9(j)(2)(iii) provided the food does not bear a claim and it is not sold through other retail channels (e.g., grocery stores). The exemption for food sold in restaurants and similar establishments, including vending machines, extends to commercially manufactured foods that have been specially packaged for sale only in such establishments. However, FDA strongly encourages that foods that are sufficiently standardized to bear nutrition labeling (e.g., individual serving size cans of soup) do so.

**R20.**

   *Question:* Could you elaborate on the types of foods that are sold from convenience stores but that would be exempt from nutrition labeling because they are similar to restaurant foods?

   *Answer:* FDA has stated that the exemption from nutrition labeling for such foods should be limited in scope and that some enforcement decisions will need to be made on a case-by-case basis. Generally, however, the foods

covered by this exemption must be of the type served in restaurants or similar establishments (i.e., ready-to-eat, sold for immediate human consumption). Such foods would be expected to be non-standardized (e.g., prepared in a commissary kitchen similar to a restaurant or cafeteria kitchen where foods are assembled by hand and subject to individual product variations) and to have a short shelf-life. Examples of such foods would include: sandwiches; single-serving packages of salads, pies, and puddings; and soups and beverages dispensed into cups, that are in direct competition with foods served in restaurants and that are generally consistent with the above criteria. In contrast, this exemption would not extend to foods that are not ready-to-eat or are not for immediate consumption. As discussed in response to question **R32**, there is a separate exemption from nutrition labeling for ready-to-eat foods not for immediate consumption (e.g., ready-to-eat foods that are processed or prepared at the location from which they are sold but that are sold for later use (# 101.9(j)(3)). Where the food sold in a convenience store is sufficiently standardized to bear nutrition labeling, it should do so, unless otherwise exempt.

## R21.

*Question:* If an exempt sandwich sold in a vending machine or convenience store includes a single serving unit of a condiment, such as mayonnaise, must nutrition labeling be provided on the mayonnaise packet?
*Answer:* Foods that are eligible for the exemption from nutrition labeling under # 101.9(j)(2), including sandwiches sold from lunch wagons, vending machines, and convenience stores, are exempt in their entirety. Therefore, a mayonnaise packet packaged with a sandwich is also exempt as long as its label does not bear a claim or other nutrition information.

## R22.

*Question:* Would a single serve package of a condiment be exempt from nutrition labeling if it is served on its own, e.g., placed in a bowl on a table?
*Answer:* Yes. Food that is served in a restaurant or similar establishment is exempt from nutrition labeling provided that the food does not bear a claim (## 101.9(j)(2)(i) and (ii)). Condiments in single serve packages placed in a bowl on a table in a full service restaurant or in a container on a lunch counter or vending facility for consumers to use at their discretion, would be eligible for these exemptions. Likewise, condiments served in larger, multi-serving containers would also be eligible for the exemption under ## 101.9(j)(2)(i) or (ii) provided the food does not bear a claim.

## R23.

*Question:* A single-serve package of a condiment is served or sold in restaurants. It is commercially manufactured, packaged, and labeled. The package label bears a claim. How should nutrition labeling be accomplished for the food?
*Answer:* In the August 18, 1993, technical amendments (58 FR 44020), FDA amended # 101.9(j)(13)(i)(B) to permit individual serving-size packages of food for use in restaurants and similar situations to use the minimum type size allowed under # 101.2(c)(5) of one thirty-second inch for nutrition labeling provided that the packages have a total area available to bear labeling of 3 square inches or less. If, despite this provision, a small package still cannot comply with nutrition labeling requirements, the person responsible for labeling is advised to write the Office of Food Labeling, FDA (HFS-150), requesting alternative means of compliance in accordance with 101.9 (g)(9). (See Q **R66** and **R67**.)

## R24.

*Question:* A restaurant serves a food that is commercially manufactured, packaged, and labeled. The food is served to consumers in the form it was purchased by the restaurant, e.g., individual serving size packages of condiments are placed in a bowl for consumer use. Would FDA hold the restaurant that serves the food responsible if the label of the food does not meet FDA's requirements, for example, if a package of salad dressing bears a "lowfat" claim but fails to bear nutrition information?
*Answer:* FDA requires that the label of a food sold in packaged form identify conspicuously the name and place of business of the manufacturer, packer, or distributor (# 101.5). The firm that is so identified is generally the firm that is responsible for insuring that the food is properly labeled.

## R25.

*Question:* Must a restaurant food be ready-to-eat to be exempt under # 101.9(j)(2)?

*Answer:* Not necessarily. The exemptions for foods served in restaurants and in similar establishments (## 101.9 (j)(2)(i) and (ii)) imply that the food is ready-to-eat and is served for immediate consumption. However, a restaurant may also sell foods for carry-out that are not ready-to-eat, e.g., a pizza that is only half cooked or a pie that is frozen. Further, foods sold for use in restaurants may be used as ingredients in the foods a restaurant prepares but are not, themselves, ready-to-eat. Thus, the exemptions for foods sold for sale or use only in restaurants (## 101.9(j)(2)(iii) and (iv)) and for foods sold by a distributor who principally sells food to such facilities (# 101.9(j)(2)(v)) are not limited to ready-to-eat foods.

**R26.**

*Question:* Company X operates a large chain of restaurants with different facilities and services at each establishment based on the size of the establishment. Larger establishments have facilities for consuming food on the premises, sell food for "carry-out," and offer home delivery services. Some of the company's smaller retail establishments have no on-site eating facilities and all food sold is for "carry-out" or home delivery. Are the foods sold from these establishments exempt from nutrition labeling under # 101.9(j)(2)?

*Answer:* In the above example, all foods served in the larger restaurant establishment would be exempt from nutrition labeling provided the food does not bear a claim. Foods sold for carry-out or home delivery from larger establishments (i.e., establishments with facilities for immediate consumption of the food) would also be exempt provided the food does not bear a claim and sale of the food is limited to restaurant-type establishments. Foods sold by an establishment with no tables and chairs would still be eligible for the exemption provided that the food is ready-to-eat and is generally consumed immediately where purchased or while walking away (e.g., pizza sold from a walk-up counter in a mall). This exemption extends to foods sold by establishments that have facilities for delivering ready-to-eat foods to homes and offices for immediate consumption. Ready-to-eat "carry-out" foods would be similar to home-delivery foods, with the consumer doing the delivering, provided the foods are sold for immediate consumption.

**R27.**

*Question:* In the preceding example, most of the smaller establishments owned by Company X (i.e., establishments that offer only carry-out and home delivery service) cook, assemble, and otherwise prepare the food on-site. However, a few of the very small locations sell ready-to-eat food for immediate consumption that is prepared at a central commissary and shipped to the retail location. Are these foods still exempt from nutrition labeling under the restaurant food exemption if they do not bear a claim?

*Answer:* Yes, provided the foods meet the general criteria for restaurant foods, i.e., they are ready-to-eat and sold for immediate consumption. Although foods served or sold in restaurants are frequently prepared on-site, this is not a requirement for this exemption. (There is a separate exemption in # 101.9(j)(3) for restaurant-type foods that are ready-to-eat, not for immediate consumption, and prepared at the retail location from which they are sold (see Q **R32**)).

**R28.**

*Question:* Would a ready-to-eat food that is normally sold for immediate consumption by a small carry-out restaurant lose its exemption from nutrition labeling if consumers occasionally purchase the food for later use? For example, if a consumer purchases an extra pizza at lunch-time and takes it home for dinner that night or the next day.

*Answer:* If a food is consistent with the general requirements for the exemption for restaurant foods, it would not automatically lose its exemption because of a limited number of sales that are different from normal practice. When determining whether a food qualifies for an exemption from nutrition labeling, and which exemption applies, FDA would consider how the food would most often be reasonably expected to be sold (e.g., for immediate consumption).

**R29.**

*Question:* Do restaurant foods that make claims need to comply with the same requirements as foods from other sources?

*Answer:* Restaurant foods that bear a claim must comply with the same definitions for nutrient content claims or qualify to bear health claims under the same authorizing regulations as foods from other sources. At the same time, FDA is providing a measure of flexibility in how restaurateurs determine the nutrient content of their food

(e.g., "reasonable basis" for believing a food meets the definition of a claim), and how they communicate this information to consumers (e.g., in a brochure or notebook) (# 101.10). These provisions are discussed in sections II and III of this document.

**R30.**

> *Question:* When are the labeling requirements for restaurant foods effective? *Answer:* The effective dates vary depending on the type of claim being made, the size of the restaurant, and the type of labeling that bears the claim. "Small restaurants" are defined as "firms with 10 or fewer establishments." Larger restaurants have more than 10 establishments. The effective dates FDA established are:
> - **May 8, 1993,** for health claims in non-menu labeling in larger restaurants;
> - **May 8, 1994,** for health claims in non-menu labeling in small restaurants;
> - **May 8, 1994,** for nutrient content claims in non-menu labeling in larger restaurants;
> - **May 8, 1995,** for nutrient content claims in non-menu labeling in small restaurants;
>
> Thus, all of these requirements are in effect.

**R31.**

> *Question:* Can a State require restaurant foods to bear nutrition labeling even if the food is exempt under Federal requirements?
>
> *Answer:* Yes. The NLEA provided for Federal preemption of State and local requirements that are not identical to the Federal requirement in a number of key areas of food labeling (section 403A(a) of the act). However, sections 403A(a)(4) and (5) of the act provide that State requirements of the type required by 403(q) (nutrition labeling) and 403(r)(1) (claims) would not be preempted for foods that are exempt from the Federal requirements. Thus, even though claims on menus are not currently subject to NLEA, States would be free to apply nutrition labeling and claims requirements to claims on menus. Furthermore, because the act exempts restaurant foods that do not bear a claim from mandatory nutrition labeling, State requirements for the nutrition labeling of such foods would not be preempted. The act also exempts restaurant foods that bear a claim from certain disclosure and referral statements. Thus, State requirements of this type would not be preempted. (The first volume of Questions and Answers, August 1993, N95, incorrectly stated that a State would need to submit a petition, and receive a favorable response to that petition, in order to enforce State requirements for the nutrition labeling of restaurant foods).

## Ready-to-eat Foods Not for Immediate Consumption (# 101.9(j)(3)):

**R32.**

> *Question:* I own a "gourmet-take-away" store. Many of the items sold in the store are ready-to-eat, similar to foods served in restaurants. However, the foods are not usually purchased for immediate consumption. Must these foods bear nutrition labeling?
>
> *Answer:* It depends. Section 101.9(j)(3) exempts the types of ready-to-eat foods that would have been exempted by ## 101.9(j)(2)(i) or (ii) (i.e., ready-to-eat foods that are served in restaurants and similar establishments and that do not bear a claim) had it not been for the requirement that the food be sold in an establishment that has facilities for immediate consumption. To be eligible for the exemption in # 101.9(j)(3), restaurant-type foods that are sold by retail establishments that do not have facilities for immediate consumption must be: (1) similar to foods served in restaurants, (2) ready-to-eat, (3) primarily processed or prepared at the retail establishment from which they are sold, and (4) not offered for sale outside such establishment. Accordingly, ready-to-eat food that is prepared on-site, and that is sold only from such retail location, is exempt from nutrition labeling under # 101.9(j)(3) provided that it does not bear a claim, regardless of whether or not there are facilities for on-site consumption. Foods that are prepared elsewhere but are portioned and packaged to consumer specifications at retail would fulfill the prepared on-site criterion.

**R33.**

> *Question:* To be exempt from nutrition labeling under # 101.9(j)(3), foods must be ready-to-eat. Are cold entrees, such as lasagna or pizza, considered ready-to-eat even though they are generally eaten hot?
>
> *Answer:* As long as the food is fully cooked, it is considered ready-to-eat. For example, a pizza with a raw crust that requires cooking before consumption would not be "ready-to-eat." However, a pizza that is cooked and then

cooled would be. While most customers would be expected to reheat the food before consumption, it would not be necessary that they do so.

**R34.**

> *Question:* Could you elaborate on which foods sold from delis and bakeries that do not have facilities for immediate consumption of food (including independent deli's and bakeries and the deli or bakery cases of retail stores) are exempt from nutrition labeling under # 101.9(j)(3)?
>
> *Answer:* Foods sold from behind deli and bakery service cases, where the customer must make a selection and indicate the amount of the item desired, are exempt unless the food bears a claim or other nutrition information. When claims or other nutrition information are given, nutrition labeling needs to be displayed clearly at the point-of-purchase. When the deli or bakery foods that are regulated by FDA are packaged for self-service, they are only exempt from nutrition labeling if the product was primarily processed or prepared on-site, and no claims are made for the product. If the food is primarily processed or prepared on the premises from which it is sold, it is exempt from nutrition labeling, regardless of how it is sold (i.e., from behind the counter or pre-portioned packages from a self-service shelf).

**R35.**

> *Question:* Would bread baked at the retail location qualify as "primarily processed or prepared on-site," if the bakery is using dough that was pre-formed at a different location? What if the bakery adds icing to a cake that was baked elsewhere?
>
> *Answer:* To meet the criterion for being "primarily processed or prepared on-site," the food must be augmented on site in a manner that changes the nutritional profile of the food, i.e., filling, icing, enrobing. Foods that are assembled on-site meet this criterion even though some components of the food (e.g., the bread or cheese used in a sandwich) were prepared elsewhere. Similarly, cakes that are custom decorated at the retail location are exempt, even if the cake was baked elsewhere. Garnishing (e.g., adding sesame seeds to bread dough) would fall under the definition of "primarily processed or prepared on-site" if the added food changes the nutritional profile of the finished product. In contrast, if a food is merely portioned on-site or if pre-formed dough or pre-scaled/-molded dough is simply thawed or merely proofed and baked at the retail location, the product is not "primarily processed or prepared on-site," and nutrition labeling is required.

**R36.**

> *Question:* Is nutrition labeling required for orange juice that is freshly squeezed in the produce section of the retail store?
>
> *Answer:* No, this product is produced on the premises from raw oranges available in the retail section of the store. It may be collected in containers brought in by consumers or containers available from the retail store. The product need not have nutrition labeling.

**R37.**

> *Question:* Must cheeses that are cut into slices or wedges and packaged in retail establishments bear nutrition labeling?
>
> *Answer:* Cheese is generally not processed or prepared on the premises. Therefore, unless it is sold from behind the deli counter, i.e., portioned to consumer specifications, it would not qualify for an exemption under # 101.9(j)(3). When pre-portioned, wrapped, and put out on a self-service counter, it is a packaged food and must meet all labeling requirements.

**R38.**

> *Question:* Must slices of cheesecake that are cut and packaged in retail establishments bear nutrition labeling?
>
> *Answer:* If the cheesecake is primarily processed or prepared on the premises, or if it is sold from behind the deli counter, it is exempt under # 101.9(j)(3). If it does not meet either of these criteria, it must bear full labeling. As with cheese, when pre-portioned, wrapped, and put out on a self-service counter, it is a packaged food and must meet all labeling requirements.

**R39.**

> *Question:* A deli purchases 6 and 8 lb loaves of bread that it cuts and sells by unsliced, random weight portions. Is

nutrition labeling required for the bread, and if so, how can the deli declare "Serving size" and "Servings per container" for the unsliced, random weight portions? *Answer:* Nutrition labeling would be required on the cut pieces when they are packaged and put out on a self-service shelf, or if claims are made on the product when sold from behind the counter. When labeling is required, the serving size for the unsliced bread should be based on the reference amount (e.g., "2 oz (56 g/1 inch slice)"), and the "Servings per container" could say "varied," so that the same nutrition label could be used on all random weight portions.

**R40.**

*Question:* Is nutrition labeling required for foods sold in a salad or soup bar in a retail store?
*Answer:* Unpackaged ready-to-eat foods available for self-service from salad and soup bars in a retail store (i.e., a grocery store that does not have facilities for immediate consumption) are generally exempt under # 101.9(j)(3) since the foods are of the type often sold from a service counter or deli case and are portioned to consumer specifications (even though it is the customer, not store personnel, who is portioning the food item). This exemption includes ready-to-eat food, not for immediate consumption, that is primarily processed or prepared at the retail location from which it is sold, regardless of whether it is sold wrapped or self-service. If the food is ready-to-eat and is sold for immediate consumption, it may also qualify for the restaurant food exemption, even if it is sold from a retail establishment with no facilities for immediate consumption. (See, e.g., foods sold in convenience stores that are in direct competition with restaurant foods (Q **R13**)). The above exemptions are dependent on the food not bearing a claim or other nutrition information. If a claim is made (e.g., "low fat pasta salad"), or when other nutrition information is provided, the above exemptions are lost, and nutrition information must be provided.

**R41.**

*Question:* When party platters of vegetables and dip or cheeses are made up in the deli or produce section of a retail store, must the platters bear nutrition labeling? On vegetable platters, does it make a difference if the dip is prepared in the store or is a commercially prepared product?
*Answer:* Platters prepared or assembled at a retail location and sold from such retail location are exempt under # 101.9(j)(3), regardless of whether the platter includes a commercially processed food component, such as a dip. In contrast, platters that are prepared in a central commissary and shipped to the retail store must bear nutrition labeling (except platters containing only fresh fruits or vegetables that are exempt under the voluntary nutrition labeling program # 101.9(j)(10)).

## Foods Sold from Bulk Containers (# 101.9(j)(16)):

**R42.**

*Question:* How should nutrition labeling be accomplished for foods sold from bulk containers?
*Answer:* Section 101.9(j)(16) allows foods sold from bulk containers to display the required nutrition information on the outside of the container or on posters, counter cards, tags, or similar measures. The containers these foods are put into when sold to the consumer do not need to bear nutrition labeling as long as the required nutrition information is displayed at point-of-purchase (i.e., plainly in view by the bulk containers).

**R43.**

*Question:* If a bulk food is repacked at the retail level and sold in packaged form instead of from the bulk container, do the individual packages have to carry nutrition labeling?
*Answer:* Yes. When foods are received by a retail store in bulk form and repacked for sale to consumers as a packaged food, the package must meet all mandatory labeling requirements.

**R44.**

*Question:* When placing nutrition labeling on bulk foods, how should the number of servings per bulk container be declared?
*Answer:* The number of servings in a bulk container will vary according to the fill of the container, and such a number is of little or no usefulness to consumers. Thus, FDA intends to propose in the Federal Register the possible use of the term "varied" or other options for expressing servings per container in this situation. Pending such rulemaking, FDA would be unlikely to object to a statement that the "Servings per container" are "varied" on

bulk food containers or on random weight portions of foods repackaged by the retailer.

**R45.**

*Question:* Who is responsible for providing nutrition information for bulk foods?
*Answer:* The retailer is responsible for displaying the nutrition information in the required format on or adjacent to the bulk container. The information may be obtained/provided by either the supplier or retailer. The decision as to who actually develops the information is up to those parties involved.

**R46.**

*Question:* If a co-op sells bulk foods directly to consumers or consumer groups, must the bulk container bear nutrition labeling?
*Answer:* Yes. Subject, of course, to the exemptions for small businesses and low volume products.

**Voluntary Nutrition Labeling of Raw Fruits, Vegetables and Fish (# 101.9(j)(10) and # 101.45):**

**R47.**

*Question:* Will posting of nutrition labeling for all raw fruit, vegetables, and fish be required?
*Answer:* No. The program is voluntary as long as there is substantial compliance by the retail food industry. FDA is required to survey every two years to see if a substantial proportion of retailers are providing nutrition labeling for the 20 most frequently consumed fresh vegetables, fruits, and raw fish.

**R48.**

*Question:* What are the 20 most frequently consumed raw *vegetables, fruits, and fish*? Are they determined on a regional basis?
*Answer:* The 20 foods for each group are identified in # 101.44. The same list is to be used nationwide.
*Vegetables:* Potato, iceberg lettuce, tomato, onion, carrot, celery, sweet corn, broccoli, green cabbage, cucumber, bell pepper, cauliflower, leaf lettuce, sweet potato, mushrooms, green onion, green (snap) beans, radishes, summer squash, and asparagus. *Fruits:* Banana, apple, watermelon, orange, cantaloupe, grapes, grapefruit, strawberries, peach, pear, nectarine, honeydew melon, plums, avocado (California), lemon, pineapple, tangerine, sweet cherries, kiwi fruit, and limes. *Fish:* Shrimp, cod, pollack, catfish, scallops, Atlantic/coho salmon, flounder, sole, oysters, orange roughy, Atlantic/Pacific and jack mackerel, ocean perch, rockfish, whiting, clams, haddock, blue crab, rainbow trout, halibut, and lobster. On July 18, 1994 (59 FR 36379), FDA proposed that the list for the 20 most frequently consumed raw fish be modified to read as follows: Shrimp, cod, pollack, catfish, scallops, salmon (Atlantic/coho, chum/pink, sockeye), flounder/sole, oysters, orange roughy, mackerel (Atlantic/Pacific), ocean perch, rockfish, whiting, clams, haddock, blue fish, rainbow trout, halibut, lobster, and swordfish.

**R49.**

*Question:* Can retailers provide nutrition labeling for raw fruit, vegetables, and fish that are not among the top 20 items?
*Answer:* Yes. The names and descriptions of these foods should clearly identify them as distinct from the foods among the most frequently consumed list for which FDA has provided data (# 101.45(c)(1)). Nutrition labeling values for foods not on FDA's lists are subject to the compliance provisions of # 101.9(g).

**R50.**

*Question:* How does FDA define "raw fruit and vegetables" for the voluntary nutrition labeling program? Are fresh herbs and nuts included under the voluntary nutrition labeling program if they are sold in the produce section of retail stores?
*Answer (revised 2/96):* The NLEA provides for voluntary nutrition labeling of "raw agricultural commodities and raw fish." The act defines "raw agricultural commodities" as any food in its raw or natural state, including all fruits that are washed, colored, or otherwise treated in their unpeeled natural form prior to marketing. Therefore, fruit and vegetables that receive little or no processing and no heat treatment, regardless of whether the fruit and vegetables are waxed, are subject to the voluntary program. In addition, for ease of administration the agency has chosen to draw a practical line in terms of retail selling practices and program implementation by including raw fruit and vegetables that are sold in the produce section and that are peeled, trimmed, cut and/or packaged with no

added ingredients (e.g., carrot sticks, mixed salad greens) in the voluntary program when no claims are made for the product. When claims are made, nutrition labeling is required on the package unless the the required nutrition information is provided on a poster or other means as specified in # 101.45. Accordingly, fresh herbs and nuts (e.g., walnuts, peanuts) that have no added ingredients, such as salt, and that are sold in the produce section would be exempt from nutrition labeling under the voluntary program. However, when shelled or unshelled nuts or produce are processed in a manner other than mixing with other raw produce items, peeling, trimming , or cutting, (e.g., dried fruit, roasted nuts, frozen melon balls), nutrition labeling is required under # 101.9.

## R51.

*Question:* Is nutrition labeling still voluntary on packages of raw vegetables or fruits when processed foods, such as salad dressings and croutons, are added to the package?

*Answer:* When processed foods, such as salad dressings or croutons, are added to packages of raw vegetables or fruits, the product is considered to be a multi-ingredient processed packaged food and is no longer part of the voluntary program. Therefore, nutrition labeling is mandatory for the entire contents of the package. (Subject, of course, to the exemption for ready-to-eat food that is primarily processed or prepared at the retail location and the small business exemptions.)

## R52.

*Question:* Would the packaged salad with dressing be considered ready-to-eat if consumers have to open the package of dressing and add it to the salad greens themselves?

*Answer:* Because restaurant salads may be served with the dressing on the side or the croutons in a side package, packages of salads prepared in the retail establishment would be considered ready-to-eat when the only preparation needed by the consumer is adding the dressing or croutons. In contrast, products that require a significant amount of assembly or preparation (e.g., a pizza kit) would generally not be considered ready-to-eat.

## R53.

*Question:* I understand that adding salad dressing to a package of greens makes the food a multi-ingredient processed food and nutrition labeling is required for the entire contents of the package. Does the requirement change if the packaged salad contains a packet of salad dressing that already bears nutrition labeling?

*Answer:* No. Nutrition labeling is still required for both the greens and the salad dressing. However, # 101.9(h)(1) allows separately packaged ingredients that are intended to be eaten at the same time to be labeled individually or with a composite value. Therefore, the greens and salad dressing can be labeled individually. If the nutrition label on the packet is visible at the point of purchase, the information on the dressing need not be reprinted on the outer bag.

## R54.

*Question:* Is nutrition labeling required for candied or caramel apples sold in the produce department?

*Answer:* Yes. These products are multi-ingredient processed food products. Therefore, nutrition labeling is mandatory.

## R55.

*Question:* Is nutrition labeling required for raw, frozen fish that are packed or repacked by the retailer and sold in the frozen food section of the retail store?

*Answer:* Raw single-ingredient fish that are packaged by the retailer, whether fresh or frozen, fall under the voluntary nutrition labeling program. However, for the retail store to be in compliance with the voluntary program, the nutrition labeling information must be available at point of purchase (i.e., be displayed in close proximity to the product) of both the fresh and frozen fish. It may be necessary for some retail stores to display signs/brochures with the nutrient data for fish in the frozen food section as well as the fresh fish section of the store. In contrast, raw frozen fish that are packaged by a manufacturer (e.g., packaged in a box with a printed label and brand name) come under the mandatory nutrition labeling program.

## R56.

*Question:* Is nutrition labeling required for crab meat that is canned and pasteurized, but not shelf-stable?

*Answer:* Pasteurized crab meat that is not shelf-stable and is sold on ice or refrigerated is included under the

voluntary nutrition labeling program, whereas canned crab meat that is shelf-stable must bear nutrition labeling.

**R57.**

*Question:* Are steamed shrimp exempt from nutrition labeling if they are purchased from a manufacturer and repacked in the retail store for sale from either the fresh fish or deli counters? Would it make a difference if the retailer adds a seasoning mix when steaming the shrimp or if a cocktail sauce is added to the package?

*Answer:* Plain, thermally processed shelled or unshelled lobster, crab, and shrimp are included in the voluntary nutrition labeling program when sold in either the fresh fish or deli sections of the store. However, consistent with earlier answers for fruit and vegetable products, when a food is composed of more than one ingredient, some of which are not included in the voluntary program (such as a seasoning mix or cocktail sauce), it must bear nutrition labeling. These added ingredients would generally alter the nutrient content of the product so that the nutrient values posted for the voluntary program would no longer accurately represent the finished product. However, if the finished product meets the criteria for a ready-to-eat food, primarily processed and prepared at the location from which it is sold (e.g., steamed, spiced shrimp prepared in-house), it may be exempt from nutrition labeling under # 101.9(j)(3) (see Q **R32**).

## Labeling

### Nutrition Label Format (# 101.9(d)):

**R58.**

*Question:* We package fresh tomatoes and want to put nutrition labeling on the package. Should we follow the guidelines for the voluntary program for raw fruit, vegetables, and fish (# 101.45) or the nutrition labeling format required by # 101.9?

*Answer:* When providing nutrition information on the package, even when nutrition labeling is otherwise voluntary, the information should be presented in a format that is consistent with the format requirements in # 101.9(d).

**R59.**

*Question:* We produce a cookie assortment containing various percentages of 6 different cookies. What nutrition format should be used?

*Answer:* The manufacturer may choose to use: (1) a separate Nutrition Facts label for each variety of cookie in the package, (2) an aggregate label (i.e., a single Nutrition Facts panel including nutrient content information and % Daily Values in separate columns for each variety), or, (3) if it is likely that one person would eat an assortment of the cookies at the same time, a composite label that provides one set of nutrition information based on a weighted average of all of the cookies in the assortment.

**R60.**

*Question:* I use a single box to package a variety of different products (e.g., cherry pie, apple pie, cheese cake, etc.). The box is partially pre-labeled, i.e., it bears nutrition labeling in the aggregate format for all possible products. When product is packaged, I print the identity statement for the food on the principal display panel. Must the Nutrition Facts panel be marked or highlighted at the time of packaging to indicate which product is in the package? *Answer:* No, the statement of identity on the principal display panel along with the statement of identity above each column of nutrient values in the aggregate Nutrition Facts panel will provide adequate information for the consumer to determine which nutritional values in the aggregate label apply to the contents of the package.

### Gift Packages (# 101.9(h)(3)):

**R61.**

*Question:* What is the correct way to label a gift basket that contains a variety of foods, candies, and liquors of various sizes? Does nutrition labeling have to be provided for each individually wrapped product, and are such packages considered multi-packs?

*Answer:* Nutrition labeling of gift food packages is addressed in # 101.9(h)(3) which:

1. allows nutrition information to be placed on labeling inside the package,
2. provides for standardized serving sizes when there is no reference amount appropriate for the variety of foods in the gift pack,
3. allows number of servings per container to be listed as "varied,"
4. allows nutrition information to be given as a composite for categories of foods in the gift pack that have similar dietary uses and similar nutritional characteristics (e.g., assorted chocolate candies, assorted cheeses), and
5. does not require declaration of nutrients in free promotional items or items used in small quantities to enhance the appearance of the gift package.

The required nutrition information for different foods may be put on a brochure or package insert using the aggregate display illustrated in # 101.9(d)(13)(ii). Listing the servings per container as "varied" allows use of the same nutrition label on packages of varied sizes. If some individually wrapped food items in the gift pack bear nutrition labeling, that information need not be repeated with the nutrition information provided for the unlabeled foods, e.g., on the outside of the gift pack or on a package insert. Further, the labeling of all malt beverages, regardless of alcohol content, and of liquors and wines containing 7 percent or more by volume of alcohol is regulated by the Bureau of Alcohol, Tobacco, and Firearms (BATF). BATF does not require that the products it regulates bear nutrition labeling.

**R62.**

*Question:* A retailer assembles gift packages containing a mixture of prepackaged and pre-labeled foods from the following categories: (1) Food items in packages that bear Nutrition Facts in accordance with # 101.9, (2) packages with less than 12 square inches of available label space that contain a phone number where nutrition information may be obtained, (3) packages labeled before May 8, 1994, with the old nutrition label format, and (4) packages labeled before May 8, 1994, that do not bear nutrition labeling. What are the nutrition labeling requirements for gift packages containing these foods when the gift package is assembled after August 8, 1994?
*Answer:* Gift packages that are assembled after August 8, 1994, are required to bear nutrition labeling in accordance with current labeling regulations. The following rules apply to the above categories:

1. When individual food packages within a gift package bear complete nutrition labeling, the nutrition information need not be repeated on the outer wrapper or in a package insert, even when such means are used to convey nutrition information on other products within the gift package.
2. Available label space is not an issue for most gift packages since the required information may be placed on the larger outer wrapper or in a package insert. Therefore, when packages with less than 12 square inches of available label space are added to a gift package, the nutrition information should be obtained from the manufacturer and placed on or within the gift package. Free promotional items and items used in small quantities to enhance the appearance of the gift package are excused from this requirement (# 101.9(h)(3) (v)).
3. Because, in part, the old nutrition label does not provide all of the nutrition information now required on nutrition labeling (e.g., percent Daily Value), those labels cannot be used in lieu of the new nutrition labels. However, the agency will not object to the use of packaged foods that bear the old nutrition label in gift packs assembled after August 8, 1994, provided that the gift pack provides nutrition labeling on the outer wrapper or in a package insert that meets the requirements of new # 101.9.
4. Nutrition labeling must be placed on the outer wrapper or on a package insert for all foods in a gift package (except free promotional items and items used in small quantities to enhance the appearance of the gift package) that do not bear the required nutrition information on the package label. This is true for foods packaged before May 8, 1994, or anytime after that date, when they are incorporated in a gift package.

**R63.**

*Question:* Is nutrition labeling required for fresh fruit included in a gift package?
*Answer:* Nutrition labeling is not required when the entire package is made up of fresh fruits (which fall under the voluntary nutrition labeling program) or when the fruit is packed with other processed foods that are intended to be eaten separately. However, if the fruit is included as one part of a kit with more than one ingredient, and some of the other ingredients are not subject to the voluntary labeling exemption, nutrition labeling is required (e.g., apples and caramel sauce).

**R64.**

*Question:* I assemble gift packs using prepackaged foods manufactured by other companies. Labeling on my part is limited to adding a "Contents List" which includes my company name and address. The gift pack is featured in the same manner in my catalogue. While some of these products have nutrition labeling, some do not because the manufacturers have a small business exemption and no claims are made. Am I responsible for providing nutrition labeling for the items that do not carry nutrition information?

*Answer:* Nutrition labeling must be made available for all foods in a gift pack unless the packer, as well as the manufacturer, qualifies for a small business exemption. Section 101.9(h)(3)(i) allows for the added nutrition information to be placed on an insert in the gift pack rather than on each package label.

# NUTRITION LABELING OF RESTAURANT FOODS
## (# 101.10)

**R65.**

*Question:* I understand that foods served or sold in restaurants are exempt from nutrition labeling if they do not bear a claim. Once they bear a claim, the restaurant must provide nutrition information upon request for the food that bears the claim. Does a restaurant have to use the Nutrition Facts format to provide nutrition information?

*Answer:* No. FDA is not requiring full nutrition labeling for restaurant foods, nor is it requiring that nutrition information be presented in the Nutrition Facts format. Because restaurant foods tend to be prepared or sold differently from foods from other sources, FDA has amended # 101.10 to provide a number of flexibilities for restaurants in how they determine the nutrient content of a food (e.g., using data base analysis or other reliable sources of nutrient information) and in how this information may be presented to consumers (e.g., in various formats and by reasonable means, such as in a flier or notebook) (January 6, 1993, 58 FR 2302 at 2410).

**R66.**

*Question:* Which foods can take advantage of the flexible provisions of # 101.10 (Nutrition labeling of restaurant foods)?

*Answer:* Section 101.10 was established to provide flexibility to restaurants and similar establishments when it is the restaurateur who is responsible for determining nutrient content or providing nutrition labeling for foods that are served or sold in such establishments. The nutrition labeling provisions in # 101.10, and discussed herein, also extend to the restaurant-type foods described in # 101.9(j)(3) provided they meet the requirements of that section (i.e., they are: similar to foods served in restaurants, ready-to-eat, not for immediate consumption, and prepared or processed primarily at the retail location from which they are sold).

**R67.**

*Question:* Can a commercial food manufacturer use the nutrition labeling provisions of # 101.10 (Nutrition labeling of restaurant foods) for foods that he/she manufactures, packages, and labels for sale or use in restaurants? Would it matter if the food was sold only in restaurants?

*Answer:* No. Section 101.10 was established to provide flexibility to restaurants and similar establishments when it is the restaurateur, not a manufacturer, who is responsible for determining nutrient content or providing nutrition labeling for food sold in such establishments. Consistent with the agency's treatment of commercially packaged fresh fish and nuts (Q **R50** and **R55**), when a manufacturer or packer labels a packaged food, including foods sold only in restaurants, the nutrition information must be presented according to the requirements in # 101.9 (Nutrition Facts) and would be judged by the compliance criteria of that section. The exception would be foods sold for use in restaurants but not served to consumers in the package in which they are received (e.g., large, institutional size containers) (## 101.9(j)(2)(iv) and (v)). Because such foods are exempt from nutrition labeling requirements, even if they bear a claim, voluntary nutrition labeling may be presented for these foods by any reasonable means, including those provided for in # 101.10.

**R68.**

*Question:* Does nutrition information have to appear on the same labeling that bears a nutrient content claim or health claim? For example, would a claim for a food listed on a placard require nutrition information on the placard also?

*Answer:* No. Section 101.10 requires that nutrition information be available upon request. It may appear on the same or different labeling from that which bears the claim. It may be presented in various forms, including those specified in # 101.45 (e.g., displayed at point of purchase by an appropriate means, such as affixing it to the food, by posting a sign, or by making the information readily available in a brochure, notebook, or leaflet, in close proximity to the foods), Nutrition Facts (# 101.9), and by other reasonable means (# 101.10).

**R69.**

*Question:* A restaurant prepares and sells a number of foods that bear a claim, including an ice cream sandwich made with "low fat ice cream." The ice cream sandwich may be served for immediate consumption or it may be wrapped and sold from a self-service cold case in the restaurant. The wrapped sandwiches sold from a self-service case bear a claim on the package label. The restaurant provides consumers, upon request, with a brochure containing nutrient content information, according to # 101.10, for the foods it serves for immediate consumption that bear claims. Can the restaurant use the same brochure to meet nutrition labeling for the wrapped ice cream sandwich that bears a claim on its label or does it have to put Nutrition Facts on each package? *Answer:* Foods that are served or sold in restaurants and similar establishments may bear nutrition information according to # 101.10, even if the food is sold in packaged form and a claim or other nutrition information appears on the package label provided the food is labeled by the restaurateur.

**R70.**

*Question:* How may nutrition information be presented for restaurant-type foods that are primarily processed or prepared at the retail location from which they are sold when that location does not have facilities for immediate consumption? Please address salads prepared and sold in-house in your answer.
*Answer:* Many restaurant-type foods (i.e., ready-to-eat but not for immediate consumption) that are prepared at the same retail location from which they are sold have similar needs for flexible nutrition labeling as foods served or sold by restaurants (e.g., the foods are generally hand assembled and, therefore, subject to individual product variations). Thus, the general provisions of # 101.10 discussed in this section are available to restaurant-type foods that meet the criteria set out in # 101.9(j)(3). For example, if a grocer prepares and sells a "low fat" potato salad in-house, nutrition labeling must, at a minimum, provide information on the fat content of the food. This information would be available to the grocer from his/her reasonable basis determination that the food meets FDA's definition for the claim. Nutrition information for a restaurant-type food that bears a claim must be available to consumers upon request and may be presented by reasonable means (e.g., in a brochure or posted at point of purchase).

**R71.**

*Question:* Can a restaurant provide nutrition information to consumers orally, or must it be presented in written form?
*Answer:* Nutrition information for restaurant and restaurant-type foods may be provided by any reasonable means, including orally. A statement from a waiter, for example, that a "low fat" meal contains less than 10 grams of fat will serve as the functional equivalent of full nutrition labeling. In such a case, however, the restaurant should also have nutrition information in writing, as a back-up, to ensure that the information communicated by the staff is valid.

**R72.**

*Question:* I understand that nutrition information for packaged foods must be provided for the food "as packaged." Information for the nutrient values of the food "as prepared" is voluntary and would be listed in a second column. What is the basis for nutrition labeling of a food served in a restaurant (not in packaged form), the uncooked ingredients or the prepared food?
*Answer:* Nutrition information must be provided on the basis of the food as packaged or purchased by the consumer (# 101.9(b)(9)). Thus, nutrition labeling of a ready-to-eat food served in a restaurant or similar establishment would be based on the nutrient content of a single serving of the finished product as it is marketed for purchase by consumers.

**R73.**

*Question:* Which nutrients should a restaurant include in nutrition labeling?

*Answer:* At a minimum, restaurants must provide information on the nutrient that is the basis for the claim, e.g., "low fat, this meal contains 10 grams of fat."

**R74.**

*Question:* How does a restaurant determine which nutrients are the basis for a claim, i.e., which nutrients must be included in nutrition labeling?

*Answer:* Nutrients that are the basis for a claim include all nutrients that are relevant in determining whether a food meets the definition for a claim. For example, fat claims are based on the fat content of a food. Thus, nutrition information for a "low fat" food must include information on the level of fat in the food bearing the claim. Cholesterol claims are based on the cholesterol content of the food and are allowed only when a food contains 2 grams or less saturated fat per reference amount (2 grams or less saturated fat per 100 grams of food for meals and main dish products). Thus, nutrition information for a food bearing a cholesterol claim must include information on both the cholesterol and the saturated fat content of the food. Health claims include both the general health claims requirements (i.e., that disqualifying levels not be exceeded) and the nutrient requirements for the specific claim (see Q **R109**). This information (e.g., information about the level of the nutrients that are the basis for the claim) should be readily available to a restaurant from its determination that the food conforms to the definition of a claim. (Definitions for nutrient content claims and requirements for health claims are summarized in attachments B, C, and D of this document.)

**R75.**

*Question:* If a restaurant wants to provide information on additional nutrients, e.g., nutrients that are not the basis for a claim, can it do so?

*Answer:* Yes. While the provision of information on nutrients that are the basis for a claim is the minimum requirement for nutrition labeling of restaurant foods, FDA encourages restaurants to provide consumers with as much information on the nutrient content of the food as possible.

**R76.**

*Question:* If a restaurateur chooses to voluntarily provide nutrition labeling for a food that is otherwise exempt, how may this be accomplished?

*Answer:* Generally, the restaurateur may provide voluntary nutrition information according to the options available to foods that bear a claim, i.e., # 101.9 (Nutrition Facts), # 101.45 (voluntary program for raw fruits, vegetables, and fish), or # 101.10 (reasonable means). For example, a restaurateur may choose to provide nutrient content information in a statement such as "Garden salad with grilled chicken, contains 390 calories, 8 g fat, and 13 mg cholesterol." Because nutrition labeling requirements are triggered by a nutrient content claim, health claim, or other nutrient content information, the food would no longer be exempt from nutrition labeling. However, this information can itself serve as the functional equivalent of nutrition labeling, and no additional labeling would be required.

**R77.**

*Question:* Would FDA consider a telephone number to be a reasonable means of providing nutrition information for a food sold in a restaurant or other vending facility and which makes a claim?

*Answer:* No. Once a food bears a claim, nutrition information must be readily accessible to consumers, e.g., on the label attached to the food or in labeling at point of purchase. Vending machine foods that are sold in packaged form should have required labeling on the product visible to the consumer prior to purchase or be otherwise displayed at point of purchase. With respect to foods prepared or processed by the vending machine (e.g., soup dispensed into a cup), the mandatory information may be displayed on the vending machines.

**R78.**

*Question:* Must a restaurant include % Daily Values in its nutrition labeling?

*Answer:* Not necessarily. Nutrition information may be presented in a variety of formats. However, the agency considers % Daily Values to be very important information and encourages such a declaration whenever practicable. If a restaurant chooses to use the Nutrition Facts format, labeling must contain all information, including % Daily Values, required for the chosen format.

**R79.**

*Question:* Can a restaurant present nutrition information in a modified version of the Nutrition Facts format? For example, can nutrition information be presented in a format that resembles the Nutrition Facts but that contains elements that were modified or eliminated compared to the requirements of # 101.9?

*Answer:* No. As stated in response to Q **R65**, a restaurant may choose to present nutrition information in a variety of formats. FDA would not object to a restaurant food bearing nutrition information according to the different Nutrition Facts formats set out in # 101.9 (e.g., the simplified format, the shortened format, an aggregate display, or a linear display) so long as labeling contains all required elements of the chosen format and it meets the requirements of # 101.10 (i.e., it includes information on the nutrient that is the basis for the claim).

**R80.**

*Question:* FDA's requirements for the Nutrition Facts format are fairly specific with respect to type style, type size, and placement. Does the agency have similar requirements for nutrition labeling of restaurant foods?

*Answer:* It depends on the format used. Nutrition labeling for restaurant foods may be presented in various formats, including Nutrition Facts (# 101.9), following the format established for raw fruit, vegetables, and fish (# 101.45), and by other reasonable means (e.g., a statement such as "low fat, this food contains no more than 3 grams of fat" in a brochure or notebook) (# 101.10). Consistent with its flexible approach towards restaurant food labeling, FDA has not established standardized type size or placement requirements in # 101.10. Labeling that is easily accessible to consumers, that contains all required nutrition information, and that is presented clearly and legibly, would be generally consistent with the "reasonable means" provision of # 101.10.

**R81.**

*Question:* Data base analysis indicates that a food contains 277 calories, 464 mg sodium, 39.22 g protein, and 5.81 g fat per serving. Can a restaurant use the same numbers that are generated by data base analysis (or provided in a cookbook or other source of nutrient content information) directly in its nutrition labeling?

*Answer:* Yes. However, labeling that declares nutrient values in a way that implies an unwarranted degree of accuracy could be misleading. To avoid the impression of unwarranted accuracy, as well as to make nutrition labeling easier for consumers to review and understand, restaurants are strongly encouraged to follow the rounding rules set out in # 101.9(c) (see attachment A). To be consistent with these rules, the above values should be declared as 280 calories, 460 mg sodium, 39 g protein, and 6 g fat.

**R82.**

*Question:* If an airline provides passengers with a special meal upon request (e.g., a "low sodium" meal), would this be a claim subject to the NLEA? How can nutrition labeling be accomplished?

*Answer:* If, in response to a special request, the airline provides a special meal and represents that the food or meal is, for example, "low sodium," "reduced sodium," or "low in fat," the airline is making a nutrient content claim for the food, and the food must meet the definition for the claim. Nutrition information must be provided for the nutrient amounts that are the basis for the claim (e.g., "low fat, this meal contains 10 grams of fat") and may be provided by reasonable means (e.g., on the back of a card wrapped with the meal identifying the meal as a special request or in a binder available from the flight attendants).

**R83.**

*Question:* Is a restaurant required to provide information on the amounts of nutrients that are not the basis for a claim? For example, if a food bears a "low fat" claim but the sodium content of the food exceeds a certain level, does the restaurant need to include sodium in its nutrition labeling?

*Answer:* FDA encourages restaurants to provide as much nutrition information as possible to consumers. However, the NLEA exempts restaurant foods from the referral and disclosure statements that must appear on the principal display panel of a packaged food if the food bears a claim and it contains a nutrient (i.e., fat, saturated fat, cholesterol, or sodium) at a level greater than the disclosure levels set out in # 101.13(h). Further, FDA's regulations provide that, in a restaurant situation, information on the nutrients that are the basis for the claim may serve as the functional equivalent of full nutrition labeling. Thus, in the above example, information about the fat content of the food bearing a "low fat" claim would serve as the functional equivalent of full nutrition labeling.

**R84.**

**Question:** Can a restaurant present nutrition information for an item based on an optional form of serving or preparation? For example, if it serves a grilled chicken breast with the skin attached, can it provide nutrient content information on the basis of the chicken with the skin removed?

**Answer:** As stated in response to Q **R72**, nutrition information must be presented for a food based on the form in which the food is served or sold to consumers. The restaurant may, however, voluntarily provide a second set of information based on an optional method of preparation or serving, e.g., the chicken breast with skin removed. If a claim is made for a food, and the food or meal only meets the definition of the claim based on an optional method of preparation (e.g., if the food may be prepared, on request, with half the oil normally used), this fact must be clearly communicated to consumers.

### R85.

**Question:** I understand that nutrient content information should be based on the labeled serving size for a food. In a restaurant situation, labeled serving size would be the same as an actual or portioned serving, e.g., the amount of food provided by the restaurant in a single serving. What basis should a restaurant use for nutrition labeling if it has no control over serving size? For example, how should a restaurant declare the nutrient content of items offered in a self-service soup and salad bar?

**Answer:** Even if it is not the restaurant that portions a food, the restaurant may still have a logical frame of reference for serving size. For example, if a restaurant provides patrons with containers or serving utensils that have a given capacity (e.g., soup bowls, salad dressing ladles) and if it is reasonable to expect that consumers may fill the containers to capacity, the restaurant should base nutrient content information on of the amount of food the container could hold. However, if a food bears a claim, it must meet the definition for the claim based on its reference amount, regardless of labeled serving size (see Q **R146**). Nutrient content information for discrete items available at a self-service salad bar, e.g., muffins, whole fruit, or slices of bread, should be declared on the basis of the number of unit items that is closest to the reference amount for the food (# 101.19(b)(2)(ii)).

### R86.

**Question:** FDA has stated that a restaurant may present nutrition information in a statement such as "contains X amount of a nutrient." Does labeling also need to specify serving size, e.g., does it need to list the weight of the food or meal?

**Answer:** It depends. FDA encourages restaurants to provide as much nutrition related information as possible, including information on serving size. However, consistent with the agency's flexible approach to nutrition labeling on restaurant foods, FDA will accept labeling that provides nutrition information for a single serving of a food or meal that does not specifically state serving size provided omission of this information does not result in labeling that is false or misleading. For example, if a menu lists the items available in a restaurant followed by a description of the food or meal and information on the fat and calorie content of the food, consumers could reasonably expect that the nutrient content information is declared on a per serving basis, and they will be able to relate this information to the quantity of food they are served. On the other hand, there may be situations in a restaurant where consumers would not have an appropriate frame of reference for nutrition information unless the serving size used as a basis for the information is specified, for example, when a food is available in more than one serving size (e.g., soup sold by the cup and by the bowl) or when serving size varies (e.g., items from a self-service soup and salad bar where the consumer controls portion size). Furthermore, if nutrition labeling is presented in a format that has requirements for declaring serving size (e.g., Nutrition Facts), nutrition labeling must contain all required elements of the chosen format.

### R87,

**Question:** Should a restaurant provide nutrition information on a "per serving" basis, or can the information be declared by other units or measures, such as "per item" or "per unit?" For example, if a restaurant sells whole pizza and pizza by the slice, how should nutrition information be declared?

**Answer:** Generally, nutrition information should be presented on a per serving basis. Nutrition information on a per unit basis could be appropriate when a single unit may also be a single serving. However, the basis for the information must be clearly communicated to consumers. It is especially important that the basis be declared when a food is available in more than one size serving, e.g., pizza that is available whole and by the slice, or soup that is available by the cup or by the bowl. The restaurant may provide additional information, such as "8 slices per medium 16-inch pizza, 1 slice contains..." to help consumers put nutrition information in context. Conversely,

it would be misleading to present the information on a per item basis when a serving generally contains more than one item of the food, for example, if a single serving of cookies contains more than one cookie.

**R88.**

*Question:* Can a restaurant provide nutrition information on a per item basis when the item is significantly larger than FDA's reference amount for the food? For example, the reference amount for muffins is 55 g. If a restaurant serves a muffin that weighs 165 g (three times as big as the reference amount) can it still treat the muffin as a single serving?

*Answer:* If a unit weighs 200 percent or more of the reference amount set out in # 101.12(b), it may be labeled as a single serving provided it is reasonable to expect that the food would be consumed in a single sitting.

**R89.**

*Question:* For packaged foods, the actual amount of naturally occurring vitamins, minerals, and protein must be at least 80 percent of the values that are declared on the label, whereas the actual calorie, carbohydrate, and sodium contents may not exceed the labeled values by more than 20 percent. Will FDA apply these same compliance criteria to the nutrient content information declared on labeling for restaurant foods?

*Answer:* No. The above compliance criteria (# 101.9(g)) were established to account for natural variations in the nutrient content of commercially manufactured and packaged foods that are subject to chemical analysis to determine compliance. These criteria ensure that values declared in the Nutrition Facts panel for nutrients such as vitamins and minerals are not over-declared, and that nutrients such as calories and fat are not under-declared, compared to actual amounts that are determined by chemical analyses. The standard that restaurant foods must meet is that a restaurateur have a "reasonable basis" for believing that a claim or other nutrition information is valid. Thus, FDA will not subject restaurant foods to chemical analysis to determine whether nutrient levels are properly declared. Rather, FDA will be assessing whether the restaurant's basis for a claim or other nutrition information is, or is not, reasonable. For example, if a restaurant claims a meal is "low fat," FDA would look at the recipe, calculations, and any other information used by the restaurant in determining whether the meal meets the definition of "low fat," i.e., that it contains no more than 3 g fat per 100 g of food.

**R90.**

*Question:* Can a restaurant provide nutrition information for different components of a single food or meal separately? For example, can it provide one set of nutrient content information for a salad and a second set of information for the salad dressing if the dressing is served on the side?

*Answer:* Nutrition information for different components of a food or meal can be presented separately when the components are served separately (e.g., for a sauce or dressing served on the side), or where the components are separate entities, e.g., a steak, baked potato, and green vegetable, even if the components are served together. It could be misleading, however, to present nutrition information separately for mixed components where the consumer could not reasonably be expected to separate them, e.g., if the dressing is served on the salad.

# CONTEXT OF CLAIMS AND COVERAGE BY THE NLEA

## The Claim

### Nutrient content claims:

**R91.**

*Question:* What is a nutrient content claim? Could you provide some examples?

*Answer:* A nutrient content claim is any statement about a food product that directly, or by implication, characterizes the level of a nutrient in the food (# 101.13(b)). Thus, nutrient content claims include direct statements about the level (or range) of a nutrient in a food, e.g., "low sodium," "reduced fat," or "contains 100 calories." An implied nutrient content claim is any claim that: (1) describes the food, or an ingredient in the food, in a manner that suggests that a nutrient is absent or present in a certain amount, e.g., "no tropical oils" or (2) suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices when the claim is made in conjunction with an explicit nutrient content claim, e.g., "healthy, contains 3 grams of fat."

**R92.**

*Question:* Would use of terms such as "Nutritious," "Wholesome," "Best choice," or "Good for you" on the label or labeling of a food subject the food to the claims requirements?

*Answer:* It depends on the context in which the term is used. When a term such as "Wholesome" or "Nutritious" is used in a context that does not render it an implied claim (e.g., "Nutritious foods, prepared fresh daily" or "Made with wholesome ingredients"), it is not subject to the claims requirements. On the other hand, FDA may consider the term to be used in a nutritional context if it appears in association with an explicit or implicit claim or statement about a nutrient. In statements such as "Nutritious, contains 3 grams of fiber," "Best choice, contains 200 mg sodium," or "Good for you, contains 5 grams of fat," the terms are implied nutrient content claims and the foods bearing the claims must meet the requirements for a claim defined by FDA for the nutrient that is the subject of the claim (# 101.65(d)(1)). For example, a food bearing the claim "Good for You, contains 5 grams of fat," would have to meet the requirements for one of the fat claims, defined in # 101.62 (e.g., "low fat") if it is to not misbrand the food.

**R93.**

*Question:* What are the requirements for a restaurant food and its labeling when the food bears a statement about the amount or percentage of a nutrient in the food?

*Answer:* Statements about the amount or percentage of a nutrient in a food (e.g., "10% protein" or "less than 3 grams of fat per serving") may be made without further qualification if the food meets the definition for a claim (i.e., if the food is "low" in, "reduced," or a "good source" of the subject nutrient (# 101.13(i) and # 101.62(b)(6)). If the nutrient content of a food is not consistent with the definition of a claim, the food may still bear such a statement characterizing the level of a nutrient provided the statement is followed by a disclaimer, e.g., "Only 200 mg sodium, not a low sodium food." If the statement does not in any way qualify the level of a nutrient (e.g., "100 calories" or "5 grams of fat"), a disclaimer is not required.

**R94.**

*Question:* Section 101.10 provides that nutrition labeling for restaurant foods may be presented in a statement such as "low fat, contains less than 10 grams of fat." Can a food that does not qualify for a claim provide nutrition information using a similar statement, e.g., "this meal contains less than 20 grams of fat?"

*Answer:* No. As stated in response to the preceding question, phrases such as "less than (X amount of nutrient)" are implied claims and can only be used for a food that meets the definition of a claim. Statements such as "contains less than 10 grams of fat" can be used in situations where, according to a restaurateur's reasonable basis determination, a food or meal meets the criteria for a claim (e.g., "low fat") but where he/she may not know the exact amount of the nutrient present. When a restaurateur is presenting nutrition information for a food that does not meet the definition for a claim, and the nutrient values determined using a reasonable basis include some variability (e.g., due to hand assembly of food items), he/she may wish to say "approximately" to indicate that the nutrient values may not be precise. Furthermore, depending on the context in which it is used, the term "contains" may itself be a nutrient content claim. A statement such as "contains fiber" is a claim that a food is a "good source" of fiber. (See attachment B). However, in a statement that includes a quantitative declaration, e.g., "contains 2 grams of fiber," the amount of fiber in the food is characterized by the quantitative declaration, "2 grams," and the term "contains" is a simple verb, not a nutrient content claim.

**R95.**

*Question:* Can a restaurant provide information on "percent calories from fat" for a restaurant food or meal?

*Answer:* General dietary guidelines recommend a diet that derives no more than 30% of calories from fat. Because a meal is comprised of a number of items from different food groups, and because it contributes a significant proportion of the daily diet, FDA would not object to labeling that provides information about percent calories derived from fat in a meal. Conversely, FDA stated in the claims final rules that this information (e.g., percent calories from fat) would not be useful for individual food items. The agency is concerned that, because a diet that is consistent with dietary guidelines may be comprised of a variety of foods, highlighting percent calories from fat for individual food items may be misleading. Consequently, FDA discourages labeling that presents fat and calorie content as "percent calories from fat" for individual food items.

**R96.**

*Question:* Can a restaurant call an item "relatively low fat," "very low fat," "extra light," or "almost fat free?"
*Answer:* No. Only those claims, or their synonyms, that are specifically defined in the regulations may be used (attachment B). All other claims are prohibited (# 101.13(b)).

**R97.**

*Question:* Would use of the term "Fresh" trigger the nutrition labeling requirements of the NLEA?
*Answer:* No. FDA addressed the use of the term "Fresh" to describe foods that are unprocessed or unpreserved in the same issue of the Federal Register in which the claims final rules appeared. However, "Fresh," as defined in # 101.95, is not a nutrient content claim or a health claim and use of the term does not trigger nutrition labeling requirements.

**R98.**

*Question:* Could FDA elaborate on the types of statements about ingredients in a food that would be an implied nutrient content claim?
*Answer:* A statement highlighting the presence or absence of an ingredient, where the ingredient is associated with the level of a nutrient, would be an implied nutrient content claim. Long recognized ingredient-nutrient relationships include: sugar and calories, oils and total fat, tropical oils and saturated fat, and whole grain or bran and dietary fiber. The statement "Contains oat bran," for example, implies that a food is "a good source of dietary fiber."

**R99.**

*Question:* I make a pizza with "low fat cheese." Even though my pizza is not "low fat" can I make a nutrient content claim about the cheese?
*Answer:* The agency considers a product that makes an express claim ("free," "low," "good source," or "high") about an ingredient in a product to be an implied relative claim about the product itself. For example, a claim that a pizza is "made with low fat cheese" is an implied claim that the pizza is at least "reduced in fat" compared to a similar pizza. Such a claim would be prohibited if the product did not meet the criteria for the relative claim ("less" or "more" of a nutrient) that it implied. In addition, for such an implied relative claim, the accompanying information required for relative claims would also be required (e.g., 25% less fat than regular pizza, contains ____g fat, regular pizza contains ____g fat). However, consistent with FDA's flexible approach, the agency would not object to the quantitative comparison information appearing on nutrition labeling if the labeling that bears the claim does not have sufficient space to accommodate the full statement.

**R100.**

*Question:* Would a statement such as "contains no dairy ingredients" be an implied claim?
*Answer:* A statement that is not presented in a nutrient context, such as statements to facilitate avoidance (e.g., "contains no dairy ingredients"), information about characterizing ingredients or ingredients perceived to add value (e.g., "contains real butter"), and ingredients that do not serve nutritive purposes (e.g., "no preservatives") would not be an implied nutrient content claim.

**R101.**

*Question:* When would a statement about the way a food is prepared be an implied nutrient content claim?
*Answer:* The statement would be an implied nutrient content claim if it highlights a preparation method that affects the nutrient content of a food (# 101.65). For example, "made only with vegetable oil" implies that, because vegetable oil was used instead of animal fat, the food is "low in saturated fat" or "cholesterol free." On the other hand, a statement about a preparation method that affects the character of a food but that does not characterize the nutrient content of a food, e.g., "made with fresh fruit" or "prepared fresh daily" would not be an implied claim. Terms such as "broiled," "fried," or "steamed" would not subject a food to the nutrient content claims requirements if they are part of a food's identity statement, e.g., "baked potato," "steamed shrimp," or "fried zucchini," or are used solely to identify different categories of food. In addition, labeling that bears a statement such as "available broiled or fried" in the context of providing optional preparation methods for a food would not, by itself, be an implied nutrient content claim. However, a statement such as "donuts, baked not fried" that highlights the preparation method in a way that consumers may assume that the food, because of the way it was prepared, has less or more of a nutrient would be an implied claim.

**R102.**

*Question:* If the name of a restaurant establishment contains a term that may, in some contexts, be an express or implied claim (e.g., "Cafe Lite" or "Skinny Haven"), would FDA require the foods sold in the establishment to meet the definition for a claim, and if so, would all the foods sold in the establishment be expected to comply?

*Answer:* The name of an establishment is not necessarily a claim for the foods sold by the establishment. If, for example, "Cafe Lite" is the name of a restaurant, but the term is not being used to describe the foods sold by the restaurant (e.g., the name of the restaurant is not printed on labeling that describes the selections offered by the restaurant), it would not be a claim for the food. Further, if the name of the restaurant appears on labeling but is used in a context other than as a nutrient content or health claim (e.g., use of the term "Lite" to describe smaller portions or "Skinny" because it is the proprietor's nick-name), the term would not be a claim subject to the NLEA. Conversely, if the name of the establishment is used to describe the foods served in the restaurant and the term is used in a nutrient context (e.g., "Cafe Lite" appears prominently on labeling and is accompanied by fat or calorie content claims), the foods that bear the claim must be clearly distinguishable from food items that do not. For example, selections that meet the requirements for a "light" claim may be highlighted by the use of a symbol or different type style and a footnote explaining that the highlighted items are light in fat or calories, or sodium.

**R103.**

*Question:* What if a restaurateur is having difficulty determining whether a statement is an implied claim?

*Answer:* Some statements clearly are implied nutrient content claims while other statements clearly are not. Situations where the agency has been able to determine that a statement would or would not constitute an implied claim are set out in # 101.65. In many cases, however, whether a label statement is an implied claim can only be determined on a case-by-case basis, considering the entire label and the context in which the claim is made. In determining whether a statement is, or is not, an implied claim, FDA would consider both the restaurateur's intent and the consumer's likely perception of a statement.

**Health claims:**

**R104.**

*Question:* What is a "Health Claim?"

*Answer:* A health claim is a reference on the label or in the labeling of a food that directly, or by implication, including 'third party' references, written statements, symbols, or vignettes, characterizes the relationship of a nutrient or substance to a disease or health related condition (# 101.14(a)(1)). While a nutrient content claim refers to a level or range of a nutrient in a food, a health claim includes two elements, i.e., a reference to a nutrient or substance and a reference to a disease or health related condition. Labeling that links a specific food to a statement such as "Heart Healthy" contains both the substance element (reference to a specific food) and the disease-condition element (implied reduction in risk of heart disease) of a health claim. Health claims may be used on the label or labeling of a food only if claims about the nutrient-disease relationship involved have been authorized by FDA in a regulation.

**R105.**

*Question:* What health claims are approved?

*Answer:* Approved health claims for recognized nutrient-disease relationships include:

- Calcium and osteoporosis (# 101.72),
- Dietary fat and cancer (# 101.73),
- Sodium and hypertension (# 101.74),
- Dietary saturated fat and cholesterol and the risk of heart disease (# 101.75),
- Fiber-containing grain products, fruits, and vegetables and cancer (# 101.76),
- Fruits, vegetables, and grain products that contain fiber, particularly soluble fiber, and the risk of heart disease (# 101.77),
- Fruits and vegetables and cancer (# 101.78), and
- Folate and neural tube defects (# 101.79).

**R106.**

*Question:* What is an implied health claim?

*Answer:* Implied health claims include those statements (e.g., "Heart Healthy"), symbols (e.g., a heart symbol), vignettes, or other forms of communication that suggest that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition (# 101.14(a)(1)).

**R107.**

*Question:* I understand that health claims may be used only if claims about the nutrient disease-relationship in the claim have been authorized by FDA. Which of the health claims that have been approved by FDA relate the nutrient content of a food to reduced risk of heart disease?

*Answer:* FDA has approved two claims regarding the nutrient content of a food and reduced risk of heart disease. The first is for foods that are "low" in saturated fat, cholesterol, and total fat (# 101.75). The second is for fruits, vegetables, and grain products that contain fiber (# 101.77).

**R108.**

*Question:* When would a heart symbol on restaurant labeling be an implied health claim?

*Answer:* Whether a heart symbol is an implied health claim will depend on the context in which it is used. FDA advises that most of the perceptions about heart symbols fall under the regulatory regime of a health claim. For example, use of a heart symbol in association with a nutrient content claim (e.g., a claim about saturated fat or cholesterol) could imply that the food, because of its nutrient content, may be useful in reducing the risk of developing a disease or health-related condition, specifically, heart disease. Use of a heart symbol or similar logo in this context would trigger the health claims requirements that a food meet the definition of an approved claim, and that it bear nutrition labeling. Further, use of a heart symbol alone, i.e., in the absence of a statement explaining its use, could be misleading. Alternatively, when a symbol is clearly being used in a context other than to highlight nutrient or health-related benefits of a food, e.g., a heart symbol followed by a statement such as "You'll love our home-made pies and cakes!" it would not be an implied claim. Further, a heart symbol may be used to identify items that are consistent with the dietary recommendations of a health professional association when labeling bears a statement explaining such use (e.g., the symbol is repeated in a footnote followed by a statement such as "these items are consistent with AHA guidelines," without triggering the claims requirements provided labeling does not bear another statement, phrase, symbol, or logo that would cause the heart symbol to be a claim in the context of the entire label (see Q **R122**).

**R109.**

*Question:* What are the nutrient-content requirements for a food to bear a health claim? *Answer:* First, a serving of the food or meal must contain less than the specified levels of four disqualifying nutrients: fat, saturated fat, cholesterol, and sodium (# 101.14(a)(5)). Second, without fortification, the food must contain at least 10 percent of the Daily Value for at least one of the following six nutrients: vitamin A, vitamin C, calcium, iron, fiber, or protein. Third, in addition to these general requirements, the food must meet the specific criteria listed in the regulation for each approved claim. For example, a food bearing a claim that links a diet low in total fat to the risk of some cancers (# 101.73) must also meet the definition for "low fat."

**R110.**

*Question:* What are disqualifying levels?

*Answer:* Disqualifying levels are those levels of total fat, saturated fat, cholesterol, or sodium in a food above which the food will be disqualified from making a health claim (# 101.14(a)(5)). For individual food items, these levels are per reference amount customarily consumed and per serving (or, in the case of foods with reference amounts of 30 grams or less or 2 tablespoons or less, per 50 grams). Values for meals and main dish items are per serving. Any one of these levels, e.g., per reference amount or per serving, will disqualify a food from making a health claim (see attachment D).

**R111.**

*Question:* How should a health claim be presented?

*Answer:* Generally, all health claims must:

- Be complete, truthful, and not misleading,
- Use "may" or "might" to express the relationship between a substance and a disease, and
- Indicate that the risk of disease depends on many factors.

An example, or model, of a health claim that meets these informational requirements is "While many factors affect heart disease, diets low in saturated fat and cholesterol may reduce the risk of this disease." Restaurateurs are not required to use model health claims verbatim. However, the labeled claim must contain all the required elements.

## R112.

*Question:* Would a claim such as "Heart Healthy" or "Heart Fest" fulfill the informational requirements for a health claim?

*Answer:* No. An implied claim such as "Heart Healthy" does not contain the required elements discussed in response to the preceding question. Terms such as "Heart Healthy" would need to be accompanied by additional information to be sufficiently informative.

## R113.

*Question:* If additional information is needed to make a claim such as "Heart Healthy" fully informative, how should it be presented, and where must it appear relative to the implied or abbreviated claim?

*Answer:* The additional information should appear adjacent to the implied or abbreviated claim. If a number of foods bear an abbreviated claim, the additional information, (e.g., the full health claim as described in response to question **R111**), may appear adjacent to each abbreviated claim or adjacent to the most prominent claim. If the foods that bear an abbreviated health claim are grouped together in a box or other section of the labeling, the full health claim may appear once within that section. Alternatively, where any graphic material or statement that constitutes an express or implied claim (e.g., "Heart Healthy"), the abbreviated claim may be followed in immediate proximity by the reference statement, "See _____ for information about the relationship between _____ and _____" informing consumers where the additional information may be found (# 101.14(d)(2)(iv)). Thus, the information required to be in the full health claim may appear elsewhere on the same or different labeling as the implied claim. In a restaurant, labeling that bears an abbreviated health claim may bear a statement such as "See your server for information about the relationship between (insert nutrient or substance) and (insert disease or health-related element)" if the full claim appears in labeling (e.g., a brochure or notebook) that is used by a restaurant to convey nutrition information.

## R114.

*Question:* Can a restaurant communicate useful nutrition-related information to consumers in a way other than a nutrient content or health claim?

*Answer:* Yes. Restaurants may offer alternative selections whose value in the diet may be recognized without elaboration, e.g., raw vegetables, steamed vegetables, a grain dish, a fresh fruit plate, or pasta with a tomato based sauce instead of a cream sauce. Optional preparation or serving methods may also be highlighted by statements such as "may be prepared with half the oil on request," "smaller portions," or "dressings and sauces available on the side," provided the statement about an ingredient or preparation method does not make an implied claim about the nutrient content of the food.

## R115.

*Question:* A number of food service establishments provide foods for special dietary use, e.g., health resorts that serve food that is useful in reducing or maintaining body weight or hospitals that provide food to help regulate sodium intake. Would such food be subject to the nutrient content claims requirements if its label or labeling bears a statement about the use of the food in a special diet? *Answer:* It depends. There is a separate set of requirements for foods for special dietary use in 21 CFR part 105. A claim made solely to identify a food that meets a particular dietary need that exists by reason of a physical, physiological, pathological, or other condition as described in part 105 would generally not be a nutrient content claim (# 101.65(b)(6)). Thus, a claim such as "Use as part of a weight reduction program" that identifies the special diet of which the food is intended to be a part would not, by itself, be a nutrient content claim. However, if the claim about the use of the food in a special diet is used in a context that highlights a nutritional aspect of the food that is relevant to the general population (e.g., it is accompanied by a "low sodium" or "low calorie" claim), the food and its labeling would be subject to the nutrient content claims requirements.

## R116.

*Question:* Are statements that are not covered by the NLEA subject to any other requirements?
*Answer:* Yes. Statements outside the coverage of the NLEA are still subject to the requirements in the law that they must be truthful and not misleading.

**Dietary Guidance:**

**R117.**

*Question:* What are "dietary guidelines?" How does dietary guidance differ from a nutrient content claim?
*Answer:* Dietary guidelines are general dietary guidance for good health made publicly available by recognized governmental or private health professional organizations (e.g., the U.S. Surgeon General, the National Academy of Sciences, the U.S. Department of Agriculture, the Department of Health and Human Services, the American Dietetic Association, the American Heart Association, and the National Cancer Institute). Dietary guidance provided by third parties other than health professional organizations would need to be consistent with the recommendations of recognized dietary authorities. Dietary guidelines generally promote moderate intake of nutrients such as sodium, fat, and saturated fat and increased consumption of grains, fruits, and vegetables. Dietary guidance is a group of general recommendations based on a total diet (e.g., "Eating 5 fruits and vegetables a day is an important part of a healthy diet"). Conversely, a nutrient content claim is a claim about the nutrient content of a particular food (e.g., "low fat, this meal contains 10 grams of fat"). Claims about a food that suggest that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and that are made in conjunction with an explicit claim or statement about a nutrient (e.g., "Healthy, contains 3 grams of fat") are implied nutrient content claims (# 101.65(d), see attachment C).

**R118.**

*Question:* Can a restaurant say that an individual food or meal meets dietary guidelines when guidelines are based on recommendations for a total diet?
*Answer:* It depends, in part, on the specific recommendations of the particular group. The Surgeon General's Dietary Guidelines for Americans, for example, recommend a diet with "moderate calorie intake, less than 30 percent of calories from fat, less than 10 percent of calories from saturated fat, emphasis on vegetables, fruit, and grain products, and moderate use of sugars and sodium." While a variety of foods may make-up a total diet, it may also be possible to identify a food or meal that can be part of a diet consistent with these recommendations.

**R119.**

*Question:* The recommendations in the dietary guidelines of a number of professional health organizations include specific levels for intake of a nutrient based on total daily consumption. For example, the American Heart Association guidelines include the recommendation that Americans consume no more than 3000 mg of sodium and no more than 300 mg of cholesterol per day. How can nutrient values for recommended minimum or maximum daily intake be related to an individual food or meal?
*Answer:* When converting a value based on daily intake to a value that is appropriate for an individual food or meal, the recommended daily intake must be divided by an appropriate factor. Consumers generally eat three meals and several snacks a day. Because a single meal constitutes approximately 25% of the daily diet, dividing the daily value for a nutrient by a factor of 4 may be appropriate for determining the contribution of the level of that nutrient in a single meal towards a daily diet. Thus, a meal containing no more than 750 mg of sodium (3000 mg/day X 1/4 daily food intake = 750 mg) could be incorporated into a diet consistent with the American Heart Association's guidelines for sodium. A recommended value for daily consumption would need to be divided by a larger number, such as 8 for a main dish and 16 or 20 for an individual food item since a greater number of individual foods may be consumed in the course of a day.

**R120.**

*Question:* Is there a simple way to identify foods that should not be highlighted as part of a diet consistent with dietary guidelines?
*Answer:* Yes. If a food contains a nutrient at a level that exceeds the disqualifying levels in the general health claims requirements set out in # 101.14(a)(5) (attachment D), it would be difficult for a consumer to incorporate such food into a diet consistent with generally accepted guidelines for a healthy diet. Although a healthy diet is composed of a variety of foods with different nutrient profiles and could include such foods, a claim that such a

food would be a useful part of a diet consistent with dietary recommendations would be misleading if the food that bears the claim is not helpful in reaching dietary goals.

**R121.**

*Question:* Can a restaurant make a claim that a meal "is consistent with dietary guidelines" if the nutrient profile of the meal is consistent with some, but not all, of the guidelines established by a particular organization? For example, can a restaurant say a meal is consistent with dietary guidelines based on, e.g., the fat content of the meal without regard to the level of other nutrients, such as sodium and cholesterol?

*Answer:* Generally, if a meal bears a claim that it is consistent with the dietary guidelines of a health professional organization, its nutrient content must be consistent with all the parameters of the guidelines of the organization. If the level of another nutrient in the meal (e.g., sodium) is not consistent with the dietary guidelines referred to, a claim that the meal is consistent with dietary guidelines would be misleading. (While statements about general dietary recommendations do not by themselves trigger specific nutrition labeling requirements, FDA would expect that a restaurant have available, as part of its reasonable basis for believing a food is consistent with dietary recommendations, information on the level of all nutrients associated with the recommendations of the organization.) Furthermore, statements that single out recommendations for a particular nutrient, e.g., "meets dietary guidelines for fat," may be a claim about the nutrient content of the food (and therefore subject to the requirements for claims), rather than a statement offering general dietary guidance.

**R122.**

*Question:* Could FDA elaborate on how restaurants can present information that a food or meal meets general dietary guidelines without making a nutrient content claim or a health claim?

*Answer:* Statements that a food or meal meets the dietary guidelines of a health professional organization or other recognized dietary authority will be considered dietary guidance and not a nutrient content claim or health claim, provided the statement is limited to general dietary guidance and does not characterize the level of a nutrient in the food (# 101.13(q)(5)(iii)). The National Cancer Institute's recommendation, for example, that "eating 5 fruits and vegetables a day is a good way to achieve a healthy lifestyle," is general dietary guidance. Restaurants may use a heart symbol to indicate food items that are consistent with the recommendations of a health professional organization such as the American Heart Association. However, information from such programs presented in labeling in a context that includes an explicit or implicit health claim (e.g., a statement such as "meets insert association name guidelines for a 'Heart Healthy' diet" or "meets the National Cancer Institute recommendations for fiber") will subject the food to the health claims requirements. If a food bears a claim, it must comply with the requirements for the claim. If a restaurant wants to provide information as dietary guidance and not a health claim, it should not give undue emphasis to terms or symbols that could be an implied claim. Restaurants are encouraged to use alternative terms or symbols, e.g., a star or a check mark instead of a heart, to identify items that may not comply with the health claims requirements. If the name or logo of a third party reference is likely to be an implied claim when seen in conjunction with an individual food or meal, and the food or meal does not comply with the requirements for the claim, care should be taken to separate the reference from individual foods. It may be possible, however, for labeling to bear a statement such as "This restaurant has been a paying member of (insert program name) since 1994" provided such statement refers to the establishment, not a food, and it is less prominent (in size, type style, and placement) compared to other statements that refer to the food.

**R123.**

*Question:* Would a statement that a meal can be part of a diet that is consistent with the dietary guidelines of a health professional organization be regulated as a health claim if the name of the organization includes a reference to a disease or health-related condition?

*Answer:* It depends. Reference to the organization will be regulated as a health claim if, within the context of the total labeling, it implies a relationship between a nutrient or substance and a disease or health-related condition. Conversely, some groups have a history of providing general dietary guidance for good health such that consumers would not automatically assume that the name of the organization or its logo implies association with the disease-related element of a health claim. Thus, reference to these groups and their guidelines (e.g., the U.S. Department of Agriculture/Department of Health and Human Services food pyramid, the American Heart Association, or the National Cancer Institute), would not constitute a health claim provided that the guidelines are general dietary recommendations (compared to dietary recommendations for individuals with a specific disease or

health related condition) and reference to the organization contains no other reference to a substance or health-related condition.

**R124.**

*Question:* Can labeling that identifies items that are consistent with general dietary guidelines also provide consumers with nutrition-related information about the guidelines? Would this information be considered a nutrient content claim?

*Answer:* Restaurant labeling may provide information about the guidelines of a professional health organization. Whether the information is regulated as a nutrient content claim or as dietary guidance will depend on the context in which it is presented. If nutrient information is directly linked to a particular food or meal (e.g., "this meal derives no more than 30% of its calories from fat"), the information would be a nutrient content claim (see Q **R121**). However, if the information merely presents the guidelines of a health professional organization without making a statement about the nutrient content of a particular food, the information would not be a nutrient content claim. For example, labeling that highlights items that may be part of a diet that is consistent with all guidelines of a particular group may bear a footnote stating "Highlighted items are consistent with the general dietary recommendations of (insert name of health professional organization). These guidelines are (describe all nutrient recommendations that comprise the group's guidelines)."

**R125.**

*Question:* What is a 'third party' reference?

*Answer:* It is a reference on product labeling or advertising, made through a name or logo, linking a product to a person or organization that is independent of the product's manufacturer, seller, or distributor (the first party), or the consumer (the second party). The third party may be a State or local health department or consumer service agency, health professional organization, registered dietician, chef, celebrity, or other independent person or organization.

**R126.**

*Question:* If labeling bears a third party endorsement of a food or meal, and a financial contribution to the third party is a mandatory criterion for the endorsement, does the labeling that bears the endorsement need to disclose that the endorsement was made for compensation? *Answer:* Yes. Failure to reveal that the endorsement required that compensation be made would be misleading. Labeling that bears the endorsement should bear a disclosure statement such as "A fee was paid to (insert name of program)" or "A paying member of (insert name of program)" in close proximity to the claim.

**R127.**

*Question:* Many restaurants and third party programs use the term "healthy," e.g., "Healthy Selection" or "Heart Healthy," to describe foods. How will FDA regulate this term?

*Answer:* The term "Healthy" has a wide variety of meanings, depending on the context in which it is used. When the term (or any derivative of the term, e.g., "health," "healthier," or "healthful") appears in association with an explicit or implicit claim or statement about a nutrient (e.g., "Healthy, contains 3 grams of fat"), it is a nutrient content claim, and the food must meet the requirements for the claim (# 101.65(d)(2)) (attachment C). "Healthy" in a phrase such as "Healthy Heart" or "Heart Healthy" could be an implied health claim about heart disease (see Q **R104**). Alternatively, the statement "Eating five fruits or vegetables a day is a good way to a healthy lifestyle" is not a health claim because it provides only general dietary guidance, i.e., it does not cite any particular health related condition nor does it refer to a particular food or substance.

**Use of undefined terms and terms or symbols in a different context (# 101.13(q)(5)(iii)):**

**R128.**

*Question:* A number of restaurants identify items with terms such as "Lite Fare" to indicate that the portion size of the food is smaller than normal. Must these foods meet FDA's definition for "Light" or "Lite?"

*Answer:* It depends. Statements such as "Light Fare," "Light Bites," or "Light Entrees" will not be considered nutrient content claims provided that they do not characterize the level of a nutrient and the labeling that bears the claim also explains how the term is being used. For example, the term "Lite Fare" may be marked with an asterisk

referring consumers to a statement explaining that the term means smaller portions. The explanatory statement must be located in reasonable proximity to the term. e.g., at the bottom of the same section of labeling that contains the "Lite Fare" term and the foods it describes.

**R129.**

*Question:* Does this mean that claims on restaurant foods are exempt from the NLEA requirements, or that the restaurant may define a term differently from FDA's requirements, so long as the labeling provides an explanatory statement for the claim?

*Answer:* No. An explanatory statement can not be used to exempt a term or symbol from the claims requirements when the term or symbol is an explicit or implied claim. Further, an explanatory statement is not sufficient to render a term or symbol not misleading when the term or symbol is used in the context of a nutrient content claim or a health claim, and the food does not meet the requirements for the claim. A restaurant cannot, for example, make a "low fat" claim for a food that contains more than 3 grams of fat per reference amount (or per 100 grams for meals and main dish items), even if the labeling that bears the claim also contains a statement explaining the restaurant's definition for the claim.

**R130.**

*Question:* Many restaurants readily substitute meal components at the request of consumers, e.g., fried fish for baked fish, or French fries in place of a salad. How would FDA regulate a meal that complies with the requirements for a claim before substitution but that does not qualify afterwards?

*Answer:* It depends. If a restaurant makes a claim about its selections (e.g., "build your own low fat meal, selections contain less than 3 grams of fat"), and allows consumers to select meal components from different categories, all combined components must meet the requirements for the claim. If different combinations of foods do not meet the definition for a claim, the restaurant should not make a claim for those combinations. However, it may still make claims for the individual food items that meet the requirements for a claim. In addition, if a consumer chooses to mix foods from categories for which the restaurant makes a claim with foods from groups for which the restaurant does not make a claim, the meal with substituted components would not need to meet the requirements for a claim so long as labeling did not make an express or implied claim for that combination. For example, if a restaurant claims a salad plate, (e.g., tuna salad, fruit, and cottage cheese), is a "low fat" meal, all items on the plate must, in combination, meet the definition of "low fat." However if a consumer orders the salad plate but decides to delete the cottage cheese and order French fries instead, the meal is a new and different combination of foods from that for which the restaurant made a claim.

**R131.**

*Question:* Where can I find more information on FDA's requirements for claims?

*Answer:* Copies of FDA's regulations are found in Title 21, Code of Federal Regulations, parts 100-169 (21 CFR parts 100-169). This book may be purchased for $21 from the U.S. Government Printing Office, Washington, DC 20402 (202-783-3238) (Order #1869-019-00067-4). The claims regulations are in part 101. Copies of the CFR may also be purchased from other U.S. Government printing offices throughout the United States.

## Criteria for Making a Claim

### Reasonable Basis Determination

**Determining the nutrient content of a restaurant food:**

**R132.**

*Question:* When making a claim, do I have to have my food analyzed by a lab to determine its nutrient content?

*Answer:* No. A restaurant food, including restaurant-type foods described in # 101.9(j)(3), may bear a nutrient content claim or health claim provided the restaurateur has a "reasonable basis" for believing that the food meets the definition for the claim. If a restaurateur labels a food "low fat," for example, he or she must have a reasonable basis for believing that the food complies with FDA's definition for "low fat," i.e., that it contains no more than 3 g of fat per reference amount customarily consumed or, in the case of meals and main dishes, no more than 3 g of fat per 100 g (see Q **R89**).

**R133.**

*Question:* What nutrient information sources can be used as a reasonable basis for determining the nutrient content of a restaurant food? Can nutrient information sources be combined?

*Answer:* Nutrient levels may be determined based on reliable nutrient data bases, cookbooks, or analyses, or by other reasonable bases that provide assurance that the food or meal meets the requirements for the claim (# 101.13 (q)(5)(ii)). Additional sources of nutrition information include: USDA's Handbook No. 8 and FDA's guideline on nutrient levels in seafood and information on the nutrient content of raw fruits and vegetables, (published in conjunction with FDA's regulation on the voluntary labeling of raw fruits and vegetables (56 FR 60880, attachment B, November 27, 1991)). FDA will review and revise these lists on a regular basis (July 18, 1994, 59 FR 36379). Nutrition information for foods manufactured for institutional or restaurant use may also be available from the manufacturer or may, in some cases, be provided on the food's labeling. Such information on nutrient content of ingredients can be used along with the restaurant's recipe to calculate the nutrient content of the prepared food. Sources of nutrient information may be combined (e.g., merging data base values with information from ingredient suppliers) so long as the combined sources of information are still valid.

**R134.**

*Question:* Restaurants often need to modify recipes when a recipe is scaled-up from a home kitchen recipe to provide a larger number of servings for institutional use. Can a restaurateur still use the nutrient information in a consumer cookbook as a basis for a claim on the finished food if the proportion of some ingredients to others is altered during scale-up?

*Answer:* It depends. The claims criteria generally require that a nutrient be present at "no more than" or "no less than" a given level. Thus, a restaurateur may be able to determine that a food prepared using a modified recipe still meets the criteria for a claim without knowing the precise amount of the nutrient that is present in the finished food. For example, a restaurateur may reduce the proportion of salt and spices in a recipe for a "low sodium" soup during scale-up while the proportion of other major ingredients remains the same. The restaurateur may no longer know the exact sodium content of the food (i.e., the sum of sodium from added salt and that contributed by the other ingredients). However, assuming the nutrient values provided with the original recipe meet FDA's definition of "low sodium," the fact that changes during scale-up reduced, rather than increased, the primary sodium containing ingredient, would support a reasonable basis determination that the finished food is "low sodium." However, if a recipe is altered in such a way that the restaurateur is not able to determine the effects of the change on the nutrient content of the finished food, the nutrient information based on the original recipe would no longer serve as a "reasonable basis" for believing the finished food meets the definition for a claim.

**R135.**

*Question:* Will FDA require prior approval for a restaurant food to bear a claim?

*Answer:* No. FDA does not have the authority to require prior approval of restaurant labeling that bears a nutrient content claim, health claim, or other nutrition information.

**R136.**

*Question:* Will restaurants be required to have claim bearing foods "certified" by a third party or an independent dietary professional?

*Answer:* No. FDA has provided broad flexibility in establishing the "reasonable basis" criterion for restaurant foods. Thus, while some restaurateurs may choose to work with a third party to modify recipes or revise labeling, there is no requirement to do so. Restaurants should be able to make their own determinations once they are familiar with the requirements.

**R137.**

*Question:* Is FDA approving or recommending data bases for use as a restaurant's "reasonable basis" for a claim?

*Answer:* FDA has not approved, nor is it recommending, any specific data base for use in restaurants. Each restaurant must assess its own information needs and capabilities to ensure that the data base or other "reasonable basis" for the claims it makes is sufficient to support a claim. Assistance may be available through the following sources: trade and professional associations, trade publications, private consultants, and colleges and universities.

**Adherence to the "reasonable basis":**

**R138.**

    *Question:* Many food service items are partially or wholly processed when they are purchased for use in a restaurant or similar establishment. Thus, it may be difficult for the restaurant to keep track of the sodium content of foods. It may also be difficult for a restaurant to monitor the use of sodium in the cooking process and to develop recipes for "low sodium" foods that taste good. How will these problems be addressed in implementing the new requirements?

    *Answer:* FDA does not intend to impose an unrealistic regime (e.g., to require exacting measurements or strict portion controls) in restaurants. However, the agency is requiring that a restaurant have a reasonable basis for believing that a food meets the nutrient requirements for a claim, and that it be able to provide reasonable assurance that the preparation of the food adheres to the basis for the claim. If a restaurateur has no knowledge of, or control over, the sodium content of a food, or some other aspect of its nutrient content, he/she should not attempt to make a sodium content or other claim about the nutrient levels in that food.

**R139.**

    *Question:* Many restaurants do not have, or do not use, scales. Consequently, wouldn't a criterion such as "no more than 30 percent of calories from fat" be more appropriate for a low fat claim on a restaurant food compared to weight based criteria?

    *Answer:* No. First, the "no more than 30 percent of calories from fat" criterion does not, by itself, ensure that a food is low in fat. Second, in order to have a reasonable basis for believing that a food derives no more than 30 percent of its calories from fat, a restaurateur needs to have sufficient information on the types and quantities of ingredients used in the food to determine both its fat and calorie content. The same information used to calculate percent calories from fat (a criterion for a low fat claim on meals and main dishes) can be used to calculate the amount of fat per reference amount or, in the case of meals and main dishes, per 100 g of food.

**R140.**

    *Question:* To support its basis for a claim, does a restaurant need to weigh every serving of a food and calculate the amount of a nutrient in each serving every time it prepares the food?

    *Answer:* No. A reasonable basis determination only needs to be done once provided portion size is reasonably constant, the restaurant follows a standardized recipe, and the method of preparation adheres to the basis for the claim.

**R141.**

    *Question:* What types of actions would invalidate a restaurant's "reasonable basis," and what should a restaurateur do to help ensure this does not happen?

    *Answer:* Restaurateurs will need to employ preparation methods that are sufficiently consistent, including weight and volume measurements, to provide reasonable assurance that the preparation method adheres to the basis for the claim. They must also consider the effects of any addition or substitution of ingredients, or of any change in preparation method, on the level of a nutrient that is the subject of a claim. For example, the nutrient content values that FDA published in conjunction with the voluntary nutrition labeling program for baked fish would no longer apply to fish that is breaded or fried. It may be necessary for some restaurateurs to develop written standard operating procedures or other kitchen instructions for use by staff to guard against uncontrolled addition or substitution of ingredients. For example, if a "low fat" claim depends on the use of skim milk rather than whole milk, staff should be aware that the food bearing a "low fat" claim may not be made with whole milk. Further, if a food bears a "low sodium" claim based on its containing a limited amount of salt, allowing staff to "salt-to-taste" instead of using measured amounts would contravene the reasonable basis for believing that the food meets the requirements for the claim.

**R142.**

    *Question:* How will compliance with the claims requirements be evaluated in a restaurant situation?

    *Answer:* For compliance purposes, FDA will look at the recipe, nutrient information source, and any calculations used by a restaurant as its "reasonable basis" for believing that a food meets the requirements for a claim or other nutrition information. FDA will evaluate whether this information, and the nutrition information provided to consumers, are consistent with FDA's definition for the claim that is used. FDA may also request that a restaurant provide reasonable assurance that the method of preparation used adheres to the restaurant's basis for the claim.

**R143.**

*Question:* Data base analysis reveals that a restaurant food contains 3.3 grams of fat per reference amount. Can the food bear a "low fat" claim? *Answer:* No. The definition for a "low fat" claim is that the food contains no more than 3 grams of fat per reference amount (3.3 g of fat per reference amount would be declared as 3.5 g). If the restaurant's reasonable basis determination shows that a food contains more than 3 grams of fat per reference amount, the restaurateur would not have a reasonable basis for believing the food meets the definition of the claim.

**R144.**

*Question:* What are the record keeping requirements for a restaurant that make claims?

*Answer:* The restaurant must keep sufficient records to provide appropriate regulatory officials, upon request, with information on its "reasonable basis" and with reasonable assurance that the preparation method adheres to that basis. The type and amount of information necessary to support a claim will vary with the type of establishment, the types of food sold, preparation methods, and the types of claims being made. However, the following check list may be helpful:

1. Standardized recipe, including ingredients used and their quantities,
2. Nutrient content data for each ingredient (may include information from the ingredient manufacturer, a reliable data base, or other nutrient information source, or a combination of these; information must include data for the nutrients that are the basis for the claim and may include data for other nutrients,
3. The source of the above data (e.g., the name of the data base, cookbook, etc.),
4. Any assumptions made by the restaurateur or any calculations that were performed that may affect the reliability of the data (e.g., combining data sources, assumed nutrient values, replacing generic or average data base values with values for brands specifically used in the restaurant, etc.),
5. Serving size (total weight) of the finished food or meal,
6. Total amount of nutrient present per reference amount, actual serving, or per 100 g of food, as appropriate for the definition of the claim,
7. Evidence of staff awareness that reasonably consistent ingredient measurement and portion control are necessary for foods bearing a claim (e.g., training materials, observation of food preparation methods),
8. Presence and use of a standard operating procedure identifying essential parameters in the preparation of a food bearing a claim (e.g., the use of skim milk instead of whole milk, broiling instead of frying, or the need to measure salt instead of salting to taste), when the method of preparation could affect the basis for a claim.

**R145.**

*Question:* If a restaurant makes a fat claim for a food based on the use of skim milk, for example, does it have to save records to prove that it purchased, and used, an appropriate quantity of skim milk? *Answer:* Not necessarily. The requirements in # 101.13(q)(5)(ii) require that a restaurant provide reasonable assurances that it adhered to its basis for making a claim. Examples of the types of information that may be useful for a restaurant to provide in support of its basis for a claim are discussed in response to the preceding question. It is unlikely that a regulatory official would require information like the records of ingredient purchases unless he/she had reasonable cause to doubt a restaurant's stated basis.

## Reference amounts

**R146.**

*Question:* What is a "reference amount?" Do restaurants need to alter their serving size to be equal to the reference amount?

*Answer:* The reference amount or reference amount customarily consumed (RACC) is the amount of a food item customarily consumed per eating occasion as determined by FDA for the purpose of establishing realistic and consistent serving sizes for use in food labeling. Reference amounts for 139 different food categories are set out in 21 CFR 101.12. (Reference amounts for meat and poultry products are listed in 9 CFR 317.312.) Restaurants do not need to alter the size of the portions they serve to be the same as the reference amount, nor does the serving size used in the labeling for a particular food need to be the same as the reference amount. However, in order to make certain nutrient content claims or health claims, an individual food must meet the definition for the claim based on the amount of the subject nutrient in an amount of the food equal to its reference amount, e.g., a "low

fat" food may contain up to 3 grams of fat per reference amount. When a food's reference amount is small (i.e., 30 grams or less or 2 tablespoons or less), the food (e.g., a sauce or condiment) must also meet the requirements for the claim based on its nutrient content per 50 grams.

**R147.**

*Question:* How does a restaurant determine whether a food meets the criteria for a claim when the serving size is different from the reference amount? Please address soup in your answer.

*Answer:* The reference amount for all types of soup is 245 grams. This value is based on the amount of soup that survey data showed is customarily consumed in a single sitting, i.e., 1 cup, and information from the USDA that the average gram-weight per cup measure for soups is 245 grams. For some claims (e.g., "free"), the criteria for the claim include the amount of a nutrient per reference amount and per labeled (or actual) serving size. In order to bear a "fat free" claim, a restaurateur must have a reasonable basis for believing the soup contains less than 0.5 grams of fat per serving. Nutrition labeling would declare fat content as "0." In order to bear a "low fat" claim, soup may contain up to 3 grams of fat per cup (245 grams) according to the restaurateur's reasonable basis determination. If the same soup is served to consumers in a bowl that holds 50 percent more soup (1 cup (367 grams)), the larger serving may contain up to 4.5 grams of fat (i.e., a serving size that is 1.5 times the reference amount may contain 1.5 times as much of the subject nutrient).

**R148.**

*Question:* Are the criteria for the claim still based on reference amounts when making a relative claim such as "reduced fat?" *Answer:* Yes. A "reduced fat food," for example, must contain at least 25% less fat per reference amount compared to the reference food. However, for all practical purposes, when the reference amounts are the same for both foods (e.g., "regular potato salad" and "reduced fat potato salad"), the comparative information (% fat reduction) may be calculated based on equivalent amounts of each food, independent of the reference amount.

**R149.**

*Question:* What basis do I use when making a claim about the nutrient content of a meal?

*Answer:* Criteria for the use of claims on meals and main dishes (as defined in ## 101.13(l) and (m)) are somewhat different from those for individual foods. The criteria for claims for meals and main dishes are based on the level of the nutrient in 100 grams of food. For example, while a "low fat" individual food contains 3 grams or less of fat per reference amount, a "low fat" meal (or main dish) contains 3 grams or less of fat per 100 grams of food. Thus, a "low fat" meal weighing 300 grams (approximately 10 ounces) may contain as much as 9 grams of fat per serving.

## Reference Foods

**R150.**

*Question:* What types of claims require identification of a reference food?

*Answer:* There are two types of nutrient content claims, i.e., relative and absolute claims. A relative claim is a claim about the level of a nutrient in one food compared to another food, i.e., the reference food. When making a relative claim (e.g., "more," "less," "reduced," or "added"), the restaurateur will need to know the level of one or more nutrients in both the food making the claim and in the reference food. Conversely, an absolute claim (e.g., "high," "low," or "free") is based on the level of a nutrient in the food making the claim, and comparison to a reference food is not necessary.

**R151.**

*Question:* Must a restaurant develop recipes for, analyze, and market, a reference food for every food that bears a relative claim?

*Answer:* No. The reference food may be the restaurant's regular product, or that of another restaurant, that has been offered for sale to the public on a regular basis for a substantial period of time. However, nutrient values for a reference food may also be derived from such sources as a valid data base, an average of top national or regional brands, or a market basket norm (# 101.13(j)(1)(ii)).

**R152.**

*Question:* Can a restaurant make nutrient comparisons between dissimilar foods in the same category, e.g., comparing two appetizers or two different entrees?

*Answer:* It depends on the claim. Claims such as "reduced" may only be used to compare individual food items that are similar (e.g., potato chips to potato chips). However, claims such as "more" or "less" may be used to compare similar foods or they may be used to compare meals, main dish items, and dissimilar foods within a product category (e.g., potato chips to pretzels) provided that the food for which the claim is made meets the nutrient requirements for the claim (e.g., "less fat," contains at least 25% less fat compared to the reference food) and the food or meal bearing the claim could reasonably be expected to be substituted for the food to which the comparison is made (e.g., one appetizer for another, one entree for another) (# 101.13(j)(1)(i)(A)).

## R153.

*Question:* I understand that restaurant labeling that bears a claim must comply with the definition for the claim set out in the claims requirements. Does restaurant labeling also need to comply with the requirements for label statements and accompanying information set out in the claims regulations? For example, if a beverage contains 30 mg of sodium per reference amount (8 fl oz (240 milliliters)) it meets the nutrient content criterion for a "very low sodium" claim (i.e., 35 mg or less sodium per reference amount). A 12 fl oz serving of the same beverage would contain 45 mg sodium per serving. While the beverage still meets the criterion for a "very low sodium" claim based on the nutrient amount per reference amount, it would not meet the criterion based on its serving size. Sections 101.12(g) and 101.13(p)(1) of the claims regulations require that, when labeled serving size is different from the reference amount and the food does not meet the nutrient content criterion in the definition for the claim based on labeled serving size, the claim must be followed by a statement providing the criterion for the claim, e.g., "Very low sodium, 35 mg or less sodium per 8 fl oz (240 milliliters)." *Answer:* Generally, restaurant labeling must comply with all requirements for a claim unless specifically exempted from the requirement (# 101.13(q)(5)). Relative claims, for example, must be accompanied by a statement identifying the reference food and the percent (or fraction) of the amount of the nutrient in the reference food by which the labeled food differs (e.g., "Reduced fat cheese cake, contains 25% less fat than regular cheesecake"). However, consistent with the agency's flexible approach to restaurant labeling, FDA would use its regulatory discretion in evaluating labeling that bears a claim but for which compliance with a particular requirement may be difficult or inappropriate (e.g., because of the way in which a food is served (e.g., unpackaged, no labeled serving size or ingredient declaration) or the way the claim is presented (e.g., a single claim in a heading in labeling for a group of foods, or nutrition labeling that is independent of the labeling that bears the claim). While FDA has stated that some information (e.g., the identity of a reference food) is material to consumers' understanding of a claim, the agency would not object, in a restaurant situation, to the required accompanying information being presented in other labeling, (e.g., in a brochure or notebook along with nutrient information), when it is impractical for such information to accompany the claim (e.g., multiple claims on a menu with limited space).

---

**This document has been superceded by Guidance for Industry: A Labeling Guide for Restaurants and Other Retail Establishments Selling Away-From-Home Foods, issued April 2008.**

---

CFSAN | Food Labeling and Nutrional Information Page

Last modified on 2000-JUN-28 by frf

# EXHIBIT 4



# U.S. Food and Drug Administration

## CENTER FOR FOOD SAFETY AND APPLIED NUTRITION



FDA Home Page | CFSAN Home | Search/Subject Index | Q & A | Help

**March 12, 2004**

# Counting Calories
## Report of the Working Group on Obesity

Table of Contents

# I. Introduction

## A. Public Health Impetus

The nation is currently facing a major long-term public health crisis. In recent years, unprecedented numbers of Americans of all ages have become either overweight or obese.[2] This trend toward overweight and obesity has accelerated during the past decade and is well documented (see Box 1) by numerous scientific analyses. (For convenience, future use in this document of the term obesity includes both overweight and obesity.) Unfortunately, this trend towards obesity shows no signs of abating. If it is not reversed, the gains in life expectancy and quality of life resulting from modern medicine's advances on disease will erode, and more health-related costs will burden the nation's healthcare systems. For these reasons, the trend toward obesity must be reversed.

---

### Box 1 - Facts and Figures on Overweight and Obesity

**The scope of the growing and urgent public health problem of obesity is outlined in the Surgeon General's Call to Action (DHHS, 2001). In 1999-2000, 64% of U.S. adults were overweight, increased from 56% when surveyed in 1988-1994; 30% of adults were obese, increased from 23% in the earlier survey (DHHS, 2003; Flegal *et al.*, 2002). Among children age 6 through 19 years, 15% were overweight, compared with 10 to 11% in the earlier survey (CDC, 2003; Ogden *et al.*, 2002). Overweight and obesity are associated with increased morbidity and mortality. It is estimated that about 400,000 deaths per year may be attributed to obesity, and overweight and obesity increase the risk for coronary heart disease, type 2 diabetes, and certain cancers (Mokdad, *et al.*, 2004). The total economic cost of obesity in the United States is up to $117 billion per year (DHHS, 2003), including more than $50 billion in avoidable medical costs, more than 5 percent of total annual health care expenditures (DHHS, 2001; DHHS, 2003).**

**The prevalence of overweight and obesity varies by gender, age, socioeconomic status, and race and ethnicity (DHHS, 2001). For example, although overweight has increased among all children, the prevalence of overweight and obesity is significantly higher among non-Hispanic black and Mexican-American adolescents than among non-Hispanic white teens (12-19 years old) (Ogden *et al.*, 2002). A majority of non-Hispanic black women over 40 are overweight or obese (Flegal *et al.*, 2002).**

The problem of obesity in America has no single cause. Rather, obesity is the result of multiple factors acting together over time, including genetic (Loos and Bouchard, 2003) and environmental factors (Hill and Peters, 1998; Hill *et al.*, 2003).[3] Similarly, there will be no single solution to the problem of obesity; it will be brought under control only as a result of coordinated, complementary efforts from a variety of sectors of society. The obesity epidemic also will not be solved quickly. Any long-lasting reversal of this phenomenon will itself be a long-term process.

Obesity is associated with significant health problems in the pediatric age group and is an important risk factor associated with adult morbidity and mortality. The causes and mitigation of childhood obesity have been and continue to be the focus of much attention (Hill and Trowbridge, 1998; Barlow and Dietz, 1998; Bowman, *et al.*, 2004). A policy statement of the American Academy of Pediatrics proposes strategies for early identification of excessive weight gain by using BMI,[4] for dietary and physical activity interventions during health supervision encounters, and for advocacy and research (AAP, 2003). According to Ritchey and Olson (1983), parental behavior is a dominant influence on children's eating habits. For adults, the literature discusses how having a specific behavior goal for the prevention of weight gain (e.g., increasing physical activity or eating less at each meal) may be key to arresting the obesity epidemic (Wyatt and Hill, 2002; Hill, 2004). In similar fashion, the *Dietary Guidelines for Americans* includes a chapter on physical activity, linking physical activity with nutrition.

The combined efforts of Federal, state and local governments, the packaged food industry, the restaurant industry (including both quickservice and other types of restaurants), the professional health community (including primary care physicians, nutritionists, dietitians, and others), consumer advocacy groups, schools, the media and, of course, committed individuals will all be required to contribute to the solution to the problem of obesity.

The current crisis has been recognized by many of these groups, including a number of our stakeholders, for some time, and many wide-ranging efforts to address and reverse the trends that lead to obesity are already underway. Within the DHHS, Secretary Tommy G. Thompson has led efforts to address the public health problem of obesity. On July 30, 2003, Secretary Thompson convened a roundtable on obesity/nutrition involving experts from academia, the health professions, industry, and government to consider the role that the Department can play in reducing or reversing the weight gain that leads to obesity (see Appendix C for the five questions presented at the roundtable). DHHS also established a Docket in FDA (Docket No. 2003N-0338) to gather additional information on this topic.

Each group now working on the problem of obesity brings unique resources and expertise to bear on it. Among the major Federal government entities with a responsibility and a capability to address the problem, FDA, within the broader context of DHHS, is bringing its own unique strengths to bear, including relevant legal authorities.

## B. FDA Obesity Working Group

In a memorandum dated August 11, 2003 (see Appendix D for the August 11 memorandum), Commissioner of Food and Drugs Mark B. McClellan, M.D., Ph.D., created the OWG and gave it its charge. FDA Deputy Commissioner Lester M. Crawford, D.V.M., Ph.D., chairs the OWG; the Director of FDA's Center for Food Safety and Applied Nutrition (CFSAN), Robert E. Brackett, Ph.D., is the vice-chair.[5] Other members of the OWG (see Appendix E for list of OWG members) were selected from across FDA to provide expertise and knowledge in a range of relevant scientific and other disciplines. The Commissioner requested that the OWG deliver, in six months, a report that outlines an action plan covering critical dimensions of the obesity problem as outlined in the charge and to help consumers lead healthier lives through better nutrition.

During its tenure, the OWG met eight times; received briefings from several invited experts from other government agencies; held one public meeting, one workshop, two roundtable discussions (one with health professionals/academicians, and one with representatives of consumer groups); and solicited comments on obesity-

Case 4:08-cv-03247-CW    Document 28-5    Filed 07/31/2008    Page 4 of 33
DA/CFSAN - Calories Count: Report of the Working Group on Obesity

Page 3 of

related issues, directing them to the Docket that DHHS established in July 2003 (Docket No. 2003N-0338). In addition, some members of the OWG met with representatives from various sectors of the packaged food and restaurant industries.

To accomplish its work, the OWG organized several subgroups (see Appendix F for list of OWG subgroups), each designed to focus on a particular aspect of the Commissioner's original charge. In addition, in order to inform its work, the OWG created a knowledge base subgroup. All the subgroups, in turn, met separately and developed respective analyses and recommendations, which serve as the basis for this report. This report presents the OWG's recommendations that are responsive to the Commissioner's charge, and that the OWG believes can contribute to confronting obesity in the United States.

# II. Foundations of this Report

Any FDA effort to address obesity must be based on the following: (a) adherence to fundamental scientific principles; (b) conformance with FDA's public health mission and legal authorities; and (c) consideration of consumer and other stakeholder views and needs.

## A. Scientific Principles

Fundamentally, obesity represents an imbalance between energy intake (e.g., calorie intake) and energy output (expended both as physical activity and metabolic activity; see text box on Calorie (Energy) Balance at Appendix B). Although there is much discussion about (1) the appropriate makeup of the diet in terms of relative proportions of macronutrients (fats [lipids], carbohydrates, and protein) that provide calories and (2) the foods that provide these macronutrients, for maintenance of a healthy body weight it is the consumption and expenditure of calories that is most important. In other words, "calories count."[6]

### 1. Calories

Quite simply, the OWG's recommendations center on the scientific fact that weight control requires caloric balance. Food supplies the energy that provides fuel for the body and for rebuilding the "wear and tear" one is subjected to during the day. The traditional unit for expressing the energy value of foods is the *kilocalorie* (kcal). The term *calorie* is commonly used in place of kilocalorie. One calorie is equal to 4.184 kilojoules (kjoules) a common unit of energy used in the physical sciences and internationally in nutrition labeling. The caloric intake that is appropriate for an individual depends on a number of factors, including height, weight, gender, and age.

### 2. Calorie Contribution of Macronutrients

Attention to caloric intake is a key element of weight control (the other is caloric expenditure). The three macronutrients that provide energy in our diets are carbohydrate, protein, and fat (see text box on Carbohydrates and Other Macronutrient Contributions to Caloric Value at Appendix B). (Alcohol is also a source of energy, yielding 7 calories per gram, but it is not a nutrient.[7]) These macronutrients yield different amounts of energy in the form of calories per unit weight.

- Carbohydrate = 4 calories per gram
- Protein = 4 calories per gram
- Fat = 9 calories per gram

To maintain a constant bodyweight over time, "energy in" from food must equal "energy out" as a result of resting metabolism plus physical activity. In other words, calories eaten should equal the calories expended on a daily basis. Bodyweight will change if one alters this basic balance. If one consumes even slightly more calories than one expends over time, one will eventually gain weight (Wright, *et al.*, 2004). Conversely, if one consumes fewer calories

than one expends over time, one will eventually lose weight.

## B. FDA's Public Health Mission and Legal Authorities

FDA's mission is to promote and protect the public health. It seeks to accomplish this mission by enforcing the laws it is charged with administering and by conducting educational and public information programs relating to its responsibilities.

The Federal Food, Drug, and Cosmetic Act (the Act) as amended by the Nutrition Labeling and Education Act of 1990 (NLEA, Public Law 101-535), together with FDA's implementing regulations, established mandatory nutrition labeling for packaged foods to enable consumers to make more informed and healthier food product choices in the context of the total daily diet. The statute and the regulations were also intended to provide incentives to food manufacturers to improve the nutritional quality of their products.

The cornerstone of the NLEA is the Nutrition Facts panel (NFP), which lists the total number of calories derived from any source, as well as the total number of calories derived from total fat. The amounts of total fat, saturated fat, cholesterol, sodium, total carbohydrate, dietary fiber, sugars, and protein in the food are also listed in the NFP, both as the quantitative "amount per serving" (grams or milligrams) and, with the exception of sugars and protein, as the percent of a dietary reference value, called the "percent Daily Value" (%DV). FDA requires the declaration of nutrients as a %DV, in part to help consumers understand the role of individual foods in the context of the total daily diet. Also, to help consumers determine how their individual dietary needs compare with the reference daily values used on the label, the NFP includes a footnote that specifies that the reference daily values are based on a 2,000 calorie diet. On larger packages, the footnote goes on to list the daily values for total fat, saturated fat, cholesterol, sodium, total carbohydrate, and dietary fiber for both a 2,000 and a 2,500 calorie diet.

As part of FDA's regulations implementing the NLEA, the agency established reference amounts customarily consumed (RACCs) for 139 food categories that manufacturers are to use in developing serving sizes that are then expressed in household measures (e.g., teaspoons, cups, pieces). These serving sizes become the basis for reporting the amount of each nutrient present and enable consumers to compare the nutritional qualities of similar food products.

Under the NLEA, FDA also has authority over health claims and nutrient content claims for foods. Appropriate health claims and nutrient content claims, like nutrition labeling, further the statutory objectives of enabling consumers to make more informed and healthier food product choices and encouraging manufacturers to improve the nutritional quality of their products.

A health claim is a claim that characterizes the relationship between a food, or a food component, and a disease or a health-related condition, and may only be made in accordance with an authorizing regulation issued by FDA. An example of a health claim is: "Although many factors affect heart disease; diets low in saturated fat and cholesterol may reduce the risk of heart disease." A nutrient content claim is a claim that characterizes the level of a nutrient in a food, and it, too, must be made in accordance with an authorizing regulation issued by the agency. Nutrient content claims describe the level of a nutrient or dietary substance in the product, using terms such as "free," "high," and "low," or they compare the level of a nutrient in a food to that of another food, using terms such as "more," "reduced," and "lite." More information on FDA's implementation of these authorities can be found at http://www.cfsan.fda.gov/~dms/hclaims.html.

Restaurants, unlike the manufacturers of packaged foods, are not required by the NLEA to provide nutrition information for a menu item or meal unless a nutrient content claim or a health claim is made for such item or meal. When such a claim is made, the restaurant need only provide information on the amount of the nutrient that is the basis of the claim. Thus, for example, if a restaurant claims that a particular menu item is "low in fat" (i.e., makes a nutrient content claim with regard to fat) then this requirement is satisfied by adding: "low fat - provides fewer than 3 grams fat per serving" (i.e., the basis of the "low fat" claim). The restaurant may provide information about the

nutrient for which the claim is made in various ways, including in brochures. In other words, restaurants need not provide such information on the menu or menu board.

A restaurant making such a claim also would not be required to provide complete nutrition information; its decision to provide nutrient content information about one nutrient does not trigger a requirement to disclose complete nutrition information for that item or meal.

## C. Stakeholder Participation

From the outset, FDA asked stakeholders to identify obesity issues that FDA should address. Prior to the creation of the OWG, DHHS convened a round table discussion in late July 2003 (bringing together experts from academia, the health professions, industry, and government) to consider how best to address the obesity issue, as reflected in five questions presented to the round table for discussion (see Appendix C for the five questions). As noted above, DHHS also established a Docket in FDA (Docket No. 2003N-0338) to gather information on this subject.

Following the creation of the OWG, FDA provided several opportunities for stakeholder participation: a public meeting on October 23, 2003; a workshop on November 20, 2003, that was co-sponsored and funded by the DHHS Office of the Assistant Secretary for Planning and Evaluation (OASPE); roundtable meetings with health professionals/academicians and consumer groups respectively, on December 15 and 16, 2003; and meetings with representatives of the packaged food and restaurant industries. FDA used these opportunities to solicit public comments on the obesity issue, as reflected in six questions the agency asked (these questions are set out in section VI.A. of this report). FDA used the Docket established in July 2003 (Docket No. 2003N-0338) to gather additional comments; the OWG organized the comments to this docket into a searchable database that informed preparation of this report.

## D. The OWG's Work

The remainder of this report reflects the work of the OWG subgroups:

- **Obesity Knowledge Base:** Gathered information on existing obesity, weight management, and nutrition related programs.
- **Messages:** Identified existing obesity-related messages in the public and private sectors; conducted focus groups to test five messages; recommended a calorie focus for FDA's action plan.
- **Education:** Explored and is initiating a number of new and enhanced private and public sector partnerships to focus on obesity education.
- **Food Label:** Explored options for enhancing the food label in relation to efforts to address obesity.
- **Restaurants/Industry:** Explored options for providing consumers with nutrition information on food consumed outside the home; considered the potential health consequences of using diet plans and related products.
- **Therapeutics:** Surveyed existing therapies for mitigating obesity; recommended next steps for updating the 1996 draft guidance entitled "Guidance for the Clinical Evaluation of Weight-Control Drugs."
- **Research:** Identified gaps in obesity knowledge and areas for further biomedical and social sciences research.
- **Stakeholder Investment:** Held meetings and a workshop to solicit stakeholder views; and organized the comments to Docket No. 2003N-0338 into a searchable database that informed preparation of this report.

# III. Messages

The Commissioner charged the OWG to set out specific means for developing and implementing a "clear, coherent, and effective FDA message (within the broader context of DHHS) that will unify various public and private efforts to reverse the current obesity epidemic." This part of the charge was expanded with an eye toward establishing a broader theme that focuses on calories[8] as a fulcrum for further action, in the context of an overall healthful diet as defined by the DHHS/USDA *Dietary Guidelines for Americans.*

## A. Obesity Knowledge Base

Prior to considering obesity messages and to ensure that it was aware of the range of current public and private efforts to address obesity, the OWG formed a subgroup to collect information on existing and planned obesity-related activities in the United States; assemble a centralized repository of the information gathered; and report out to the full OWG on the scope/contents of the repository.

A majority of the activities listed in the repository and database are programs that provide advice on nutrition/diet and/or physical activity. Most associations, agencies, and organizations identified are sending out the message that diet and physical activity should be addressed together in the fight against obesity.

Many partnerships or collaborations exist between government agencies and/or private entities. There are several areas, however, where different groups manage similar programs. These similar programs, if merged into a larger partnership, could have a greater impact.

To determine whether various programs, activities and initiatives are effective in reducing and/or preventing overweight and obesity in the United States, program evaluation must improve. In addition, improvements are needed in educational outreach to convey the messages and implement the initiatives that government and non-government entities have developed.

## B. Obesity Messages

*Message Recommendation Highlight:*

- *Develop messages tied to a "calories count" focus*

The OWG formed a subgroup to identify existing messages in the public and private sectors and to set out specific means for developing simple, clear, coherent, and effective FDA messages around the theme of "calories count" based on the scientific fact that net calorie gain or loss over time is the root cause of obesity.

### 1. Identifying Existing Messages

Today, consumers are inundated with a range of messages about food. Some of these messages are in the form of food advertisements or marketing efforts that focus on product convenience, taste and value. Other messages relate to weight-loss programs or products, or weight management. Some of the messages in each of these areas may not necessarily direct consumers toward wise dietary choices.

The Federal government tries to provide long-term sound nutrition advice to consumers (e.g., government-sponsored public health campaigns). For example, DHHS collaborates with the USDA to establish and promote the *Dietary Guidelines for Americans,* which provide guidance on choosing a lifestyle that combines sensible eating with regular physical activity. An important recent effort of DHHS is *Steps to a HealthierUS.*[9] In support of the President's *HealthierUS*[10] initiative, the DHHS effort emphasizes personal responsibility for the choices Americans make to ensure that policy makers support prevention programs that foster healthy behaviors.

### 2. FDA Focus Groups on Obesity Messages

---

### Box 2 - FDA Focus Groups

FDA conducts its own consumer research to evaluate the appropriateness and effectiveness of its messages. For example, FDA conducted consumer research before the implementation of NLEA, to determine the usefulness of potential choices for the NFP format. Since NLEA, FDA and other researchers have studied how consumers use the NFP, nutrient content claims, and health claims (separately and in combination) to make dietary choices.

Consumer research is used to assess people's knowledge, attitudes, perceptions, and preferences for a topical subject area or reactions to any type of stimuli. Research methods may include qualitative studies, such as focus groups; quantitative, nationally representative surveys, using structured questionnaires; experimental studies of consumer responses to labeling and package variations; and intervention studies of the effects of point of purchase labeling.

In November-December 2003, FDA, with OASPE funding, conducted focus group research. There were 8 groups of 7-10 participants. Groups were segregated by gender and education level. All participants were at least 18 years old, had been grocery shopping and had eaten in a fast food and/or quickservice restaurant in the past month. The purpose of the groups was to explore (1) how consumers use the nutrition information on food labels; (2) what type of nutrition information they would like to see in quickservice restaurants; and (3) which messages would be effective as part of a public information and education effort aimed toward encouraging consumers to use the food label. Participants discussed and reacted to variations in the NFP and the principal display panel (PDP) on food packages and to various presentations of nutrition information at restaurants.

It is important to emphasize that the findings from these focus groups are based on qualitative research with small sample sizes. They should not be viewed as nationally representative or projectable. Quantitative experimental data are necessary to make reliable and verifiable conclusions. However, these focus group results shed some interesting light on the complex issues discussed in this report and are useful in identifying quantitative research needs.

The focus group findings discussed in this report are preliminary and are based on observations recorded by the observer, as well as post-group discussions with the focus group moderator and other observers.

---

In November and December 2003, FDA focus groups were convened to evaluate, among other things: (1) how consumers use the nutrition information on food labels; and (2) which messages would be effective as part of a public information and education effort aimed toward encouraging consumers to use the food label (see Appendix G for FDA Division of Market Studies report, referenced in this report as FDA, 2003).[11] Appendix H contains a discussion on the development of effective consumer messages. The findings from the FDA focus group efforts are discussed below.

FDA developed five NFP-based messages that the agency tested through its focus groups. The messages and materials were intended to remind people where to find the NFP, why it is there, and how to use the information; while at the same time reinforcing various "promises" (i.e., motivators) associated with regularly using the NFP.

The messages tested were as follows:

1.  "Read it before you eat it - Always look at the Nutrition Facts"
2.  "Calories count and fat matters - Always look at the Nutrition Facts"
3.  "Do you know the serving size? - Always look at the Nutrition Facts"
4.  "What you eat is what you are - Always look at the Nutrition Facts"
5.  "If you read labels for things you put *on* your body, why wouldn't you read labels for what you put *in* your body?"

Overall, none of these "slogan-type" messages resonated particularly well with the FDA focus group participants. Nevertheless, FDA focus group participants believed that reminder messaging about the NFP would be helpful. In addition, the results of other focus groups indicate that messaging should emphasize small, incremental steps versus major life changes with respect to weight management and obesity prevention, and should address the importance of "planning ahead" as a necessary step for eating right (Borra *et al.*, 2003; IFIC, 2003).

## C. OWG Message Recommendations

The OWG recognizes that some focus group (Borra *et al.*, 2003; FDA, 2003; IFIC, 2003) and some quantitative data (Derby and Levy, 2000; Levy, 2004; Lin, 2004) indicate that not all consumers pay enough attention to calorie information in the NFP. Nevertheless, given the fact that obesity, at its most fundamental level, is a direct function of caloric imbalance, the OWG believes that "calories count" must be the focus for its recommendations. Accordingly, in relation to messages, the OWG recommends the development and testing of messages tied to this focus.

# IV. Education Program to Deliver the Message

---

*Education Recommendation Highlight:*

- *Establish partnerships to educate Americans about obesity and leading healthier lives through better nutrition.*

---

The Commissioner directed the OWG to outline an FDA program (component of DHHS program) for educating Americans about obesity and the means to prevent chronic diseases associated with it.

## A. Need for Education Programs

Consumer perceptions regarding weight and dietary habits are significant in the fight against the obesity epidemic. Consumers who are not aware of their own weight status and its medical implications are unlikely to be receptive to public health efforts to alleviate obesity. This point extends to parental perceptions of children's weight status and dietary habits as well, given that parents have significant influence over their children's environment, habits, and health. Lack of knowledge about weight status and its health implications undermine consumers' "promise" or motivation, a key component of messaging; therefore the OWG identified education as a critical adjunct to effective messaging about caloric balance.

Recent focus group studies conducted by the International Food Information Council (IFIC)[12] suggest that consumers distinguish between "overweight" and "obesity," and consider the first to be of relatively little health significance (IFIC, 2003). Therefore, consumers who consider themselves to be merely "overweight" may have less incentive to take action. There is also evidence to suggest that both adults (Kuchler and Variyam, 2003) and teenagers (Kant, 2002) misperceive their weight status, although the form of misperception can vary with gender, socioeconomic status, age and race and ethnicity. For example, men were found to be more likely than women to

underestimate the level of their weight status; healthy or underweight women were more likely to consider themselves overweight. Lower income and education were also associated with underassessment of weight status; higher income and education levels were linked to overestimation of weight status. Parents also appear prone to misjudge their children's weight status and its health significance (Borra *et al.*, 2003; Contento *et al.*, 2003; Maynard *et al.*, 2003). Many parents with overweight children consider their children to be at a healthy weight. In some cases this may be due to cultural perceptions of appropriate weight (Bruss *et al.*, 2003; Contento *et al.*, 2003). In some cases where parents do accurately judge their children's weight status, they may believe that the child will outgrow their overweight or obese status and, therefore, be less likely to take action.

Consumers may have difficulty accurately assessing the nutritional quality of their diet. Although consumers report in focus group studies that they understand what comprises a healthy diet (IFIC, 2003), approximately 40 percent of one sample (almost 3000 household meal preparers drawn from USDA 1994-1996 Continuing Survey of Food Intakes by Individuals (CSFII) data) perceived the quality of their diets to be better than the calculated diet quality (Variyam *et al.*, 2001). Parents, in particular, do not always have a clear picture of their children's diets. In a recent series of focus groups and phone/Internet surveys conducted by the American Dietetic Association Foundation (Moag-Stahlberg *et al.*, 2003), parents significantly underestimated the frequency with which children ate outside of regular mealtimes, such as after dinner and while engaged in sedentary activities like television viewing. A recent report by the Kaiser Family Foundation discusses the role of media in childhood obesity (KFF, 2004).

Qualitative research by Borra and colleagues (Borra *et al.*, 2003) also suggests that children (aged 8-12 years) give little thought to good health, although they associate achieving "good health" with what they eat, rather than with physical activity. For many of the children involved in the research by Borra and colleagues, the term "healthy" had negative connotations; for example, it meant having to eat fruits and vegetables they did not like or not eating their favorite foods. In terms of weight, children between 8 and 10, regardless of their own weight, did not think about food choices. Equally disturbing, some 11-12 year olds who were overweight said they tried to lose weight by skipping meals, rather than by eating differently. Among a group of children perceived to be above normal weight for their age, Borra and colleagues found that although the children knew it was important to eat healthfully because their parents stressed it at home and they learned about nutrition in school, this teaching provided little useful information for the children.

These qualitative findings are supported by a recent unpublished survey conducted for the nonprofit Dole Nutrition Institute of more than 6,000 children between grades 1-8 in 194 classrooms (Dole, 2003). The responses to survey questions "What is obesity?" and "Which statement is true [about being overweight]?" indicate that many children seem to have either misperceptions or are misinformed about (1) the meaning of obesity and (2) the value of exercise in preventing or mitigating health problems due to overweight.

## B. OWG Education Recommendations

The OWG recommends that FDA focus its education strategy on influencing behavior, as well as imparting knowledge, in the context of healthy choices for consumers. Any such efforts will require a long-term agency commitment. Education programs should help consumers make more informed food choices that result in better weight management; should direct messages to large audiences on a frequent basis; and should be crafted to reach a variety of audiences.

The OWG recommends that FDA implement education programs incrementally and design them to be flexible enough to take into account new research findings and policy decisions and possible changes in the food label (e.g., revisions to the content or format of the NFP). Education efforts, however, should not be delayed pending such changes. Education programs should be simple to understand and apply, and should focus on showing consumers how to achieve a specific goal.

Given the resources and time that FDA would need to develop and implement new education programs for multiple subpopulations, the OWG recommends that FDA, as part of a larger DHHS initiative, establish relationships with

private and public sector partners for educational outreach. Such efforts will have the ability to reach larger and more diverse audiences on a more frequent basis, and will enable calorie-focused education campaigns to begin more quickly. Given the prevalence of obesity among children, establishing relationships with youth oriented organizations is especially important. For this reason, the following partnerships are being pursued as a part of a larger DHHS initiative:

- **Girl Scouts of the USA :** FDA and Girl Scouts of the USA seek to launch an initiative entitled "Healthy Living." Building on current Girl Scout resources and programs, the initiative will provide girls and their families with the skills, knowledge, and support needed to make healthier food choices, engage in physical activity, build self-esteem, and maintain a healthier lifestyle. This initiative includes developing a charm of the food label as a part of the Studio B teen collection.
- **National Association of State Universities and Land Grant Colleges (4-H program):** Youth health and obesity is one of three strategic priorities for 4-H Youth Development. FDA envisions a partnership that will use 4-H for targeted population evaluation of obesity/nutrition message(s), and use the 4-H network of over 3,500 professional Cooperative Extension programs across the United States for education and delivery of the message(s).

In addition, FDA, along with other components of DHHS, is participating in the "Shaping America's Youth" initiative to identify actions being taken to address childhood and adolescent inactivity and excess weight. Information collected for this initiative in an on-line survey will be used by "Shaping America's Youth" to prepare a report that provides an overview of current public and private programs that target physical activity and nutrition in our nation's children. As of the date of this report, Shaping America's Youth has registered over 1950 programs directed at the childhood obesity issue, collected surveys of funding and tactical information from over 1150 organizations and entities, and assembled nearly 800 fully completed in-depth surveys from programs representing all 50 states and the District of Columbia.

Public sector partnerships should have the goal of developing programs similar to the "Power of Choice" program FDA developed with the USDA, which teaches children who are 11-13 years of age how to make smart food and physical activity choices in real-life settings. Learning how to use the NFP to make healthy food decisions is a major skill throughout the "Power of Choice" program (see Appendix I for additional information about "Power of Choice"). One way to help better ensure collaboration and cooperation with our public health partners is for FDA to coordinate its messages and educational material with those of its partners.

- **Centers for Disease Control and Prevention:** FDA is pursuing a collaboration between the agency and the CDC to develop a holistic approach to healthy living for children that will enable the FDA to meld a caloric intake message with a CDC caloric output message on physical activity.
- **Department of Education:** FDA has made preliminary contact with the Department of Education to join in supporting programs that target school-age children.
- **Department of Agriculture:** FDA plans to work through DHHS with counterparts at USDA to ensure that the agency's focus on calories is considered as USDA revises its Food Stamp Program/WIC (Women, Infants, and Children) programs and its Food Guide Pyramid, and as DHHS and USDA collectively revise the *Dietary Guidelines for Americans.*

The OWG recommends that FDA work through a facilitator to establish a forum for stakeholders to seek consensus-based solutions to specific aspects of the obesity epidemic in the United States, with a particular focus on the needs of children. As a first step, the OWG further recommends that the initiation of such a dialogue be raised at the next meeting of the FDA Science Board.

# V. Supporting the Message

It is important to support any message(s) through appropriate actions and policies where the "calories count" focus is likely to have an impact on consumer knowledge, behavior, and/or treatment (i.e., food labels, restaurants,

therapeutics, and research).

## A. Food Labels

---

*Food Labeling Recommendation Highlights:*

- *Calories:*
  - *Issue an ANPRM to solicit public comment on how to give more prominence to calories on the food label.*
  - *Consider authorizing a health claim on "reduced" or "low" calorie foods.*
  - *Issue an ANPRM about serving sizes.*
- *Serving Sizes:*
  - *Encourage manufacturers immediately to take advantage of the flexibility in current regulations on serving sizes and label as a single-serving those food packages where the entire contents can reasonably be consumed at a single-eating occasion.*
  - *Highlight enforcement of serving sizes in FDA's food labeling compliance program and consider enforcement action against products that declare inaccurate serving sizes.*
- *Carbohydrates:*
  - *File petitions and publish a proposed rule to provide for nutrient content claims related to carbohydrate content of foods, including guidance for use of the term "net" in relation to the carbohydrate content of foods.*
- *Comparative Labeling Statements:*
  - *Encourage manufacturers to use appropriate comparative labeling statements that make it easier for consumers to make healthy substitutions, including calories (e.g., "instead of cherry pie, try our delicious low fat cherry yogurt - 29 percent fewer calories and 86 percent less fat").*

---

The Commissioner directed the OWG to "develop an approach for enhancing and improving the food label to assist consumers in preventing weight gain and reducing obesity."

## 1. The Food Label

The Act, as amended by the NLEA, and FDA's implementing regulations require an NFP on the label of most packaged foods. The NFP lists the serving size, the number of servings per container, the number of calories per serving and the amount and %DV[13] per serving for specified nutrients.

Before recommending any changes in the NFP relevant to obesity, it is important to understand how consumers currently use the NFP and to assess whether the NFP has been effective in facilitating positive dietary change. Research shows that most consumers are familiar with the nutrition information on food labels (Marietta *et al.*, 1999; Neuhouser *et al.*, 1999; Kristal *et al.*, 2001; FDA, 2003), which they use primarily for evaluating the nutrition quality of specific food products, but the percentage of consumers who use NFP information productively for weight management purposes is low (Barone *et al.*, 1996; FMI, 1996; Ford *et al.*, 1996; Levy *et al.*, 1996; Mitra *et al.*, 1999; Roe *et al.*, 1999; Garretson and Burton, 2000; Levy *et al.*, 2000; IOM, 2003; FDA, 2003) (e.g., see Table 1 below).

/CFSAN - Calories Count: Report of the Working Group on Obesity

**Table 1. Recent Trends in Reported Food Label Use: 1994-2002 HDS Surveys** (Derby and Levy, 2000; Levy, 2004; Lin, 2004)

| | 1994 | 1995 | 2002 |
|---|---|---|---|
| Sample size (N) | (1,945) | (1,001) | (2,743) |
| | % population (weighted) | % population (weighted) | % population (weighted) |
| **(1) Percent who use food labels "often" or "sometimes" when buying a food product for the first time** | | | |
| How often do you read the food label? | 70 | 69 | 69 |
| **(2) Percent who use labels "often" for specific purposes[1]** | | | |
| To figure out how much to eat | 34 | 40 | 35 |
| To see if food is high or low in calories, salt, vitamins, fat, etc. | 77 | 83 | 67 |
| To help in meal planning | 34 | 36 | 32 |
| **(3) Percent who use specific label information "often"[2]** | | | |
| Do you use the serving size information, when available? | 29 | 26 | Not Asked |
| [1] Based only on label users who "often" or "sometimes" use labels when they buy a food product for the first time. [2] Based on all respondents. | | | |

Associations between dietary behavior and food label use have also been identified, although the body of literature is relatively small (IOM, 2003). A low-fat diet, for example, has been positively correlated with food label use, both in the general population and among family clinic patients. Clinic patients with health conditions (e.g., high blood pressure or high cholesterol) as well as consumers who are in action or maintenance stages of dietary change were also more likely to use the food label (Kreuter et al., 1997; Marietta et al., 1999; Neuhouser et al., 1999; Kristal et al., 2001). In addition, label claims (e.g., low sodium and low fat) may allow consumers to avoid specific ingredients or make food substitutions (Balasubramanian and Cole, 2002), resulting in changes to dietary patterns. Kim and coworkers (Kim et al., 2001) analyzed data from the USDA's CSFII and the Diet and Health Knowledge Survey. Their findings indicate that food label use is positively correlated with measurable increases in the Healthy Eating Index (Kim et al., 2001).[14]

Despite reports of a positive correlation between label use and certain positive dietary characteristics, the trend toward obesity has accelerated over the past decade. It may be that consumers do not take advantage of the available information on the food label to control their weight, perhaps because they do not appreciate how the information could be used for weight management purposes or perhaps because they find it too hard to apply the available information to such purposes. In any case, it is clear that consumers would benefit if they were to pay more attention to and make better use of information, including calories, on food labels. Providing encouragement and making it as easy as possible for consumers to do so are worthy public health objectives.

## 2. FDA Focus Groups on Food Labels

As described in Box 2, FDA recently conducted focus group research in which it asked general nutrition questions as well as how consumers use the nutrition information on food labels.

The questions covered under general nutrition dealt with three topics: (1) attitudes towards nutrition; (2) macronutrients; and (3) %DV. Those covered under food label modification dealt with six topics: (1) large package sizes; (2) serving versus package; (3) calorie-related variations; (4) serving size variations; (5) calorie cues; and (6) "healthier" symbol. For additional information on FDA's focus group findings, see Appendix G.

*Attitudes towards nutrition.* In many of the groups, especially the women's groups, participants cared about nutrition and report using the NFP. At the same time, however, many also said that they do not always consider nutrition when deciding what to eat. Taste, convenience, price, what kind of mood they are in, and what their family eats were often at odds with healthy eating. Although participants were interested in calories, many pointed to multiple concerns that went beyond calories such as the level of saturated fat, total fat, cholesterol, carbohydrates and sodium. Many participants reported not wanting to spend a lot of time reading labels.

*Macronutrients.* In general, individual participants tended to care more about some macronutrients than others, depending on their individual dietary practices. In most groups, at least one participant was familiar with the Atkins diet and many of these participants were most concerned about carbohydrates and sugars. Others were concerned about fat and saturated fat. Some participants checked the NFP mostly for information about sodium. Those who were on the Weight Watchers diet were concerned about calories and fiber.

*%DV.* Very few participants reported using the %DV column on the NFP. Either they did not understand the meaning of %DV or they thought that it was not relevant to them since they did not consume a 2000 calorie diet. Those who did use or might use %DV thought that is was a good way to estimate how much of a particular nutrient they were eating or to gauge a healthy and balanced diet.

*Large package sizes.* In all the groups, participants were presented with a mock-up label of a 20 ounce soda and a large packaged muffin. Both of these products are thought to be commonly consumed in one sitting, but have more than one serving listed.

*Serving versus package.* In general, participants thought it was misleading to list either product as having more than one serving. Many participants did realize that if the entire package is eaten, the number of servings should be multiplied by the amount of the nutrient of interest, though some participants were confused and made mistakes when trying to calculate the total amount in their heads.

*Calorie-related variations.* The first test label added a %DV for calories, removed the *calories from fat* line, enlarged the calories line, and changed the way serving size was declared. In general these changes were not noticed by participants. When the new wording for serving size was pointed out, most participants did not think it was an improvement over the existing language.

*Serving size variations.* The second test label had two %DV columns on the NFP, one for a specified serving size and one for the entire package. In the first four groups, the absolute quantities of macronutrients were only listed for the specified serving size. After comments from these groups, the label was modified to have the absolute amount for both the specified serving size and the entire product. Participants reacted positively to this modification, but some thought it was not necessary to list the amount for a specified serving size.

*Calorie cues.* Both a "starburst" with the calories per serving and a white square with calories per whole product on the package's PDP were tested. Many participants thought that the starburst was misleading because they thought the manufacturer was trying to indicate the entire product had fewer calories than it did. The white square with the total calories per product got mixed reactions, but many participants just said that they recognized these as high calorie products and would stay away from them.

*"Healthier" symbol.* Half of the groups tested a "healthy" meat lasagna with a purple keyhole symbol on the PDP. There was generally positive reaction to including a front-of-package symbol indicating that a product was "healthy," as long as participants understood the definition of the symbol and could trust that it was true. Participants believed

that they would have to be educated as to the meaning of such a symbol. Some participants mentioned that they would look for the symbol when they were in a hurry in the store. They expressed some concern that these products would cost more or that they would lack in taste.

### 3. OWG Food Label Recommendations

The OWG recommends that FDA (1) develop options for revising or adding caloric and other nutritional information on food packaging (examples provided below); (2) obtain information on the effectiveness of these options in affecting consumer understanding and behavior relevant to caloric intake; and (3) evaluate this information to make evidence-based decisions on which option(s) to pursue.

#### a. Calories and Serving Sizes

In light of the critical importance of caloric balance in relation to overweight and obesity, the OWG recommends that FDA: (1) solicit comment on how to give more prominence to calories on the food label; (2) consider authorizing a health claim on "reduced" or "low" calorie foods; and (3) reexamine the agency's regulations about serving size.

*Solicit comments on how to give more prominence to calories on the food label.* Many of the written and public comments submitted to the agency suggested that FDA develop ways to emphasize calories on the food label. To address this, the OWG recommends that FDA publish an ANPRM requesting comments on how best to give more prominence to calories. Possible changes to the NFP include: (1) increasing the font size for calories; (2) providing for a %DV for calories; (3) eliminating "calories from fat" listing as this takes the emphasis away from "total calories;" and (4) increasing the font size for serving size in order to give it more prominence.

*Consider authorizing a health claim on "reduced" or "low" calorie foods.* A number of comments submitted to the agency, including those from the FTC, suggested that FDA permit health claims on reduced calorie foods as a way to reduce the risk of certain chronic diseases associated with obesity, such as diabetes, coronary heart disease and cancer. To address this suggestion, the OWG recommends that FDA publish an ANPRM on whether to allow a health claim such as "Diets low in calories may reduce the risk of obesity, which is associated with diabetes, heart disease, and certain cancers" on certain foods that meet FDA's definition of "reduced" or "low" calorie. In addition, the OWG recommends that FDA encourage manufacturers to use dietary guidance statements (e.g., "to manage your weight, balance the calories you eat with your physical activity; have a carrot, not the carrot cake; and as a snack have an apple rather than a serving of potato chips").

*Reexamine the agency's regulations on serving sizes.* The comments that FDA has received at its public meetings and to the docket (including comments from the FTC) express concern about the serving sizes used in nutrition labeling, particularly on packaged products that can readily be consumed at one occasion but that indicate they represent more than one serving. To address this issue, the OWG recommends the following:

- In the short-term, that FDA encourage manufacturers immediately to take advantage of the flexibility in current regulations on serving sizes (21 CFR 101.9(b)(6)) that allows food packages to be labeled as a single-serving if the entire content of the package can reasonably be consumed at a single-eating occasion.
- In the long-term, that FDA develop two separate ANPRMs. The first would solicit comment on whether to require additional columns within the nutrition label to list the quantitative amounts and %DV of the entire package on those products and package sizes that can reasonably be consumed at one eating occasion or, alternatively, declare the whole package as a single serving. This ANPRM would also solicit information on products and package sizes that can reasonably be consumed at one eating occasion. The second ANPRM would solicit comments on which, if any, RACCs of food categories appear to have changed the most over the past decade and therefore need to be updated.

The serving size is critical to nutrition labeling since all of the information on nutrient levels depends on the amount of the product represented. By statute, the serving size is to be based on the "amount [of the food] customarily

consumed" (section 403 of the Act). Accordingly, when implementing NLEA, FDA reviewed food consumption data obtained from USDA's 1977-78 and 1987-88 Nationwide Food Consumption Surveys and, based on the results of that review, established RACCs for 139 food categories (58 FR 2229, January 6, 1993). Inasmuch as there is evidence that Americans are eating larger portions than they did in the 1970s and 1980s, the OWG recommends that FDA determine whether and, if so, how to update RACCs.

The accuracy of the information in the NFP is crucial for consumers who use this information to monitor their intake of calories and nutrients. Current enforcement efforts targeted at the NFP as described in FDA's Food Labeling Compliance Program[15] are directed at ensuring that actual nutrient levels are within 20% of declared values. More limited resources have been directed at ensuring that serving sizes are calculated and declared accurately. Comments and other information submitted to FDA express concern about the inaccuracy of serving size declarations used in nutrition labeling and reiterate the importance of accurate serving size declarations because all of the information on nutrient levels is dependent upon the amount of the product represented. To address this issue, the OWG recommends that FDA highlight enforcement of serving sizes in the Food Labeling Compliance Program by April 2004, and consider enforcement activities against those products that declare inaccurate serving sizes.

### b. Carbohydrate[16] Labeling

Today there is increasing interest in low carbohydrate diets (see text box on Carbohydrates and Other Macronutrient Contributions to Caloric Value in Appendix B). FDA has recently received petitions requesting that the agency provide for nutrient content claims related to the carbohydrate content of foods. Claims for carbohydrate content of foods have become increasingly common in the marketplace while, at the same time, the level of carbohydrates in foods marketed under the various carbohydrate claims appears to vary widely. In order to ensure that terms are consistently defined and that carbohydrate claims are not false or misleading, the OWG recommends that FDA file these petitions and publish a proposed rule to provide for nutrient content claims related to the carbohydrate content of foods, including guidance for the use of the term "net" in relation to carbohydrate content of foods.

### c. Other Labeling Issues

The OWG considered comments from the FTC on the issues of (1) reduced/fewer calorie comparisons, (2) comparison to food of different portion size, (3) comparison to food of different product type, and (4) disclosure requirements for comparative claims.

*Reduced/fewer calorie comparisons.* The underlying principle for FDA's regulation is that reductions be **significant** compared to the reference food (21 CFR 101.60(b)(4). FDA determined that percentage reductions less than 25% were too small to be meaningful because of normal product variability. Such variability may be caused by factors such as: natural nutrient variability of the food due to season of the year, soil type, variety, and weather conditions; variability in processing; rounding rules (e.g., rounding to the nearest 5 calories up to 50 calories and to the nearest 10 calories above 50 calories); analytical variance (ranging from +/- 3-4% to +/- 30 % with an average variance of about +/- 15%); sampling procedures; and shelf life and stability of nutrients in the product.

As a result, 21 CFR 101.9(g) allows for a 20% excess in the actual (analytical) nutrient content of calories, sugars, total fat, saturated fat, cholesterol or sodium of a product compared to the declared nutrient values for that product (and consequently the qualifying values for nutrient content claims) before the food is considered to be misbranded. Therefore, nutrient reductions less than 25% are virtually within the allowable product variability and are not considered significant. The minimum absolute reduction (e.g., equivalent to the value of "low") was changed to permit claims compared to reference foods that were not already "low" in the nutrient because it was the agency's conclusion that benefits derived from several servings of nutritionally modified nutrient dense foods over a day could have a significant impact provided that the reduction was significant, i.e., 25 % or more. FDA further concluded foods already "low" in that nutrient were below the level at which the amount of nutrient in the food becomes significant relative to the total diet and therefore should not be used as reference foods.

For relative claims, the OWG notes that the Codex Alimentarius Commission[17] requires that there be a difference of at least 25% in energy value or nutrient content (except for micronutrients where a 10% difference in the nutrient reference value would be acceptable) with a minimum difference between the compared foods equivalent to a "low" value (FDA's proposed requirements for "less"). Moreover, Canada requires that comparative claims be based on differences which are both nutritionally and analytically significant.[18] Canadian regulations consider reductions of less than 25% from the reference value to be of questionable nutritional significance. Canada does not allow claims on reductions of less than 25%.

The OWG recommends the agency be receptive to such a claim, if the proponent of such a claim is able to provide data and information to substantiate that:

1. The claim is not misleading due to the known variations in food composition and analytical methods, and
2. The claimed reductions are nutritionally significant.

*Comparison to food of different portion size.* FTC has suggested that FDA consider "allowing food marketers to make truthful non-misleading label claims comparing foods of different portion sizes." FTC provided the example of a 10 oz chicken and rice casserole labeled as having 33 percent fewer calories than 15 oz. of the same chicken and rice casserole.

Consuming a smaller portion size of the same food simply decreases caloric consumption proportionally. To enable consumers to make meaningful comparisons for calorie reduction, FDA requires such claims to be based on the amount per RACCs, or per 100 gram in the case of meal-type products. Thus, under FDA's current regulations (21 CFR 101.60(b)), a comparative calorie claim of the type that FTC proposes would not be allowed.

Nevertheless, using the food label to promote consumption of smaller portions may have merit. This is especially true if consumers understand that (a) the calorie reduction is solely a function of the reduction in portion size, and (b) that the smaller portion size is actually less than what they usually consume. Thus, the OWG recommends that FDA issue an ANPRM to solicit comments on truthful non-misleading and useful approaches for promoting consumption of smaller portion sizes, including FTC's suggestion.

*Comparison to food of different product type (which the OWG refers to as comparative labeling statements).* FTC suggests that FDA "consider allowing food companies to make label claims that compare the calories of foods [across] different product categories." FTC points out that switching from one category to another category often can be an effective means of reducing calories, such as substituting carrot sticks for potato chips or fruit for cookies. FTC notes that comparative caloric claims across categories could help consumers make these healthy substitutions. FTC offered as an example, "instead of cherry pie, try our delicious low fat cherry yogurt - 29 percent fewer calories and 86 percent less fat."[19]

Current FDA regulations do in fact permit certain comparative claims. In addition to the example that FTC provided, the OWG offers the following as examples of comparative claims that are permissible under current regulations:

- One medium apple (80 calories) contains 47% fewer calories than a one ounce serving of potato chips (150 calories).
- Carrots have 93% fewer calories than carrot cake. One 7-inch carrot (78 g) contains 35 calories while one slice of carrot cake with icing (125 g) contains 500 calories.
- Air-popped popcorn (without added toppings) contains one-half the calories of a plain granola bar (98 calories per 3-cup serving of popcorn, 200 calories per 1.5 ounce granola bar).

The OWG recommends that FDA encourage manufacturers to use appropriate comparative labeling statements that make it easier for consumers to make healthy substitutions, including calories. Such comparisons provide valuable information that can be used in making food choices. Moreover, there is a flexible standard for product categories

that is intended to facilitate useful comparisons for foods that are generally interchangeable in the diet (for example, "apples have less fat than potato chips") while prohibiting meaningless or misleading claims (58 FR 2302 at 2363, January 6, 1993). Manufacturers have to use judgment in developing claims to ensure that the claims comply with the regulations and are not false or misleading under section 403(a) of the Act.

*Disclosure requirements for comparative claims.* FTC suggests that FDA "evaluate whether unnecessarily cumbersome disclosure requirements have deterred truthful, non-misleading comparative label claims for foods." As always, FDA is open to dialogue on such an issue, particularly when a proposal is supported by relevant data and information.

To make a comparative nutrient claim, a food marketer must provide information on the reference food, the percentage by which the nutrient in the reference food has been changed, and the absolute amount of the nutrient in the labeled and reference food (21 CFR 101.13(j)(2)). The agency, however, is not wholly prescriptive as to the actual words used or where all the information is placed on the label.

FTC offered as an example, a baked potato chip that is lower in both calories and fat than a regular potato chip, and indicated that label claims explaining the benefits would be awkward to place (and read) on the front panel. According to FTC, under FDA regulations, the claim would read as follows (italicized phrases may be placed on the back nutrition label):

> "Reduced fat and fewer calories than our Classic Potato Chips. Fat reduced by 85 percent, *from 10 grams per ounce to 1.5 grams per ounce*. Calories reduced by 27 percent, *from 150 calories per ounce to 110 calories per ounce*."

The OWG notes that the FTC example could be more succinct. As FTC suggests, more than 50% of the text may be placed on the back nutrition label. Beyond that, under FDA's current regulations (21 CFR 101.13(j)), the PDP could simply read:

> 85% less fat and 27% fewer calories than our Classic Potato Chips.

## B. Restaurants/Industry

*Restaurants/Industry Recommendation Highlights:*

- *Short-term*
  - *Urge restaurant industry to launch a nation-wide, voluntary, and point-of-sale nutrition information campaign for consumers*
  - *Encourage consumers routinely to request nutrition information in restaurants*
- *Long-term*
  - *Development of a series of options for providing voluntary, standardized, simple, and understandable nutrition information, including calorie information, at the point-of-sale to consumers in restaurants.*
    - *FDA to seek participating restaurants for a pilot program to study these options in well controlled studies*
    - *FDA to provide incentives, if necessary, for voluntary industry participation in the pilot program.*
    - *FDA to evaluate results of the pilot program to determine whether further research is warranted before such a program is implemented on a large scale.*

> - o *Exploration of the concept of third-party certification of weight-loss diet plans and related products.*
> - **Enforcement**
>   - o *Together with the FTC, increase enforcement against weight loss products having false or misleading claims.*

The Commissioner directed the OWG to "develop an approach for working with the restaurant industry to create an environment conducive to better informed consumers."

In light of the growing proportion of American meals consumed outside of the home, it is important to enlist the assistance and support of restaurants in addressing population obesity. Since the late 1990s and projecting through 2004, American households are spending approximately 46 percent of their total food budget on food consumed outside the home (ERS, 2003; NRA 2004). During 1994-1996, food consumed outside the home, especially from restaurants and quickservice food establishments, contributed 32 percent of daily intakes of energy calories, 32 percent of added sugars, and 37 percent of fat (ERS, 2000). Thus, food consumed away-from-home is an important part of American diets and more informed dietary choices away-from-home could help reduce calorie over-consumption and the risk of obesity and its associated health problems.

The distribution of meal sources has also shifted over the past few decades, and this shift may be another significant factor in weight gain. Food consumed outside the home has increased from approximately 33 percent of U.S. consumers' food budget in 1970 to approximately 47 percent as of 2002 (ERS, 2003; Young and Nestle, 2002). Over a similar period, total calories from food consumed outside the home, especially from quickservice restaurants, increased from 18 percent to 32 percent. In addition, food consumed outside the home was higher per meal in calories, total fat and saturated fat, as well as was lower in fiber, calcium and iron on a per-calorie basis (Guthrie *et al.*, 2002).

As noted above, under the laws administered by FDA, restaurants are not required to provide nutrition information unless a nutrient content or health claim is made for a food or meal. When claims are made, however, the restaurant need only provide information about the amount of the nutrient that is the subject of the claim. Restaurants may, and many do, provide nutrition information on a voluntary basis. Nevertheless, this nutrition information is often in the form of posters, placemats or menu icons, or on the Internet; rather than at the point-of-sale. Such information is not always readily available or observable at the point-of-sale.

## 1. FDA Focus Groups on Restaurants

As described in Box 2, FDA recently conducted focus group research in which it asked questions about what type of nutrition information participants would like to see in quickservice restaurants. Participants discussed and reacted to various presentations of nutrition information at restaurants. The questions dealt with four topics: (1) nutrition information; (2) menu board information; (3) menu board section; and (4) "healthier" symbol. For additional information on FDA's focus groups, see Appendix G.

*Nutrition information.* Most participants seemed interested in having nutrition information available to them when they eat at fast food and/or quickservice restaurants, though they might not use it every time they eat out. Participants suggested that this information could be presented in many locations in the restaurant including food wrappers, tray liners, brochures, on the take-away bags, posters near the counter, and the menu boards.

*Menu board information.* Participants reacted to multiple versions of a menu board for a typical fast food restaurant. In general, participants liked having calories listed after meal items and after combo meals. Those who tend to order *a la carte* preferred to have calories listed after each item, while those who usually order a combo meal preferred to have calories listed for the entire meal. Although participants were concerned with multiple macronutrients for foods,

having just calories listed was enough for many of them. Participants thought that calories could be a signal for the level of other macronutrients.

*Menu board section.* Most participants also reacted favorably to the idea of placing healthier options, including meals, in a separate section of the menu board so they could find healthier options at a quick glance.

*"Healthier" symbol.* Many participants also reacted favorably to a purple keyhole symbol for healthier meals, but some thought that the exact number of calories should be listed as well. Again, the symbol would have to be trusted and consumers would have to understand the meaning of the definition.

## 2. OWG Restaurant Recommendations

The OWG recommends that FDA encourage restaurants to provide more, and more readily available, nutrient content information at the point-of-sale. The restaurant industry has voiced concern that requiring nutrition labeling for all menu items is infeasible because recipes change frequently, and patrons often request customization of their meals and the number of options available for customization is large. For example, recent National Restaurant Association research indicates that 70% of consumers customize their meals when eating in restaurants.[20] Nevertheless, the OWG believes that the restaurant industry could provide some level of nutrition information to its patrons to enhance their ability to make wise food choices. Calculating nutrition information may have been a difficult task for most members of this industry in the past, when such information had to be determined by direct chemical analysis. This task, however, is easier today because nutrient composition databases and software for labeling are readily available. Possibilities for providing nutrition information to consumers include: segregating "healthier" menu items with simple nutrition information in a separate section of the menu; providing icons for individual "healthier" menu items; and presenting nutrition information in locations in the restaurant where patrons can readily use it (i.e., at the point-of-sale).

The OWG also recommends that FDA encourage consumers routinely to request nutrition information in restaurants. Because restaurants respond to consumer demand (as evidenced by comments made by members of the restaurant panel at the November 20, 2003, workshop), such demand may help create an impetus for more restaurants to provide such information.

The OWG believes that there is a need for research to determine the best way(s) to present nutrient content information to consumers so that they will make healthier choices when eating food away from home. The OWG recognizes, however, that such research will take a substantial period to plan and complete. In the interim, the pervasiveness of the obesity epidemic means that more nutrition information must be presented to consumers in restaurant settings. Accordingly, the OWG has developed both short-term and long-term recommendations

The OWG recommends that in the short-term, FDA urge the restaurant industry to launch a nation-wide, voluntary, and point-of-sale nutrition information campaign for customers.

Over the long-term, the OWG recommends that:

> *(1) Options be developed for providing voluntary standardized, simple, and understandable nutritional information, including calorie information, at the point-of-sale in a restaurant setting.*

Ideally these options should focus on the caloric content and nutritional composition of complete meals rather than individual menu items. Although a focus on total calories is the most useful single piece of information in relation to managing weight, additional information on nutrient content of the meal is also important. This is true, for example, for people with diabetes or coronary heart disease who need to more carefully control their consumption of certain nutrients (e.g., carbohydrates, sodium, fat). An alternative to listing detailed numeric information is to use a graphical representation that conveys the same information using a picture or symbol.

*(2) FDA seek participating restaurants for a pilot program to study these options in well controlled studies.*

The number of restaurants participating in the pilot program should be large enough to include a variety of locations, cuisines, and average price of menu items. The pilot program needs to be long enough to account for any time required to understand the new menu formats and nutrition information. Participating restaurants would need to provide item-by-item sales data before, during, and after the pilot. Experimental economics methods could substitute partly but not wholly for actual market data to assess the impact of various labeling options on consumer behavior.

FDA could also use this pilot program to explore engaging the restaurant industry as a powerful distribution system for the agency's messages on obesity and its education programs.

*(3) FDA provide incentives, if necessary, for voluntary industry participation in the pilot program.*

Such incentives could include allowing restaurants to use FDA's name to promote the pilot in advertising, on stickers, and on their menus; and/or coupling the pilot program with an overall FDA education campaign, which may include space on restaurant menus or on separate handouts for FDA messages on healthy lifestyles.

*(4) FDA evaluate results of the pilot program.*

FDA would need to analyze the results of any pilot program to determine whether further research is warranted before such a program is implemented on a large scale.

In order to pursue these more long-term recommendations, the OWG recommends that FDA work through a facilitator to provide a forum for stakeholders to seek consensus-based solutions to specific aspects of the obesity epidemic in the United States, with a particular focus on food consumed away from home. As a first step, the OWG further recommends that the initiation of such a dialogue be raised at the next meeting of the FDA Science Board.

## 3. OWG Weight-Loss Diet Plan Recommendations

Just as consumers spend a significant amount of money for foods consumed outside the home, they spend substantial sums on weight-loss diet plans and diet-related products. Such plans and products have the potential to affect all food choices by at least some consumers. The long-term weight or health effects of these and other weight control measures remains unclear (Connors and Melcher, 1993; Ayyad and Andersen, 2000; Saris, 2001; Anderson, *et al.*, 2001; and Phelan, *et al.*, 2003). This raises the question of whether consumers who follow these plans and buy these products understand the health implications, particularly the systematic difficulties of long-term weight management. For these reasons, the OWG also considered the health consequences of using weight-loss diet plans and related products. The OWG concluded that, in the long-term, research needs to be done outside of FDA to determine whether claims for such diet plans and related products have been or can be substantiated. Thus, the OWG recommends that there be an exploration of the concept of third party certification of weight-loss diet plans and related products. The goal is to improve consumer information about the health consequences of their overall dietary choices.

With respect to diet-related products, on December 18, 2002, FDA announced a significant enforcement initiative targeted at misleading claims about dietary supplement-associated health benefits. Dietary supplements are used by an estimated 158 million Americans, and so misleading claims about their health benefits may have significant consequences - not only for wasting consumers' money but also for luring consumers interested in improving their health in wrong directions. Although FDA's enforcement goals related to truthful and non-misleading statements about health benefits apply to all of the products the agency regulates, this initiative was especially focused on products that in recent years have been the subject of important misrepresentation.

As part of the December 18 announcement, FDA released the "Dietary Supplement Enforcement Report" that pledged to closely scrutinize and bring enforcement actions against products identified as "clearly problematic."

Dietary supplements that falsely claim effectiveness as treatments for overweight were included among those identified as "clearly problematic."

CFSAN and the Office of Regulatory Affairs have focused their dietary supplement enforcement budgets principally on targeted inspections and, where appropriate, recommending enforcement action against parties who violate the Dietary Supplement Health and Education Act (DSHEA). In terms of the strategies used to enforce DSHEA, FDA has proceeded on several fronts: (1) traditional enforcement activities (e.g., inspections, warning letters, seizures and injunctions, criminal enforcement); (2) inter-agency and international enforcement; and (3) consumer and industry education.

More recently, in December 2003, FTC staff released a report, *Deception in Weight-loss Advertising Workshop: Seizing Opportunities and Building partnerships to Stop Weight-Loss Fraud* (FTC, 2003). This FTC staff report lays out a number of opportunities for industry and media to assume a leadership role in addressing deceptive weight loss advertising. To complement these efforts, the OWG recommends that FDA continue its enforcement initiative targeted at misleading claims about dietary supplement weight loss products.

## C. Therapeutics

> **Therapeutics Recommendation Highlights:**
>
> - *Convene an FDA advisory committee meeting to address challenges, as well as gaps in knowledge, about existing drug therapies for the treatment of obesity.*
> - *Continue discussions with pharmaceutical and medical device sponsors about development of new obesity therapies.*
> - *Revise 1996 draft guidance on developing obesity drugs and re-issue for comment.*

The Commissioner directed the OWG to "develop an approach for facilitating the development of therapeutics for the treatment of obesity."

The role of obesity in many acute and chronic diseases is well documented. The contribution of obesity to premature mortality through increased risks of diabetes, heart disease, stroke, and cancer, among others, mandates an aggressive, proactive stance by the entire medical community.

## 1. Background

Modern medicine's experience with weight loss drugs dates to the late nineteenth century when initial enthusiasm for the weight loss properties of thyroid extract were eventually tempered by the negative effects that iatrogenic hyperthyroidism had on lean muscle mass, bone, the central nervous system (CNS), and cardiac function (Schwartz, 1986; Bray, 1976). The next century of obesity drug development saw the introduction of a number of drugs that proved to have significant side effects: Dinitrophenol (cataracts, neuropathy) in 1934; Amphetamine (addiction, CNS and cardiac toxicity) in 1937; Rainbow pills, or digitalis and diuretics (cardiac arrest) in 1967; Aminorex (pulmonary hypertension) in 1971; and Redux (cardiac valvulopathy) in 1996 (Bray and Greenway, 1999).

Prior to 1996, all approved obesity drugs were labeled for short-term treatment of obesity based on pre-approval clinical trials of up to 12 weeks' duration and of limited size by today's standards. Over the past 10-15 years, increasing recognition of several facts have led to changes in the approach to the treatment of obesity and thus to the study of new drugs for this condition: (1) obesity is a chronic condition with long-term morbid and mortal sequelae; (2) maintenance of weight loss, even while on continued drug therapy (and certainly after discontinuation of drugs) is

the rare exception rather than the rule; and (3) maintenance of a "healthy" weight (rather than weight "cycling") is the key to reduced risk for obesity-associated adverse sequelae.

## 2. FDA's Draft Guidance

In 1996, FDA issued draft guidance entitled "Guidance for the Clinical Evaluation of Weight-Control Drugs." The draft guidance gives recommendations for the design and conduct of phase 1-3 clinical studies aimed at demonstrating the effectiveness and safety of weight-loss medications.[21] This guidance proposed two alternative criteria for effectiveness for drug therapies:

- Mean weight loss in the drug-treated group is 5% greater than the mean weight loss in the placebo group following one year of treatment.
- The proportion of patients that lose at least 5% of their baseline weight is greater in the drug vs. the placebo group.

## 3. Existing Therapies

Under the criteria in the 1996 draft guidance, three drugs have been approved for the long-term treatment of obesity: dexfenfluramine (Redux) in 1996 (withdrawn in 1997 for safety reasons), sibutramine (Meridia) in 1997, and orlistat (Xenical) in 1999. In addition, a number of drugs were approved prior to 1996 for the short-term (e.g., a few weeks) treatment of obesity (e.g., phentermine (Adipex) and diethylpropion (Tenuate)).

FDA-approved drugs for the long and short-term treatment of obesity are indicated for use by those patients with: (1) a body mass index of > 27 kg/m$^2$ when accompanied by obesity-related comorbidities such as hypertension, diabetes, and dyslipidmeia; or (2) a body mass index > 30 kg/m$^2$.

For patients with extreme obesity (those with BMIs at or over 40), for whom no other measures have been effective in promoting weight loss, surgical or device-mediated gastroplasty is increasingly employed. Worldwide, over 100,000 of these devices have been implanted over the past 8 years. In the United States alone, tens of thousands of devices are implanted each year to restrict the size of the stomach and thus severely limit food intake. Despite serious complications, gastroplasty procedures as well as device implantations are effective for some individuals, with average durable loss of 35-40% of excess (over ideal) weight.

## 4. OWG Therapeutics Recommendations

Ideally, individual consumers will avoid becoming overweight or obese through diet and exercise. Yet the OWG recognizes that obese and extremely obese individuals are likely to need medical intervention to reduce weight and mitigate associated diseases and other adverse health effects. The OWG concurs with agency plans to (1) convene an FDA advisory committee meeting to address challenges, as well as gaps in knowledge, about existing therapies (i.e., head-to-head comparisons of marketed drugs, cardiovascular endpoint studies); (2) continue discussion with pharmaceutical and medical device sponsors about new obesity medical products; and (3) revise 1996 draft guidance on developing obesity drugs and re-issue for comment.

## D. Research

*Research Recommendation Highlights:*

- *Pursue research on obesity prevention with USDA/ARS.*
- *Support and collaborate, as appropriate, on obesity-related research with others, including NIH*

- *Pursue obesity related research in the following five areas:*
  - ○ *Information used to facilitate consumers' weight management decisions.*
  - ○ *Relationship between overweight/obesity and food patterns.*
  - ○ *Incentives to product reformulation*
  - ○ *Potential for FDA regulated products unintentionally to contribute to or result in obesity*
  - ○ *Translational research conducted by the National Center for Toxicological Research (NCTR) and CFSAN's Office of Applied Research and Safety Assessment (OARSA)*

The Commissioner directed the OWG to "identify applied and basic research needs relative to obesity that include the development of healthier foods as well as a better understanding of consumer behavior and motivation."

## 1. Joint Research with USDA/ARS

As part of its research efforts, the OWG recommends that FDA collaborate with USDA/ARS on a national obesity prevention conference to be held in October 2004. The conference will draw on the expertise of both the public and private sector scientific communities to provide guidance for research agendas in the short- and long-term to address obesity prevention from a variety of scientific and other disciplines. Such disciplines will include diet and nutrition, behavioral and economic science, and research involving exercise, education, integrated programs, and outreach.

## 2. Survey of Research

The OWG focused on three areas of research related to its charge: (1) "labeling information"[22] and consumer perceptions and dietary behaviors with regard to weight management; and (2) support for safety evaluation with respect to the potential for FDA regulated products unintentionally to contribute to or result in obesity; and (3) translational research conducted by FDA's National Center for Toxicological Research and CFSAN's Office of Applied Research and Safety Assessment. to enable the agency to use the basic scientific research conducted by such agencies as the NIH in FDA's regulatory activities. Of these three, the OWG considers the first two to be more directly and immediately relevant to its charge. Translational research, because of its link to basic nature, takes a long time to yield practical results. Nevertheless, the OWG believes FDA should continue to conduct translational research in order to gain a better understanding of obesity.

Based on a review of the relevant research as well as comments provided during a variety of public meetings, the OWG has identified several knowledge gaps related to the two research areas above. The OWG recommends that further obesity-related research be conducted in the following areas: (1) information used to facilitate consumers' weight management decisions, (2) the relationship between overweight/obesity and food consumption patterns, (3) incentives to product reformulation, and (4) the potential for FDA-regulated products unintentionally to contribute to or result in obesity, and (5) the extension of basic research findings to the regulatory environment through translational research. In addition, the OWG recommends that FDA pursue collaborations with other groups who are undertaking obesity research such as NIH, which has recently issued an obesity research agenda, and CDC.

*Information used to facilitate consumers' weight management decisions.* The OWG recommends conducting additional qualitative and quantitative research with an emphasis on (1) consumer reaction to and effectiveness of current packaged food labeling and possible changes to the food label (e.g., highlighting calories, listing the quantitative amounts for all nutrients in multi-size packages, and using "healthy" symbols, graphic devices, or caloric/nutrient density indicators), (2) consumer reaction to and effectiveness of current restaurant nutrition information and possible changes (e.g., listing nutritional information such as calories, fat and sodium for both *a la carte* items and meals and using "healthy" symbols), and (3) consumer dietary behavior and attitudes toward weight

JCFSAN - Calories Count: Report of the Working Group on Obesity

management.

*Relationship between obesity and food consumption patterns.* The OWG recommends conducting research to evaluate the relationship between obesity in adults and children and the frequency of foods obtained from and/or consumed in different locations (e.g., home cooked meals, packaged foods, and quickservice establishments/restaurants) and with respect to socioeconomic status and vulnerable populations (e.g., Hispanic Americans, African Americans, American Indians, and the elderly). This research would be conducted in collaboration with the Economic Research Service of the USDA using CDC and National Health and Nutrition Education Survey data to evaluate these relationships.

*Incentives to product reformulation.* The OWG recommends conducting further research with the packaged food and restaurant industries in addition to that currently being conducted by OASPE in collaboration with FDA (FDA, 2003). This research would (1) examine whether the incentives (e.g., label prominence and other label characteristics of calorie and weight management information) and barriers (e.g., food additive and claims approval processes and the regulatory policy related to standards of identity and fortification) to reformulation identified by the packaged food industry during previous discussions are real or perceived, and (2) expand the scope of the research conducted by OASPE to include additional discussions with key restaurant industry, including quickservice, personnel regarding the barriers and incentives to the development/reformulation of healthier restaurant foods.

*Potential for FDA-regulated products to unintentionally contribute to or result in obesity.* Although most FDA-regulated products are intended to be used or consumed for purposes other than weight management, weight gain may be an unintentional adverse side effect associated with use of some of these products. In general, for both foods and drugs, weight gain or obesity has not consistently been measured, evaluated, or considered as an adverse effect when designing study protocols or evaluating submitted research results. Strategies to systematically evaluate this endpoint are needed as part of the safety assessment for FDA-regulated foods and drugs. Thus, the OWG recommends conducting research to investigate (1) the promotion of weight gain as an adverse side effect of FDA-regulated drugs and whether this is a factor that should be taken into account regarding drug safety and (2) the development of animal model assessment strategies that encompass the evaluation of long-term effects on weight gain as a safety assessment parameter.

*Translational research.* Translational research is essential for FDA to use basic research from other agencies and academic institutions in developing regulatory policies and actions. Thus, the OWG recommends extending basic research on (1) developmental imprinting[23] to differentiate among food components and eating behaviors of neonates, or nutrient/food component exposures of fetuses via maternal diets, with regard to weight management challenges in adolescence and adulthood, (2) biomarker and effects-evaluation techniques through emerging genomics, proteomics and metabolomics technologies to identify how FDA-regulated products modify risk factors and susceptibilities for weight gain, obesity, and co-morbidities, and (3) development of animal models to evaluate the effects of diets and dietary components, drug therapies, and medical device uses on long-term weight maintenance, health and longevity. The OWG further recommends that FDA take into account translational as well as other obesity-related research being done by NIH, as it considers future research in these areas.

# VI. Stakeholder Investment to Help Ensure Results

> *Stakeholder Investment Recommendation Highlight:*
>
> - *Continue to promote and engage in active dialogue with invested stakeholders.*

The Commissioner charged the OWG to set out specific means for developing and implementing "an active dialogue with outside invested stakeholders including consumers groups, academia, and the food and restaurant industry on

developing a framework for consumers to receive messages about reducing obesity and achieving better nutrition."

## A. Background

Recognizing the high level of interest in obesity among FDA's many stakeholders, the OWG initiated a process for establishing ongoing relationships with individuals and organizations from all sectors. A key aspect of this process included providing the public with multiple opportunities to become involved in a dialogue with the OWG on its activities and the issues associated with helping consumers address the problem of obesity.

As one of its first major outreach initiatives, the OWG sponsored a public meeting on October 23, 2003,[24] to accomplish several objectives:

- To initiate a discussion of FDA's role and responsibilities in addressing the major public health problem of obesity;
- To focus on issues related to promoting better consumer dietary and lifestyle choices that have the potential to significantly improve the health and well-being of Americans; and
- To obtain stakeholder views on how best to build a framework for messages to consumers about reducing obesity and achieving better nutrition.

Approximately 320 attendees representing diverse stakeholder viewpoints registered to participate in this discussion, with nineteen organizations making formal presentations on issues associated with the six focus questions. These nineteen organizations represented science/research, academia, consumers, health and medical associations, industry, and advocacy groups. In addition to the formal presentations given at the October 23 public meeting, interested and concerned stakeholders submitted written comments to Docket No. 2003N-0338 on various aspects of the six focus questions.

The scope of the discussion at this meeting, and at two subsequent roundtable meetings (held with health professionals/academicians and with consumer groups, on December 15-16, 2003, respectively) centered on the following six focus questions:

*1. What is the available evidence on the effectiveness of various education campaigns to reduce obesity?*

Stakeholders regarded education as an essential component of FDA's contribution to public health efforts to confront the problem of obesity. Stakeholders consistently reinforced FDA's leadership role in educating the public about the food label, good nutrition, and healthy diets.

Stakeholder comments focused on four key areas: (a) effectiveness of existing education campaigns; (b) type of education campaigns needed; (c) what campaigns should address; and (d) what messages are likely to affect weight gain, weight management, or weight loss.

*2. What are the top priorities for nutrition research to reduce obesity in children?*

Stakeholders were particularly concerned about childhood obesity. Stakeholders emphasized the importance of parental involvement in efforts to address childhood obesity. The views focused on the scope of the problem, as well as on the research on activities that are needed to address the issue of childhood obesity.

*3. What is the available evidence that FDA can look to in order to guide rational, effective public efforts to prevent and treat obesity by behavioral or medical interventions, or combinations or both?*

Stakeholders expressed a range of views and perspectives about what would inform FDA decisions in preventing and treating obesity.

*4. Are there changes needed to food labeling that could result in the development of healthier, lower calorie foods by industry and the selection of healthier, lower calorie foods by consumers?*

Stakeholders were highly interested in participating in the area of food labeling. The views focused on (a) general advice; (b) calories; (c) energy balance; (d) serving sizes; (e) current health-related information on the label; (f) consumer education on the food label; (g) messages on the food label; and (h) expanding nutrition information availability in restaurants.

*5. What opportunities exist for the development of healthier foods/diets and what research might best support the development of healthier foods?*

Stakeholders provided a diverse array of research needs, creative incentives for the development of healthier foods/diets, and general advice.

*6. Based on the scientific evidence available today, what are the most important things that FDA could do that would make a significant difference in efforts to address the problem of overweight and obesity?*

Stakeholder views related to three major categories: (a) food labels; (b) research; and (c) education.

On November 20, 2003, FDA, in conjunction with OASPE, sponsored a workshop on "Exploring the Connections Between Weight Management and Food Labels and Packaging."[25] The two major issues explored at this workshop were:

- Current food labels and packaging: Effects on weight management and reduced risk of overweight and obesity and
- Data supporting options for change

This daylong workshop involved presentations by researchers, academicians, and public health officials, who discussed issues such as the effect of portion/package size, shape and structure on consumption (e.g., comments by Brian Wansink in transcript of November 20 workshop); and presentations by representatives of the restaurant industry, who addressed issues surrounding provision of nutrition information in restaurants.

The OWG organized the comments to Docket No. 2003N-0338 into a searchable database that informed preparation of this report.

FDA also met with representatives of the packaged food and restaurant industries to learn about their obesity-related activities.

## B. OWG Stakeholder Investment Recommendations

The OWG believes it is worthwhile to maintain contacts with stakeholders concerned about the obesity issue both to benefit from their continued involvement and to ensure that, to the extent possible, collective obesity efforts are mutually supportive.

# VII. Overall Conclusions

In response to the charge to the OWG, this report provides a range of recommendations for addressing the obesity epidemic. These recommendations address multiple facets of the obesity problem under FDA's purview, including developing appropriate and effective consumer messages to aid consumers in making wiser dietary choices; formulating educational strategies in the form of partnerships, to support the dissemination and understanding of these messages; specific new initiatives to improve the labeling of packaged foods with respect to caloric and other

nutritional information; initiatives enlisting and involving restaurants in the effort to combat obesity; the development of new therapeutics; the design and conduct of effective research in the fight against obesity; and the continuing involvement of stakeholders in the process.

As noted previously in this report, achieving ultimate success against obesity will occur only as a result of the complementary efforts over time by many concerned sectors of our society. It is the belief and the hope of the OWG that the recommendations contained in this report, when carried out by FDA in concert with the complementary ongoing and planned efforts of other sister DHHS agencies and other agencies of government, will make a significant impact in reversing current trends.

# VIII. References (26)

1. American Academy of Pediatrics. Policy Statement Prevention of Pediatric Overweight and Obesity. *Pediatrics*. 2003; 112-2: 424-430.
2. Anderson J, Konz E, Frederich R, Wood C. Long-Term Weight-Loss Maintenance: A Meta-Analysis of US Studies. *American Journal of Clinical Nutrition*. 2001; 74: 579-584.
3. Ashton D. Food advertising and childhood obesity. *Journal of The Royal Society of Medicine*. 2004; 97-2:51-52.
4. Ayyad C, Andersen T. Long-Term Efficacy of Dietary Treatment of Obesity: A Systematic Review of Studies Published Between 1931 and 1999. *The International Association for the Study of Obesity*. 2000; 1: 113-119.
5. Balasubramanian S, Cole C. Consumers' Search and Use of Nutrition Information: The Challenge and Promise of the Nutrition Labeling and Education Act. *Journal of Marketing*. 2002; 66: 112-127.
6. Barlow S, Dietz W. Obesity Evaluation and Treatment: Expert Committee Rrecommendations. *Pediatrics*. 1998; 102-3:e29
7. Barone M, Rose R, Manning K, Miniard P. Another Look at the Impact of Reference Information on Consumer Impressions of Nutrition Information. *Journal of Public Policy & Marketing*. 1996; 15: 55-62.
8. Borra S, Kelly L, Tuttle M, Neville K. Developing Actionable Dietary Guidance Messages: Dietary Fat As A Case Study. *Journal of the American Dietetic Association*. 2001; 101: 678-684.
9. Borra S, Kelly L, Shirreffs M, Neville K, Geiger C. Developing Health Messages: Qualitative Studies With Children, Parents, and Teachers Help Identify Communications Opportunities for Healthful Lifestyles and the Prevention of Obesity. *Journal of the American Dietetic Association*. 2003; 103: 721-728.
10. Bowman S, Gortmaker S, Ebbeling C, Pereira M, Ludwig D. Effects of Fast-Food Consumption on Energy Intake and Diet Quality Among Children in a National Household Survey. *Pediatrics*. 2004; 113-1:112-118.
11. Bray G. *The Obese Patient*. Philadelphia, Pennsylvania: W.B. Saunders; 1976.
12. Bray G, Greenway F. Current and Potential Drugs for Treatment of Obesity. *Endocrine Reviews*. 1999; 20: 805-875.
13. Bruss M, Morris J, Dannison L. Prevention of Childhood Obesity: Sociocultural and Familial Factors. *Journal of the American Dietetic Association*. 2003; 103: 1042-1045.
14. Connors M, Melcher S. Ethical Issues in the Treatment of Weight-Dissatisfied Clients. *Professional Psychology: Research and Practice*. 1993; 24: 404-408.
15. Contento I, Basch C, Zybert P. Body Image, Weight, Food Choices of Latina Women and Their Young Children. *Journal of Nutrition Education and Behavior*. 2003; 35: 236.
16. Derby M, Levy A. Do Food Labels Work? Gauging The Effectiveness of Food Labels Pre-and Post-NLEA (Pre-publication draft). In P.N. Bloom & G.T. Gundlack (Eds.) *Handbook of Marketing and Society*. 2000; 372-398.
17. Dole Nutrition Institute. *Dole Nutrition Institute Literacy Survey* (Unpublished). 2003. Westlake Village California. Further information available from: Jennifer Grossman or Amy Myrdal at Dole Nutrition Institute, or at: Dole5AdayProgram@NA.Dole.com. (Cited as Dole, 2003)
18. Federal Trade Commission, Bureau of Consumer Protection. *Deception In Weight-Loss Advertising Workshop: Seizing Opportunities and Building Partnerships to Stop Weight-Loss Fraud*. Washington, D.C; 2003. (Cited as FTC, 2003)
19. Flegal K, Carroll M, Ogden C, Johnson C. Prevalence and Trends in Obesity Among US Adults, 1999-2000.

*Journal of the American Medical Association.* 2002; 288: 1723-1727.

20. Food Marketing Institute and Prevention Magazine. *Shopping for Health 1996: Americans Look For Answers About The Food They Eat.* Washington, D.C; 1996. (Cited as FMI, 1996)

21. Ford G, Hastak M, Mitra A, Ringold D. Can Consumers Interpret Nutrition Information in the Presence of a Health Claim? A Laboratory Investigation. *Journal of Public Policy & Marketing.* 1996; 15: 6-27.

22. Gans K, Burkholder G, Upegui D, Risica P, Lasater T, Fortunet R. Comparison of Baseline Fat-Related Behaviors of Puerto Rican, Dominican, Colombian, and Guatemalan Participants Who Joined a Cholesterol Education Project. *American Journal of Education and Behavior.* 2002; 34: 202.

23. Gans K, Burkholder G, Risica P, Lasater T. Baseline Fat-Related Dietary Behaviors of White, Hispanic, and Black Participants In A Cholesterol Screening and Education Project in New England. *Journal of The American Dietetic Association.* 2003; 103: 699-706.

24. Garretson J, Burton S. Effects of Nutrition Facts Panel Values, Nutrition Claims, and Health Claims on Consumer Attitudes, Perceptions of Disease-Related Risks, and Trust. *Journal of Public Policy & Marketing.* 2000; 19: 213-227.

25. Guthrie J, Lin BH, Frazao E. Role of Food Prepared Away from Home in the American Diet, 1977-78 versus 1994-96: Changes and Consequences. *Journal of Nutrition Education and Behavior.* 2002; 34:140.

26. Hill, J. Physical activity and obesity. *The Lancet.* 2004; 363:182.

27. Hill JO, Peters JC. Environmental Contributions to the Obesity Epidemic. *Science.* 1998; 280(5368):1371-4.

28. Hill JO, Trowbridge FL. Childhood obesity: future directions and research priorities. *Pediatrics.* 1998; 101:570-574.

29. Hill JO, Wyatt HR, Reed GW, Peters JC. Obesity and the environment: where do we go from here? *Science.* 2003; 301(5633): 598.

30. Ikeda J, Pham L, Nguyen KP, Mitchell R. Culturally Relevant Nutrition Education Improves Dietary Quality Among WIC-Eligible Vietnamese Immigrants. *Journal of Nutrition Education and Behavior.* 2002; 334: 151.

31. Institute of Medicine. *Dietary Reference Intakes: Guiding Principles for Nutrition Labeling and Fortification.* Washington, D.C: National Academies Press; 2003. (Cited as IOM, 2003)

32. International Food Information Council Foundation. *Addressing The Obesity Debate: A Consumer Point of View.* IFICF: Washington, D.C; 2003. (Cited as IFIC, 2003)

33. Jenkins D, Wolever T, Taylor R, Barker H, Fielden H, Baldwin J, Bowling A, Newman H, Jenkins A, Goff D. Glycemic Index of Foods: A Physiological Basis for Carbohydrate Exchange. *The American Journal of Clinical Nutrition.* 1981; 34: 362-366.

34. Kaiser Family Foundation. *The Role of Media in Childhood Obesity.* 2004; www.kff.org. (Cited as KFF, 2004)

35. Kant A. Association of Self- Perceived Body Weight Status with Dietary Reporting by U.S. Teens. *Obesity Research.* 2002; 10: 1259-1269.

36. Kennedy E, Davis C. Dietary Guideline 2000- The Opportunity and Challenges for Reaching the Consumer. *Journal of the American Dietetic Association.* 2000; 100: 1462-1465.

37. Kim SY, Nayga R, Capps O. Food Label Use, Self-Selectivity, and Diet Quality. *Journal of Consumer Affairs.* 2001; 35: 346-363.

38. Kreuter M, Brennan L, Scharff D, Lukwago S. Do Nutrition Label Readers Eat Healthier Diets? Behavioral Correlates of Adults' Use of Food Labels. *American Journal of Preventive Medicine.* 1997; 13: 277-283.

39. Kristal A, Hedderson M, Patterson R, Neuhauser M. Predictors of Self-Initiated, Healthful Dietary Changes. *Journal of the American Dietetic Association.* 2001; 101: 762-766.

40. Kuchler F, Variyam J. Mistakes Were Made: Misperception As A Barrier To Reducing Weight. *International Journal of Obesity.* 2003; 27: 856-861.

41. Levy A, Fein S, Schucker R. Performance Characteristics of Seven Nutrition Label Formats. *Journal of Public Policy & Marketing.* 1996; 15: 1-15.

42. Levy A. Analysis of 2002 Health and Diet Survey. Personal communication. 2004.

43. Levy L, Patterson R, Kristal A, Li S. How Well do Consumers Understand Percentage Daily Value on Food Labels? *American Journal of Health Promotion.* 2000; 14: 157-160.

44. Lin C-TJ. Analysis of Health and Diet Survey. Personal communication. 2004.

45. Loos RJ, Bouchard C. Obesity - is it a genetic disorder? *Journal of Internal Medicine.* 2003; 254: 401-25.

46. Marietta A, Welshimer K, Anderson S. Knowledge, Attitudes, and Behaviors of College Students Regarding the 1990 Nutrition Labeling Education Act Food Labels. *Journal of The American Dietetic Association.* 1999;

99: 445-449.

47.  Maynard L, Galuska D, Blanck H, Serdula M. Maternal Perceptions of Weight Status of Children. *Pediatrics.* 2003; 111: 1226-1231.

48.  Mitra A, Hastak M, Ford G, Ringold D. Can the Educationally Disadvantaged Interpret the FDA-Mandated Nutrition Facts Panel In The Presence Of An Implied Health Claim? *Journal of Public Policy & Marketing.* 1999; 18: 106-117.

49.  Moag-Stahlberg A, Miles A, Marcello M. What Kids Say They Do and What Parents Think Kids Are Doing: the ADAF/Knowledge Networks 2003 Family Nutrition and Physical Activity Study. *Journal of the American Dietetic Association.* 2003; 103: 1541 - 1546.

50.  Mokdad A, Marks J, Stroup D, Gerberding J. Actual Causes of Death in the United States, 2000. *Journal of the American Medical Association.* 2004; 291: 1238-1245.

51.  National Restaurant Association. *2004 Restaurant Industry Forecast Executive Summary.* Available at: www.restaurant.org/faq.cfm. (Cited as NRA, 2004)

52.  Neuhouser M, Kristal A, Patterson R. Use of Food Nutrition Labels Is Associated With Lower Fat Intake. *Journal of the American Dietetic Association.* 1999; 99: 45-53.

53.  Ogden C, Flegel K, Carroll M, Johnson C. Prevalence and Trends in Overweight Among US Children and Adolescents 1999-2000. *Journal of the American Medical Association.* 2002; 288: 1728-1732.

54.  Patterson R, Satia J, Kristal A, Neuhouser M, Drewnowski A. Is There A Consumer Backlash Against The Diet and Health Message? *Journal of the American Dietetic Association.* 2001; 101: 37-41.

55.  Phelan S, Hill J, Lang W, Debello J, Wing R. Recovery From Relapse Among Successful Weight Maintainers. *American Journal of Clinical Nutrition.* 2003; 78: 1079-1084.

56.  Ritchey N, Olson C. Relationships Between Family Variables and Children's Preference for Consumption of Sweet Foods. *Ecology of Food and Nutrition.* 1983; 13:257-266

57.  Roe B, Levy A, Derby B. The Impact of Health Claims on Consumer Search and Product Evaluation Outcomes: Results from FDA Experimental Data. *Journal of Public Policy & Marketing.* 1999; 18: 89-105.

58.  Saris W. Very-Low-Calorie Diets and Sustained Weight Loss. *Obesity Research.* 2001; 9: 295S-301S.

59.  Schwartz H. *Never Satisfied. A Cultural History of Diets, Fantasia, and Fat.* New York, New York: Doubleday; 1986.

60.  U.S. Department of Agriculture, Economic Research Service. Table 5. *Daily Food Consumption at Different Locations: All Individuals Ages 2 and Older. Daily Diet and Health: Food Consumption and Nutrient Intake Tables.* Washington, D.C. 2000. (Cited as ERS, 2000)

61.  U.S. Department of Agriculture, Economic Research Service. Table 1. *food cpi, prices, and expenditures: food and alcoholic beverages: total expenditures.* Washington, D.C. 2003. (Cited as ERS, 2003).

62.  U.S. Department of Health and Human Services. A Quick Guide to Interpreting Estimates of Overweight and Obesity. 2003 (Cited as DHHS, 2003)

63.  U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics. *Health, United States, 2003.* 2003; Washington, D.C. Available from the US Government Printing Office. (Cited as CDC, 2003)

64.  U.S. Department of Health and Human Services, Food and Drug Administration, Center for Food Safety and Applied Nutrition *Helping Consumers Lead Healthier Lives through Better Nutrition: A Social Science Approach to Consumer Information, Food Choices and Weight Management.* Washington, D.C. 2003. (Cited as FDA, 2003)

65.  U.S. Department of Health and Human Services, Public Health Service. Office of the Surgeon General. *The Surgeon General's Call To Action to Prevent and Decrease Overweight and Obesity.* 2001; Washington, D.C. Available from the US Government Printing Office. (Cited as DHHS, 2001)

66.  Variyam J, Young S, Blaylock J. Consumer Misperceptions of Diet Quality. *Journal of Nutrition Education and Behavior.* 2001; 33: 314.

67.  Wright JD, Kennedy Stephenson J, Wang CY, McDowell, MA, Johnson, CL. Trends in Intake of Energy and Macronutrients - United States, 1971 - 2000. *Morbidity and Mortality Weekly Report.* February 6, 2004; 53 (04): 80-82.

68.  Wyatt HR, Hill JO. Let's get serious about promoting physical activity. *American Journal of Clinical Nutrition.* 2002; 75:449-50.

69.  Young L, Nestle M. The Contribution of Expanding Portion Sizes to the US Obesity Epidemic. *American*

*Journal of Public Health.* 2002; 92: 246-248.

## Notes:

[(2)] National Institutes of Health (NIH) clinical guidelines (http://www.nhlbi.nih.gov/health/public/heart/obesity/lose_wt/risk.htm#limitations) define "overweight" in adults as a body mass index (BMI) of 25.0 to 29.9, and "obesity" as a BMI of 30.0 or higher. BMI (see Text Box at Appendix B) is defined as the ratio of a person's bodyweight in kilograms divided by the square of his or her height in meters.

[(3)] For additional information on factors contributing to obesity see CDC webpage (http://www.cdc.gov/nccdphp/dnpa/obesity/contributing_factors.htm)

[(4)] In children, the BMI is expressed as percentile growth that is based on gender-and age specific growth charts.

[(5)] When the OWG was formed, Joseph A. Levitt was the Director of CFSAN, and the OWG vice-chair. As of January 5, 2004, Dr. Brackett became director of CFSAN, and assumed the role of vice-chair.

[(6)] For a further discussion of energy balance see, *Dietary Reference Intakes* - Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein and Amino Acids Part 2, Chapter 12 Physical Activity; 12:1-39 (Institute of Medicine of the National Academies, 2002) and references cited therein.

[(7)] Although alcoholic beverages are not a focus of this report, there is some interest in having calorie and other nutrition information declared on the label of such beverages, as evidenced by a recent petition from the Center for Science in the Public Interest (CSPI) submitted to the Tax and Trade Bureau of the Treasury Department. In a letter dated December 17, 2003, to DHHS Secretary Thompson, CSPI requested that DHHS support the petition.

[(8)] As noted earlier in Section II.A.1., there is much discussion in the field of nutrition concerning the specific macronutrient source of calories, but given the charge to focus on obesity, the OWG believes that a primary focus on calories is appropriate.

[(9)] For more information on *Steps to a HealthierUS* see http://www.healthierus.gov/steps/index.html

[(10)] For more information on the *HealthierUS* Initiative see http://www.healthierus.gov/

[(11)] In addition, the focus groups explored what type of nutrition information they would like to see in quickservice restaurants (see section V.B.1.of this report). Participants discussed and reacted to various presentations of nutrition information at restaurants.

[(12)] IFIC states that its mission is to communicate science-based information on food safety and nutrition to health and nutrition professionals, educators, journalists, government officials and others providing information to consumers. IFIC states that its purpose is to bridge the gap between science and communications by collecting and disseminating scientific information on food safety, nutrition and health and by working with an extensive roster of scientific experts and through partnerships to help translate research into understandable and useful information for opinion leaders and ultimately, consumers. IFIC is supported primarily by the food, beverage and agricultural industries.

[(13)] The %DV indicates the amount of a nutrient present in a serving in relation to reference levels for a daily diet.

The reference levels for vitamins and minerals are based on Recommended Dietary Allowances established by the National Academies; the reference levels for macronutrients are based on recommendations in the *Dietary Guidelines for Americans* or as established by public health organizations. For macronutrients whose recommended intake levels are based on caloric intake (e.g., saturated fat intake should be less than 10% of calories), the %DV is calculated for a 2,000 calorie diet.

[14] USDA's Healthy Eating Index is a summary measure of overall diet quality. It provides a picture of the type and quantity of foods people eat and the degree to which diets comply with specific recommendations in the *Dietary Guidelines for Americans* and USDA's Food Guide Pyramid. For further information go to http://www.usda.gov/cnpp/healthyeating.html

[15] The Food Labeling Compliance Program gives instructions to FDA Field Offices that describes food labeling enforcement strategies and identifies/highlights specific areas where resources should be targeted with regard to the accuracy of the food label.(currently on the Internet at: http://www.cfsan.fda.gov/~comm/cp21008.html)

[16] For a further discussion on carbohydrates, see *Dietary Reference Intakes* - Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein and Amino Acids Part 1, Chapter 6 Dietary Carbohydrates: Sugars and Starches 6:1-57 (Institute of Medicine of the National Academies, 2002) and references cited therein.

[17] Guidelines for Use of Nutrition Claims (CAC/GL 23-1997).

[18] Guide to Food Labeling and Advertising. Section VI. Nutrient Content Claims 6.1.9(c).

[19] This example also contains an express nutrient content claim ("try our delicious low fat yogurt"), and two relative claims ("29 percent fewer calories" and "86 percent less fat"). Hence, the statement, as written, would need to meet the regulatory requirements for these types of claims, and would also need to provide serving size information that would allow for appropriate comparison between the cherry pie and the cherry yogurt.

[20] From remarks by Hudson Riehle of the National Restaurant Association at the November 20, 2003, workshop "Exploring the Connections Between Weight Management and Food Labels and Packaging" (http://www.fda.gov/ohrms/dockets/dockets/03n0338/03n0338-tr.htm)

[21] On January 26, 2004 (69 FR 3588), FDA issued a *Federal Register* notice specifically to solicit comments on this previously published draft guidance. FDA is interested in incorporating the latest scientific advances in the field of obesity and drug development into an amended obesity guidance document. Once the agency revises the draft, FDA will issue the guidance again for comment before finalizing the guidance.

[22] For the purposes of V.D.2., "labeling information" includes possible changes to the NFP, possible changes to the PDP, graphic devices, caloric/nutrient density indicators, and nutrient content claims.

[23] The developmental imprinting hypothesis suggests that the increase in childhood obesity is, in part, a result of an epigenetic effect of poor nutrition or exposure to some toxic agent during the perinatal period when metabolic pathways are being established in the fetus and neonate, creating a dysfunctional metabolic pathway. As the child ages, these dysfunctional metabolic pathways, in conjunction with other factors, such as inadequate exercise, may become sufficient to cause or contribute to overweight or obesity. This developmental programming hypothesis, developed from epidemiological data, has also been recently extended to animal models.

[24] In the *Federal Register* of October 8, 2003 (68 FR 58117), FDA announced this public meeting. Transcript of the meeting is available in FDA Docket No. 2003N-0338, and as of the date of this report, available on the Internet at

(http://www.fda.gov/ohrms/dockets/dockets/03n0338/03n0338-tr.htm).

<u>(25)</u> In the *Federal Register* of October 17, 2003 (68 FR 59795), FDA announced this public workshop. On November 19, 2003 (68 FR 65303), FDA amended its original announcement to reflect that the agency was requesting comments regarding the workshop. Transcript of the workshop is available in FDA Docket No. 2003N-0338, and as of the date of this report, available on the Internet at (http://www.fda.gov/ohrms/dockets/dockets/03n0338/03n0338-tr.htm)

<u>(26)</u> This listing includes references in the Report and Appendices B and H

---

Food Labeling and Nutrition   |   Calories Count

CFSAN Home | CFSAN Search/Subject Index | CFSAN Disclaimers & Privacy Policy | CFSAN Accessibility/Help
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA

FDA/Center for Food Safety & Applied Nutrition
Hypertext updated by cjm/las March 12, 2004

# EXHIBIT 5



# U.S. Food and Drug Administration

## CENTER FOR FOOD SAFETY AND APPLIED NUTRITION


Department of
Health and
Human Services

FDA Home Page | CFSAN Home | Search/Subject Index | Q & A | Help

**Office of Nutrition, Labeling, and Dietary Supplements**
**April 2008**

## Guidance for Industry

# A Labeling Guide for Restaurants and Other Retail Establishments Selling Away-From-Home Foods

*Additional copies are available from:*
*Office of Nutrition, Labeling, and Dietary Supplements*
*HFS-800*
*Center for Food Safety and Applied Nutrition*
*Food and Drug Administration*
*5100 Paint Branch Parkway*
*College Park, MD 20740*
*(Tel) 301-436-2373*
*http://www.cfsan.fda.gov/guidance.html*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Food Safety and Applied Nutrition**
**April 2008**

## Table of Contents

I. Introduction
II. Background
III. Nutrition Labeling of Restaurant Foods (21 CFR 101.10)
IV. Context of Claims and Coverage by the NLEA
  o Nutrient Content Claims
  o Health Claims
  o Dietary Guidance
  o Use of Undefined Terms and Terms or Symbols in a Different Context (21 CFR 101.13(q)(5)(iii))
  o Determining the Nutrient Content of a Restaurant Food
  o Adherence to the "Reasonable Basis"
  o Reference Amounts Customarily Consumed
  o Reference Foods
V. Exemptions and Special Labeling Provisions (21 CFR 101.9(j))

Case 4:08-cv-03347-CW    Document 28-6    Filed 07/31/2008    Page 2 of 33

○ Foods Which are Served or Sold in Establishments in
Which Foods are Served for Immediate Consumption (21
CFR 101.9(j)(2))
○ Ready-to-Eat Foods Not for Immediate Consumption (21
CFR 101.9(j)(3))

### Guidance for Industry[1]

# A Labeling Guide for Restaurants and Other Retail Establishments Selling Away-From-Home Foods

> This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It
> does not create or confer any rights for or on any person and does not operate to bind FDA or the public.
> You can use an alternative approach if the approach satisfies the requirements of the applicable statutes
> and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for
> implementing this guidance. If you cannot identify the appropriate FDA staff, call the appropriate
> telephone number listed on the title page of this guidance.

## I. INTRODUCTION

"A Labeling Guide for Restaurants and Other Retail Establishments Selling Away-From-Home Foods" is intended to
be guidance to facilitate compliance with the new regulations. It does not bind the agency, nor does it create or confer
any rights, privileges, or benefits for or on any person. While "A Labeling Guide for Restaurants and Other Retail
Establishments Selling Away-From-Home Foods" represents the best advice of FDA, it does not have the force and
effect of law. The interpretations presented herein are obviously subject to the requirements of law both in the statute
and in the regulations.

The FDA will continue to update and issue additional editions of guidance as resources permit. Questions will be
collected by FDA from correspondence and other inquiries that it receives. FDA will also consider specific
submissions of questions for inclusion in future editions of this guidance. Questions concerning the interpretation of
the requirements of the food labeling regulations should be submitted to the Office of Nutrition, Labeling, and
Dietary Supplements (HFS-800), Food and Drug Administration, 5100 Paint Branch Ave., College Park, MD 20740.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead,
guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless
specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that
something is suggested or recommended, but not required.

## II. BACKGROUND

The Nutrition Labeling and Education Act of 1990 (the NLEA) and the final regulations to implement the NLEA
(January 6, 1993), provide for a number of fundamental changes in how food is labeled, including requiring that
nutrition labeling be placed on most foods, requiring that terms that characterize the level of nutrients in a food be
used in accordance with definitions established by FDA, and providing for the use of claims about the relationship
between nutrients and diseases or health-related conditions. These changes apply to virtually all foods in the food
supply, including, in large measure, to foods sold in restaurants.

Following publication of the January 6, 1993, final rules, FDA issued technical amendments that correct unintended technical effects contained in several of the various rules in the Federal Register of August 18, 1993 (58 FR 44020). Nonetheless, a large number of questions were raised by industry, consumers, and others concerning the interpretation of these various final rules. Consequently, the former Office of Food Labeling (OFL)/Center for Food Safety and Applied Nutrition (CFSAN)/FDA developed the "Food Labeling, Questions and Answers" (August 1993, Updated June 2007) as an efficient way to provide answers to some of the more common questions that had been raised concerning the food labeling regulations. The agency also issued "Food Labeling: Questions and Answers, Volume II; A Guide for Restaurants and Other Retail Establishments" as part of a continuing effort to respond to concerns. This Guide is updated in this document, and responds to questions raised since publication of the first guide, including questions related to the labeling of foods sold in restaurants.

# III. NUTRITION LABELING OF RESTAURANT FOODS (21 CFR 101.10)

1. **I understand that foods served or sold in restaurants are exempt from nutrition labeling if they do not bear a claim. Once they bear a claim, the restaurant must provide nutrition information upon request for the food that bears the claim. Does a restaurant have to use the Nutrition Facts format to provide nutrition information?**

   **Answer:** No. FDA is not requiring full nutrition labeling for restaurant foods, nor is it requiring that nutrition information be presented in the Nutrition Facts format. Because restaurant foods tend to be prepared or sold differently from foods from other sources, FDA has amended 21 CFR 101.10 to provide a number of flexibilities for restaurants in how they determine the nutrient content of a food (e.g., using data base analysis or other reliable sources of nutrient information) and in how this information may be presented to consumers (e.g., in various formats and by reasonable means, such as in a flier or notebook) January 6, 1993, 58 FR 2302 at 2410 (available in PDF, 22.87 MB).

2. **Which foods can take advantage of the flexible provisions of 21 CFR 101.10 (Nutrition labeling of restaurant foods)?**

   **Answer:** Section 101.10 was established to provide flexibility to restaurants and similar establishments when it is the restaurateur who is responsible for determining nutrient content or providing nutrition labeling for foods that are served or sold in such establishments. The nutrition labeling provisions in 21 CFR 101.10, and discussed herein, also extend to the restaurant-type foods described in 21 CFR 101.9 (j)(3) provided they meet the requirements of that section (i.e., they are: similar to foods served in restaurants, ready-to-eat, not for immediate consumption, and prepared or processed primarily at the retail location from which they are sold).

3. **Can a commercial food manufacturer use the nutrition labeling provisions of 21 CFR 101.10 (Nutrition labeling of restaurant foods) for foods that he/she manufactures, packages, and labels for sale or use in restaurants? Would it matter if the food was sold only in restaurants?**

   **Answer:** No. 21 CFR 101.10 was established to provide flexibility to restaurants and similar establishments when it is the restaurateur, not a manufacturer, who is responsible for determining nutrient content or providing nutrition labeling for food sold in such establishments. Consistent with the agency's treatment of commercially packaged fresh fish and nuts (See Food Labeling Guidance), when a manufacturer or packer labels a packaged food, including foods sold only in restaurants, the nutrition information must be presented according to the requirements in 21 CFR 101.9 (Nutrition Facts) and would be judged by the compliance criteria of that section.

   The exception would be foods sold for use in restaurants but not served to consumers in the package in

which they are received (e.g., large, institutional size containers) (21 CFR 101.9). Because such foods are exempt from nutrition labeling requirements, even if they bear a claim, voluntary nutrition labeling may be presented for these foods by any reasonable means, including those provided for in 21 CFR 101.10.

4. **Does nutrition information have to appear on the same labeling that bears a nutrient content claim or health claim? For example, would a claim for a food listed on a placard require nutrition information on the placard also?**

   **Answer:** No. Section 101.10 requires that nutrition information be available upon request. It may appear on the same or different labeling from that which bears the claim. It may be presented in various forms, including those specified in 21 CFR 101.45 (e.g., displayed at point of purchase by an appropriate means, such as affixing it to the food, by posting a sign, or by making the information readily available in a brochure, notebook, or leaflet, in close proximity to the foods), Nutrition Facts (21 CFR 101.9), and by other reasonable means (21 CFR 101.10).

5. **A restaurant prepares and sells a number of foods that bear a claim, including an ice cream sandwich made with "low fat ice cream." The ice cream sandwich may be served for immediate consumption or it may be wrapped and sold from a self-service cold case in the restaurant. The wrapped sandwiches sold from a self-service case bear a claim on the package label. The restaurant provides consumers, upon request, with a brochure containing nutrient content information, according to 21 CFR 101.10, for the foods it serves for immediate consumption that bear claims. Can the restaurant use the same brochure to meet nutrition labeling for the wrapped ice cream sandwich that bears a claim on its label or does it have to put Nutrition Facts on each package?**

   **Answer:** Foods that are served or sold in restaurants and similar establishments may bear nutrition information according to 21 CFR 101.10, even if the food is sold in packaged form and a claim or other nutrition information appears on the package label provided the food is labeled by the restaurateur.

6. **How may nutrition information be presented for restaurant-type foods that are primarily processed or prepared at the retail location from which they are sold when that location does not have facilities for immediate consumption? Please address salads prepared and sold in-house in your answer.**

   **Answer:** Many restaurant-type foods (i.e., ready-to-eat but not for immediate consumption) that are prepared at the same retail location from which they are sold have similar needs for flexible nutrition labeling as foods served or sold by restaurants (e.g., the foods are generally hand assembled and, therefore, subject to individual product variations). Thus, the general provisions of 21 CFR 101.10 discussed in this section are available to restaurant-type foods that meet the criteria set out in 21 CFR 101.9(j)(3). For example, if a grocer prepares and sells a "low fat" potato salad in-house, nutrition labeling must, at a minimum, provide information on the fat content of the food. This information would be available to the grocer from his/her reasonable basis determination that the food meets FDA's definition for the claim. Nutrition information for a restaurant-type food that bears a claim must be available to consumers upon request and may be presented by reasonable means (e.g., in a brochure or posted at point of purchase).

7. **Can a restaurant provide nutrition information to consumers orally, or must it be presented in written form?**

   **Answer:** Nutrition information for restaurant and restaurant-type foods may be provided by any reasonable means, including orally. A statement from a waiter, for example, that a "low fat" meal contains less than 10 grams of fat will serve as the functional equivalent of full nutrition labeling. In such a case, however, the restaurant should also have nutrition information in writing, as a back-up, to

ensure that the information communicated by the staff is valid.

**8. I understand that nutrition information for packaged foods must be provided for the food "as packaged." Information for the nutrient values of the food "as prepared" is voluntary and would be listed in a second column. What is the basis for nutrition labeling of a food served in a restaurant (not in packaged form), the uncooked ingredients or the prepared food?**

**Answer:** Nutrition information must be provided on the basis of the food as packaged or purchased by the consumer (21 CFR 101.9(b)(9)). Thus, nutrition labeling of a ready-to-eat food served in a restaurant or similar establishment would be based on the nutrient content of a single serving of the finished product as it is marketed for purchase by consumers.

**9. Which nutrients should a restaurant include in nutrition labeling?**

**Answer:** At a minimum, restaurants must provide information on the nutrient that is the basis for the claim (e.g., "low fat, this meal contains 10 grams of fat").

**10. How does a restaurant determine which nutrients are the basis for a claim (i.e., which nutrients must be included in nutrition labeling)?**

**Answer:** Nutrients that are the basis for a claim include all nutrients that are relevant in determining whether a food meets the definition for a claim. For example, fat claims are based on the fat content of a food. Thus, nutrition information for a "low fat" food must include information on the level of fat in the food bearing the claim. Cholesterol claims are based on the cholesterol content of the food and are allowed only when a food contains 2 grams or less saturated fat per RACC (2 grams or less saturated fat per 100 grams of food for meals and main dish products). Thus, nutrition information for a food bearing a cholesterol claim must include information on both the cholesterol and the saturated fat content of the food. Health claims include both the general health claims requirements (i.e., that disqualifying levels not be exceeded) and the nutrient requirements for the specific claim (see question 43). This information (e.g., information about the level of the nutrients that are the basis for the claim) should be readily available to a restaurant from its determination that the food conforms to the definition of a claim. (Definitions for nutrient content claims and requirements for health claims are summarized in Appendices B, C, and D of the Food Labeling Guide.)

**11. If a restaurant wants to provide information on additional nutrients (e.g., nutrients that are not the basis for a claim) can it do so?**

**Answer:** Yes. While the provision of information on nutrients that are the basis for a claim is the minimum requirement for nutrition labeling of restaurant foods, FDA encourages restaurants to provide consumers with as much information on the nutrient content of the food as possible.

**12. If a restaurateur chooses to voluntarily provide nutrition labeling for a food that is otherwise exempt, how may this be accomplished?**

**Answer:** Generally, the restaurateur may provide voluntary nutrition information according to the options available to foods that bear a claim (i.e., 21 CFR 101.9 (Nutrition Facts), 21 CFR 101.45 (voluntary program for raw fruits, vegetables, and fish), or 21 CFR 101.10 (reasonable means)). For example, a restaurateur may choose to provide nutrient content information in a statement such as "Garden salad with grilled chicken, contains 390 calories, 8 g fat, and 13 mg cholesterol." Because nutrition labeling requirements are triggered by a nutrient content claim, health claim, or other nutrient content information, the food would no longer be exempt from nutrition labeling. However, this information can itself serve as the functional equivalent of nutrition labeling, and no additional labeling

would be required.

**13. Would FDA consider a telephone number to be a reasonable means of providing nutrition information for a food sold in a restaurant or other vending facility and which makes a claim?**

**Answer:** No. Once a food bears a claim, nutrition information must be readily accessible to consumers (e.g., on the label attached to the food or in labeling at point of purchase). Vending machine foods that are sold in packaged form should have required labeling on the product visible to the consumer prior to purchase or be otherwise displayed at point of purchase. With respect to foods prepared or processed by the vending machine (e.g., soup dispensed into a cup), the mandatory information may be displayed on the vending machines.

**14. Must a restaurant include % Daily Values in its nutrition labeling?**

**Answer:** Not necessarily. Nutrition information may be presented in a variety of formats. However, the agency considers % Daily Values to be very important information and encourages such a declaration whenever practicable. If a restaurant chooses to use the Nutrition Facts format, labeling must contain all information, including % Daily Values, required for the chosen format.

**15. Can a restaurant present nutrition information in a modified version of the Nutrition Facts format? For example, can nutrition information be presented in a format that resembles the Nutrition Facts but that contains elements that were modified or eliminated compared to the requirements of 21 CFR 101.9?**

**Answer:** No. As stated in response to question 1, a restaurant may choose to present nutrition information in a variety of formats. FDA would not object to a restaurant food bearing nutrition information according to the different Nutrition Facts formats set out in 21 CFR 101.9 (e.g., the simplified format, the shortened format, an aggregate display, or a linear display) so long as labeling contains all required elements of the chosen format and it meets the requirements of 21 CFR 101.10 (i.e., it includes information on the nutrient that is the basis for the claim).

**16. FDA's requirements for the Nutrition Facts format are fairly specific with respect to type style, type size, and placement. Does the agency have similar requirements for nutrition labeling of restaurant foods?**

**Answer:** It depends on the format used. Nutrition labeling for restaurant foods may be presented in various formats, including Nutrition Facts (21 CFR 101.9), following the format established for raw fruit, vegetables, and fish (21 CFR 101.45), and by other reasonable means (e.g., a statement such as "low fat, this food contains no more than 3 grams of fat" in a brochure or notebook) (21 CFR 101.10).

Consistent with its flexible approach towards restaurant food labeling, FDA has not established standardized type size or placement requirements in 21 CFR 101.10. Labeling that is easily accessible to consumers, that contains all required nutrition information, and that is presented clearly and legibly, would be generally consistent with the "reasonable means" provision of 21 CFR 101.10.

**17. Data base analysis indicates that a food contains 277 calories, 464 mg sodium, 39.22 g protein, and 5.81 g fat per serving. Can a restaurant use the same numbers that are generated by data base analysis (or provided in a cookbook or other source of nutrient content information) directly in its nutrition labeling?**

**Answer:** Yes. However, labeling that declares nutrient values in a way that implies an unwarranted degree of accuracy could be misleading. To avoid the impression of unwarranted accuracy, as well as to make nutrition labeling easier for consumers to review and understand, restaurants are strongly encouraged to follow the rounding rules set out in 21 CFR 101.9 (see Appendix H of the Food Labeling

Guide). To be consistent with these rules, the above values should be declared as 280 calories, 460 mg sodium, 39 g protein, and 6 g fat.

**18.** **If an airline provides passengers with a special meal upon request (e.g., a "low sodium" meal), would this be a claim subject to the NLEA? How can nutrition labeling be accomplished?**

**Answer:** If, in response to a special request, the airline provides a special meal and represents that the food or meal is, for example, "low sodium," "reduced sodium," or "low in fat," the airline is making a nutrient content claim for the food, and the food must meet the definition for the claim. Nutrition information must be provided for the nutrient amounts that are the basis for the claim (e.g., "low fat, this meal contains 10 grams of fat") and may be provided by reasonable means (e.g., on the back of a card wrapped with the meal identifying the meal as a special request or in a binder available from the flight attendants).

**19.** **Is a restaurant required to provide information on the amounts of nutrients that are not the basis for a claim? For example, if a food bears a "low fat" claim but the sodium content of the food exceeds a certain level, does the restaurant need to include sodium in its nutrition labeling?**

**Answer:** FDA encourages restaurants to provide as much nutrition information as possible to consumers. However, the NLEA exempts restaurant foods from the referral and disclosure statements that must appear on the principal display panel of a packaged food if the food bears a claim and it contains a nutrient (i.e., fat, saturated fat, cholesterol, or sodium) at a level greater than the disclosure levels set out in 21 CFR 101.13(h). Further, FDA's regulations provide that, in a restaurant situation, information on the nutrients that are the basis for the claim may serve as the functional equivalent of full nutrition labeling. Thus, in the above example, information about the fat content of the food bearing a "low fat" claim would serve as the functional equivalent of full nutrition labeling.

**20.** **Can a restaurant present nutrition information for an item based on an optional form of serving or preparation? For example, if it serves a grilled chicken breast with the skin attached, can it provide nutrient content information on the basis of the chicken with the skin removed?**

**Answer:** As stated in response to question 8, nutrition information must be presented for a food based on the form in which the food is served or sold to consumers. The restaurant may, however, voluntarily provide a second set of information based on an optional method of preparation or serving, e.g., the chicken breast with skin removed.

If a claim is made for a food, and the food or meal only meets the definition of the claim based on an optional method of preparation (e.g., if the food may be prepared, on request, with half the oil normally used), this fact must be clearly communicated to consumers.

**21.** **I understand that nutrient content information should be based on the labeled serving size for a food. In a restaurant situation, labeled serving size would be the same as an actual or portioned serving (e.g., the amount of food provided by the restaurant in a single serving). What basis should a restaurant use for nutrition labeling if it has no control over serving size? For example, how should a restaurant declare the nutrient content of items offered in a self-service soup and salad bar?**

**Answer:** Even if it is not the restaurant that portions the food, the restaurant may still have a logical frame of reference for serving size. For example, if a restaurant provides patrons with containers or serving utensils that have a given capacity (e.g., soup bowls, salad dressing ladles) and if it is reasonable to expect that consumers may fill the containers to capacity, the restaurant should base nutrient content information on of the amount of food the container could hold. However, if a food bears a claim, it must meet the definition for the claim based on its RACC, regardless of labeled serving

size (see question 79).

Nutrient content information for discrete items available at a self-service salad bar (e.g., muffins, whole fruit, or slices of bread) should be declared on the basis of the number of unit items that is closest to the RACC for the food (21 CFR 101.19(b)(2)(ii)).

**22. FDA has stated that a restaurant may present nutrition information in a statement such as "contains X amount of a nutrient." Does labeling also need to specify serving size (e.g., does it need to list the weight of the food or meal)?**

**Answer:** It depends. FDA encourages restaurants to provide as much nutrition related information as possible, including information on serving size. However, consistent with the agency's flexible approach to nutrition labeling on restaurant foods, FDA will accept labeling that provides nutrition information for a single serving of a food or meal that does not specifically state serving size provided omission of this information does not result in labeling that is false or misleading. For example, if a menu lists the items available in a restaurant followed by a description of the food or meal and information on the fat and calorie content of the food, consumers could reasonably expect that the nutrient content information is declared on a per serving basis, and they will be able to relate this information to the quantity of food they are served.

On the other hand, there may be situations in a restaurant where consumers would not have an appropriate frame of reference for nutrition information unless the serving size used as a basis for the information is specified, for example, when a food is available in more than one serving size (e.g., soup sold by the cup and by the bowl) or when serving size varies (e.g., items from a self-service soup and salad bar where the consumer controls portion size). Furthermore, if nutrition labeling is presented in a format that has requirements for declaring serving size (e.g., Nutrition Facts), nutrition labeling must contain all required elements of the chosen format.

**23. Should a restaurant provide nutrition information on a "per serving" basis, or can the information be declared by other units or measures, such as "per item" or "per unit?" For example, if a restaurant sells whole pizza and pizza by the slice, how should nutrition information be declared?**

**Answer:** Generally, nutrition information should be presented on a per serving basis. Nutrition information on a per unit basis could be appropriate when a single unit may also be a single serving. However, the basis for the information must be clearly communicated to consumers.

It is especially important that the basis be declared when a food is available in more than one size serving (e.g., pizza that is available whole and by the slice), or soup that is available by the cup or by the bowl. The restaurant may provide additional information, such as "8 slices per medium 16-inch pizza, 1 slice contains..." to help consumers put nutrition information in context.

Conversely, it would be misleading to present the information on a per item basis when a serving generally contains more than one item of the food, for example, if a single serving of cookies contains more than one cookie.

**24. Can a restaurant provide nutrition information on a per item basis when the item is significantly larger than FDA's RACC for the food? For example, the RACC for muffins is 55 g. If a restaurant serves a muffin that weighs 165 g (three times as big as the RACC) can it still treat the muffin as a single serving?**

**Answer:** If a unit weighs 200 percent or more of the RACC set out in 21 CFR 101.12(b), it may be labeled as a single serving provided it is reasonable to expect that the food would be consumed in a single sitting. For more information on RACCs, see chapter 7 in the Food Labeling Guidelines.

25. **For packaged foods, the actual amount of naturally occurring vitamins, minerals, and protein must be at least 80 percent of the values that are declared on the label, whereas the actual calorie, carbohydrate, and sodium contents may not exceed the labeled values by more than 20 percent. Will FDA apply these same compliance criteria to the nutrient content information declared on labeling for restaurant foods?**

> **Answer:** No. The above compliance criteria (21 CFR 101.9(g)) were established to account for natural variations in the nutrient content of commercially manufactured and packaged foods that are subject to chemical analysis to determine compliance. These criteria ensure that values declared in the Nutrition Facts panel for nutrients such as vitamins and minerals are not over-declared, and that nutrients such as calories and fat are not under-declared, compared to actual amounts that are determined by chemical analyses. The standard that restaurant foods must meet is that a restaurateur has a "reasonable basis" for believing a claim or other nutrition information is valid. Thus, FDA will not subject restaurant foods to chemical analysis to determine whether nutrient levels are properly declared. Rather, FDA will be assessing whether the restaurant's basis for a claim or other nutrition information is, or is not, reasonable. For example, if a restaurant claims a meal is "low fat," FDA would look at the recipe, calculations, and any other information used by the restaurant in determining whether the meal meets the definition of "low fat" (i.e., that it contains no more than 3 g fat per 100 g of food).

26. **Can a restaurant provide nutrition information for different components of a single food or meal separately? For example, can it provide one set of nutrient content information for a salad and a second set of information for the salad dressing if the dressing is served on the side?**

> **Answer:** Nutrition information for different components of a food or meal can be presented separately when the components are served separately (e.g., for a sauce or dressing served on the side), or where the components are separate entities (e.g., a steak, baked potato, and green vegetable) even if the components are served together. It could be misleading, however, to present nutrition information separately for mixed components where the consumer could not reasonably be expected to separate them (e.g., if the dressing is served on the salad).

# IV. CONTEXT OF CLAIMS AND COVERAGE BY THE NLEA

**Nutrient Content Claims:**

27. **What is a nutrient content claim? Could you provide some examples?**

> **Answer:** A nutrient content claim is a statement about a food product that directly, or by implication, characterizes the level of a nutrient in the food (21 CFR 101.13(b)). Thus, nutrient content claims include direct statements about the level (or range) of a nutrient in a food (e.g., "low sodium," "reduced fat," or "contains 100 calories"). An implied nutrient content claim is any claim that: (1) describes the food, or an ingredient in the food, in a manner that suggests that a nutrient is absent or present in a certain amount (e.g., "no tropical oils") or (2) suggests that a food, because of its nutrient content, may be useful in maintaining healthy dietary practices when the claim is made in conjunction with an explicit nutrient content claim (e.g., "healthy, contains 3 grams of fat").

28. **Would use of terms such as "Nutritious," "Wholesome," "Best choice," or "Good for you" on the label or labeling of a food subject the food to the claims requirements?**

> **Answer:** It depends on the context in which the term is used. When a term such as "Wholesome" or "Nutritious" is used in a context that does not render it an implied claim (e.g., "Nutritious foods, prepared fresh daily" or "Made with wholesome ingredients"), it is not subject to the claims requirements. On the other hand, FDA may consider the term to be used in a nutritional context if it

appears in association with an explicit or implicit claim or statement about a nutrient. In statements such as "Nutritious, contains 3 grams of fiber," "Best choice, contains 200 mg sodium," or "Good for you, contains 5 grams of fat," the terms are implied nutrient content claims and the foods bearing the claims must meet the requirements for a claim defined by FDA for the nutrient that is the subject of the claim (21 CFR 101.65(d)(1)). For example, a food bearing the claim "Good for You, contains 5 grams of fat," would have to meet the requirements for one of the fat claims, defined in 21 CFR 101.62 (e.g., "low fat") if it is to not misbrand the food.

### 29. What are the requirements for a restaurant food and its labeling when the food bears a statement about the amount or percentage of a nutrient in the food?

**Answer:** Statements about the amount or percentage of a nutrient in a food (e.g., "10% protein" or "less than 3 grams of fat per serving") may be made without further qualification if the food meets the definition for a claim (i.e., if the food is "low" in, "reduced," or a "good source" of the subject nutrient (21 CFR 101.13(i) and 21 CFR 101.62(b)(6)). If the nutrient content of a food is not consistent with the definition of a claim, the food may still bear such a statement characterizing the level of a nutrient provided the statement is followed by a disclaimer, e.g., "Only 200 mg sodium, not a low sodium food." If the statement does not in any way qualify the level of a nutrient (e.g., "100 calories" or "5 grams of fat"), a disclaimer is not required.

### 30. Section 101.10 provides that nutrition labeling for restaurant foods may be presented in a statement such as "low fat, contains less than 10 grams of fat." Can a food that does not qualify for a claim provide nutrition information using a similar statement, e.g., "this meal contains less than 20 grams of fat?"

**Answer:** No. As stated in response to the preceding question, phrases such as "less than (X amount of nutrient)" are implied claims and can only be used for a food that meets the definition of a claim. Statements such as "contains less than 10 grams of fat" can be used in situations where, according to a restaurateur's reasonable basis determination, a food or meal meets the criteria for a claim (e.g., "low fat") but where he/she may not know the exact amount of the nutrient present. When a restaurateur is presenting nutrition information for a food that does not meet the definition for a claim, and the nutrient values determined using a reasonable basis include some variability (e.g., due to hand assembly of food items), he/she may wish to say "approximately" to indicate that the nutrient values may not be precise.

Furthermore, depending on the context in which it is used, the term "contains" may itself be a nutrient content claim. A statement such as "contains fiber" is a claim that a food is a "good source" of fiber (See Appendix B of the Food Labeling Guide). However, in a statement that includes a quantitative declaration (e.g., "contains 2 grams of fiber"), the amount of fiber in the food is characterized by the quantitative declaration, "2 grams," and the term "contains" is a simple verb, not a nutrient content claim.

### 31. Can a restaurant provide information on "percent calories from fat" for a restaurant food or meal?

**Answer:** General dietary guidelines recommend a diet that derives 20-35% of calories from fat. Because a meal is comprised of a number of items from different food groups, and because it contributes a significant proportion of the daily diet, FDA would not object to labeling that provides information about percent calories derived from fat in a meal.

Conversely, FDA stated in the claims final rules that this information (e.g., percent calories from fat) would not be useful for individual food items. The agency is concerned that, because a diet that is consistent with dietary guidelines may be comprised of a variety of foods, highlighting percent calories from fat for individual food items may be misleading. Consequently, FDA discourages labeling that presents fat and calorie content as "percent calories from fat" for individual food items.

**32. Can a restaurant call an item "relatively low fat," "very low fat," "extra light," or "almost fat free?"**

> **Answer:** No. Only those claims, or their synonyms, that are specifically defined in the regulations may be used (Appendix B of the Food Labeling Guide). All other claims are prohibited (21 CFR 101.13(b)).

**33. Would use of the term "Fresh" trigger the nutrition labeling requirements of the NLEA?**

> **Answer:** No. FDA addressed the use of the term "Fresh" to describe foods that are unprocessed or unpreserved in the same issue of the Federal Register in which the claims final rules appeared. However, "Fresh," as defined in 21 CFR 101.95, is not a nutrient content claim or a health claim and use of the term does not trigger nutrition labeling requirements.

**34. Could FDA elaborate on the types of statements about ingredients in a food that would be an implied nutrient content claim?**

> **Answer:** A statement highlighting the presence or absence of an ingredient, where the ingredient is associated with the level of a nutrient, would be an implied nutrient content claim. Long recognized ingredient-nutrient relationships include: sugar and calories, oils and total fat, tropical oils and saturated fat, and whole grain or bran and dietary fiber. The statement "Contains oat bran," for example, implies that a food is "a good source of dietary fiber."

**35. I make a pizza with "low fat cheese." Even though my pizza is not "low fat" can I make a nutrient content claim about the cheese?**

> **Answer:** The agency considers a product that makes an express claim ("free," "low," "good source," or "high") about an ingredient in a product to be an implied relative claim about the product itself. For example, a claim that a pizza is "made with low fat cheese" is an implied claim that the pizza is at least "reduced in fat" compared to a similar pizza. Such a claim would be prohibited if the product did not meet the criteria for the relative claim ("less" or "more" of a nutrient) that it implied. In addition, for such an implied relative claim, the accompanying information required for relative claims would also be required (e.g., 25% less fat than regular pizza, contains _____ g fat, regular pizza contains _____ g fat). However, consistent with FDA's flexible approach, the agency would not object to the quantitative comparison information appearing on nutrition labeling if the labeling that bears the claim does not have sufficient space to accommodate the full statement (21 CFR 101.65(b)).

**36. Would a statement such as "contains no dairy ingredients" be an implied claim?**

> **Answer:** A statement that is not presented in a nutrient context, such as statements to facilitate avoidance (e.g., "contains no dairy ingredients"), information about characterizing ingredients or ingredients perceived to add value (e.g., "contains real butter"), and ingredients that do not serve nutritive purposes (e.g., "no preservatives") would not be an implied nutrient content claim (21 CFR 101.65(b)).

**37. When would a statement about the way a food is prepared be an implied nutrient content claim?**

> **Answer:** The statement would be an implied nutrient content claim if it highlights a preparation method that affects the nutrient content of a food (21 CFR 101.65). For example, "made only with vegetable oil" implies that, because vegetable oil was used instead of animal fat, the food is "low in saturated fat" or "cholesterol free." On the other hand, a statement about a preparation method that affects the character of a food but that does not characterize the nutrient content of a food (e.g., "made with fresh fruit" or "prepared fresh daily") would not be an implied claim.

Terms such as "broiled," "fried," or "steamed" would not subject a food to the nutrient content claims requirements if they are part of a food's identity statement (e.g., "baked potato," "steamed shrimp," or "fried zucchini"), or are used solely to identify different categories of food. In addition, labeling that bears a statement such as "available broiled or fried" in the context of providing optional preparation methods for a food would not, by itself, be an implied nutrient content claim. However, a statement such as "donuts, baked not fried" that highlights the preparation method in a way that consumers may assume that the food, because of the way it was prepared, has less or more of a nutrient would be an implied claim.

**38. If the name of a restaurant establishment contains a term that may, in some contexts, be an express or implied claim (e.g., "Cafe Lite" or "Skinny Haven"), would FDA require the foods sold in the establishment to meet the definition for a claim, and if so, would all the foods sold in the establishment be expected to comply?**

**Answer:** The name of an establishment is not necessarily a claim for the foods sold by the establishment. If, for example, "Cafe Lite" is the name of a restaurant, but the term is not being used to describe the foods sold by the restaurant (e.g., the name of the restaurant is not printed on labeling that describes the selections offered by the restaurant), it would not be a claim for the food. Further, if the name of the restaurant appears on labeling but is used in a context other than as a nutrient content or health claim (e.g., use of the term "Lite" to describe smaller portions or "Skinny" because it is the proprietor's nick-name), the term would not be a claim subject to the NLEA.

Conversely, if the name of the establishment is used to describe the foods served in the restaurant and the term is used in a nutrient context (e.g., "Cafe Lite" appears prominently on labeling and is accompanied by fat or calorie content claims), the foods that bear the claim must be clearly distinguishable from food items that do not. For example, selections that meet the requirements for a "light" claim may be highlighted by the use of a symbol or different type style and a footnote explaining that the highlighted items are light in fat or calories, or sodium.

**39. What if a restaurateur is having difficulty determining whether a statement is an implied claim?**

**Answer:** Some statements clearly are implied nutrient content claims while other statements clearly are not. Situations where the agency has been able to determine that a statement would or would not constitute an implied claim are set out in 21 CFR 101.65. In many cases, however, whether a label statement is an implied claim can only be determined on a case-by-case basis, considering the entire label and the context in which the claim is made. In determining whether a statement is, or is not, an implied claim, FDA would consider both the restaurateur's intent and the consumer's likely perception of a statement.

## Health Claims:

**40. What is a "Health Claim?"**

**Answer:** A health claim is a reference on the label or in the labeling of a food that directly, or by implication, including 'third party' references, written statements, symbols, or vignettes, characterizes the relationship of a nutrient or substance to a disease or health related condition (21 CFR 101.14(a) (1)). While a nutrient content claim refers to a level or range of a nutrient in a food, a health claim includes two elements, i.e., a reference to a nutrient or substance and a reference to a disease or health related condition. Labeling that links a specific food to a statement such as "Heart Healthy" contains both the substance element (reference to a specific food) and the disease-condition element (implied reduction in risk of heart disease) of a health claim. Health claims may be used on the label or labeling of a food only if claims about the nutrient-disease relationship involved have been authorized by FDA

in a regulation.

**41. What is an implied health claim?**

> **Answer:** Implied health claims include those statements (e.g., "Heart Healthy"), symbols (e.g., a heart symbol), vignettes, or other forms of communication that suggest that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition (21 CFR 101.14(a)(1)).

**42. When would a heart symbol on restaurant labeling be an implied health claim?**

> **Answer:** Whether a heart symbol is an implied health claim will depend on the context in which it is used. FDA advises that most of the perceptions about heart symbols fall under the regulatory regime of a health claim. For example, use of a heart symbol in association with a nutrient content claim (e.g., a claim about saturated fat or cholesterol) could imply that the food, because of its nutrient content, may be useful in reducing the risk of developing a disease or health-related condition, specifically, heart disease. Use of a heart symbol or similar logo in this context would trigger the health claims requirements that a food meet the definition of an approved claim, and that it bear nutrition labeling. Further, use of a heart symbol alone (i.e., in the absence of a statement explaining its use), could be misleading.

> Alternatively, when a symbol is clearly being used in a context other than to highlight nutrient or health-related benefits of a food (e.g., a heart symbol followed by a statement such as "You'll love our home-made pies and cakes!") it would not be an implied claim. Further, a heart symbol may be used to identify items that are consistent with the dietary recommendations of a health professional association when labeling bears a statement explaining such use (e.g., the symbol is repeated in a footnote followed by a statement such as "these items are consistent with AHA guidelines," without triggering the claims requirements provided labeling does not bear another statement, phrase, symbol, or logo that would cause the heart symbol to be a claim in the context of the entire label (see question 55).

**43. What are the nutrient-content requirements for a food to bear a health claim?**

> **Answer:** Generally, a serving of the food or meal must contain less than the specified levels of four disqualifying nutrients: fat, saturated fat, cholesterol, and sodium (21 CFR 101.14(a)(5)).

> Generally, without fortification, the food must contain at least 10 percent of the Daily Value for at least one of the following six nutrients: vitamin A, vitamin C, calcium, iron, fiber, or protein.

> In addition to these general requirements, the food must meet the specific criteria listed in the regulation for each claim. For example, a food bearing a claim that links a diet low in total fat to the risk of some cancers (21 CFR 101.73) must also meet the definition for "low fat."

**44. What are disqualifying levels?**

> **Answer:** Disqualifying levels are those levels of total fat, saturated fat, cholesterol, or sodium in a food above which the food will be disqualified from making a health claim (21 CFR 101.14(a)(5)). For individual food items, these levels are per Reference Amount Customarily Consumed and per serving (or, in the case of foods with RACCs of 30 grams or less or 2 tablespoons or less, per 50 grams). Values for meals and main dish items are per serving. Any one of these levels (e.g., per RACC or per serving), will disqualify a food from making a health claim.

**45. Would a claim such as "Heart Healthy" or "Heart Fest" fulfill the informational requirements for a**

health claim?

> **Answer:** No. An implied claim such as "Heart Healthy" does not contain the required elements. Terms such as "Heart Healthy" would need to be accompanied by additional information to be sufficiently informative.

**46.  If additional information is needed to make a claim such as "Heart Healthy" fully informative, how should it be presented, and where must it appear relative to the implied or abbreviated claim?**

> **Answer:** The additional information should appear adjacent to the implied or abbreviated claim. If a number of foods bear an abbreviated claim, the additional information, (e.g., the full health claim), may appear adjacent to each abbreviated claim or adjacent to the most prominent claim. If the foods that bear an abbreviated health claim are grouped together in a box or other section of the labeling, the full health claim may appear once within that section.
>
> Alternatively, where any graphic material or statement that constitutes an express or implied claim (e.g., "Heart Healthy"), the abbreviated claim may be followed in immediate proximity by the reference statement, "See _____ for information about the relationship between _____ and _____" informing consumers where the additional information may be found (21 CFR 101.14(d)(2)(iv)). Thus, the information required to be in the full health claim may appear elsewhere on the same or different labeling as the implied claim. In a restaurant, labeling that bears an abbreviated health claim may bear a statement such as "Ask your server for information about the relationship between (insert nutrient or substance) and (insert disease or health-related element)" if the full claim appears in labeling (e.g., a brochure or notebook) that is used by a restaurant to convey nutrition information.

**47.  Can a restaurant communicate useful nutrition-related information to consumers in a way other than a nutrient content or health claim?**

> **Answer:** Yes. Restaurants may offer alternative selections whose value in the diet may be recognized without elaboration, e.g., raw vegetables, steamed vegetables, a grain dish, a fresh fruit plate, or pasta with a tomato based sauce instead of a cream sauce. Optional preparation or serving methods may also be highlighted by statements such as "may be prepared with half the oil on request," "smaller portions," or "dressings and sauces available on the side," provided the statement about an ingredient or preparation method does not make an implied claim about the nutrient content of the food.

**48.  A number of food service establishments provide foods for special dietary use (e.g., health resorts that serve food that is useful in reducing or maintaining body weight or hospitals that provide food to help regulate sodium intake). Would such food be subject to the nutrient content claims requirements if its label or labeling bears a statement about the use of the food in a special diet?**

> **Answer:** It depends. There is a separate set of requirements for foods for special dietary use in 21 CFR part 105. A claim made solely to identify a food that meets a particular dietary need that exists by reason of a physical, physiological, pathological, or other condition as described in part 105 would generally not be a nutrient content claim (21 CFR 101.65(b)(6)). Thus, a claim such as "Use as part of a weight reduction program" that identifies the special diet of which the food is intended to be a part would not, by itself, be a nutrient content claim.
>
> However, if the claim about the use of the food in a special diet is used in a context that highlights a nutritional aspect of the food that is relevant to the general population (e.g., it is accompanied by a "low sodium" or "low calorie" claim), the food and its labeling would be subject to the nutrient content claims requirements.

**49. Are statements that are not covered by the NLEA subject to any other requirements?**

**Answer:** Yes. Statements outside the coverage of the NLEA are still subject to the requirements in the law that they must be truthful and not misleading.

## Dietary Guidance:

**50. What are "dietary guidelines?" How does dietary guidance differ from a nutrient content claim?**

**Answer:** Dietary guidelines are general dietary guidance for good health made publicly available by recognized governmental (e.g., the U.S. Surgeon General, the U.S. Department of Agriculture, the Department of Health and Human Services, the National Cancer Institute, and the Centers for Disease Control and Prevention), or private health professional organizations (e.g., the National Academy of Sciences, the American Dietetic Association, and the American Heart Association). Dietary guidance provided by third parties would need to be consistent with the recommendations of recognized dietary authorities and the current Federal Government's *Dietary Guidelines for Americans*. *Dietary Guidelines* generally promote moderate intake of nutrients such as sodium, fat, and saturated fat and increased consumption of grains, fruits, and vegetables. Dietary guidance is a group of general recommendations based on a total diet (e.g., "Eating a variety of 5 fruits and vegetables a day is an important part of a healthy diet," "Diets rich in whole grain foods and other plant foods and low in total fat, saturated fat, and cholesterol, may help reduce the risk of heart disease and certain cancers").

Conversely, a nutrient content claim is a claim about the nutrient content of a particular food (e.g., "low fat, this meal contains 10 grams of fat"). Claims about a food that suggest that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and that are made in conjunction with an explicit claim or statement about a nutrient (e.g., "Healthy, contains 3 grams of fat") are implied nutrient content claims (21 CFR 101.65(d), see Appendix B of the Food Labeling Guide).

**51. Can a restaurant say that an individual food or meal meets dietary guidelines when guidelines are based on recommendations for a total diet?**

**Answer:** It depends, in part, on the specific recommendations of the particular group. The Federal Government's 2005 *Dietary Guidelines for Americans*, for example, recommend a diet with "moderate calorie intake, between 20-35 percent of calories from fat, less than 10 percent of calories from saturated fat, less than 300 mg cholesterol per day, emphasis on vegetables, fruit, and grain products, and minimal use of added sugars, *trans* fats, and sodium." While a variety of foods may make-up a total diet, it may also be possible to identify a food or meal that can be part of a diet consistent with these recommendations.

**52. The recommendations in the dietary guidelines of a number of professional health organizations include specific levels for intake of a nutrient based on total daily consumption. For example, the American Heart Association guidelines include the recommendation that Americans consume no more than 2,300 mg of sodium and no more than 300 mg of cholesterol per day. How can nutrient values for recommended minimum or maximum daily intake be related to an individual food or meal?**

**Answer:** When converting a value based on daily intake to a value that is appropriate for an individual food or meal, the recommended daily intake must be divided by an appropriate factor. Consumers generally eat three meals and several snacks a day. Because a single meal constitutes approximately 25% of the daily diet, dividing the daily value for a nutrient by a factor of 4 may be appropriate for determining the contribution of the level of that nutrient in a single meal towards a daily diet. Thus, a

meal containing no more than 575 mg of sodium (2,300 mg/day X ¼ daily food intake = 575 mg) could be incorporated into a diet consistent with the American Heart Association's guidelines for sodium. A recommended value for daily consumption would need to be divided by a larger number, such as 8 for a main dish and 16 or 20 for an individual food item since a greater number of individual foods may be consumed in the course of a day.

**53. Is there a simple way to identify foods that should not be highlighted as part of a diet consistent with dietary guidelines?**

> **Answer:** Yes. If a food contains a nutrient at a level that exceeds the disqualifying levels in the general health claims requirements set out in 21 CFR 101.14(a)(5), it would be difficult for a consumer to incorporate such food into a diet consistent with generally accepted guidelines for a healthy diet. Although a healthy diet is composed of a variety of foods with different nutrient profiles and could include such foods, a claim that such a food would be a useful part of a diet consistent with dietary recommendations would be misleading if the food that bears the claim is not helpful in reaching dietary goals.

**54. Can a restaurant make a claim that a meal "is consistent with dietary guidelines" if the nutrient profile of the meal is consistent with some, but not all, of the guidelines established by a particular organization? For example, can a restaurant say a meal is consistent with dietary guidelines based on the fat content of the meal without regard to the level of other nutrients, such as sodium and cholesterol?**

> **Answer:** Generally, if a meal bears a claim that it is consistent with the dietary guidelines of a health professional organization, its nutrient content must be consistent with all the parameters of the guidelines of the organization. If the level of another nutrient in the meal (e.g., sodium) is not consistent with the dietary guidelines referred to, a claim that the meal is consistent with dietary guidelines would be misleading. (While statements about general dietary recommendations do not by themselves trigger specific nutrition labeling requirements, FDA would expect that a restaurant have available, as part of its reasonable basis for believing a food is consistent with dietary recommendations, information on the level of all nutrients associated with the recommendations of the organization.) Furthermore, statements that single out recommendations for a particular nutrient (e.g., "meets dietary guidelines for fat"), may be a claim about the nutrient content of the food (and therefore subject to the requirements for claims), rather than a statement offering general dietary guidance.

**55. Could FDA elaborate on how restaurants can present information that a food or meal meets general dietary guidelines without making a nutrient content claim or a health claim?**

> **Answer:** Statements that a food or meal meets the dietary guidelines of a health professional organization or other recognized dietary authority will be considered dietary guidance and not a nutrient content claim or health claim, provided the statement is limited to general dietary guidance and does not characterize the level of a nutrient in the food (21 CFR 101.13(q)(5)(iii)). The Centers for Disease Control and Prevention's recommendation, for example, that "Eating a variety of fruits and vegetables a day is an important part of a healthy diet," is general dietary guidance.
>
> Restaurants may use a heart symbol to indicate food items that are consistent with the recommendations of a health professional organization such as the American Heart Association. However, information from such programs presented in labeling in a context that includes an explicit or implicit health claim (e.g., a statement such as "meets (insert association name) guidelines for a 'Heart Healthy' diet" or "meets the National Cancer Institute recommendations for fiber") will subject the food to the health claims requirements.
>
> If a food bears a claim, it must comply with the requirements for the claim. If a restaurant wants to

provide information as dietary guidance and not a health claim, it should not give undue emphasis to terms or symbols that could be an implied claim. Restaurants are encouraged to use alternative terms or symbols (e.g., a star or a check mark instead of a heart), to identify items that may not comply with the health claims requirements. If the name or logo of a third party reference is likely to be an implied claim when seen in conjunction with an individual food or meal, and the food or meal does not comply with the requirements for the claim, care should be taken to separate the reference from individual foods. It may be possible, however, for labeling to bear a statement such as "This restaurant has been a paying member of (insert program name) since 1994" provided such statement refers to the establishment, not a food, and it is less prominent (in size, type style, and placement) compared to other statements that refer to the food.

**56. Would a statement that a meal can be part of a diet that is consistent with the dietary guidelines of a health professional organization be regulated as a health claim if the name of the organization includes a reference to a disease or health-related condition?**

> **Answer:** It depends. Reference to the organization will be regulated as a health claim if, within the context of the total labeling, it implies a relationship between a nutrient or substance and a disease or health-related condition. Conversely, some groups have a history of providing general dietary guidance for good health such that consumers would not automatically assume that the name of the organization or its logo implies association with the disease-related element of a health claim. Thus, reference to these groups and their guidelines would not constitute a health claim provided that the guidelines are general dietary recommendations (compared to dietary recommendations for individuals with a specific disease or health related condition) and reference to the organization contains no other reference to a substance or health-related condition.

**57. Can labeling that identifies items that are consistent with general dietary guidelines also provide consumers with nutrition-related information about the guidelines? Would this information be considered a nutrient content claim?**

> **Answer:** Restaurant labeling may provide information about the guidelines of a professional health organization. Whether the information is regulated as a nutrient content claim or as dietary guidance will depend on the context in which it is presented. If nutrient information is directly linked to a particular food or meal (e.g., "this meal derives no more than 30% of its calories from fat"), the information would be a nutrient content claim (see question 54). However, if the information merely presents the guidelines of a health professional organization without making a statement about the nutrient content of a particular food, the information would not be a nutrient content claim. For example, labeling that highlights items that may be part of a diet that is consistent with all guidelines of a particular group may bear a footnote stating, "Highlighted items are consistent with the general dietary recommendations of (insert name of health professional organization). These guidelines are (describe all nutrient recommendations that comprise the group's guidelines)."

**58. What is a 'third party' reference?**

> **Answer:** It is a reference on product labeling or advertising, made through a name or logo, linking a product to a person or organization that is independent of the product's manufacturer, seller, or distributor (the first party), or the consumer (the second party). The third party may be a State or local health department or consumer service agency, health professional organization, registered dietician, chef, celebrity, or other independent person or organization.

**59. If labeling bears a third party endorsement of a food or meal, and a financial contribution to the third party is a mandatory criterion for the endorsement, does the labeling that bears the endorsement need to disclose that the endorsement was made for compensation?**

Answer: Yes. Failure to reveal that the endorsement required that compensation be made would be misleading. Labeling that bears the endorsement should bear a disclosure statement such as "A fee was paid to (insert name of program)" or "A paying member of (insert name of program)" in close proximity to the claim.

60. **Many restaurants and third party programs use the term "healthy," (e.g., "Healthy Selection" or "Heart Healthy"), to describe foods. How will FDA regulate this term?**

Answer: The term "Healthy" has a wide variety of meanings, depending on the context in which it is used. When the term (or any derivative of the term, e.g., "health," "healthier," or "healthful") appears in association with an explicit or implicit claim or statement about a nutrient (e.g., "Healthy, contains 3 grams of fat"), it is a nutrient content claim, and the food must meet the requirements for the claim (21 CFR 101.65(d)(2)) (Appendix B of the Food Labeling Guide).

"Healthy" in a phrase such as "Healthy Heart" or "Heart Healthy" could be an implied health claim about heart disease (see question 40). Alternatively, the statement "Eating a variety of fruits or vegetables a day is a good way to a healthy lifestyle" is not a health claim because it provides only general dietary guidance (i.e., it does not cite any particular health related condition nor does it refer to a particular food or substance).

## Use of Undefined Terms and Terms or Symbols in a Different Context (21 CFR 101.13(q)(5)(iii)):

61. **A number of restaurants identify items with terms such as "Lite Fare" to indicate that the portion size of the food is smaller than normal. Must these foods meet FDA's definition for "Light" or "Lite?"**

Answer: It depends. Statements such as "Light Fare," "Light Bites," or "Light Entrees" will not be considered nutrient content claims provided that they do not characterize the level of a nutrient and the labeling that bears the claim also explains how the term is being used. For example, the term "Lite Fare" may be marked with an asterisk referring consumers to a statement explaining that the term means smaller portions. The explanatory statement must be located in reasonable proximity to the term (e.g., at the bottom of the same section of labeling that contains the "Lite Fare" term and the foods it describes).

62. **Does this mean that claims on restaurant foods are exempt from the NLEA requirements, or that the restaurant may define a claim differently from FDA's requirements, so long as the labeling provides an explanatory statement for the claim?**

Answer: No. An explanatory statement can not be used to exempt a term or symbol from the claims requirements when the term or symbol is an explicit or implied claim. Further, an explanatory statement is not sufficient to render a term or symbol not misleading when the term or symbol is used in the context of a nutrient content claim or a health claim, and the food does not meet the requirements for the claim. A restaurant cannot, for example, make a "low fat" claim for a food that contains more than 3 grams of fat per RACC (or per 100 grams for meals and main dish items), even if the labeling that bears the claim also contains a statement explaining the restaurant's definition for the claim.

63. **Many restaurants readily substitute meal components at the request of consumers, e.g., fried fish for baked fish, or French fries in place of a salad. How would FDA regulate a meal that complies with the requirements for a claim before substitution but that does not qualify afterwards?**

Answer: It depends. If a restaurant makes a claim about its selections (e.g., "build your own low fat meal, selections contain less than 3 grams of fat"), and allows consumers to select meal components from different categories, all combined components must meet the requirements for the claim. If

different combinations of foods do not meet the definition for a claim, the restaurant should not make a claim for those combinations. However, it may still make claims for the individual food items that meet the requirements for a claim. In addition, if a consumer chooses to mix foods from categories for which the restaurant makes a claim with foods from groups for which the restaurant does not make a claim, the meal with substituted components would not need to meet the requirements for a claim so long as labeling did not make an express or implied claim for that combination. For example, if a restaurant claims a salad plate, (e.g., tuna salad, fruit, and cottage cheese), is a "low fat" meal, all items on the plate must, in combination, meet the definition of "low fat." However if a consumer orders the salad plate but decides to delete the cottage cheese and order French fries instead, the meal is a new and different combination of foods from that for which the restaurant made a claim.

**64. Where can I find more information on FDA's requirements for claims?**

> **Answer:** Copies of FDA's regulations are found in Title 21, Code of Federal Regulations, parts 100-169. This book may be purchased from the U.S. Govt. Print. Off., Supt. of Docs., Mail Stop: SSOP, Washington, DC 20402-9328 (Order # 869-038-00000-8 GPO for paper). The claims regulations are in part 101. Copies of the CFR may also be purchased from other U.S. Government printing offices throughout the United States and are available online at http://www.access.gpo.gov.

## Determining the Nutrient Content of a Restaurant Food:

**65. When making a claim, do I have to have my food analyzed by a lab to determine its nutrient content?**

> **Answer:** No. A restaurant food, including restaurant-type foods described in 21 CFR 101.9(j)(3), may bear a nutrient content claim or health claim provided the restaurateur has a "reasonable basis" for believing that the food meets the definition for the claim. If a restaurateur labels a food "low fat," for example, he or she must have a reasonable basis for believing that the food complies with FDA's definition for "low fat" (i.e., that it contains no more than 3 g of fat per RACC or, in the case of meals and main dishes, no more than 3 g of fat per 100 g) (see question 25).

**66. What nutrient information sources can be used as a reasonable basis for determining the nutrient content of a restaurant food? Can nutrient information sources be combined?**

> **Answer:** Nutrient levels may be determined based on reliable nutrient data bases, cookbooks, or analyses, or by other reasonable bases that provide assurance that the food or meal meets the requirements for the claim (21 CFR 101.13(q)(5)(ii)). Additional sources of nutrition information include: USDA's Handbook No. 8 and current FDA's guideline on nutrient levels in seafood and information on the nutrient content of raw fruits and vegetables, (published in conjunction with FDA's regulation on the voluntary labeling of raw fruits and vegetables). Nutrition information for foods manufactured for institutional or restaurant use may also be available from the manufacturer or may, in some cases, be provided on the food's labeling. Such information on nutrient content of ingredients can be used along with the restaurant's recipe to calculate the nutrient content of the prepared food. Sources of nutrient information may be combined (e.g., merging data base values with information from ingredient suppliers) so long as the combined sources of information are still valid.

**67. Restaurants often need to modify recipes when a recipe is scaled-up from a home kitchen recipe to provide a larger number of servings for institutional use. Can a restaurateur still use the nutrient information in a consumer cookbook as a basis for a claim on the finished food if the proportion of some ingredients is altered during scale-up?**

> **Answer:** It depends. The claims criteria generally require that a nutrient be present at "no more than" or "no less than" a given level. Thus, a restaurateur may be able to determine that a food prepared using a

modified recipe still meets the criteria for a claim without knowing the precise amount of the nutrient that is present in the finished food. For example, a restaurateur may reduce the proportion of salt and spices in a recipe for a "low sodium" soup during scale-up while the proportion of other major ingredients remains the same. The restaurateur may no longer know the exact sodium content of the food (i.e., the sum of sodium from added salt and that contributed by the other ingredients). However, assuming the nutrient values provided with the original recipe meet FDA's definition of "low sodium," the fact that changes during scale-up reduced, rather than increased, the primary sodium containing ingredient, would support a reasonable basis determination that the finished food is "low sodium."

However, if a recipe is altered in such a way that the restaurateur is not able to determine the effects of the change on the nutrient content of the finished food, the nutrient information based on the original recipe would no longer serve as a "reasonable basis" for believing the finished food meets the definition for a claim.

**68. Will FDA require prior approval for a restaurant food to bear a claim?**

> **Answer:** No. FDA does not have the authority to require prior approval of restaurant labeling that bears a nutrient content claim, health claim, or other nutrition information.

**69. Will restaurants be required to have claim bearing foods "certified" by a third party or an independent dietary professional?**

> **Answer:** No. FDA has provided broad flexibility in establishing the "reasonable basis" criterion for restaurant foods. Thus, while some restaurateurs may choose to work with a third party to modify recipes or revise labeling, there is no requirement to do so. Restaurants should be able to make their own determinations once they are familiar with the requirements.

**70. Is FDA approving or recommending data bases for use as a restaurant's "reasonable basis" for a claim?**

> **Answer:** FDA has not approved, nor is it recommending, any specific data base for use in restaurants. Each restaurant must assess its own information needs and capabilities to ensure that the data base or other "reasonable basis" for the claims it makes is sufficient to support a claim. Assistance may be available through the following sources: trade and professional associations, trade publications, private consultants, and colleges and universities.

## Adherence to the "Reasonable Basis":

**71. Many food service items are partially or wholly processed when they are purchased for use in a restaurant or similar establishment. Thus, it may be difficult for the restaurant to keep track of the sodium content of foods. It may also be difficult for a restaurant to monitor the use of sodium in the cooking process and to develop recipes for "low sodium" foods that taste good. How will these problems be addressed in implementing the new requirements?**

> **Answer:** FDA does not intend to impose an unrealistic regime (e.g., to require exacting measurements or strict portion controls) in restaurants. However, the agency is requiring that a restaurant have a reasonable basis for believing that a food meets the nutrient requirements for a claim, and that it be able to provide reasonable assurance that the preparation of the food adheres to the basis for the claim. If a restaurateur has no knowledge of, or control over, the sodium content of a food, or some other aspect of its nutrient content, he/she should not attempt to make a sodium content or other claim about the nutrient levels in that food.

**72. Many restaurants do not have, or do not use, scales. Consequently, wouldn't a criterion such as "no**

more than 30 percent of calories from fat" be more appropriate for a low fat claim on a restaurant food compared to weight based criteria?

Answer: No. First, the "no more than 30 percent of calories from fat" criterion does not, by itself, ensure that a food is low in fat. Second, in order to have a reasonable basis for believing that a food derives no more than 30 percent of its calories from fat, a restaurateur needs to have sufficient information on the types and quantities of ingredients used in the food to determine both its fat and calorie content. The same information used to calculate percent calories from fat (a criterion for a low fat claim on meals and main dishes) can be used to calculate the amount of fat per RACC or, in the case of meals and main dishes, per 100 g of food.

73. **To support its basis for a claim, does a restaurant need to weigh every serving of a food and calculate the amount of a nutrient in each serving every time it prepares the food?**

Answer: No. A reasonable basis determination only needs to be done once provided portion size is reasonably constant, the restaurant follows a standardized recipe, and the method of preparation adheres to the basis for the claim.

74. **What types of actions would invalidate a restaurant's "reasonable basis," and what should a restaurateur do to help ensure this does not happen?**

Answer: Restaurateurs will need to employ preparation methods that are sufficiently consistent, including weight and volume measurements, to provide reasonable assurance that the preparation method adheres to the basis for the claim. They must also consider the effects of any addition or substitution of ingredients, or of any change in preparation method, on the level of a nutrient that is the subject of a claim. For example, the nutrient content values that FDA published in conjunction with the voluntary nutrition labeling program for baked fish would no longer apply to fish that is breaded or fried.

It may be necessary for some restaurateurs to develop written standard operating procedures or other kitchen instructions for use by staff to guard against uncontrolled addition or substitution of ingredients. For example, if a "low fat" claim depends on the use of skim milk rather than whole milk, staff should be aware that the food bearing a "low fat" claim may not be made with whole milk. Further, if a food bears a "low sodium" claim based on its containing a limited amount of salt, allowing staff to "salt-to-taste" instead of using measured amounts would contravene the reasonable basis for believing that the food meets the requirements for the claim.

75. **How will compliance with the claims requirements be evaluated in a restaurant situation?**

Answer: For compliance purposes, FDA will look at the recipe, nutrient information source, and any calculations used by a restaurant as its "reasonable basis" for believing that a food meets the requirements for a claim or other nutrition information. FDA will evaluate whether this information, and the nutrition information provided to consumers, are consistent with FDA's definition for the claim that is used. FDA may also request that a restaurant provide reasonable assurance that the method of preparation used adheres to the restaurant's basis for the claim.

76. **Data base analysis reveals that a restaurant food contains 3.3 grams of fat per RACC. Can the food bear a "low fat" claim?**

Answer: No. The definition for a "low fat" claim is that the food contains no more than 3 grams of fat per RACC (3.3 g of fat per RACC would be declared as 3.5 g). If the restaurant's reasonable basis determination shows that a food contains more than 3 grams of fat per RACC, the restaurateur would

not have a reasonable basis for believing the food meets the definition of the claim. For more information on rounding guidelines, see Appendix H of the Food Labeling Guide.

**77. What are the record keeping requirements for a restaurant that make claims?**

> **Answer:** The restaurant must keep sufficient records to provide appropriate regulatory officials, upon request, with information on its "reasonable basis" and with reasonable assurance that the preparation method adheres to that basis. The type and amount of information necessary to support a claim will vary with the type of establishment, the types of food sold, preparation methods, and the types of claims being made. However, the following check list may be helpful:
>
> 1. Standardized recipe, including ingredients used and their quantities,
> 2. Nutrient content data for each ingredient (may include information from the ingredient manufacturer, a reliable data base, or other nutrient information source, or a combination of these; information must include data for the nutrients that are the basis for the claim and may include data for other nutrients,
> 3. The source of the above data (e.g., the name of the data base, cookbook, etc.),
> 4. Any assumptions made by the restaurateur or any calculations that were performed that may affect the reliability of the data (e.g., combining data sources, assumed nutrient values, replacing generic or average data base values with values for brands specifically used in the restaurant, etc.),
> 5. Serving size (total weight) of the finished food or meal,
> 6. Total amount of nutrient present per RACC, actual serving, or per 100 g of food, as appropriate for the definition of the claim,
> 7. Evidence of staff awareness that reasonably consistent ingredient measurement and portion control are necessary for foods bearing a claim (e.g., training materials, observation of food preparation methods),
> 8. Presence and use of a standard operating procedure identifying essential parameters in the preparation of a food bearing a claim (e.g., the use of skim milk instead of whole milk, broiling instead of frying, or the need to measure salt instead of salting to taste), when the method of preparation could affect the basis for a claim.

**78. If a restaurant makes a fat claim for a food based on the use of skim milk, for example, does it have to save records to prove that it purchased, and used, an appropriate quantity of skim milk?**

> **Answer:** Not necessarily. The requirements in 21 CFR 101.13(q)(5)(ii) require that a restaurant provide reasonable assurances that it adhered to its basis for making a claim. Examples of the types of information that may be useful for a restaurant to provide in support of its basis for a claim are discussed in response to the preceding question. It is unlikely that a regulatory official would require information like the records of ingredient purchases unless he/she had reasonable cause to doubt a restaurant's stated basis.

## Reference Amounts Customarily Consumed:

**79. What is a "Reference Amount Customarily Consumed (RACC)?" Do restaurants need to alter their serving size to be equal to the RACC?**

> **Answer:** The RACC is the amount of a food item customarily consumed per eating occasion as determined by FDA for the purpose of establishing realistic and consistent serving sizes for use in food labeling. RACCs for almost 150 different food categories are set out in 21 CFR 101.12. (RACCs for meat and poultry products are listed in 9 CFR 317.312.)

Restaurants do not need to alter the size of the portions they serve to be the same as the RACC, nor does the serving size used in the labeling for a particular food need to be the same as the RACC. However, in order to make certain nutrient content claims or health claims, an individual food must meet the definition for the claim based on the amount of the subject nutrient in an amount of the food equal to its RACC (e.g., a "low fat" food may contain up to 3 grams of fat per RACC). When a food's RACC is small (i.e., 30 grams or less or 2 tablespoons or less), the food (e.g., a sauce or condiment) must also meet the requirements for the claim based on its nutrient content per 50 grams.

**80. How does a restaurant determine whether a food meets the criteria for a claim when the serving size is different from the RACC? Please address soup in your answer.**

Answer: The RACC for all types of soup is 245 grams. This value is based on the amount of soup that survey data showed is customarily consumed in a single sitting, i.e., 1 cup, and information from the USDA that the average gram-weight per cup measure for soups is 245 grams.

For some claims (e.g., "free"), the criteria for the claim include the amount of a nutrient per RACC and per labeled (or actual) serving size. In order to bear a "fat free" claim, a restaurateur must have a reasonable basis for believing the soup contains less than 0.5 grams of fat per serving. Nutrition labeling would declare fat content as "0." In order to bear a "low fat" claim, soup may contain up to 3 grams of fat per cup (245 grams) according to the restaurateur's reasonable basis determination. If the same soup is served to consumers in a bowl that holds 50 percent more soup (1.5 cup (367 grams)), the larger serving may contain up to 4.5 grams of fat (i.e., a serving size that is 1.5 times the RACC may contain 1.5 times as much of the subject nutrient).

**81. Are the criteria for the claim still based on RACCs when making a relative claim such as "reduced fat?"**

Answer: Yes. A "reduced fat food," for example, must contain at least 25% less fat per RACC compared to the reference food. However, for all practical purposes, when the RACCs are the same for both foods (e.g., "regular potato salad" and "reduced fat potato salad"), the comparative information (% fat reduction) may be calculated based on equivalent amounts of each food, independent of the RACC.

**82. What basis do I use when making a claim about the nutrient content of a meal?**

Answer: Criteria for the use of claims on meals and main dishes (as defined in 21 CFR 101.13(l) and (m)) are somewhat different from those for individual foods. The criteria for claims for meals and main dishes are based on the level of the nutrient in 100 grams of the food. For example, while a "low fat" individual food contains 3 grams or less of fat per RACC, a "low fat" meal (or main dish) contains 3 grams or less of fat per 100 grams of food. Thus, a "low fat" meal weighing 300 grams (approximately 10 ounces) may contain as much as 9 grams of fat per serving.

# Reference Foods

**83. Question: What types of claims require identification of a reference food?**

Answer: There are two types of nutrient content claims (i.e., relative and absolute claims). A relative claim is a claim about the level of a nutrient in one food compared to another food (i.e., the reference food). When making a relative claim (e.g., "more," "less," "reduced," or "added"), the restaurateur will need to know the level of one or more nutrients in both the food making the claim and in the reference food. Conversely, an absolute claim (e.g., "high," "low," or "free") is based on the level of a nutrient in the food making the claim, and comparison to a reference food is not necessary.

**84. Must a restaurant develop recipes for, analyze, and market, a reference food for every food that bears a**

relative claim?

> **Answer:** No. The reference food may be the restaurant's regular product, or that of another restaurant, that has been offered for sale to the public on a regular basis for a substantial period of time. However, nutrient values for a reference food may also be derived from such sources as a valid data base, an average of top national or regional brands, or a market basket norm (21 CFR 101.13(j)(1)(ii)).

85. **Can a restaurant make nutrient comparisons between dissimilar foods in the same category (e.g., comparing two appetizers or two different entrees)?**

> **Answer:** It depends on the claim. Claims such as "reduced" may only be used to compare individual food items that are similar (e.g., potato chips to potato chips). However, claims such as "more" or "less" may be used to compare similar foods or they may be used to compare meals, main dish items, and dissimilar foods within a product category (e.g., potato chips to pretzels) provided that the food for which the claim is made meets the nutrient requirements for the claim (e.g., "less fat," contains at least 25% less fat compared to the reference food) and the food or meal bearing the claim could reasonably be expected to be substituted for the food to which the comparison is made (e.g., one appetizer for another, one entree for another) (21 CFR 101.13(j)(1)(i)(A)).

86. **I understand that restaurant labeling that bears a claim must comply with the definition for the claim set out in the claims requirements. Does restaurant labeling also need to comply with the requirements for label statements and accompanying information set out in the claims regulations? For example, if a beverage contains 30 mg of sodium per RACC (8 fl oz (240 milliliters)) it meets the nutrient content criterion for a "very low sodium" claim (i.e., 35 mg or less sodium per RACC). A 12 fl oz serving of the same beverage would contain 45 mg sodium per serving. While the beverage still meets the criterion for a "very low sodium" claim based on the nutrient amount per RACC, it would not meet the criterion based on its serving size. Sections 101.12(g) and 101.13(p)(1) of the claims regulations require that, when labeled serving size is different from the RACC and the food does not meet the nutrient content criterion in the definition for the claim based on labeled serving size, the claim must be followed by a statement providing the criterion for the claim (e.g., "Very low sodium, 35 mg or less sodium per 8 fl oz (240 milliliters)").**

> **Answer:** Generally, restaurant labeling must comply with all requirements for a claim unless specifically exempted from the requirement (21 CFR 101.13(q)(5)). Relative claims, for example, must be accompanied by a statement identifying the reference food and the percent (or fraction) of the amount of the nutrient in the reference food by which the labeled food differs (e.g., "Reduced fat cheese cake, contains 25% less fat than regular cheesecake").

> However, consistent with the agency's flexible approach to restaurant labeling, FDA would use its regulatory discretion in evaluating labeling that bears a claim but for which compliance with a particular requirement may be difficult or inappropriate (e.g., because of the way in which a food is served (e.g., unpackaged, no labeled serving size or ingredient declaration) or the way the claim is presented (e.g., a single claim in a heading in labeling for a group of foods, or nutrition labeling that is independent of the labeling that bears the claim). While FDA has stated that some information (e.g., the identity of a reference food) is material to consumers' understanding of a claim, the agency would not object, in a restaurant situation, to the required accompanying information being presented in other labeling (e.g., in a brochure or notebook along with nutrient information), when it is impractical for such information to accompany the claim (e.g., multiple claims on a menu with limited space).

# V. EXEMPTIONS AND SPECIAL LABELING PROVISIONS (21 CFR 101.9(j))

## Foods Which are Served or Sold in Establishments in Which Foods are Served for Immediate Consumption (21 CFR 101.9(j)(2)):

**87. If a restaurant makes a claim for one item, does it need to provide nutrition information for all the foods it serves?**

> **Answer:** No. The exemptions in 21 CFR 101.9(j)(2)(i) through (iii) apply to individual food items that are served or sold in a restaurant or similar establishment, not to the establishment. A restaurant need only provide nutrition information for those items that bear a claim. The restaurant may voluntarily provide nutrition information for restaurant foods that do not bear a claim.

**88. Are foods sold to and used by restaurants in food preparation, but not served to consumers in the package in which they are received, exempt from nutrition labeling, even if claims are made?**

> **Answer:** Yes. The exemptions in 21 CFR 101.9(j)(2)(iv) for foods sold for use only in restaurants but not served directly to consumers in the package received (e.g., large quantity containers) and in 21 CFR 101.9(j)(2)(v) for foods sold by a distributor who principally sells food to such facilities are not conditional on the absence of claims as are the other exemptions under 21 CFR 101.9(j)(2) because the consumer will not see these package labels. However, manufacturers, packers, or distributors may wish to place nutrition information on the label of the package or case, or in a flyer in each case of product, for the benefit of the food service operator who may need such information to support any claims made to consumers in the restaurant. Likewise, the restaurateur may require nutrient content information as a condition of purchase.

**89. How does FDA define "restaurants?"**

> **Answer:** The term "restaurant" applies broadly to establishments where food is served or sold for immediate, on-site consumption (e.g., institutional food service establishments, such as schools, hospitals, and cafeterias; transportation carriers, such as trains and airplanes; delicatessens, and catering where there are facilities for immediate consumption on the premises).
>
> The definition of "restaurant" extends to establishments where foods are generally consumed immediately where purchased or while walking away (e.g., lunch wagons, cookie counters in a mall, and vending machines, including similar foods sold from convenience stores); and food delivery systems or establishments where ready-to-eat foods are delivered to homes or offices for immediate consumption.

**90. Are all foods that are sold in restaurants or from other facilities such as vending machines and that do not bear a claim exempt from nutrition labeling?**

> **Answer:** No. The exemptions in 21 CFR 101.9(j)(2)(i) through (iii) are limited to (1) ready-to-eat foods served in restaurants and in other establishments in which food is sold for immediate human consumption and (2) foods sold for sale or use *only* in such establishments. Commercially packaged foods such as soft drinks in cans, bags of potato chips, and candy bars that may be sold in restaurants and vending machines but that are also sold through other retail outlets (e.g., grocery stores) must bear nutrition labeling, regardless of whether or not they bear a claim (subject, of course, to the low volume product and small business exemptions).

**91. Are foods that are served aboard airlines required to have nutrition labeling?**

> **Answer:** Food served aboard airplanes and other common carriers is exempt from nutrition labeling

under 21 CFR 101.9(j)(2)(ii) provided it does not bear a claim.

92. **A restaurant serves a salsa that was commercially manufactured under the restaurant's brand name. The restaurant also offers a bottled salsa for sale to patrons for later use. The food does not bear a claim. To be eligible for an exemption under 21 CFR 101.9(j)(2), does it matter whether the food is served for immediate consumption or whether it is sold in packaged form?**

> **Answer:** No. The exemptions in 21 CFR 101.9(j)(2)(i) through (iii) cover foods that are served or sold in restaurants and similar establishments, regardless of whether they are sold in packaged form provided their sale is limited to restaurant establishments. However, FDA strongly encourages that products such as the bottled salsa bear nutrition labeling when they are sufficiently standardized to do so.

93. **A bottled salsa sold in a restaurant is also sold through conventional retail outlets. The food does not bear a claim. Must the food bear nutrition labeling?**

> **Answer:** Yes. The exemption in 21 CFR 101.9(j)(2)(iii) for foods sold in restaurants specifies that the food be sold only in restaurants. Because the sale of the salsa is not limited to restaurants, both products (i.e., restaurant and retail) must bear nutrition labeling under 21 CFR 101.9. The exceptions to this requirement would be (1) foods that are packaged differently for use in restaurants compared to the food sold at other retail locations (e.g., catsup, soy sauce, and other condiments packed in decorative containers for table service), and (2) products covered by the small business or low volume products exemptions.

94. **Would foods sold in a gift shop attached to a restaurant or food items sold from a counter across the aisle from the cash register in a truck stop be considered "restaurant foods?"**

> **Answer:** If the retail area is located in close proximity to the restaurant (e.g., across the aisle from the area where food is served), and if it is not operated independently from the restaurant, it could be considered part of the restaurant establishment and the foods sold therein may qualify for the "restaurant food" exemption. However, any food item whose sale is not limited to restaurants would not be a restaurant food and, therefore, would not be eligible for the exemption in 21 CFR 101.9(j)(2)(iii).

95. **Could you elaborate on the types of foods sold in vending machines that are exempt from nutrition labeling?**

> **Answer:** Foods that are prepared or dispensed by a vending machine (e.g., soda, coffee, soup, or popcorn that is dispensed into a cup) would be analogous to foods served in a restaurant and, therefore, would be exempt from nutrition labeling requirements provided the food does not bear a claim (21 CFR 101.9(j)(2)(ii)).
>
> Vending machine foods sold in packaged form (e.g., a salad or sandwich prepared in a commissary) that are similar to foods sold in restaurants are exempt from nutrition labeling requirements under 21 CFR 101.9(j)(2)(iii) provided the food does not bear a claim and it is not sold through other retail channels (e.g., grocery stores).
>
> The exemption for food sold in restaurants and similar establishments, including vending machines, extends to commercially manufactured foods that have been specially packaged for sale only in such establishments. However, FDA strongly encourages that foods that are sufficiently standardized to bear nutrition labeling (e.g., individual serving size cans of soup) do so.

96. **Could you elaborate on the types of foods that are sold from convenience stores but that would be**

exempt from nutrition labeling because they are similar to restaurant foods?

Answer: FDA has stated that the exemption from nutrition labeling for such foods should be limited in scope and that some enforcement decisions will need to be made on a case-by-case basis. Generally, however, the foods covered by this exemption must be of the type served in restaurants or similar establishments (i.e., ready-to-eat, sold for immediate human consumption). Such foods would be expected to be non-standardized (e.g., prepared in a commissary kitchen similar to a restaurant or cafeteria kitchen where foods are assembled by hand and subject to individual product variations) and to have a short shelf-life.

Examples of such foods would include: sandwiches; single-serving packages of salads, pies, and puddings; and soups and beverages dispensed into cups, that are in direct competition with foods served in restaurants and that are generally consistent with the above criteria.

In contrast, this exemption would not extend to foods that are not ready-to-eat or are not for immediate consumption. As discussed in response to question 107, there is a separate exemption from nutrition labeling for ready-to-eat foods not for immediate consumption (e.g., ready-to-eat foods that are processed or prepared at the location from which they are sold but that are sold for later use (21 CFR 101.9(j)(3)). Where the food sold in a convenience store is sufficiently standardized to bear nutrition labeling, it should do so, unless otherwise exempt.

97. If an exempt sandwich sold in a vending machine or convenience store includes a single serving unit of a condiment, such as mayonnaise, must nutrition labeling be provided on the mayonnaise packet?

Answer: Foods that are eligible for the exemption from nutrition labeling under 21 CFR 101.9(j)(2), including sandwiches sold from lunch wagons, vending machines, and convenience stores, are exempt in their entirety. Therefore, a mayonnaise packet packaged with a sandwich is also exempt as long as its label does not bear a claim or other nutrition information.

98. Would a single serve package of a condiment be exempt from nutrition labeling if it is served on its own (e.g., placed in a bowl on a table)?

Answer: Yes. Food that is served in a restaurant or similar establishment is exempt from nutrition labeling provided that the food does not bear a claim (21 CFR 101.9(j)(2)(i) and (ii)). Condiments in single serve packages placed in a bowl on a table in a full service restaurant or in a container on a lunch counter or vending facility for consumers to use at their discretion, would be eligible for these exemptions. Likewise, condiments served in larger, multi-serving containers would also be eligible for the exemption under 21 CFR 101.9(j)(2)(i) or (ii) provided the food does not bear a claim.

99. A single-serve package of a condiment is served or sold in restaurants. It is commercially manufactured, packaged, and labeled. The package label bears a claim. How should nutrition labeling be accomplished for the food?

Answer: In the August 18, 1993, technical amendments (58 FR 44020[c2]), FDA amended 21 CFR 101.9(j)(13)(i)(B) to permit individual serving-size packages of food for use in restaurants and similar situations to use the minimum type size allowed under current 21 CFR 101.2(c)(2) of one thirty-second inch for nutrition labeling provided that the packages have a total area available to bear labeling of 3 square inches or less. If, despite this provision, a small package still cannot comply with nutrition labeling requirements, the person responsible for labeling is advised to write the Office of Nutrition, Labeling, and Dietary Supplements, CFSAN, FDA (HFS-800), 5100 Paint Branch Pkwy., College Park, MD 20740 requesting alternative means of compliance in accordance with 21 CFR 101.9(g)(9). (See question 2 and question 3.)

100. **A restaurant serves a food that is commercially manufactured, packaged, and labeled. The food is served to consumers in the form it was purchased by the restaurant (e.g., individual serving size packages of condiments are placed in a bowl for consumer use). Would FDA hold the restaurant that serves the food responsible if the label of the food does not meet FDA's requirements, for example, if a package of salad dressing bears a "low fat" claim but fails to bear nutrition information?**

> **Answer:** FDA requires that the label of a food sold in packaged form identify conspicuously the name and place of business of the manufacturer, packer, or distributor (21 CFR 101.5). The firm that is so identified is generally the firm that is responsible for insuring that the food is properly labeled.

101. **Must a restaurant food be ready-to-eat to be exempt under 21 CFR 101.9(j)(2)?**

> **Answer:** Not necessarily. The exemptions for foods served in restaurants and in similar establishments (21 CFR 101.9(j)(2)(i) and (ii)) imply that the food is ready-to-eat and is served for immediate consumption. However, a restaurant may also sell foods for carry-out that are not ready-to-eat (e.g., a pizza that is only half cooked or a pie that is frozen). Further, foods sold for use in restaurants may be used as ingredients in the foods a restaurant prepares but are not, themselves, ready-to-eat. Thus, the exemptions for foods sold for sale or use only in restaurants (21 CFR 101.9(j)(2)(iii) and (iv)) and for foods sold by a distributor who principally sells food to such facilities (21 CFR 101.9(j)(2)(v)) are not limited to ready-to-eat foods.

102. **Company X operates a large chain of restaurants with different facilities and services at each establishment based on the size of the establishment. Larger establishments have facilities for consuming food on the premises, sell food for "carry-out," and offer home delivery services. Some of the company's smaller retail establishments have no on-site eating facilities and all food sold is for "carry-out" or home delivery. Are the foods sold from these establishments exempt from nutrition labeling under 21 CFR 101.9(j)(2)?**

> **Answer:** In the above example, all foods served in the larger restaurant establishment would be exempt from nutrition labeling provided the food does not bear a claim. Foods sold for carry-out or home delivery from larger establishments (i.e., establishments with facilities for immediate consumption of the food) would also be exempt provided the food does not bear a claim and sale of the food is limited to restaurant-type establishments.
>
> Foods sold by an establishment with no tables and chairs would still be eligible for the exemption provided that the food is ready-to-eat and is generally consumed immediately where purchased or while walking away (e.g., pizza sold from a walk-up counter in a mall). This exemption extends to foods sold by establishments that have facilities for delivering ready-to-eat foods to homes and offices for immediate consumption. Ready-to-eat "carry-out" foods would be similar to home-delivery foods, with the consumer doing the delivering, provided the foods are sold for immediate consumption.

103. **In the preceding example, most of the smaller establishments owned by Company X (i.e., establishments that offer only carry-out and home delivery service) cook, assemble, and otherwise prepare the food on-site. However, a few of the very small locations sell ready-to-eat food for immediate consumption that is prepared at a central commissary and shipped to the retail location. Are these foods still exempt from nutrition labeling under the restaurant food exemption if they do not bear a claim?**

> **Answer:** Yes, provided the foods meet the general criteria for restaurant foods (i.e., they are ready-to-eat and sold for immediate consumption). Although foods served or sold in restaurants are frequently prepared on-site, this is not a requirement for this exemption. (There is a separate exemption in 21 CFR 101.9(j)(3) for restaurant-type foods that are ready-to-eat, not for immediate consumption, and prepared

at the retail location from which they are sold (see question 107).

**104. Would a ready-to-eat food that is normally sold for immediate consumption by a small carry-out restaurant lose its exemption from nutrition labeling if consumers occasionally purchase the food for later use? For example, if a consumer purchases an extra pizza at lunch-time and takes it home for dinner that night or the next day.**

**Answer:** If a food is consistent with the general requirements for the exemption for restaurant foods, it would not automatically lose its exemption because of a limited number of sales that are different from normal practice. When determining whether a food qualifies for an exemption from nutrition labeling, and which exemption applies, FDA would consider how the food would most often be reasonably expected to be sold (e.g., for immediate consumption).

**105. Do restaurant foods that make claims need to comply with the same requirements as foods from other sources?**

**Answer:** Restaurant foods that bear a claim must comply with the same definitions for nutrient content claims or qualify to bear health claims under the same authorizing regulations as foods from other sources. At the same time, FDA is providing a measure of flexibility in how restaurateurs determine the nutrient content of their food (e.g., "reasonable basis" for believing a food meets the definition of a claim), and how they communicate this information to consumers (e.g., in a brochure or notebook) (21 CFR 101.10). These provisions are discussed in section IV of this document.

**106. Can a State require restaurant foods to bear nutrition labeling even if the food is exempt under Federal requirements?**

**Answer:** Yes. Even though claims on menus are not currently subject to NLEA, States would be free to apply nutrition labeling and claims requirements to claims on menus. Furthermore, because the FD&C Act exempts restaurant foods that do not bear a claim from mandatory nutrition labeling, State requirements for the nutrition labeling of such foods would not be preempted. The FD&C Act also exempts restaurant foods that bear a claim from certain disclosure statements. Thus, State requirements of this type would not be preempted (FD&C Act section 403A(a)).

The NLEA provided for Federal preemption of State and local requirements that are not identical to the Federal requirement in a number of key areas of food labeling (section 403A (a) of the FD&C Act). However, sections 403A(a)(4) and (5) of the FD&C Act provide that State requirements of the type required by 403(q) (nutrition labeling) and 403(r)(1) (claims) would not be preempted for foods that are exempt from the Federal requirements.

## Ready-to-Eat Foods Not for Immediate Consumption (21 CFR 101.9(j)(3)):

**107. I own a "gourmet-take-away" store. Many of the items sold in the store are ready-to-eat, similar to foods served in restaurants. However, the foods are not usually purchased for immediate consumption. Must these foods bear nutrition labeling?**

**Answer:** It depends. 21 CFR 101.9(j)(3) exempts the types of ready-to-eat foods that would have been exempted by 21 CFR 101.9(j)(2)(i) or (ii) (i.e., ready-to-eat foods that are served in restaurants and similar establishments and that do not bear a claim) had it not been for the requirement that the food be sold in an establishment that has facilities for immediate consumption.

To be eligible for the exemption in 21 CFR 101.9(j)(3), restaurant-type foods that are sold by retail establishments that do not have facilities for immediate consumption must be: (1) similar to foods

served in restaurants, (2) ready-to-eat, (3) primarily processed or prepared at the retail establishment from which they are sold, and (4) not offered for sale outside such establishment.

Accordingly, ready-to-eat food that is prepared on-site, and that is sold only from such retail location, is exempt from nutrition labeling under 21 CFR 101.9(j)(3) provided that it does not bear a claim, regardless of whether or not there are facilities for on-site consumption. Foods that are prepared elsewhere but are portioned and packaged to consumer specifications at retail would fulfill the prepared on-site criterion.

**108. To be exempt from nutrition labeling under 21 CFR 101.9(j)(3), foods must be ready-to-eat. Are cold entrees, such as lasagna or pizza, considered ready-to-eat even though they are generally eaten hot?**

> **Answer:** As long as the food is fully cooked, it is considered ready-to-eat. For example, a pizza with a raw crust that requires cooking before consumption would not be "ready-to-eat." However, a pizza that is cooked and then cooled would be. While most customers would be expected to reheat the food before consumption, it would not be necessary that they do so.

**109. Could you elaborate on which foods sold from delis and bakeries that do not have facilities for immediate consumption of food (including independent deli's and bakeries and the deli or bakery cases of retail stores) are exempt from nutrition labeling under 21 CFR 101.9(j)(3)?**

> **Answer:** Foods sold from behind deli and bakery service cases, where the customer must make a selection and indicate the amount of the item desired, are exempt unless the food bears a claim or other nutrition information. When claims or other nutrition information are given, nutrition labeling needs to be displayed clearly at the point-of-purchase. When the deli or bakery foods that are regulated by FDA are packaged for self-service, they are only exempt from nutrition labeling if the product was primarily processed or prepared on-site, and no claims are made for the product.
>
> If the food is primarily processed or prepared on the premises from which it is sold, it is exempt from nutrition labeling, regardless of how it is sold (i.e., from behind the counter or pre-portioned packages from a self-service shelf).

**110. Would bread baked at the retail location qualify as "primarily processed or prepared on-site," if the bakery is using dough that was pre-formed at a different location? What if the bakery adds icing to a cake that was baked elsewhere?**

> **Answer:** To meet the criterion for being "primarily processed or prepared on-site," the food must be augmented on site in a manner that changes the nutritional profile of the food, i.e., filling, icing, enrobing. Foods that are assembled on-site meet this criterion even though some components of the food (e.g., the bread or cheese used in a sandwich) were prepared elsewhere. Similarly, cakes that are custom decorated at the retail location are exempt, even if the cake was baked elsewhere. Garnishing (e.g., adding sesame seeds to bread dough) would fall under the definition of "primarily processed or prepared on-site" if the added food changes the nutritional profile of the finished product. In contrast, if a food is merely portioned on-site or if pre-formed dough or pre-scaled/-molded dough is simply thawed or merely proofed and baked at the retail location, the product is not "primarily processed or prepared on-site," and nutrition labeling is required.

**111. Is nutrition labeling required for orange juice that is freshly squeezed in the produce section of the retail store?**

> **Answer:** No, this product is produced on the premises from raw oranges available in the retail section of the store. It may be collected in containers brought in by consumers or containers available from the

retail store. The product need not have nutrition labeling.

**112. Must cheeses that are cut into slices or wedges and packaged in retail establishments bear nutrition labeling?**

> **Answer:** Cheese is generally not processed or prepared on the premises. Therefore, unless it is sold from behind the deli counter (i.e., portioned to consumer specifications), it would not qualify for an exemption under 21 CFR 101.9(j)(3). When pre-portioned, wrapped, and put on a self-service counter, it is a packaged food and must meet all labeling requirements.

**113. Must slices of cheesecake that are cut and packaged in retail establishments bear nutrition labeling?**

> **Answer:** If the cheesecake is primarily processed or prepared on the premises, or if it is sold from behind the deli counter, it is exempt under 21 CFR 101.9(j)(3). If it does not meet either of these criteria, it must bear full labeling. As with cheese, when pre-portioned, wrapped, and put out on a self-service counter, it is a packaged food and must meet all labeling requirements.

**114. A deli purchases 6 and 8 lb loaves of bread that it cuts and sells by unsliced, random weight portions. Is nutrition labeling required for the bread, and if so, how can the deli declare "Serving size" and "Servings per container" for the unsliced, random weight portions?**

> **Answer:** Nutrition labeling would be required on the cut pieces when they are packaged and put out on a self-service shelf, or if claims are made on the product when sold from behind the counter. When labeling is required, the serving size for the unsliced bread should be based on the RACC (e.g., "2 oz (56 g/1 inch slice)"), and the "Servings per container" could say "varied," so that the same nutrition label could be used on all random weight portions.

**115. Is nutrition labeling required for foods sold in a salad or soup bar in a retail store?**

> **Answer:** Unpackaged ready-to-eat foods available for self-service from salad and soup bars in a retail store (i.e., a grocery store that does not have facilities for immediate consumption) are generally exempt under 21 CFR 101.9(j)(3) since the foods are of the type often sold from a service counter or deli case and are portioned to consumer specifications (even though it is the customer, not store personnel, who is portioning the food item). This exemption includes ready-to-eat food, not for immediate consumption, that is primarily processed or prepared at the retail location from which it is sold, regardless of whether it is sold wrapped or self-service.

> If the food is ready-to-eat and is sold for immediate consumption, it may also qualify for the restaurant food exemption, even if it is sold from a retail establishment with no facilities for immediate consumption. (See, e.g., foods sold in convenience stores that are in direct competition with restaurant foods (question 89.)

> The above exemptions are dependent on the food not bearing a claim or other nutrition information. If a claim is made (e.g., "low fat pasta salad"), or when other nutrition information is provided, the above exemptions are lost, and nutrition information must be provided.

**116. When party platters of vegetables and dip or cheeses are made up in the deli or produce section of a retail store, must the platters bear nutrition labeling? On vegetable platters, does it make a difference if the dip is prepared in the store or is a commercially prepared product?**

> **Answer:** Platters prepared or assembled at a retail location and sold from such retail location are exempt under 21 CFR 101.9(j)(3), regardless of whether the platter includes a commercially processed

Case 4:08-cv-03247-CW   Document 28-6    Filed 07/31/2008    Page 33 of 33

food component, such as a dip. In contrast, platters that are prepared in a central commissary and shipped to the retail store must bear nutrition labeling (except platters containing only fresh fruits or vegetables that are exempt under the voluntary nutrition labeling program 21 CFR 101.9(j)(10)).

-----

[1] This guidance has been prepared by the Office of Nutrition, Labeling, and Dietary Supplements in the Center for Food Safety and Applied Nutrition at the U.S. Food and Drug Administration.

-----

Food and Cosmetic Guidance Documents  |  Food Labeling and Nutrition  |  Retail Food Protection

CFSAN Home | CFSAN Search/Subject Index | CFSAN Disclaimers & Privacy Policy | CFSAN Accessibility/Help
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA

FDA/Center for Food Safety & Applied Nutrition
Hypertext updated by cjm April 4, 2008

# EXHIBIT 6

## CHAPTER 256

### (Senate Bill No. 775)

An act to add Chapter 4 (commencing with Section 27500) to, and to repeal Chapter 6 (commencing with Section 28190), Chapter 11 (commencing with Section 28520), and Chapter 14 (commencing with Section 28800) of Division 22 of, the Health and Safety Code, relating to food facilities.

]Approved by Governor June 26, 1984. Filed with Secretary of State June 27, 1984.]

### LEGISLATIVE COUNSEL'S DIGEST

SB 775, Presley.    Foods: California Uniform Retail Food Facilities Law.

(1) Existing law contains various provisions regulating restaurants, retail food production and marketing establishments, bakeries, itinerant restaurants, food vehicles, and other food establishments.

This bill would repeal these laws, and would instead enact the California Uniform Retail Food Facilities Law which consolidates and revises the existing laws regulating restaurants, retail food production and marketing establishments, bakeries, itinerant restaurants, food vehicles, and other food establishments.

Among other things, the bill would (1) require a person proposing to build or remodel a food facility, as defined, to submit complete plans and specifications to the local enforcement agency and to obtain a permit; and (2) impose a state-mandated local program by providing that a violation of this law, or regulations adopted pursuant to this law, would be a misdemeanor, punishable by a fine of $25 to $1,000, or by imprisonment in a county jail not to exceed 6 months, or both.

(2) Article XIII B of the California Constitution and Sections 2231 and 2234 of the Revenue and Taxation Code require the state to reimburse local agencies and school districts for certain costs mandated by the state. Other provisions require the Department of Finance to review statutes disclaiming these costs and provide, in certain cases, for making claims to the State Board of Control for reimbursement.

However, this bill would provide that no appropriation is made and no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1.    Chapter 4 (commencing with Section 27500) is added to Division 22 of the Health and Safety Code, to read:

### CHAPTER 4

### California Uniform Retail Food Facilities Law

### ARTICLE 1

### Declaration of Policy and General Provisions

§ 27500. This chapter shall be known and may be cited as the California Uniform Retail Food Facilities Law.

§ 27501. The Legislature finds and declares that the public health interest requires that there be uniform statewide health and sanitation standards for retail food facilities to assure the people of this state that food will be pure, safe, and

unadulterated. It is the intention of the Legislature to occupy the whole field of health and sanitation standards for these food facilities, and the standards set forth in this chapter and regulations adopted pursuant to its provisions shall be exclusive of all local health and sanitation standards relating to these facilities.

§ 27502. The State Department of Health Services shall adopt regulations to implement and administer the provisions of this chapter.

§ 27503. Nothing in this chapter shall prohibit a local governing body from adopting an evaluation or grading system for food facilities, from adopting an employee health certification or employee training program, from prohibiting any type of food facility, or from regulating food facilities, operations, construction, or the provision of patron toilet and handwashing facilities, not covered by this chapter.

§ 27504. In all laws and regulations, references to Chapter 6 (commencing with Section 28190), Chapter 11 (commencing with Section 28520), and Chapter 14 (commencing with Section 28800), of Division 22 of the Health and Safety Code, or to the California Bakery Sanitation Law, the California Restaurant Act, and the Retail Food Production and Marketing Establishments Law, shall mean Chapter 4 (commencing with Section 27500) of Division 22 or the California Uniform Retail Food Facilities Law.

§ 27505. Primary responsibility for enforcement of the provisions of this chapter shall be with local health agencies. Nothing in this chapter shall prevent the department from taking any necessary program or enforcement actions for the protection of the public health and safety.

Whenever the enforcement of the requirements of this chapter by any local enforcement agency is satisfactory to the department, the enforcement of the provisions of this chapter shall not be duplicated by the department. The department may investigate to determine satisfactory enforcement of this chapter by a local enforcement agency.

§ 27506. Any construction, alteration, remodeling, or installation of a food establishment pursuant to this chapter shall be in accordance with applicable building codes.

## ARTICLE 2

### Definitions

§ 27510. "Adulterated" means food which bears or contains any poisonous or deleterious substance which may render the food impure or injurious to health.

§ 27511. "Approved" means acceptable to the department or health authority based on a determination of conformity with current public health principles, practices, and generally recognized industry standards.

§ 27512. "Certified farmers' market" means a location certified by the county agricultural commissioner and operated as specified in Article 6.5 (commencing with Section 1392) of Title 3 of the California Administrative Code.

§ 27513. "Commissary" means a food establishment in which food, containers, equipment, or supplies are stored or handled for use in vehicles, mobile food preparation units, food carts, or vending machines.

§ 27515. "Employee" means any person working in a food facility covered by this chapter.

§ 27516. "Enforcement agency" means the State Department of Health Services and all local health agencies.

§ 27517. "Enforcement officer" means the director, agents, or sanitarians ap-

pointed by the Director o
environmental health, and
sanitarians.

§ 27518. "Equipment"
machines, tables, refriger:
used in a food facility.

§ 27519. "Food" mea:
ingredient intended to be
consumption.

§ 27520. "Food establi:
thereof, maintained, used,
manufacturing, packaging
retail level. "Food establ
27523.5.

"Food establishment" o
ment as defined in Secti
machine, satellite food dis
cue, certified farmers' m
arrangement wherein no p
a private home; or a churc
or sells food at occasional

§ 27521. "Food facility
produce stand, temporar
mobile food preparation u
places used in conjunctio
storage facilities for food-re

§ 27522. "Food prepar
which changes the form,
trimming of produce.

§ 27523. "Frozen food"
moisture therein is in a s
Fahrenheit).

§ 27523.5. "Grocery st
thereof, maintained, used,
staple foodstocks, meats,
grocer.

§ 27524. "Hot dog" me
stuffed in a casing and wh
red hot, vienna, bologna, g;

§ 27525. "Impound" me:
over the use, sale, disposal,

§ 27526. "Mobile food
service unit upon which fo
Mobile food preparation u
food or approved unpacka
Article 11 (commencing wi

§ 27527. "Multiservice ut
more than one time by any

§ 27528. "Occasional eve
days in any 90-day period.

pointed by the Director of Health Services, and all local health officers, directors of environmental health, and their duly authorized registered sanitarians and assistant sanitarians.

§ 27518. "Equipment" means all cooking units, hoods, cutting blocks, processing machines, tables, refrigerators, sinks, dish machines, steam tables, and other items used in a food facility.

§ 27519. "Food" means any raw or processed substance, ice, beverage, or ingredient intended to be used as food, drink, confection, or condiment for human consumption.

§ 27520. "Food establishment" means any room, building, or place, or portion thereof, maintained, used, or operated for the purpose of storing, preparing, serving, manufacturing, packaging, transporting, salvaging, or otherwise handling food at the retail level. "Food establishment" includes a grocery store as defined in Section 27523.5.

"Food establishment" does not include a commercial food processing establishment as defined in Section 28280.1, at the wholesale level, a vehicle, vending machine, satellite food distribution facility, temporary food facility, open-air barbecue, certified farmers' market, or mobile food preparation unit; a cooperative arrangement wherein no permanent facilities are used for storing or handling food; a private home; or a church, private club, or other nonprofit association which gives or sells food at occasional events defined in Section 27528.

§ 27521. "Food facility" means food establishment, vehicle, vending machine, produce stand, temporary food facility, satellite food distribution facility, and mobile food preparation unit as defined in Section 27526. Food facility also includes places used in conjunction with these operations, including, but not limited to, storage facilities for food-related utensils, equipment, and materials.

§ 27522. "Food preparation" means packaging, processing, or any operation which changes the form, flavor, or consistency of food, but does not include trimming of produce.

§ 27523. "Frozen food" means a food maintained at a temperature at which all moisture therein is in a solid state, not to exceed O degrees Celsius (32 degrees Fahrenheit).

§ 27523.5. "Grocery store" means any room, building, or place, or portion thereof, maintained, used, or operated for, or in conjunction with, the retail sale of staple foodstocks, meats, and other foods, and household supplies, by a retail grocer.

§ 27524. "Hot dog" means a whole cured, cooked sausage that is skinless or stuffed in a casing and which is also known as a frankfurter, frank, furter, wiener, red hot, vienna, bologna, garlic bologna, or knockwurst.

§ 27525. "Impound" means the legal control exercised by the enforcement officer over the use, sale, disposal, or removal of any food or equipment.

§ 27526. "Mobile food preparation unit" means any vehicle or portable food service unit upon which food is prepared for service, sale, or distribution at retail. Mobile food preparation unit shall not include vehicles from which prepackaged food or approved unpackaged food is sold or offered for sale as prescribed by Article 11 (commencing with Section 27670).

§ 27527. "Multiservice utensil" means a utensil manufactured and aproved for use more than one time by any person.

§ 27528. "Occasional event" means an event which occurs not more than three days in any 90-day period.

§ 27528.5. "Open-air barbecue facility" means an unenclosed facility for barbecuing food which is operated by a food establishment.

§ 27529. "Permit" means a written authorization to operate issued by a local enforcement officer.

§ 27530. "Person" means any individual, firm, partnership, joint venture, association, corporation, estate, trust, receiver, syndicate, city, county, or other political subdivision, or any other group or combination acting as a unit.

§ 27531. "Potentially hazardous food" means food capable of supporting rapid and progressive growth of microorganisms that may cause food infections or intoxications. Potentially hazardous food does not include edible shell eggs.

§ 27532. "Produce" means any fruit or vegetable in its raw or natural state.

§ 27533. "Produce stand" means a food establishment which has one side open to the outside air during business hours and which sells, offers for sale, or gives away only produce or shell eggs, or both.

§ 27534. "Refrigeration unit" means a mechanical unit which extracts heat from an area through liquification and evaporation of a fluid by a compressor, flame, or thermoelectric device. Refrigeration unit also includes a cold plate permanently connected to a compressor or any other unit approved by the department.

§ 27535. "Remodeled" means construction, building, or repair to the food facility that requires a permit from the local building authority.

§ 27536. "Retail" means the storing, preparing, serving, manufacturing, packaging, transporting, salvaging, or otherwise handling food for dispensing or sale directly to the consumer.

§ 27536.5. "Satellite food distribution facility" means a location where only prepackaged, unit servings of food are distributed, which have been prepared or stored in an approved food facility operated by a school, governmental agency, or nonprofit organization.

§ 27537. "Single service utensil" means a utensil which is manufactured and approved for use only once and which shall be discarded after use.

§ 27538. "Temporary food facility" means a food facility operating out of temporary facilities approved by the enforcement officer at a fixed location for a period of time not to exceed 14 days in any 90-day period in conjunction with a single event or celebration.

§ 27539. "Utensil" means any kitchenware, tableware, cutlery, glassware, container, implement, high chair tray, or other item with which food comes in contact during storage, transportation, display, preparation, serving, sale, or through use by an employee or consumer.

§ 27540. "Vehicle" means any motorized or nonmotorized conveyance or portable food service unit upon which prepackaged food or approved unpackaged food is sold or offered for sale at retail. "Vehicle" does not include a mobile food preparation unit as defined in Section 27526.

§ 27541. "Vending machine" means any self-service device which, upon insertion of money or tokens, dispenses food without the necessity of replenishing the device between each vending operation. "Vending machine" does not include any such device dispensing exclusively peanuts, nuts, popcorn, ballgum, or hard candy; prepackaged candy, cookies, crackers, or similar snacks and beverages which are not potentially hazardous as defined in Section 27531, and prepackaged ice.

§ 27550. A person pro
complete plans and speci
approval pursuant to the
or rejected within 20 wc
and the applicant shall b
rejected within 20 work
department shall not iss
received plan approval b

§ 27551. Except as oth
be open for business with
January 1, 1985, that do
business without a valid
period not to exceed six

A permit shall be issu
determined that the pro
the requirements of this
shall be valid only for
activity approved and, v
indicated.

Any fee for the perr
governing body. Fees sh
ing and enforcing this 1
carrying out the provisio

A permit shall be po
office of a vending mach

§ 27560. Enforcemen
and all regulations ado

An enforcement offic
photographs, or other
being a food facility, f
the inspection shall be
manager, or operator c

§ 27561. (a) Based
officer may do any of

(1) Impound any fo
or adulterated.

(2) Impound equip
shrepair that food, e
ated. The enforcemen
which shall be remov
the condition has bee

(b) No food, equip
be used unless the im

(c) Within 30 da
equipment, or utensi

Case 4:08-cv-03247-CW    Document 28-7    Filed 07/31/2008    Page 6 of 21

## ARTICLE 3

### Plan Review and Permits

§ 27550. A person proposing to build or remodel a food facility shall submit complete plans and specifications to the local enforcement agency for review and approval pursuant to the requirements of this chapter. The plans shall be approved or rejected within 20 working days after receipt by the local enforcement agency and the applicant shall be notified of the decision. Unless the plans are approved or rejected within 20 working days, they shall be deemed approved. The building department shall not issue a building permit for a food facility until after it has received plan approval by the local enforcement officer.

§ 27551. Except as otherwise provided for in this section, a food facility shall not be open for business without a valid permit. A food facility which is in existence on January 1, 1985, that does not possess a valid permit on that date may be open for business without a valid permit, but shall apply for a permit on forms, and within a period not to exceed six months, prescribed by the local enforcement agency.

A permit shall be issued by the local enforcement agency when investigation has determined that the proposed facility and its method of operation will conform to the requirements of this chapter. A permit, once issued, is nontransferable. A permit shall be valid only for the person, location, type of food sales, or distribution activity approved and, unless suspended or revoked for cause, for the time period indicated.

Any fee for the permit and related services shall be determined by the local governing body. Fees shall be sufficient to cover the actual expenses of administering and enforcing this program. All moneys collected as fees shall be expended in carrying out the provisions of this chapter.

A permit shall be posted in a conspicuous place in the food facility or in the office of a vending machine business.

## ARTICLE 4

### Enforcement and Inspection

§ 27560. Enforcement officers are charged with the enforcement of this chapter and all regulations adopted pursuant to it.

An enforcement officer may enter, inspect, issue citations, and secure any sample, photographs, or other evidence from any food facility, or any facility suspected of being a food facility, for the purpose of enforcing this chapter. A written report of the inspection shall be made and a copy shall be supplied or mailed to the owner, manager, or operator of the food facility.

§ 27561. (a) Based upon inspection findings or other evidence, an enforcement officer may do any of the following:

(1) Impound any food which is found to be, or suspected of being, contaminated or adulterated.

(2) Impound equipment or utensils which are found to be unsanitary or in such disrepair that food, equipment, or utensils may become contaminated or adulterated. The enforcement officer may attach a tag to such food, equipment or utensils which shall be removed only by the enforcement officer following verification that the condition has been corrected.

(b) No food, equipment, or utensils impounded pursuant to subdivision (a) shall be used unless the impoundment has been released.

(c) Within 30 days the enforcement agency that has impounded the food, equipment, or utensils pursuant to subdivision (a) shall commence proceedings to

release the impounded materials or to seek administrative or legal remedy for its disposition.

§ 27562. Any person who violates any provision of this chapter or regulation adopted pursuant to this chapter is guilty of a misdemeanor. Each offense shall be punished by a fine of not less than twenty-five dollars ($25) or more than one thousand dollars ($1,000) or by imprisonment in the county jail for a term not exceeding six months, or by both such fine and imprisonment.

§ 27563. The owner, manager, or operator of any food facility is responsible for any violation by an employee of any provision of this chapter. Each day the violation occurs shall be a separate and distinct offense.

§ 27564. A violation of any provision of this chapter relating to facilities held in common or shared by more than one food facility shall be deemed a violation for which the owner or operator of each food facility is responsible.

## ARTICLE 5

### Permit Suspension or Revocation

§ 27580. Any permit may be suspended or revoked by a local enforcement officer for a violation of this chapter. Any food facility for which the permit has been suspended shall close and remain closed until the permit has been reinstated. Any food facility for which the permit has been revoked shall close and remain closed until a new permit has been issued.

Whenever a local enforcement officer finds that a food facility is not in compliance with the requirements of this chapter, a written notice to comply shall be issued to the permittee. If the permittee fails to comply, the local enforcement officer shall issue to the permittee a notice setting forth the acts or omissions with which the permittee is charged, and informing him or her of a right to a hearing, if requested, to show cause why the permit should not be suspended or revoked. A written request for a hearing shall be made by the permittee within 15 calendar days after receipt of the notice. A failure to request a hearing within 15 calendar days after receipt of the notice shall be deemed a waiver of the right to a hearing. When circumstances warrant, the hearing officer may order a hearing at any reasonable time within this 15-day period to expedite the permit suspension or revocation process.

The hearing shall be held within 15 calendar days of the receipt of a request for a hearing. Upon written request of the permittee, the hearing officer may postpone any hearing date, if circumstances warrant such action.

§ 27581. At the conclusion of the hearing, the hearing officer shall issue a written notice of decision to the permittee within five working days following the hearing. In the event of a suspension or revocation, the notice shall specify the acts or omissions with which the permit is charged, and shall state the terms of the suspension or that the permit has been revoked.

§ 27582. (a) If any immediate danger to the public health or safety is found, unless the danger is immediately corrected, an enforcement officer may temporarily suspend the permit and order the food facility immediately closed. Immediate danger to the public health and safety means any condition, based upon inspection findings or other evidence, that can cause food infection, food intoxication, disease transmission, or hazardous condition, including, but not limited to, unsafe food temperature, sewage contamination, nonpotable water supply, or an employee who is a carrier of a communicable disease.

(b) Whenever a permit is suspended as the result of an immediate danger to the public health or safety, the enforcement officer shall issue to the permittee a notice

setting forth the acts
the pertinent code sec

(c) At any time w
subdivision (b), the p
officer to show cause
be held within 15 cal
to request a hearing v
to such hearing.

§ 27583. The enforc
modify, suspend, or r
requirements of this c
enforcement officer.

§ 27584. A permit
agency determines th
longer exist.

§ 27590. This artic
defined in this chapte

§ 27591. All food
packed, stored, tran:
contamination, adult
sources; shall otherv
the applicable provis
21 (commencing wit

§ 27600. This arti
in this chapter.

§ 27601. All pot
Celsius (45 degrees
degrees Fahrenheit)
Celsius (2 degrees F
located to indicate
for vending machin
hazardous food dis
similar means whic
Fahrenheit). Excep
thermometer suita
available on the pr

§ 27602. Raw du
from the provision
duck will subseque
(350 degrees Fahre

(a) Whole Chin
period not to exce
to prepare these f
infections or food

setting forth the acts or omissions with which the permittee is charged, specifying the pertinent code section, and informing the permittee of the right to a hearing.

(c) At any time within 15 calendar days after service of a notice pursuant to subdivision (b), the permittee may request in writing a hearing before a hearing officer to show cause why the permit suspension is not warranted. The hearing shall be held within 15 calendar days of the receipt of a request for a hearing. A failure to request a hearing within 15 calendar days shall be deemed a waiver of the right to such hearing.

§ 27583. The enforcement agency may, after providing opportunity for a hearing, modify, suspend, or revoke a permit for serious or repeated violations of any of the requirements of this code or for interference in the performance of the duty of the enforcement officer.

§ 27584. A permit may be reinstated or a new permit issued if the enforcement agency determines that conditions which prompted the suspension or revocation no longer exist.

## ARTICLE 6

### General Sanitation Requirements

§ 27590. This article governs general sanitation requirements for food facilities as defined in this chapter.

§ 27591. All food shall be manufactured, produced, prepared, compounded, packed, stored, transported, kept for sale, and served so as to be pure, free from contamination, adulteration, and spoilage; shall have been obtained from approved sources; shall otherwise be fully fit for human consumption; and shall conform to the applicable provisions of the Sherman Food, Drug, and Cosmetic Law (Division 21 (commencing with Section 26000)).

## ARTICLE 7

### Sanitation Requirements for Food Facilities

§ 27600. This article governs sanitation requirements for food facilities as defined in this chapter.

§ 27601. All potentially hazardous food shall be held at or below 7 degrees Celsius (45 degrees Fahrenheit) or shall be kept at or above 60 degrees Celsius (140 degrees Fahrenheit) at all times. A thermometer accurate to plus or minus 1 degree Celsius (2 degrees Fahrenheit) shall be provided for each refrigeration unit, shall be located to indicate the air temperature in the warmest part of the unit and, except for vending machines, shall be affixed to be readily visible. Containers of potentially hazardous food displayed for service may be placed in an ice bed or held by a similar means which maintains the food at or below 7 degrees Celsius (45 degrees Fahrenheit). Except for vending machines, an accurate easily readable metal probe thermometer suitable for measuring the temperature of food shall be readily available on the premises.

§ 27602. Raw duck, which otherwise would be readily perishable, shall be exempt from the provisions of Section 27601 for a period not to exceed two hours, if the duck will subsequently be cooked at or above a temperature of 177 degrees Celsius (350 degrees Fahrenheit) for at least 60 minutes.

(a) Whole Chinese-style roast duck shall be exempted from Section 27601 for a period not to exceed four hours after the duck is prepared, since the methods used to prepare these foods inhibit the growth of microorganisms which can cause food infections or food intoxications.

§ 27614. All new and replacement equipment shall meet or be equivalent to applicable National Sanitation Foundation (NSF) standards or, in the absence of applicable NSF standards, be approved by the enforcement officer.

§ 27615. Each food facility wherein sulfiting agents are added to food to preserve natural appearance and freshness shall have conspicuously displayed and easily readable signs, labels, or menu statements to inform customers of that use. Sulfites shall not be added to potentially hazardous foods.

## ARTICLE 8

### Sanitation Requirements for Food Establishments

§ 27620. This article governs sanitation requirements for food establishments, as defined in this chapter.

§ 27621. (a) Adequate and suitable space shall be provided for the storage of food. Except for large or bulky food containers, all food shall be stored at least 15 centimeters (6 inches) off the floor or under such other conditions as are approved. Containers may be stored on dollies, racks, or pallets not meeting this height requirement, provided these items are easily movable. All cartons, boxes, or other materials used in the packaging of any food shall be protected at all times from dirt, vermin, and other forms of contamination or adulteration. All returned or damaged food products and food products from which the label has been removed shall be separated and stored in a separate area and in such a manner as to prevent adulteration of other foods and shall not contribute to a vermin problem. Bulk food not stored in original packaging shall be stored in containers identifying the food by common name.

(b) A display of unpackaged food shall be shielded so as to intercept a direct line between the customer's mouth and the food being displayed, or shall be in a self-service container which has a tight-fitting, securely attached lid. This subdivision shall not apply to produce sold or given away in retail grocery stores, produce stands, or commissaries.

(c) Unpackaged processed food, except potentially hazardous food as defined in Section 27531, may be displayed and sold in bulk in self-service containers in grocery stores, if all of the following conditions are satisfied:

(1) Each self-service container has a utensil with a handle for dispensing the product, or the food may be dispensed from approved mechanical dispensers.

(2) A label is conspicuously displayed in plain view of the customer and securely attached to each self-service container, or in clear relationship thereto, which contains all of the following:

(A) The common name of the product.

(B) A declaration of the ingredients used by their common or usual name in descending order of predominance by weight. This declaration shall be provided in writing to the food establishment by the manufacturer, packer, or distributor.

(3) Nonfood items shall be displayed and stored in an area separate from food.

(d) Unpackaged processed food may be displayed and sold in bulk in other than self-service containers if both of the following conditions are satisfied:

(1) The food is served by an employee of the food establishment directly to a consumer.

(2) The food is displayed in clean, sanitary, and covered or otherwise protected containers.

(e) If the director makes a specific finding that a disease is actually transmitted by the method of dispensing unpackaged processed foods, as prescribed by this section, the director may establish by regulation greater restrictions on the sale of such food than are required by this section. These regulations shall bear directly on

the specific relationship
methods permitted by t

§ 27622. (a) All froz
food in the frozen stat
has been thawed shall

(b) Potentially hazar

(1) In refrigeration

(2) Under potable r
into the sink drain.

(3) In a microwave

(4) As part of the c

§ 27623. (a) All ute
circumstances require.

(b) All food establi
kitchen utensils are us
integral metal drainboa
enough to accommod
which is in use on Jan

(c) All food establis
clean such utensils in

(1) Handwashing c
integral metal drainboa
cleanser until they ar
in a final warm solutio

(2) Machine washi
sanitizing rinse shall
and shall be installe
machines shall be of
department. The vel
concentration of dete
water, shall be such
water and the time o
equivalent to that pr
standards if approv
designed for hot wat
and pressure test plu
rinse manifold in a h

(3) A two-compart
water sanitization, v
until replaced.

(4) Other methods

(d) Hot and cold
to each sink compar
1, 1985.

(e) All utensil wa
provided with two
One such drainboard
shall be attached a
undercounter dish
soiled utensils and
drainboards shall
requirement may b

the specific relationship between the disease actually transmitted and the dispensing methods permitted by this section.

§ 27622. (a) All frozen food shall be kept at a temperature which will keep the food in the frozen state until ready for processing or preparation. No food which has been thawed shall be refrozen unless it has been cooked or processed.

(b) Potentially hazardous frozen foods shall be thawed only:

(1) In refrigeration units.

(2) Under potable running water of sufficient velocity to flush loose food particles into the sink drain.

(3) In a microwave oven.

(4) As part of the cooking process.

§ 27623. (a) All utensils and equipment shall be scrapped, cleaned, or sanitized as circumstances require.

(b) All food establishments in which food is prepared or in which multiservice kitchen utensils are used shall have at least a two-compartment metal sink with two integral metal drainboards. The sink compartments and drainboards shall be large enough to accommodate the largest utensil used. A one-compartment utensil sink which is in use on January 1, 1985, may be continued in use until replaced.

(c) All food establishments in which multiservice consumer utensils are used shall clean such utensils in one of the following ways:

(1) Handwashing of utensils using a three-compartment metal sink with dual integral metal drainboards where the utensils are first washed by hot water and a cleanser until they are clean, then rinsed in clear, hot water before being immersed in a final warm solution meeting the requirements of Section 27613.

(2) Machine washing of utensils in machines using a hot water or chemical sanitizing rinse shall conform to National Sanitation Foundation (NSF) standards, and shall be installed and operated in accordance with those standards. The machines shall be of a type, and shall be installed and operated as approved by the department. The velocity, quantity, and distribution of the washwater, type and concentration of detergent used therein, and the time the utensils are exposed to the water, shall be such as to clean the utensils. The quantity and pressure of rinse water and the time of exposure shall be such as to provide bactericidal effectiveness equivalent to that provided by compliance with NSF standards, or more restrictive standards if approved by the department. All new spray-type dish machines designed for hot water sanitizing shall be equipped with a self-sealing temperature and pressure test plug. The test plug shall be located immediately upstream of the rinse manifold in a horizontal position and on the machine exterior.

(3) A two-compartment metal sink, having metal drainboards, equipped for hot water sanitization, which is in use on January 1, 1985, may be continued in use until replaced.

(4) Other methods may be used after approval by the department.

(d) Hot and cold water under pressure shall be provided through a mixing valve to each sink compartment in all food establishments constructed on or after January 1, 1985.

(e) All utensil washing equipment, except undercounter dish machines, shall be provided with two integral metal drainboards of adequate size and construction. One such drainboard shall be attached at the point of entry for soiled items and one shall be attached at the point of exit for cleaned and sanitized items. Where an undercounter dish machine is used, there shall be two metal drainboards, one for soiled utensils and one for clean utensils, located adjacent to the machine. The drainboards shall be sloped and drained to an approved waste receptor. This requirement may be satisfied by using the drainboards appurtenant to sinks as

required in subdivision (b) and paragraph (1) of subdivision (c), if such facilities are located adjacent to the machine.

(f) The handling of cleaned and soiled utensils, equipment, and kitchenware shall be undertaken in such a manner as to preclude possible contamination of cleaned items with soiled items.

(g) All utensils, display cases, windows, counters, shelves, tables, refrigeration units, sinks, dishwashing machines, and other equipment or utensils used in the preparation, sale, service, and display of food shall be made of nontoxic, noncorrosive materials, shall be constructed, installed, and maintained to be easily cleaned, and shall be kept clean and in good repair.

(h) Utensils and equipment shall be handled and stored so as to be protected from contamination. Single-service utensils shall be obtained only in sanitary containers or approved sanitary dispensers, stored in a clean, dry place until used, handled in a sanitary manner, and used once only.

§ 27624. An adequate, protected, pressurized, potable supply of hot water, at least 47 degrees Celsius (120 degrees Fahrenheit), and cold water shall be provided. The water supply shall be from a water system approved by the health officer. Any hose used for conveying potable water shall be constructed of nontoxic materials, shall be used for no other purpose, and shall be clearly labeled as to its use. The hose shall be stored and used so as to be kept free of contamination.

§ 27625. All plumbing and plumbing fixtures shall be installed in compliance with local plumbing ordinances, shall be maintained so as to prevent any contamination, and shall be kept clean, fully operative, and in good repair.

All liquid wastes shall be disposed of through the plumbing system which shall discharge into the public sewerage or into an approved private sewage disposal system.

All steam tables, ice machines and bins, food preparation sinks, display cases, and other similar equipment which discharge liquid waste shall have this waste conveyed by a closed system, such as by a tube or rigid pipe, to an approved sewer line and disposed therein by an indirect connection. Drainage from refrigeration units shall be conducted in a sanitary manner to a floor sink or other approved device by an indirect connection or to a properly installed and functioning evaporator. Indirect waste receptors shall be located to be readily accessible for inspection and cleaning. Dishwashing machines may be connected directly to the sewer immediately downstream from a floor drain or they may be drained through an approved indirect connection.

§ 27626. In each food establishment constructed or extensively remodeled on or after January 1, 1985, there shall be provided clean toilet facilities in good repair for use by employees. The number of toilet facilities required shall be in accordance with local building and plumbing ordinances. Toilet facilities whose construction begins on or after January 1, 1985, and which are provided for use by patrons, shall be so situated that patrons do not pass through food preparation, food storage, or utensil washing areas. Toilet rooms shall be separated from other portions of the food establishment by well-fitting, self-closing doors or by other methods approved by the enforcement officer. Toilet rooms shall not be used for the storage of food, equipment, or supplies. Toilet tissue shall be provided in a permanently installed dispenser at each toilet.

§ 27627. Handwashing facilities shall be provided within or adjacent to toilet rooms and shall be equipped with an adequate supply of hot and cold running water under pressure. Facilities constructed on or after January 1, 1985, shall have such water provided from a combination faucet, or water from a premixing faucet which supplies warm water for a minimum of 10 seconds while both hands are free

for washing. The numbe[...]
with local building and [...]
sanitary towels or hot-ai[...]
handwashing facilities. [...]
remodeling on or after [...]
handwashing within, or [...]

§ 27627.3. Clean toile[...]
guests, or invitees on p[...]
with more than 20,000 s[...]

For the purposes of t[...]
maintained in conjuncti[...]
used in connection wit[...]
square footage of floorsp[...]

There shall be at leas[...]
facility for women. Toil[...]
that prevent passage of [...]

Handwashing faciliti[...]
invitees within or adjac[...]
running water. Handw[...]
blowers shall be provid[...]
ing devices. Notwiths[...]
27627.5, a violation of [...]

§ 27627.5. The requi[...]
accessible to patrons, [...]
permitting access by th[...]
required by other provi[...]

However, if the requ[...]
by those persons to t[...]
other provisions of th[...]
meanor punishable pur[...]

§ 27627.7. Sections [...]
construction is comme[...]

§ 27628. A room, [...]
storage, food preparat[...]
employees may chan[...]
personal effects in any[...]

§ 27629. Ventilatio[...]
vapors, or smoke fron[...]

All areas shall hav[...]
provide a reasonable [...]
performed by the em[...]
mechanical exhaust v[...]
required in Article [...]
Chapter 4-20 (comn[...]
California Administra[...]

The provisions of [...]
equipment has been [...]
that the equipment [...]
when operated under[...]

Toilet rooms shall [...]
window, an air shal[...]
requirements of loca[...]

for washing. The number of handwashing facilities required shall be in accordance with local building and plumbing ordinances. Handwashing cleanser and single-use sanitary towels or hot-air blowers shall be provided in dispensers at, or adjacent to, handwashing facilities. Food establishments beginning construction or extensive remodeling on or after January 1, 1985, shall provide facilities exclusively for handwashing within, or adjacent to, each kitchen.

§ 27627.3. Clean toilet facilities, in good repair, shall be provided for patrons, guests, or invitees on property used in connection with, or in, each grocery store with more than 20,000 square feet of floor space.

For the purposes of this section, the gas pump area of a service station which is maintained in conjunction with a grocery store shall not be considered as property used in connection with the grocery store or be considered in determining the square footage of floorspace of the grocery store.

There shall be at least one separate toilet facility for men and one separate toilet facility for women. Toilet rooms shall be separated by well-fitted, self-closing doors that prevent passage of flies, dust, or odors.

Handwashing facilities, in good repair, shall be provided for patrons, guests, or invitees within or adjacent to toilet rooms and shall be equipped with hot and cold running water. Handwashing detergent or soap and sanitary towels or hot-air blowers shall be provided at handwashing facilities in permanently installed dispensing devices. Notwithstanding any other provision of law, other than Section 27627.5, a violation of this section shall be an infraction.

§ 27627.5. The requirements of Section 27627.3 for restroom facilities which are accessible to patrons, guests, or invitees on the property may be satisfied by permitting access by those persons to the toilet and handwashing facilities which are required by other provisions of this chapter.

However, if the requirements of Section 27627.3 are satisfied by permitting access by those persons to the toilet and handwashing facilities which are required by other provisions of this chapter, a violation of these provisions shall be a misdemeanor punishable pursuant to Section 27562.

§ 27627.7. Sections 27627.3 and 27627.5 apply only to grocery stores as to which construction is commenced on or after July 1, 1984.

§ 27628. A room, enclosure, or designated area, separated from toilets, food storage, food preparation areas, and utensil washing areas, shall be provided where employees may change and store clothes. No employee shall store clothing or personal effects in any other area on the premises.

§ 27629. Ventilation shall be provided to remove gases, odors, steam, heat, grease, vapors, or smoke from the food establishment.

All areas shall have sufficient ventilation to facilitate proper food storage and to provide a reasonable condition of comfort for any employee, consistent with the job performed by the employee. On or after January 1, 1985, there shall be provided mechanical exhaust ventilation at or above all newly installed cooking equipment as required in Article 10.4 (commencing with Section 13670) of Title 17 of, and Chapter 4-20 (commencing with Section 4-2000) of Part 4 of Title 24 of, the California Administrative Code.

The provisions of this section shall not apply to cooking equipment when such equipment has been submitted to the department for evaluation, and it has been found that the equipment does not produce toxic gases, smoke, grease, vapors, and heat when operated under conditions recommended by the manufacturer.

Toilet rooms shall be vented to the outside air by means of an openable, screened window, an air shaft, or a light-switch-activated exhaust fan, consistent with the requirements of local building codes.

§ 27630. Each food establishment, except produce stands, shall be fully enclosed in a building consisting of floors, walls, and overhead structure which meet the minimum standards prescribed by this chapter. Food establishments which are not fully enclosed on all sides and which are in operation on January 1, 1985, shall not be required to meet the requirement for a fully enclosed structure pursuant to this section. This section shall not be construed to require the enclosure of dining areas or open-air barbecue facilities.

§ 27631. (a) Except in dining areas and as otherwise provided in subdivision (d), the floor surfaces in all areas in which food is prepared, packaged, or stored, where any utensil is washed, where refuse or garbage is stored, and where janitorial facilities are located, and in all toilet and handwashing areas, shall be smooth and of such durable construction and nonabsorbent material as to be easily cleaned.

These floor surfaces shall be coved at the juncture of the floor and wall with a 10 millimeter (⅜ inch) minimum radius coving and shall extend up the wall at least 15 centimeters (6 inches) except in areas where food is stored only in unopened bottles, cans, cartons, sacks, or other original shipping containers.

(b) Upon new construction or extensive remodeling on or after January 1, 1985, floor drains shall be installed as follows:

(1) In floors that are water-flushed for cleaning.

(2) In areas where pressure spray methods for cleaning equipment are used.

Floor surfaces in areas pursuant to this subdivision shall be sloped 1:50 to the floor drains.

(c) Upon new construction or extensive remodeling on or after January 1, 1985, floor sinks, funnel drains, or equivalent devices shall be installed to receive discharges of water or other fluid waste from equipment.

(d) Except for dining and serving areas, the use of sawdust, wood shavings, peanut hulls, or similar materials is prohibited.

(e) This section shall not prohibit the use of approved dust-arresting floor sweeping and cleaning compounds during floor cleaning operations or the use of approved anti-slip floor materials in areas where necessary for safety reasons.

(f) Food establishments which are in operation on January 1, 1985, and in which sawdust is used as an absorbent in meat holding units may continue this use until the floor is replaced.

§ 27632. The walls and ceilings of all rooms, except for bars, rooms where food is stored in unopened containers, and dining areas, shall be of a durable, smooth, nonabsorbent, washable surface. Walls and ceilings of food preparation and utensil washing areas and interior surfaces of walk-in refrigeration units shall also be light-colored. Wall areas adjacent to bar sinks shall be smooth and easily cleanable. Acoustical paneling may be utilized providing it is installed not less than 1.8 meters (6 feet) above the floor. Any perforations shall not penetrate the entire depth of the panel, shall not be greater than 3 millimeters (⅛ inch) in any dimension, and shall not comprise more than 25 percent of the exposed panel surface. The paneling shall otherwise meet the requirements of this section.

Conduits of all types shall be installed within walls as practicable. When otherwise installed, they shall be mounted or enclosed so as to facilitate cleaning.

§ 27633. Adequate and suitable space shall be provided for the storage of clean linens, including apparel, towels, and cleaning cloths.

Soiled linens, apparel, towels, tablecloths, and cleaning cloths shall be kept in cleanable containers provided only for this purpose and shall not be reused until they have been laundered.

§ 27634. (a) A room, area, or cabinet separated from any food preparation or storage area, or utensil washing or storage area, shall be provided for the storage of

cleaning equipment and
waxes.

(b) Any food establi
January 1, 1985, shall
exclusively for general c
and other liquid wastes:

(1) A one-compartme

(2) A slab, basin, or
and sloped to a drain.
provided with hot and
with a backflow protect

§ 27635. In every ro
processed, or packaged
artificial lighting shall b
(20 footcandles) as mea
the working surfaces o
used in the preparatic
provided with at least
rooms, refrigeration sto
least 108 lux (10 footca
or where open food is
construction or shall
cleanable.

During general clea
measured 76 centimete
being cleaned, includii
prepared or served.

§ 27636. No sleepin
where food is prepare
separated from the foo
in the partition which
quarters.

§ 27637. (a) The
designed and intende
person's throat. Thes
involving the use of
mouth or throat.

(b) The departmen
lishment adopted an
proprietor shall post
include an employee
by anyone attempting

(c) In the absence
that the instructions
choking emergency s
employees or indepen
personal injuries or w

(d) Nothing in thi
assist in removing, o
person's throat. In a
neither the proprieto
to remove such foo

cleaning equipment and supplies, such as mops, buckets, brooms, cleansers, and waxes.

(b) Any food establishment constructed or extensively remodeled on or after January 1, 1985, shall be equipped with at least one of the following to be used exclusively for general cleaning purposes and for the disposal of mop bucket wastes and other liquid wastes:

(1) A one-compartment, nonporous janitorial sink.

(2) A slab, basin, or floor constructed of concrete or equivalent material, curbed and sloped to a drain. Such facilities shall be connected to approved sewerage and provided with hot and cold running water through a mixing valve and protected with a backflow protection device.

§ 27635. In every room and area in which any food is prepared, manufactured, processed, or packaged, or in which utensils are cleaned, sufficient natural or artificial lighting shall be provided to produce an intensity of not less than 215 lux (20 footcandles) as measured 76 centimeters (30 inches) above the floor, except that the working surfaces on which alcoholic beverages are prepared or where utensils used in the preparation or service of alcoholic beverages are cleaned, shall be provided with at least 108 lux (10 footcandles) of light. Food and utensil storage rooms, refrigeration storage, and toilet and dressing rooms shall be provided with at least 108 lux (10 footcandles) of light. Light fixtures in areas where food is prepared or where open food is stored or where utensils are cleaned shall be of shatterproof construction or shall be protected with shatterproof shields and shall be readily cleanable.

During general cleanup activities, at least 215 lux (20 footcandles) of light, measured 76 centimeters (30 inches) above the floor, shall be provided in the area being cleaned, including, but not limited to, areas where alcoholic beverages are prepared or served.

§ 27636. No sleeping accommodations shall be maintained or kept in any room where food is prepared, stored, or sold. All living and sleeping quarters shall be separated from the food establishment. No door or other opening shall be permitted in the partition which separates the food establishment from the living or sleeping quarters.

§ 27637. (a) The department shall adopt and approve first aid instructions designed and intended for use in removing food which may become stuck in a person's throat. These instructions shall be limited to first aid techniques not involving the use of any physical instrument or device inserted into the victim's mouth or throat.

(b) The department shall supply to the proprietor of every on-site eating establishment adopted and approved instructions pursuant to subdivision (a). The proprietor shall post the instructions in a conspicuous place or places, which may include an employee notice board, in order that the instructions may be consulted by anyone attempting to provide relief to a victim in a choking emergency.

(c) In the absence of other evidence of noncompliance with this section, the fact that the instructions were not posted as required by this section at the time of a choking emergency shall not in and of itself subject the proprietor or his or her employees or independent contractors to liability in any civil action for damages for personal injuries or wrongful death arising from a choking emergency.

(d) Nothing in this section shall impose any obligation on any person to remove, assist in removing, or attempt to remove food which has become stuck in another person's throat. In any action for damages for personal injuries or wrongful death, neither the proprietor nor any person who removes, assists in removing, or attempts to remove such food in accordance with instructions adopted by the department

shall be liable for any civil damages as a result of any acts or omissions by such person in rendering emergency assistance.

## ARTICLE 9

### Open-air Barbecue Facilities

§ **27640.** This article governs sanitation requirements for open-air barbecue facilities as defined in this chapter.

§ **27641.** Notwithstanding the provisions of this chapter, neither the state department nor any city, county, or city and county shall require the enclosure of an open-air barbecue facility if the appropriate enforcement officer determines that the barbecue facility meets all of the following requirements:

(a) The facility is operated on the same premises as, in reasonable proximity to, and in conjunction with, a food establishment.

(b) All food waste and rubbish containing food waste is handled in accordance with the requirements of Section 27608.

(c) The facility is operated in compliance with the provisions of Articles 6 (commencing with Section 27590) and 7 (commencing with Section 27600), except for Sections 27607, 27610, and 27613.

(d) The multiuse utensils and equipment used in conjunction with the open-air barbecue facility are made of nontoxic materials, are constructed and maintained in a manner so they can be easily cleaned, and are kept clean and in good repair.

(e) Food and beverages served out of doors are dispensed from units approved by the enforcement officer. No other food may be prepared or stored in the out of doors, except for food cooked on the open-air barbecue unit.

(f) No live animals, birds, or fowl are kept or allowed in an area within 20 feet of any area where food or beverage is prepared, stored, kept, or served. This subdivision does not apply to guide dogs used by the blind, signal dogs used by deaf persons or persons whose hearing is impaired, service dogs used by physically handicapped persons, or dogs used by uniformed employees of private patrol operators and operators of a private patrol service who are licensed pursuant to Chapter 11 (commencing with Section 7500) of Division 3 of the Business and Professions Code, while those employees are acting within the course and scope of their employment as private patrolmen.

As used in this subdivision, "guide dog," "signal dog," and "service dog" have the meanings specified in Section 54.1 of the Civil Code.

(g) If the barbecue facility is a permanent structure, it is equipped with an impervious and easily cleaned floor surface that extends a minimum of five feet from the open-air barbecue facility on all open sides.

(h) The barbecue facility is located in an area reasonably protected from dust, as determined by the enforcement officer.

(i) The barbecue facility is not operated in, or out of, any motor vehicle or in any area or location that may constitute a fire hazard, as determined by the enforcement officer.

(j) Sanitary facilities, including, but not limited to, toilet facilities and handwashing facilities shall be available for use within 200 feet of the barbecue facility and shall comply with all provisions of this chapter. Sanitary facilities that do not meet the requirements of this chapter shall not be located closer to the barbecue facility than the sanitary facilities required to be provided by this section.

§ **27642.** No air pollution control district or air quality management district shall require the enclosure of an open-air barbecue facility if the appropriate enforcement officer determines that the barbecue facility meets all requirements prescribed by Section 27641.

§ 27650. This article
defined in this chapter.

§ 27651. Each vendi
prominent place a sign i

§ 27652. All food shal
handled, transported, an
products is prohibited.

Potentially hazardous
package into which it
potentially hazardous fo

§ 27653. All food con
a machine so designed a
and sanitizing at an app

All food contact sur
sanitizing shall be pro
machine.

A record of cleaning
machine and shall be cu

§ 27654. Single-servic
in bulk, shall be obtain
until used, and shall
stored in the original
dispenser of the vend
machine shall be protec
tion.

§ 27655. Each vendi
shall minimize the pot
vending machines are
capable of withstandin

§ 27656. Water used

§ 27657. While in tr
equipment shall be pr

§ 27658. On or afte
in accordance with N
chandizing Association

§ 27659. Vending r
mencing with Section
Section 27600).

§ 27670. This artic
this chapter.

§ 27671. The nam
permittee, business n
on both sides of a
centimeters (3 inche

## ARTICLE 10
### Vending Machines

§ 27650. This article governs sanitation requirements for vending machines as defined in this chapter.

§ 27651. Each vending machine or machine location shall have posted in a prominent place a sign indicating the owner's name, address, and telephone number.

§ 27652. All food shall be stored and packaged in clean, protected containers, and handled, transported, and vended in a sanitary manner. Wet storage of packaged products is prohibited.

Potentially hazardous food shall be dispensed to the consumer in the original package into which it was placed at the commissary or processing plant. Bulk potentially hazardous food is prohibited.

§ 27653. All food contact surfaces shall be cleaned and sanitized either in place in a machine so designed and approved or by removing from the machine and cleaning and sanitizing at an approved facility.

All food contact surfaces when removed from the machine after cleaning and sanitizing shall be protected from contamination before being returned to the machine.

A record of cleaning and sanitizing shall be maintained by the operator in each machine and shall be current for at least the past 30 days.

§ 27654. Single-service containers which are used in machines dispensing products in bulk, shall be obtained in sanitary packages, shall be stored in a clean, dry place until used, and shall be handled in a sanitary manner. The containers shall be stored in the original package until introduced into the container magazine or dispenser of the vending machine. The containers stored within the vending machine shall be protected from manual contact, dirt, vermin, and other contamination.

§ 27655. Each vending machine shall be located in a room, area, or space which shall minimize the potential for contamination of food. The floor area upon which vending machines are located shall be smooth, of cleanable construction, and capable of withstanding repeated washing and scrubbing.

§ 27656. Water used in vending machines shall be potable.

§ 27657. While in transit to machine locations, food, single-service containers, and equipment shall be protected from dirt, vermin, and other contamination.

§ 27658. On or after January 1, 1985, all vending machines shall be constructed in accordance with National Sanitation Foundation or National Automatic Merchandizing Association standards, or the equivalent thereof.

§ 27659. Vending machines shall meet all the requirements of Article 6 (commencing with Section 27590) and applicable sections of Article 7 (commencing with Section 27600).

## ARTICLE 11
### Vehicles

§ 27670. This article governs sanitation requirements for vehicles as defined in this chapter.

§ 27671. The name, address, and telephone number of the owner, operator, permittee, business name, or commissary shall be clearly and permanently indicated on both sides of a vehicle exterior. The name shall be in letters at least 8 centimeters (3 inches) high and shall have strokes at least 1 centimeter (⅜ inch)

wide, and shall be of a color contrasting with the vehicle exterior. Letters for address and telephone numbers shall not be less than 2.5 centimeters (1 inch) high.

§ 27672. (a) Equipment on a vehicle, including the interior of cabinet units or compartments, shall be equipped so as to have smooth, easily accessible, and easily cleanable surfaces. Unfinished wooden surfaces are not permitted. Construction joints shall be tightly fitted and sealed so as to be readily cleanable. Equipment, including utensils, shall be constructed of nontoxic materials and shall be readily cleanable.

(b) All food displayed, sold, or offered for sale from vehicles shall be prepackaged at a facility approved by the enforcement agency except as provided in Sections 27673 and 27675.

(c) During operation, no food shall be stored, displayed, or served from any place other than the vehicle.

(d) Food condiments shall be protected from contamination and, where available for self-service, shall be prepackaged or available only from approved dispensing devices.

(e) During transportation and storage, food and food contact surfaces shall be protected from contamination.

(f) All vehicles shall operate out of a commissary or other facility approved by the enforcement agency. Vehicles shall report to the commissary at least once each operating day for cleaning and servicing operations. In addition, vehicles whereon nonprepackaged hot dogs are handled shall be properly stored at a commissary or other facility approved by the enforcement agency so as to be protected from unclean or unsanitary conditions.

(g) Food products remaining after each day's operation shall be stored only in an approved food facility.

(h) Utensils and equipment shall be handled and stored so as to be protected from contamination. Single-service utensils shall be obtained only in sanitary containers or approved sanitary dispensers, stored in a clean, dry place until used, handled in a sanitary manner, and used once only.

(i) All waste water shall be drained to an approved water receptor.

(j) Potentially hazardous foods shall be maintained at or below 7 degrees Celsius (45 degrees Fahrenheit) or at or above 60 degrees Celsius (140 degrees Fahrenheit) at all times.

(k) Vehicular food sales shall be conducted within 60 meters (200 feet) of approved and readily available toilet and handwashing facilities or as otherwise approved by the enforcement officer to ensure proper sanitary facilities are available to the vehicle employee.

§ 27673. (a) The following foods may be sold from vehicles in an unpackaged state, provided the storage, display, and dispensing methods are approved by the enforcement agency:

(1) Popcorn.

(2) Nuts.

(3) Produce.

(4) Pretzels and similar bakery products.

(5) Candy.

(6) Hot dogs.

(7) Snowcones.

(8) Whole fish and whole aquatic invertebrates.

(b) Hot and cold beverages which are not potentially hazardous, as defined in Section 27531, may be sold from approved bulk dispensing units.

(c) Vehicles selling or offering for sale nonprepackaged foods except produce and

---

approved beverages shal
subdivision (a) of Sectio
aged hot dogs shall com
Those vehicles handling
comply with subdivision
display and storage comp

§ 27674. All potential
facility except as provide
aged if dispensed to the

§ 27675. Vehicles on v
shall, in addition to the
as follows:

(a) The food compart
compartment shall be
operations and shall be
protects interior surfaces
food contact surfaces sh
easily cleanable.

(b) A one-comparte
at least 38 degrees Celsi
be of a size suitable for

(c) Handwashing clea

(d) A water supply ta

(e) A waste water tan

§ 27676. Vehicles on
that operate exclusively
utensil washing faciliti
be exempt from the requ

Mobile

§ 27790. This article
units and commissaries

§ 27791. All mobile
applicable requirements
(commencing with Sect
unless specifically exem
and shall meet the pro
and Article 10.1 (comn
5 of Part 1 of Title
preparation units shall
27628, and subdivision

§ 27800. This article
as defined in this chapt

§ 27801. (a) Floors s
materials is prohibited.

(b) Walls and ceilin
similar material and fin

approved beverages shall be equipped with a food compartment as specified in subdivision (a) of Section 27675. In addition, those vehicles handling nonprepackaged hot dogs shall comply with subdivisions (b), (c), (d) and (e) of Section 27675. Those vehicles handling unpackaged whole fish and aquatic invertebrates shall comply with subdivision (e) of Section 27675, for drainage of waste water from display and storage compartments.

§ 27674. All potentially hazardous food shall be prepackaged in an approved facility except as provided in Section 27675. A tamale shall be considered prepackaged if dispensed to the customer in its original, inedible wrapper.

§ 27675. Vehicles on which nonprepackaged hot dogs are sold or offered for sale shall, in addition to the requirements of Section 27672, be constructed and equipped as follows:

(a) The food compartment shall be completely closed. The opening to the food compartment shall be sufficiently large to permit food assembly and service operations and shall be provided with a tightly fitted closure which, when closed, protects interior surfaces from dust, debris, and vermin. All food compartments and food contact surfaces shall be constructed so as to be smooth, easily accessible, and easily cleanable.

(b) A one-compartment metal sink furnished with warm running water which is at least 38 degrees Celsius (101 degrees Fahrenheit) and cold water. The sink shall be of a size suitable for washing hands and utensils.

(c) Handwashing cleanser and single-service towels.

(d) A water supply tank of at least 18 liters (5 gallons) capacity.

(e) A waste water tank of at least 28 liters (7.5 gallons) capacity.

§ 27676. Vehicles on which nonprepackaged hot dogs are sold or offered for sale that operate exclusively on premises wherein approved toilet, handwashing, and utensil washing facilities are readily available and within 60 meters (200 feet) shall be exempt from the requirements of subdivisions (b) through (e) of Section 27675.

## ARTICLE 12

### Mobile Food Preparation Units and Commissaries

§ 27790. This article governs sanitation requirements for mobile food preparation units and commissaries as defined in this chapter.

§ 27791. All mobile food preparation units and commissaries shall meet the applicable requirements in Article 6 (commencing with Section 27590), Article 7 (commencing with Section 27600), and Article 8 (commencing with Section 27620), unless specifically exempted from any of these provisions as provided in this article, and shall meet the provisions of Article 10 (commencing with Section 13600) of, and Article 10.1 (commencing with Section T17-13611) of subchapter 2 of Chapter 5 of Part 1 of Title 17 of the California Administrative Code. Mobile food preparation units shall be exempt from the requirements of Sections 27626 and 27628, and subdivision (b) of Section 27634.

## ARTICLE 13

### Temporary Food Facilities

§ 27800. This article governs sanitation requirements for temporary food facilities as defined in this chapter.

§ 27801. (a) Floors shall be smooth and cleanable. The use of sawdust or similar materials is prohibited.

(b) Walls and ceilings shall be constructed of either wood, canvas, plastic, or similar material and fine mesh fly screening and shall completely enclose the facility.

Facilities wherein all food and beverage is prepackaged at a facility approved by the local enforcement officer shall not be required to be fully enclosed with fly screening. Food service openings shall be equipped with tightfitting closures to minimize the entrance of insects.

(c) Except where all food and beverage is prepackaged, handwashing and utensil washing facilities approved by the enforcement officer shall be provided within temporary food facilities.

(d) Facilities for the sanitary disposal of all liquid waste shall be subject to the approval of the enforcement officer.

(e) At least one toilet facility for each 15 employees shall be provided within 60 meters (200 feet) of each temporary food facility.

(f) Food contact surfaces shall be smooth, easily cleanable, and nonabsorbent.

§ 27802. (a) All food shall be prepared in a food establishment or on the premises of a temporary food facility. No food or beverage stored or prepared in a private home may be offered for sale, sold, or given away from a temporary food facility.

(b) All food and beverage shall be protected at all times from unnecessary handling and shall be stored, displayed and served so as to be protected from contamination.

(c) Potentially hazardous food and beverage shall be maintained at or below 7 degrees Celsius (45 degrees Fahrenheit) or at or above 60 degrees Celsius (140 degrees Fahrenheit) at all times.

(d) Ice used in beverages shall be protected from contamination and shall be maintained separate from ice used for refrigeration purposes.

(e) All food and food containers shall be stored off the floor on shelving or pallets located within the facility.

(f) Smoking is prohibited in temporary food facilities.

(g) Live animals, birds, or fowl are not permitted in temporary food facilities.

(h) All garbage shall be disposed of in a manner approved by the enforcement officer.

(i) Employees preparing or handling food shall wear clean clothing and shall keep their hands clean at all times.

§ 27803. The enforcement officer may establish additional structural or operational requirements as necessary to ensure that food is of a safe and sanitary quality.

## ARTICLE 14

### Produce Stands

§ 27820. This article governs sanitation requirements for produce stands as defined in this chapter.

§ 27821. (a) Produce stands operated by a producer selling or offering for sale produce or shell eggs, or both, are exempt from the provisions of this chapter, provided the produce stand is operated on premises controlled by the producer.

(b) For purposes of this section, "producer" means a person or entity who produces shell eggs, fruits, nuts, or vegetables by practice of the agricultural arts upon land which the person or entity controls.

All other produce stands shall meet the requirements of Articles 6 (commencing with Section 27590), 7 (commencing with Section 27600), and 8 (commencing with Section 27620), except for the following:

(a) All food shall be stored at least 46 centimeters (18 inches) off the floor, except that food stored in a walk-in refrigeration unit shall be stored at least 13 centimeters (5 inches) off the floor.

(b) Food preparation is prohibited.

(c) Unpackaged prep
such food establishment

§ 27830. This article
markets, as defined in t

§ 27831. Certified f
(commencing with Sect
requirements:

(a) All food shall b
ground or under any ot

(b) Food preparation

(c) Approved toilet a
(200 feet) of the prem
enforcement officer.

(d) No live animals,
of any area where food
guide dogs, signal dogs
Section 54.1 of the Civ

(e) All garbage and
approved by the enforc

§ 27840. This articl
distribution facilities as

§ 27841. All satellite
provisions of Article 6
ing with Section 2760
ments:

(a) All utensils an
circumstances require.

(b) Utensils and eq
from contamination.
containers or approved
handled in a sanitary r

SEC. 2. Chapter
Health and Safety Coc

SEC. 3. Chapter
Health and Safety Coc

SEC. 4. Chapter
Health and Safety Coc

SEC. 5. If any pro
circumstances is held
applications of the ac
application, and to thi

SEC. 6. No appro
pursuant to Section 6
2231 or 2234 of the F
be incurred by a loca

(c) Unpackaged prepared foods, other than trimmed produce, shall not be kept at such food establishments. This shall not apply to retail dairy processing rooms.

## ARTICLE 15

### Certified Farmers' Markets

§ 27830. This article governs general sanitation requirements for certified farmers' markets, as defined in this chapter.

§ 27831. Certified farmers' markets shall meet the provisions of Article 6 (commencing with Section 27590) and, in addition, shall meet all of the following requirements:

(a) All food shall be stored at least 15 centimeters (6 inches) off the floor or ground or under any other conditions which are approved.

(b) Food preparation is prohibited.

(c) Approved toilet and handwashing facilities shall be available within 60 meters (200 feet) of the premises of the certified farmers' market or as approved by the enforcement officer.

(d) No live animals, birds, or fowl are kept or allowed within 6 meters (20 feet) of any area where food is stored or held for sale. This subdivision does not apply to guide dogs, signal dogs, or service dogs when used within the meaning specified by Section 54.1 of the Civil Code.

(e) All garbage and rubbish shall be stored, and disposed of, in a manner approved by the enforcement officer.

## ARTICLE 16

### Satellite Food Distribution Facilities

§ 27840. This article governs general sanitation requirements for satellite food distribution facilities as defined in this chapter.

§ 27841. All satellite food distribution facilities shall be subject to the applicable provisions of Article 6 (commencing with Section 27590) and Article 7 (commencing with Section 27600) and, in addition, shall meet all of the following requirements:

(a) All utensils and equipment shall be scrapped, cleaned, or sanitized as circumstances require.

(b) Utensils and equipment shall be handled and stored so as to be protected from contamination. Single-service utensils shall be contained only in sanitary containers or approved sanitary dispensers, stored in a clean, dry place until used, handled in a sanitary manner, and used once only.

SEC. 2.  Chapter 6 (commencing with Section 28190) of Division 22 of the Health and Safety Code is repealed.

SEC. 3.  Chapter 11 (commencing with Section 28520) of Division 22 of the Health and Safety Code is repealed.

SEC. 4.  Chapter 14 (commencing with Section 28800) of Division 22 of the Health and Safety Code is repealed.

SEC. 5.  If any provision of this act or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are severable.

SEC. 6.  No appropriation is made and no reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution or Section 2231 or 2234 of the Revenue and Taxation Code because the only costs which may be incurred by a local agency or school district will be incurred because this act

creates a new crime or infraction, changes the definition of a crime or infraction, changes the penalty for a crime or infraction, or eliminates a crime or infraction.

(2) Under existing
Water District Law in
treatment facilities, bu
pollution or contamina

This bill would au
investigations, examina
to require persons dis
the system with the
comment upon applic
systems; to enjoin the
by the discharges; and
civil suit. The bill wou
would also be a lien o
district taxes are colle

The bill would also
state law or county o
require the district to
law or regulation rela
bill would authorize e
the other party for a
would authorize the
Improvement Act of
specified pollution aba
program by making v
prescribed.

(3) Article XIII B
the Revenue and Tax

# EXHIBIT 7

Document2

Volume 1

# STATUTES OF CALIFORNIA

## 1960 AND 1961

CONSTITUTION OF 1879 AS AMENDED
MEASURES SUBMITTED TO VOTE OF ELECTORS,
SPECIAL ELECTION, JUNE 7, 1960
GENERAL ELECTION, NOVEMBER 8, 1960

GENERAL LAWS, AMENDMENTS TO CODES, RESOLUTIONS,
AND CONSTITUTIONAL AMENDMENTS

PASSED AT

THE 1960 REGULAR SESSION OF
THE LEGISLATURE

THE 1960 FIRST AND SECOND EXTRAORDINARY
SESSIONS OF THE LEGISLATURE
AND

THE 1961 REGULAR SESSION OF THE LEGISLATURE



Compiled by
RALPH N. KLEPS
Legislative Counsel

1812

STATUTES OF CALIFORNIA [Ch. 632

Such tax shall be in addition to any tax levied to meet the bonded indebtedness of said district and all interest thereon. If the district has been divided into zones, the taxes to be levied as provided in this section shall be apportioned in accordance with the zones established for the levying and collection of taxes to pay the principal and interest of the bonds of the district.

CHAPTER 632

An act to amend Section 27491 of and add Article 4 (commencing at 27540) to Chapter 10 of Part 3 of Division 2 of Title 3 of the Government Code, relating to coroners and coroners inquests.

[Approved by Governor June 1, 1961. Filed with Secretary of State June 2, 1961.]

The people of the State of California do enact as follows:

SECTION 1. Article 4 (commencing at Section 27540) is added to Chapter 10 of Part 3 of Division 2 of Title 3 of the Government Code, to read:

Article 4. Coroners' Inquest in Counties Containing a Population of 4,000,000 or More

27540. This article applies only to counties with a population of 4,000,000 or more. In such a county, the coroner shall hold inquests pursuant to the provisions of this article.

27541. The coroner may in his discretion, and shall when requested by the district attorney, sheriff, city prosecutor or a chief of police of a city in the county in which the coroner has jurisdiction, hold an inquest. Such inquest may be held by the coroner sitting without a jury, or by a coroner's jury in the discretion of the coroner, except that such inquest must be by coroner's jury when such jury is requested by the district attorney, sheriff, city prosecutor or a chief of police of a city in the county in which the coroner has jurisdiction.

27542. Where an inquest is held by a coroner's jury, the provisions of Sections 27492 through 27497 shall be applicable. Where an inquest is held by a coroner sitting without a jury or by a coroner's jury, the provisions of Section 27498 through 27502, 27511 and 27513 shall be applicable.

27513. If it appears that an error in the identity of the body has been made, the coroner may call another inquest without reference to the court, and a memorandum of the error shall be entered upon the erroneous inquisition.

27544. The testimony of the witnesses examined before the coroner shall be filed in the office of the county clerk, without any verdict.

*In effect September 15, 1961*

*Application to counties*

*Inquest*

*Error in identity*

*Testimony filed with county clerk*

---

Ch. 633] 1961 REGULAR SESSION 1813

27545. The testimony of the witnesses examined before the coroner's jury shall be filed by the coroner, with the inquisition, in the office of the county clerk.

27546. After hearing the testimony, the jury shall render an advisory verdict and certify it by an inquisition in writing signed by the members of the jury, setting forth: (a) the name of the person killed, and when, where, and by what means he came to his death, and (b) if his death was occasioned by the act of another, whether it was occasioned by criminal means, without naming any person as being responsible therefor.

SEC. 2. Section 27491 of said code is amended to read:

27491. It shall be the duty of the coroner to determine the cause of death of any person reported to the coroner as having been killed by violence, or who has suddenly died under such circumstances as to afford a reasonable ground to suspect that his death has been occasioned by the act of another by criminal means, or who has committed suicide, and of all deaths of which the provisions of the Health and Safety Code make it the duty of the coroner to sign certificates of death. In order to make such determination he may in his discretion take possession of and inspect the body of the decedent, which shall include the power to exhume such body, make or cause to be made a post mortem examination or autopsy thereon, and make or cause to be made an analysis of the stomach, blood, or contents, or organs, or tissues of the body, and secure professional opinions as to the result of such post mortem examination. He shall cause the information secured either to be reduced to writing or permanently preserved on recording discs or other similar recording media and forthwith filed by him in his records of the death of the individual. He may also in his discretion, if the circumstances warrant it, hold an inquest. He shall have the right to retain only such tissues of the body removed at the time of autopsy as may, in his opinion, be necessary or advisable to the investigation of the case, or for the verification of his findings.

CHAPTER 633

An act to repeal Chapter 11 (commencing at Section 28600) of Division 21 of, and to add Chapter 11 (commencing at Section 28520) to Division 21 of, the Health and Safety Code, relating to sanitation and health requirements for restaurants, itinerant restaurants, vehicles, and vending machines.

[Approved by Governor June 1, 1961. Filed with Secretary of State June 2, 1961.]

The people of the State of California do enact as follows:

SECTION 1. Chapter 11 (commencing at Section 28600) of Division 21 of the Health and Safety Code is repealed.

*Same*

*Advisory verdict*

*Determination of cause of death*

*In effect September 15, 1961*

*Repeal*

[Ch. 633]

Sec. 2. Chapter 11 (commencing at Section 28520) is added to Division 21 of said code, to read:

CHAPTER 11. SANITATION OF RESTAURANTS, ITINERANT RESTAURANTS, VEHICLES AND VENDING MACHINES

Article 1. Definitions and General Provisions

**Short title** 28520. This chapter is known as the "California Restaurant Act."

**Construction** 28521. Unless the context otherwise requires, the definitions set forth in this article govern the construction of this chapter.

**"Restaurant"** 28522. "Restaurant" means any coffee shop, cafeteria, short-order cafe, luncheonette, tavern, cocktail lounge, sandwich stand, soda fountain, private and public school cafeteria or eating establishment, in-plant or employee eating establishment, and any other eating establishment, organization, club including veterans' club, boardinghouse, guesthouse, or political subdivision, which gives, sells, or offers for sale, food to the public, guests, patrons, or employees as well as kitchens in including catering functions. The term "restaurant" shall not include itinerant restaurants, vending machines, vehicles, cooperative arrangements by employees who purchase food or beverages for their own consumption and where no employee is assigned full time to care for or operate equipment used in such arrangement, or private homes; nor shall the term "restaurant" include private clubs or other nonprofit organizations which purchase food or other nonprofit organization their members and where no employee or member is assigned full time to care for or operate equipment used in such arrangement.

**"Itinerant restaurant"** 28523. "Itinerant restaurant" means any restaurant, operating from temporary facilities, serving, offering for sale, selling, or giving away food or beverage, and includes, but is not limited to, a restaurant where only wrapped sandwiches or other wrapped and packaged, ready-to-eat foods are served, and any mobile unit on which food is prepared and served.

**"Vehicle"** 28524. "Vehicle" means any vehicle upon which food or beverage is displayed, sold, or offered for sale at retail, or given away to the public, but not including bakery delivery vehicles which are used exclusively to carry bakery products in sealed packages which are subject to the provisions of Section 28235.

**"Vending machine"** 28525. "Vending machine" means any self-service device offered for public use, which, upon insertion of a coin, coins or token, or by other means, dispenses unit servings of food or beverage, either in bulk or in package, without the necessity of replenishing the device between each vending operation, but not including devices dispensing peanuts, wrapped candy, gum, or ice exclusively.

**"Machine location"** 28526. "Machine location" means the room, enclosure, space, or area where one or more vending machines are installed and operated.

**"Food and beverage"** 28527. "Food or beverage" includes all articles used for food, drink, confectionery or condiment, whether simple or compound, and all substances and ingredients used in the preparation thereof for human consumption.

**"Employee"** 28528. "Employee" means any person working in an operation covered by this chapter.

**"Utensils"** 28529. "Utensils" includes any kitchenware, tableware, glasses, cutlery, containers, implements, or other equipment with which food or beverage comes in contact during storage, display, preparation, serving, or through use by an employee or consumer.

**"Single service"** 28530. "Single service," as used with reference to any utensil, container, implement, wrapper, or other article, means a utensil, container, implement, wrapper or other article intended for use only once in the preparation, storage, display, service, or consumption of food or beverage.

**"Product contact surface"** 28531. "Product contact surface" means any surface of service or consumption of food or beverage the vending machine, appurtenances, or containers which comes into direct contact with any food, beverage, or ingredient.

**"Multiuse"** 28532. "Multiuse," as used with reference to any utensil, container, implement, wrapper, or other article, means a container, implement, wrapper, or other article, intended for use for more than one time in the preparation, storage, display, service, or consumption of food or beverage.

**"New"** 28533. "New," as used in reference to new restaurants or machines new equipment, applies to restaurants constructed or machines or equipment installed after the effective date of the act enacted at the 1961 Regular Session of the Legislature adding this chapter.

**"Person"** 28534. "Person" means natural person, club, including veterans' club, firm, corporation, partnership, organization, association, or political subdivision.

**"Local health officer"** 28535. "Local health officer" means the city, county, or district health officer having jurisdiction over an operation covered by this chapter.

Article 2. Sanitation Requirements for Restaurants

**Floors** 28540. The floor surfaces in all rooms in which food or beverage is stored or prepared, utensils are washed, or refuse or garbage is stored, and the floor surfaces of toilet, dressing, or locker rooms and of walk-in refrigerators, shall be of such construction and material as to be easily cleaned. They shall be smooth, in good repair, and kept clean.

The floors of rooms in which food or beverage is served shall be clean and kept in good repair. The use of sawdust on floors of food preparation rooms is prohibited.

**Walls and ceilings: Construction**

28541. The walls and ceilings of all kitchens shall be of light-colored, smooth, washable material and kept clean and in good repair. The walls and ceilings of food storage rooms and toilet rooms shall be of such construction as to be easily cleaned and shall be kept clean and in good repair.

This section shall not be applicable to storage rooms where foods or beverages in unopened bottles, cans, cartons, sacks, or other original shipping containers, are stored, but such storage rooms shall be kept free from vermin and in a sanitary condition.

**Same: Cleaning**

28542. Walls and ceilings of all rooms shall be cleaned as often as is necessary to maintain them in a clean condition. In rooms or areas where food is prepared, or where utensils are washed, acoustical tile may be used, if it is not installed less than six feet above the floor and where used it complies with all applicable requirements of this section and Section 28541.

**Control of vermin, etc.**

28543. All restaurants shall be so equipped, maintained, and operated as to control the entrance, harborage and breeding of vermin, including flies. When flies or other vermin are present, effective control measures shall be instituted for their control or elimination.

**Light**

28544. Light shall be provided in all areas and rooms of a restaurant. The working surfaces in rooms or areas in which food or beverages, other than alcoholic beverages, are prepared or in which utensils are washed shall be provided with at least 10 foot-candles of light. Food and utensil storage rooms, and toilet and dressing rooms shall be provided with at least four foot-candles of light, as measured 30 inches above the floor.

During general cleanup activities, adequate light for efficient conduct of such activities shall be provided in the area being cleaned.

**Ventilation**

28545. Ventilation shall be provided for dissipation of disagreeable odors and condensation in all rooms of a restaurant where food or beverages are prepared, stored, or served, where utensils are washed, in garbage storage rooms, and in all toilet rooms and dressing rooms.

At or above all cooking equipment, such as ranges, griddles, ovens, deep-fat fryers, barbecues, and rotisseries, there shall be provided mechanical exhaust ventilation equipment, as required to effectively remove cooking odors, smoke, steam, grease, and vapors.

All food preparation and dishwashing areas shall have sufficient ventilation to provide a reasonable condition of comfort for the employees working there, consistent with the job performed by the employee.

**Hot and cold running water**

28546. Hot and cold running water under pressure shall be provided in all areas in which food is prepared or utensils are washed. The water supply shall be of a safe, sanitary quality.

**Toilet facilities**

28547. Toilet facilities shall be provided convenient to the employees on the premises. Where there are five or more em-

---

ployees of different sex, separate toilets shall be provided for each sex. Toilet rooms shall be separated from other portions of the restaurant by tight-fitting, self-closing doors.

**Handwashing facilities**

28548. Handwashing facilities, in good repair, shall be provided for employees within or adjacent to toilet rooms and shall be equipped with hot and cold running water. Handwashing detergent or soap and single-service sanitary towels or hot-air blowers shall be provided at handwashing facilities in permanently installed dispensing devices.

No person shall begin or resume work in a restaurant after visiting the toilet without first washing his hands. Legible signs shall be posted in each toilet room directing attention to this requirement.

**Dressing room**

28549. A room or enclosure, separated from toilets or any food storage or food preparation area, shall be provided where employees may change and store their outer garments. No employee shall dress or undress or store his clothing in any other area on the premises.

**Cleanliness**

28550. All toilets, lavatory facilities, and change rooms shall be maintained in a clean and sanitary condition.

**Soaps, towels, etc.**

28551. Toilet paper, handwashing detergent or soap, and single-service sanitary towels or hot-air blowers shall be provided at all times when the restaurant is in operation.

**Plumbing**

28552. All plumbing shall be installed and maintained so as to prevent contamination of the water supply and minimize the possibility of contamination of foods and specialized equipment used in the washing of utensils.

**Utensils**

28553. All multiuse utensils and all show and display cases or windows, counters, shelves, tables, refrigeration equipment, sinks, dishwashing machines and other equipment or utensils used in connection with the preparation, service, and display of food, in the operation of a restaurant, shall be made of nontoxic materials and so constructed, installed, and maintained as to be readily cleaned, and shall be kept clean and in good repair.

**Adequate cleaning facilities**

28554. All restaurants shall have adequate facilities for the cleaning and sanitizing of all multiuse utensils.

**Dishwashing facilities**

28555. Where single-service eating and drinking utensils are used exclusively, no facilities for dishwashing need be required, except that if multiuse kitchen utensils are used, then at least a two-compartment metal sink, equipped with hot and cold running water, and metal drainboards shall be required.

**Bactericidal process**

28556. All multiuse eating and drinking utensils shall be thoroughly cleaned and subjected to an effective bactericidal process after each usage.

**Washing by hand**

28557. Where multiuse eating and drinking utensils are washed by hand, one of the following facilities shall be provided for washing and sanitization:

(a) A three-compartment metal sink with metal drainboards, where chemicals are used for sanitization.

(b) A two-compartment metal sink with metal drainboards, where hot water is used for sanitization. The rinse compart-

[UL 665]

*Continued use of two-compartment metal sink*

ment shall be equipped with heating facilities, so insulated or separated from the wash sink as to maintain the rinse water at not less than 180 degrees Fahrenheit.

28558. A two-compartment metal sink, having metal drainboards, with a chemical sanitizer, which is in use in a restaurant on the effective date of the act enacted at the 1961 Regular Session of the Legislature adding this chapter, may be continued in use until replaced because of deterioration thereof or modernization of the premises.

In all new restaurants, or where replacement of existing equipment takes place, if the use of a chemical sanitizer is proposed, there shall be provided a three-compartment metal sink, with metal drainboards.

*Three-compartment sink methods*

28559. (a) All multiuse eating and drinking utensils, when washed by hand in a three-compartment sink, shall be washed in hot water with an effective detergent until thoroughly clean. They shall then be rinsed in clear water before being immersed in a solution containing a bactericidal chemical for such time and in such concentration as shall be first approved and prescribed by the state department; provided, that such fact with a hypochlorite solution containing 100 parts per million of available chlorine for 30 seconds.

*Two-compartment sink methods*

(b) All multiuse eating and drinking utensils, when washed by hand in a two-compartment sink, shall be washed in hot water with an effective detergent until thoroughly clean and then immersed for at least one-half minute (30 seconds) in clean hot water, at a temperature of at least 180 degrees Fahrenheit, as measured by a thermometer, or immersed in a solution containing a bactericidal chemical as prescribed in subdivision (a).

*Other methods*

(c) Other methods may be used if approved by the state department.

*Machine washers*

28560. Where multiuse eating and drinking utensils are washed by machine, the machine shall be so designed, installed, and operated as to thoroughly clean and to provide an effective bactericidal rinse for all such utensils.

*Standard spray-type machines*

All new spray-type machines which are designed for a hot-water bactericidal rinse shall conform to the Standard No. 3 of the National Sanitation Foundation, as amended in September, 1956, and shall be installed and operated in accordance with such standard, or such machines shall be of a type, and shall be installed and operated, as approved by the state department. The velocity, quantity, and distribution of the washwater, type and concentration of detergent used therein, and the time the utensils are exposed to the water, shall be such as to thoroughly clean the utensils. The machine shall be connected to a hot water system so installed and maintained as to continuously provide water of at least 180 degrees Fahrenheit at the connection to the machine during the required bactericidal rinse. The quantity of rinse water and the time of exposure shall be such as to provide bactericidal effectiveness equivalent to that provided by compliance with Standard No. 3 of the National Sanitation Foundation, as amended in September, 1956, or that approved by the state department.

*Multiuse kitchen utensils*

28561. All multiuse kitchen utensils used in the preparation or serving of food or beverage shall be thoroughly cleaned after each usage or following each day's operations or as circumstances require.

*Same: Washed by hand*

28562. Where multiuse kitchen utensils are washed by hand, there shall be provided at least a two-compartment metal sink, with metal drainboards. There shall be provided hot and cold running water.

*Methods of dishwashing*

28563. In all dishwashing operations, dishes shall be scraped or rinsed prior to dishwashing.

Different methods or materials for washing or bactericidal rinsing of utensils may be used if approved by the state department as providing results equivalent to those produced by the methods required by this article.

The local health officer may test the adequacy of the bactericidal process by performing rim counts in accordance with methods approved by the state department, and the average of such counts on eating and drinking utensils at all times after washing and before serving shall not exceed 100 colonies per utensil.

*Storage facilities; utensils*

28564. Adequate and suitable space shall be provided for the storage of utensils and equipment. The storage rooms, shelves, and racks shall be constructed and installed so as to be easily cleaned. Utensils and equipment shall be so handled and stored as to be protected from contamination. Single-service utensils shall be obtained only in sanitary containers, shall be stored in a clean, dry place until used, handled in a sanitary manner, and used once only.

*Same: Waste disposal*

28565. Every restaurant shall be provided with such facilities and equipment as are necessary to properly store or dispose of all waste material.

*Food waste disposals*

28566. Food waste disposals, when provided, shall be connected to a public sewerage system or a private sewerage disposal system which is designed to properly collect and dispose of such waste.

*Inside waste storage*

28567. All food waste and rubbish containing food waste which is kept inside the restaurant prior to disposal shall be kept in tight, nonabsorbent containers covered with close-fitting lids.

*Outside waste storage*

All food waste and rubbish containing food waste which is stored outside of the restaurant prior to collection or disposal shall be kept in rodentproof containers covered with close-fitting lids.

All food waste and rubbish containing food waste shall be removed and disposed of in a sanitary manner as frequently as may be necessary to prevent the creation of a nuisance.

*Waste containers*

28568. Waste containers used for storing garbage shall be maintained in a clean and sanitary condition.

Liquid wastes

28560. All liquid wastes disposed of through the plumbing system of a restaurant shall discharge into the public sewerage system or into a private sewerage disposal system which satisfactorily disposes of such materials beneath the surface of the ground. Other types of private sewerage disposal systems shall be used only with the written approval of the local health officer.

Storage facilities. Food and beverages. Pure ingredients for food

28570. Adequate and suitable space shall be provided for the storage of food and beverage.

28571. Ingredients used in the preparation of foods or beverages, and all foods or beverages offered for sale, sold or served, shall be manufactured, produced, prepared, compounded, packed, stored, transported, kept for sale and served so as to be pure, free from adulteration and spoilage; shall be obtained from approved sources, when such approval is required by law; shall otherwise be fully fit for human consumption; and shall conform to the applicable provisions of Chapter 3 (commencing at Section 26450) of this division.

No food or beverage prepared in a private home shall be sold, or given away in a restaurant.

This section shall not be construed to require temperature controls.

Protection of food

28572. All food or beverage shall be prepared, stored, displayed, dispensed, placed, and served so as to be protected from dust, flies, vermin, pollution by rodents, unnecessary handling, droplet infection, overhead leakage, or other contamination.

Storage of food on floors

28573. No food, or food in a container, shall be stored directly on the floor. They shall be stored at least six inches above the floor, or under such conditions as are approved by the state department.

Unpackaged foods

28574. Displays of unpackaged foods, arranged for self-service to the public, shall be effectively shielded so as to intercept a direct line between the customer's mouth and the food being displayed.

Perishable food

28575. Except as provided in Section 28578, all readily perishable food or beverage, capable of supporting rapid and progressive growth of micro-organisms which can cause food infections or food intoxications, and which are intended to be held prior to processing, or are to be reused on the premises, shall be maintained at or below a temperature of 50 degrees Fahrenheit. No such readily perishable food or beverage which pared shall be held above such temperature for such periods of time and under such conditions which can cause food intoxication.

Refrigerators

28576. All refrigerators shall be kept in good repair and clean. All food stored in refrigerators shall be protected from contamination. Foods that require no further preparation before service, when stored in refrigerators, shall either be covered or so placed that they are not subject to contamina-

tion from containers, unwashed fruits and vegetables, raw meats, or other contamination from above. An accurate thermometer shall be installed in all refrigerators so as to be readily visible.

Frozen foods

28577. All frozen foods shall be kept at a temperature which will keep such food in a frozen state until ready for processing or preparation. No food which has been completely thawed shall be refrozen.

Warmed foods

28578. All readily perishable food or beverages, capable of supporting rapid and progressive growth of micro-organisms which can cause food infections or food intoxications, when being maintained hot for serving, or while being served hot, shall be kept in devices which maintain the temperature of all portions of the food or beverage above 140 degrees Fahrenheit. An accurate thermometer, suitable for measuring temperature of food, shall be kept readily available.

Previously served food

28579. No article of food or any beverage which has been previously served to any person or returned from any table shall be used in the preparation of other foods or beverages for human consumption.

Insecticides

28580. No insecticide or other poisonous substance shall be stored in any food preparation room or in any room where food products are kept, stored, or served except in a separate cabinet provided for that purpose. All poisonous substances shall be specifically and plainly labeled as to contents and hazardous use. No insecticide or rodenticide shall be used in a manner which would cause contamination of food or utensils.

Live animals, etc.

28581. No live animal, bird, or fowl shall be kept or allowed in any room where food or beverage is prepared, stored, kept, or served. This section shall not apply to dogs being used by the blind.

Litter and rubbish

28582. The premises of all restaurants shall be kept clean and free, by all reasonable means, of litter and rubbish.

Separation of sleeping quarters

28583. Living and sleeping quarters shall be separated entirely, with a solid partition, from the restaurant. No couch, cot, bed, or other sleeping accommodation shall be maintained or kept in any room where food is prepared, stored, or served.

Soiled linens, etc.

28584. Soiled linens, coats, and aprons shall be kept in containers provided for this purpose. No tablecloths, napkins, or other linen that has been used for any other purpose since laundering shall be used for wiping utensils, counters, tables, food preparation or dispensing equipment, or in connection therewith.

Article 3.   Sanitation Requirements for Itinerant Restaurants

Itinerant restaurants. Floors

28590. The floors of all rooms or areas of an itinerant restaurant shall be of such construction as to be smooth, in good repair, and kept clean. Dust control measures shall be effected in the surrounding area to reduce the hazard of dust.

1822    STATUTES OF CALIFORNIA    [Ch. 633]

[Ch. 633]    1961 REGULAR SESSION

*Same: Walls*

28591. The walls and ceilings of all food preparation and utensil washing areas shall be of light-colored, smooth, washable material and shall be kept clean and in good repair. If able material and shall be kept clean and in good repair. Temporary stand may be of clean, light-colored canvas.

*Same: Vermin*

28592. All itinerant restaurants shall be so equipped, maintained, and operated as to effectively control the entrance, harborage, and breeding of vermin, including flies. When flies or other vermin are present, effective control measures shall be instituted for their control or elimination.

*Same: Light*

28593. Light shall be provided in all areas and rooms of an itinerant restaurant. The working surfaces in rooms or areas in which food or beverages, other than alcoholic beverages, are prepared or in which utensils are washed shall be provided with at least 10 foot-candles of light. Food and utensil storage areas, if provided, shall be lighted to an intensity of four foot-candles of light, as measured 30 inches above the floor.

During general cleanup activities, adequate light for efficient conduct of such activities shall be provided in the area being cleaned.

*Same: Ventilation*

28594. Ventilation shall be provided for dissipation of disagreeable odors and condensation in all rooms or areas of an itinerant restaurant where food or beverages are prepared, stored, or served, where utensils are washed, and in garbage storage rooms or areas.

At or above all cooking equipment, such as ranges, griddles, ovens, deep-fat fryers, barbecues, and rotisseries, there shall be provided mechanical exhaust ventilation equipment, as required to effectively remove cooking odors, smoke, steam, grease, and vapors.

*Same: Hot and cold running water*

28595. Hot and cold running water under pressure shall be provided in all areas in which food is prepared or utensils washed. The water supply shall be of a safe, sanitary quality.

*Same: Toilet facilities*

28596. Toilet facilities shall be provided convenient to the employees. Where there are five or more employees of different sex, separate toilets shall be provided for each sex. At public gatherings, including, but not limited to, fairs, carnivals and circuses, where a number of itinerant restaurants are operating, toilets shall be provided in the ratio of at least one water closet, chemical toilet, or privy for each 15 employees.

*Same: Handwashing facilities*

28597. Handwashing facilities, in good repair, shall be provided for employees within or adjacent to the food preparation area and shall be equipped with hot and cold running water. Handwashing detergent or soap and single-service sanitary towels shall be provided at handwashing facilities, in permanently installed dispensing devices.

*Same: Washing hands*

No person shall begin or resume work in an itinerant restaurant after visiting the toilet without first washing his hands. Legible signs shall be posted in each toilet room directing attention to this requirement.

28598. All toilet and lavatory facilities shall be maintained in a clean and sanitary condition.

28599. Toilet paper, handwashing detergent or soap, and towels shall be provided at all times when the itinerant restaurant is in operation.

*Same: Plumbing*

28600. All plumbing shall be installed and maintained so as to prevent contamination of the water supply and minimize the possibility of contamination of utensils.

*Construction with non-toxic materials*

28601. All multiuse utensils and all show and display cases or windows, counters, shelves, tables, refrigeration equipment, sinks, dishwashing machines and other equipment or utensils used in connection with the preparation, service and display of food, in the operation of an itinerant restaurant, shall be made of nontoxic materials and so constructed, installed and maintained as to be readily cleaned, and shall be kept clean and in good repair.

*Dishwashing facilities*

28602. Where single-service eating and drinking utensils are used exclusively, no facilities for dishwashing shall be required, except that if multiuse kitchen utensils are used, then at least a two-compartment metal sink, equipped with hot and cold running water, and metal drainboards shall be required.

28603. If multiuse eating and drinking utensils are used, the itinerant restaurant shall have adequate facilities for their cleaning and sanitizing. These utensils shall be thoroughly cleaned and subjected to an effective bactericidal process after each usage.

*Same: Dishwashing by hand: Methods*

28604. Where multiuse eating and drinking utensils are washed by hand, one of the following facilities shall be provided for washing and sanitization:

(a) A three-compartment metal sink with metal drainboards, where chemicals are used for sanitization.

(b) A two-compartment metal sink with metal drainboards, where hot water is used for sanitization. The rinse compartment shall be equipped with heating facilities, so insulated or separated from the wash sink as to maintain the rinse water at not less than 180 degrees Fahrenheit.

28605. (a) All multiuse eating and drinking utensils, when washed by hand in a three-compartment sink, shall be washed in hot water until thoroughly clean. They shall then be rinsed in clear water before being immersed in hot water which shall be at least one water in a solution containing a bactericidal chemical for such time and in such concentration as shall be first approved and prescribed by the state department, provided that such process produces results equivalent to those produced by contact with a hypochlorite solution containing 100 parts per million of available chlorine for 30 seconds.

(b) All multiuse eating and drinking utensils, when washed by hand in a two-compartment sink, shall be washed in hot water with an effective detergent until thoroughly clean, and then immersed for at least 30 seconds in clean hot water, at a

61—L-1555

temperature of at least 180 degrees Fahrenheit, as measured by a thermometer.

(c) Other methods may be used if approved by the state department.

**Dishwashing by machine: Methods**

28606. Where multiuse eating and drinking utensils are washed by machine, the machine shall be so designed, installed and operated as to thoroughly clean and to provide an effective bactericidal rinse for all such utensils.

All new spray-type machines which are designed for a hot-water bactericidal rinse shall conform to the Standard No. 3 of the National Sanitation Foundation, as amended in September, 1956, and shall be installed and operated in accordance with such standard; or such machines shall be of a type, and shall be installed and operated, as approved by the state department. The velocity, quantity, and distribution of the wash-water, and type and concentration of detergent used therein, and the time the utensils are exposed to the water, shall be such as to thoroughly clean the utensils. The machine shall be connected to a hot water system so installed and maintained as to continuously provide water of at least 180 degrees Fahrenheit, at the connection to the machine during the required bactericidal rinse. The quantity of rinse water and the time of exposure shall be such as to provide bactericidal effectiveness equivalent to that provided by compliance with Standard No. 3 of the National Sanitation Foundation, as amended in September, 1956, or that approved by the state department.

**Kitchen utensils**

28607. All multiuse kitchen utensils used in the preparation or serving of food and drink shall be thoroughly cleaned after each usage or following each day's operations, or as circumstances require.

**Dishwashing methods**

28608. In all dishwashing operations, dishes shall be scraped or rinsed prior to dishwashing.

Different methods or materials for washing or bactericidal rinsing of utensils may be used if approved by the state department as providing results equivalent to those produced by the methods required by this article. The local health officer may test the adequacy of the bactericidal process by performing rim counts in accordance with methods approved by the state department, and the average of such counts on eating and drinking utensils at all times after washing and before serving shall not exceed 100 colonies per utensil.

**Storage facilities: Utensils**

28609. Adequate and suitable space shall be provided for the storage of utensils and equipment. The storage rooms, shelves, and racks shall be constructed and installed as to be easily cleaned. Utensils and equipment shall be so handled and stored as to be protected from contamination. Single-service utensils shall be obtained only in sanitary containers, shall be stored in a clean, dry place until used, handled in a sanitary manner, and used once only.

**Waste: Storage: Disposal**

28610. Every itinerant restaurant shall be provided with such facilities and equipment as are necessary to properly collect, store or dispose of all waste material.

28611. Food waste disposals, when provided, shall be connected to a public sewerage system or a private sewerage disposal system which is designed to properly collect and dispose of such waste.

28612. All food waste and rubbish containing food waste which is kept inside the restaurant prior to disposal shall be kept in tight, nonabsorbent containers covered with close-fitting lids.

All food waste and rubbish containing food waste which is stored outside of the itinerant restaurant prior to collection or disposal shall be kept in rodentproof containers covered with close-fitting lids.

All food waste and rubbish containing food waste shall be removed and disposed of in a sanitary manner as frequently as may be necessary to prevent the creation of a nuisance.

28613. Waste containers used for storing garbage shall be maintained in a clean and sanitary condition.

28614. All liquid wastes disposed of through the plumbing system of an itinerant restaurant shall discharge into the public sewerage system or into a private sewerage disposal system which satisfactorily disposes of such materials beneath the surface of the ground. Other types of private sewerage disposal systems shall be used only with the written approval of the local health officer.

**Storage: Food and beverages**

28615. Adequate and suitable space shall be provided for the storage of food or beverage.

**Storage: Un-adulterated ingredients**

28616. Ingredients used in the preparation of foods or beverages, and all foods or beverages offered for sale, sold or served, shall be manufactured, produced, prepared, compounded, packed, stored, transported, kept for sale and served so as to be pure, free from adulteration and spoilage; shall have been obtained from approved sources, when such approval is required by law; shall otherwise be fully fit for human consumption; and shall conform to the applicable provisions of Chapter 3 (commencing at Section 26450) of this division.

No food or beverage prepared in a private home shall be used in the preparation of foods or beverages, offered for sale, sold or given away in an itinerant restaurant.

This section shall not be construed to require temperature controls.

**Storage, etc.: Food and beverages**

28617. All food or beverage shall be prepared, stored, displayed, dispensed, placed, and served so as to be protected from dust, flies, vermin, pollution by rodents, unnecessary handling, droplet infection, overhead leakage, or other contamination.

**Storage: On floor**

28618. No food, or food in a container, shall be stored directly on the floor. They shall be stored at least six inches

stored, or served. This section shall not apply to dogs being used by the blind.

28627. The itinerant restaurant and the adjacent areas of influence thereto, shall be kept clean and free, by all reasonable means, of litter and rubbish. [Litter and rubbish]

28628. Living and sleeping quarters shall be separated entirely, with a solid partition, from the itinerant restaurant. No couch, cot, bed, or other sleeping accommodation shall be maintained or kept in any room where food is prepared, stored, or served. [Separation of sleeping quarters]

28629. Soiled linens, coats, and aprons shall be kept in containers provided for this purpose. No tablecloths, napkins, or other linen that has been used for any other purpose since laundering shall be used for wiping utensils, counters, tables, food preparation or dispensing equipment, or in connection therewith. [Soiled linens, etc.]

Article 4. Sanitation Requirements for Vehicles

28640. The name and address of the owner or operator of the vehicle shall be plainly indicated on each side of the exterior of the vehicle, in letters at least three inches high. [Owner identified]

28641. The compartments on all vehicles in which food or beverage is displayed, sold, offered for sale, or given away shall have tightly fitted exterior doors, which when closed, enclose the compartment. [Exterior doors]

28642. The surfaces in all compartments in which food or beverage is stored, displayed, sold, offered for sale, or given away shall be of such construction and material as to be easily cleaned and to prevent vermin harborage, and shall be washable, in good repair, and kept clean. Effective control measures shall be instituted for vermin control when necessary. [Storage surfaces / Vermin control]

28643. During cleanup activities, adequate light for efficient conduct of such activities shall be provided in the area of the vehicle being cleaned. [Lighting]

28644. No insecticide, rodenticide, or other poisonous material shall be stored in any food compartment, nor used in such a manner as to cause contamination of food or utensils. [Insecticides]

28645. All utensils used for dispensing, service, and display of food or beverage and with which food or beverage comes in contact shall be so constructed, installed, and maintained as to be readily cleaned, and shall be kept clean and in good repair. Cleaning shall be done at an establishment with proper facilities, approved by the local health officer. [Utensils]

28646. Single-service utensils shall be obtained only in sanitary containers, shall be stored in a clean, dry place until used or placed in a closed dispenser which protects them from contamination, handled in a sanitary manner, and used once only. [Storage of single-service utensils]

28647. The vehicle operator shall maintain a suitable container for refuse. He shall be responsible for sanitation of the environs of the place of operation unless operating on private [Refuse containers]

above the floor, or under such other conditions as are approved by the state department.

28619. Displays of unpackaged foods, arranged for self-service to the public, shall be effectively shielded so as to intercept a direct line between the customer's mouth and the food being displayed. [Displays]

28620. Except as provided in Section 28623 all readily perishable food or beverage, capable of supporting rapid and progressive growth of micro-organisms which can cause food infections or food intoxications, and which are intended to be held prior to processing, or are to be reused on the premises shall be maintained at or below a temperature of 50 degrees Fahrenheit. No such readily perishable food or beverage which is to be served to the consumer on the premises where prepared shall be held above such temperature for such periods of time and under such conditions which can cause food intoxication. [Refrigeration]

28621. All refrigerators shall be kept in good repair and clean. All food stored in refrigerators shall be protected from contamination. Foods that require no further preparation before service, when stored in refrigerators, shall either be covered or so placed that they are not subject to contamination from containers, unwashed fruits and vegetables, raw meats, or other contamination from above. An accurate thermometer shall be installed in all refrigerators so as to be readily visible. [Same]

28622. All frozen foods shall be kept at a temperature which will keep such food in a frozen state until ready for processing or preparation. No food which has been completely thawed shall be refrozen. [Frozen foods]

28623. All readily perishable food or beverages, capable of supporting rapid and progressive growth of micro-organisms which can cause food infections or food intoxications, hot when being maintained hot for serving, or while being served shall be kept in devices which maintain the temperature of all portions of the food or beverage above 140 degrees Fahrenheit. An accurate thermometer, suitable for measuring temperature of food, shall be kept readily available. [Warmed foods]

28624. No article of food or any beverage which has been previously served to any person or returned from any table shall be used in the preparation of other foods or beverages for human consumption. [Previously served food]

28625. No insecticide or other poisonous substance shall be stored in any food preparation room or in any room where food products are kept, stored, or served except in a separate cabinet provided for that purpose. All poisonous substances shall be specifically and plainly labeled as to contents and hazardous use. No insecticide or rodenticide shall be used in a manner which would cause contamination of food or utensils. [Insecticides, etc.]

28626. No live animal, bird, or fowl shall be kept or allowed in any room where food or beverage is prepared, [Live animals, etc.]

...manufacture is provided by the property owner or manager.

**Ingredients** 28648. Ingredients used in the preparation of foods or beverages, and all foods or beverages offered for sale, sold, or served, shall be manufactured, produced, prepared, compounded, packed, stored, transported, kept for sale, and served so as to be pure, free from adulteration and spoilage; shall have been obtained from approved sources, when such approval is required by law; shall otherwise be fully fit for human consumption; and conform to the applicable provisions of Chapter 3 (commencing at Section 26450) of this division.

No food or beverage prepared in a private home shall be sold, or given away in a vehicle.

This section shall not be construed to require temperature controls.

**Refrigeration** 28648.5. Except as provided in Section 28650, all readily perishable food or beverages, capable of supporting rapid and progressive growth of micro-organisms which can cause food infections or food intoxications, and which are intended to be stored or held, shall be maintained at or below a temperature of 60 degrees Fahrenheit. No such readily perishable food or beverage which is to be served to the consumer shall be held above such temperature for such periods of time and under such conditions which can cause food intoxication.

**Vermin** 28649. All food or beverages shall be wrapped, packaged, enclosed, dispensed, or handled so as to be protected from dust, flies, vermin, droplet infection, or other contamination.

**Warmed foods** 28650. All readily perishable food or beverages, capable of supporting rapid and progressive growth of micro-organisms which can cause food infections or food intoxications when being maintained hot for serving, or being served hot, shall be kept in devices which maintain the temperature of all portions of the food or drink above 140 degrees Fahrenheit. The devices shall be equipped with a thermometer showing their internal temperature.

Article 5. Sanitation Requirements for Vending Machines

**Sources of foods, etc.** 28660. Foods, beverages, and ingredients intended for sale through vending machines shall be obtained from sources complying with Section 28571.

**Contact surfaces** 28661. All product contact surfaces of containers and equipment shall be protected from contamination.

**Storage containers** 28662. All foods, beverages, and ingredients shall be stored and packaged in clean, protected containers and handled, transported, and vended in a sanitary manner. Wet storage of packaged products is prohibited.

**Perishable foods** 28663. Readily perishable foods offered for sale through vending machines shall be dispensed to the consumer in the individual, original container or wrapper into which it was placed at the commissary or at the manufacturer's or proces-

sor's plant, or such products shall be dispensed into single-service containers.

**Same** 28664. In vending machines dispensing readily perishable foods, beverages, or ingredients in bulk, the bulk supplies of such foods, beverages, or ingredients shall be transferred only to a bulk vending machine container and appurtenances which are clean and have been subjected to an approved bactericidal process in accordance with Sections 28554 to 28563, inclusive.

**Same** 28665. Readily perishable foods or beverages or ingredients within the vending machine shall be maintained at a temperature not higher than 50 degrees Fahrenheit or a temperature not lower than 140 degrees Fahrenheit. Vending machines dispensing readily perishable foods or beverages shall be provided with controls which insure the maintenance of these temperatures at all times. An exception may be made for the actual time required to fill or otherwise service the machine and for a maximum recovery period of 30 minutes following completion of filling or servicing operations. Such controls shall also place the machine in an inoperative condition until serviced by the operator, in the event of power failure or other condition which permits the food storage compartment to attain a temperature above 50 degrees Fahrenheit, or below 140 degrees Fahrenheit, whichever is applicable. Vending machines dispensing readily perishable foods or beverages shall be provided with a thermometer which, to an accuracy of plus or minus two degrees Fahrenheit, indicates the air temperature of the food storage compartment.

**Milk** 28666. In the case of vending machines that use fluid milk products as an ingredient in hot liquid foods or beverages, such milk product may be transferred at the machine location from the individual, original container of not more than one-half-gallon capacity to a vending machine bulk container which is clean and has been subjected to an approved bactericidal process in accordance with Sections 28554 to 28563, inclusive. In any such transfer, the entire contents of the individual, original container shall be used.

**Multiuse containers; Cleaned daily** 28667. All multiuse containers or parts of vending machines which come in direct contact with readily perishable foods, beverages, or ingredients shall be removed from the machine daily and thoroughly cleaned and effectively subjected to an approved bactericidal process at the commissary or other approved facility. The requirements for daily cleaning and bactericidal treatment may be waived by the local health officer for those contact surfaces which are maintained at all times at a temperature of not higher than 50 degrees Fahrenheit or at a temperature of not lower than 140 degrees Fahrenheit, whichever is applicable. Such parts shall, after cleaning and bactericidal treatment, be protected from contamination.

**Cleaning daily** 28668. All parts of vending machines which come into direct contact with other than readily perishable foods, shall be thoroughly cleaned and subjected to bactericidal treatment as specified in Sections 28554 to 28563, inclusive. The fre-

STATE OF CALIFORNIA                                    [Ch. 633

quency of the cleaning and bactericidal treatment shall be established by the local health officer, based upon the type of product being dispensed. A record of the cleaning and bactericidal treatment operations shall be maintained by the operator in each machine and shall be current for at least the past 30 days.

*Single-service containers used with vending machine*

28669. All single-service containers which receive food or beverage from machines dispensing such products in bulk, shall be purchased in sanitary cartons or packages which protect the containers from contamination, shall be stored in a clean, dry place until used, and shall be handled in a sanitary manner. The containers shall be stored in the original carton or package in which they are placed at the point of manufacture until introduced into the container magazine or dispenser of the vending machine. The containers stored within the vending machine shall be protected from manual contact, dust, insects, rodents, and other contamination.

*Location of vending machine*

28670. The machine location shall be such as to minimize the potential for contamination of the product, shall be easily cleanable, and shall be kept clean.

Each vending machine shall be located in a room, area, or space which can be maintained in a clean condition and which is protected from overhead leakage from drains and piping. Each vending machine shall be so located that the space around and under the machine can be readily cleaned and so that insect and rodent harborage is not created.

The floor area upon which vending machines are located shall be reasonably smooth, of cleanable construction, and capable of withstanding repeated washing and scrubbing. This space, and the immediate surroundings of each vending machine, shall be maintained in a clean condition.

*Vending machine construction*

28671. The vending machines shall be of sturdy construction and the exterior construction shall be so designed, fabricated, and finished as to facilitate its being kept clean and to minimize the entrance of insects and rodents.

The exterior construction of the vending machines shall be such as to facilitate cleaning and to minimize the entrance of insects and rodents, and the exterior of the machine shall be kept clean. Service connections shall be such as to protect against unintentional or accidental interruption of service to the machine.

Door and panel access openings to the product and container storage spaces of the machine shall be tight fitting, and, if necessary, gasketed so as to preclude the entrance of dust, moisture, insects, and rodents.

*Ventilation*

28672. All ventilation louvers or openings into vending machines shall be effectively screened against insects and rodents by screening materials of not less than 16 mesh to the inch or equivalent. An exception to this provision may be made for vending machines currently in use until such time as the machines are relocated or removed from present machine location for any other purposes.

[Ch. 633]

28673. In all new machines in which a condenser unit is an integral part of the machine, such unit shall be sealed from the product and container storage spaces.

*Seal condenser unit*

28674. Unless the vending machine is sealed to the floor so as to prevent seepage underneath or can be manually moved with ease, one or more of the following provisions shall be utilized to facilitate cleaning operation:

*Floor clearance*

(a) The machine shall be mounted on legs at least six inches in height.

(b) The machine shall be mounted on casters or rollers.

(c) The machine shall be mounted on gliders which permit it to be easily moved.

28675. All service connections through an exterior wall of the machine, including water, gas, electrical, and refrigeration connections, shall be grommeted or sealed to prevent the entrance of insects or rodents. All connections to such utilities shall be such as to discourage their unauthorized or unintentional disconnection.

*Service connections*

28676. All interior surfaces and component parts of the vending machines shall be so designed and constructed as to permit easy cleaning and shall be kept clean. All product contact surfaces of the machine shall be of smooth, nontoxic, corrosion resistant, and nonabsorbent material, shall be capable of withstanding repeated cleaning and bactericidal treatment by normal procedures, and shall be protected against contamination.

*Interior surface*

28677. Water used in vending machines shall be from a source approved by the local health officer and shall be of a safe sanitary quality.

*Water supply*

28678. All vending machines which dispense carbonated beverages and which are connected to a water supply system shall be equipped with two check valves or a double check valve, an air gap, a device to vent carbon dioxide to the atmosphere, or any other device approved by the local health officer, which will provide positive protection against the entrance of carbon dioxide or carbonated water into the water supply system.

*Carbonated beverage; Check valves*

Where check valves are used for the protection of a water supply system, a screen of not less than 100 mesh to the inch shall be installed in the water supply line immediately upstream from the check valves.

28679. In all vending machines which dispense carbonated beverages and which are connected to a water supply system, the ingredient water contact surfaces from the check valves or other protective device downstream, including the protective device itself, shall be of such material as to preclude the production of toxic substances which might result from interaction of carbon dioxide or carbonated water.

*Same; Water supply*

28680. The vending machine operator shall maintain a suitable container for refuse. He shall be responsible for sanitation of the environs of the place of operation unless operat-

*Refuse containers*

*Collection of drip, etc.*

ing on private property where adequate sanitary maintenance is provided by the property owner or manager.

28681. Containers shall be provided within all machines dispensing liquid products in bulk for the collection of drip, spillage, overflow, or other liquid wastes.

*Shutoff devices*

An automatic shutoff device shall be provided which will place the vending machine out of operation before such containers overflow. Containers or surfaces on which such wastes may accumulate shall be easily cleanable, and shall be readily removable for cleaning, be corrosive resistant, and shall be kept clean. They shall drip, spillage, or overflow, which originate within the machine, are discharged into a sewage system, the connection to the sewer shall be through an air gap.

*Food in transit*

28682. Foods, beverages, or ingredients while in transit to vending machine locations shall be protected from the elements, dirt, dust, insects, rodents, and other contamination. Similar protection shall be provided for single-service containers, and for the product contact surfaces of equipment, containers, and devices in transit to machine locations.

Article 6. Health Requisites for Restaurants, Itinerant Restaurants, Vehicles, and Vending Machines

*Employees' garments*

28686. All employees preparing, serving, or handling food shall wear clean, washable outer garments or other clean uniforms and shall keep their hands clean at all times while engaged in handling food, beverage, or utensils. All such food handlers shall wash their hands and arms with soap or detergent and warm water before commencing work after using toilet facilities, and before returning to work, and at such other times as are necessary to prevent contamination of food.

*Hairnets*

Female employees shall wear hairnets, caps, headbands, or other suitable coverings which confine the hair. Wherever practical, employees serving food shall use tongs or other implements rather than their hands. The use of tobacco in any form by any employee while handling or serving food, beverage, or utensils is prohibited. No employee or other person shall use tobacco in any form in any room or space used primarily for the preparation of food, and the employer shall post and maintain "No Smoking" signs in such rooms or places.

*Use of tobacco*

28687. No person shall be employed in a restaurant, itinerant restaurant, vehicle, or in connection with a vending machine, who, in the opinion of the local health officer, is affected with, or a carrier of, any disease in a stage which is likely to be communicable to persons exposed as a result of the affected employee's normal duties as a food handler.

*Communicable disease*

28688. When information as to the possibility of disease transmission is presented to the local health officer, he shall investigate conditions and take appropriate action. The health

*Health investigations*

officer may, after investigation and for reasonable cause, require any or all of the following measures:

(a) The immediate exclusion of such employee or owner from the restaurant, itinerant restaurant, vehicle, or affected vending machine operation, by the health officer.

(b) The immediate closing of the restaurant, itinerant restaurant, vehicle, or affected vending machine operation, until no further danger of disease outbreak exists in the opinion of the health officer.

(c) Adequate medical examination of the owner, employee, and his coemployees, with such laboratory examination as may be indicated; or should such examination or examinations be refused, then the immediate exclusion of the refusing owner, employee, or coemployee from that or any other restaurant, itinerant restaurant, vehicle, or affected vending machine operation, until an adequate medical or laboratory examination shows that he is not affected with or a carrier of any disease in a communicable form.

*Medical examinations*

Article 7. Enforcement and Inspection

*Enforcement*

28690. The director, agents, or sanitarians appointed by the director, and all local health officers, sanitarians, and duly authorized agents thereof, are charged with the enforcement of the provisions of this chapter.

*Inspection*

28691. The director, sanitarians and agents appointed by the director, and local health officers, sanitarians, and duly authorized agents thereof, may at all reasonable times enter or inspect any restaurant, itinerant restaurant, vehicle, or vending machine, or any operation suspected of being such, for the purpose of carrying out the provisions of this chapter.

If a written report of the inspection is made, a copy shall be supplied or mailed to the operator, manager, or owner of the establishment, vehicle, or vending machine.

*Penalties*

28692. Any person who violates any provision of this chapter is guilty of a misdemeanor. Each offense shall be punished by a fine of not less than twenty-five dollars ($25) nor more than five hundred dollars ($500), or by imprisonment in the county jail for a term not exceeding six months, or by both such fine and imprisonment.

The owner, manager, or operator of any restaurant, itinerant restaurant, vehicle, or vending machine is responsible for any violation of any provision of this chapter.

*Local regulation*

28693. The provisions of this chapter shall not prevent any city, county, or city and county from adopting standards of sanitation, health, and hygiene for restaurants, itinerant restaurants, vehicles, or vending machines more strict than those contained in this chapter, and requiring a local health permit to maintain and conduct any restaurant, itinerant restaurant, vehicle, or vending machine within such city, county, or city and county.

18

Ch. 635]          1961 REGULAR SESSION

## CHAPTER 635

*An act to repeal Section 24755 of, and to add Sections 24749, 24750.5 and 24755 to, and to amend Sections 24752 and 24757 of, the Business and Professions Code, relating to alcoholic beverages.*

[Approved by Governor June 1, 1961. Filed with Secretary of State June 2, 1961.]

*The people of the State of California do enact as follows:*

SECTION 1. Section 24749 is added to the Business and Professions Code, immediately following the title of Chapter 10 (commencing with Section 24750) of Division 9 of said code, to read:

24749. It is the declared policy of the State that it is necessary to regulate and control the manufacture, sale, and distribution of alcoholic beverages within this State for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to the law. In order to eliminate price wars which unduly stimulate the sale and consumption of alcoholic beverages and disrupt the orderly sale and distribution thereof, it is hereby declared as the policy of this State that the sale of alcoholic beverages should be subjected to certain restrictions and regulations. The necessity for the enactment of provisions of this chapter is, therefore, declared as a matter of legislative determination.

SEC. 2. Section 24750.5 is added to said code, to read:

24750.5. Fair trade contracts for wine have been and shall continue to be authorized by this chapter. Such contracts shall be governed by the applicable provisions of this chapter and Chapter 11 (commencing with Section 24850).

SEC. 2.5. Section 24752 of said code is amended to read:

24752. Willfully and knowingly advertising, offering for sale, or selling any alcoholic beverage at less than the price stipulated in any contract, entered into pursuant to this chapter, or in any effective minimum retail price schedule filed with the department pursuant to Section 24755, whether the person so advertising, offering for sale, or selling is or is not a party to the contract, is unfair competition and is actionable at the suit of any person damaged thereby.

SEC. 3. Section 24755 of said code is hereby repealed.

SEC. 4. Section 24755 is added to said code, to read:

24755. (a) No package of distilled spirits which bears the brand, trademark or name of the owner or person in control shall be sold at retail in this State for consumption off the licensed premises unless a minimum retail price for such package first shall have been filed with the department in accordance with the provisions of this section.

(b) A price for each of such packages shall be in a minimum retail price schedule setting forth with respect to each package the exact brand, trademark or name, capacity, and

*Side notes:* In effect September 15, 1961 · Temperance · Fair trade contracts; Wine · Violations · Repeal · Branded package · Minimum retail price schedules

---

Whenever the enforcement of the minimum requirements of this chapter by any organized local health service is satisfactory to the state department, the enforcement of the provisions of this chapter shall not be duplicated by the state department. The state department may investigate to determine satisfactory enforcement of this chapter by the local authorities.

28694. The state department may adopt and enforce rules and regulations for the execution of its duties under this chapter.

28695. Dining cars and other railroad rolling equipment, and commissaries serving only airlines, which are subject to the United States Public Health Service inspection, are not subject to the provisions of this chapter.

28696. The provisions of this chapter, made available to restaurant, itinerant restaurant, vehicle, and vending machine owners by the state department.

SEC. 2. Section 28648.5, which is added to the Health and Safety Code by Section 1 of this act, shall become operative 18 months after this act takes effect.

*Side notes:* Minimum requirements · Rules and regulations · Exemptions · Operative date

## CHAPTER 634

*An act to amend Section 5185.1 of the Welfare and Institutions Code, relating to assets of a ward of the public guardian.*

[Approved by Governor June 1, 1961. Filed with Secretary of State June 2, 1961.]

*The people of the State of California do enact as follows:*

SECTION 1. Section 5185.1 of the Welfare and Institutions Code is amended to read:

5185.1. The public guardian upon the death of his ward shall pay the unpaid expenses of his ward's burial and the expenses of his ward's last illness. After the payment of such expenses, the public guardian may transfer any remaining assets of such ward which are under his control in accordance with and subject to the provisions of Section 630 Probate Code. Before making any such transfer the public guardian shall pay the unpaid expenses of his ward's burial and last illness, the value of the deceased ward's property for the purpose of ascertaining the right to transfer under said section being the net value of the remaining estate after deduction of the burial and last illness expenses paid.

*Side note:* In effect September 15, 1961

# EXHIBIT 8

Westlaw.

**c**

**Effective: July 1, 2007**

West's Annotated California Codes Currentness
  Health and Safety Code (Refs & Annos)
    Division 104. Environmental Health (Refs & Annos)
      Part 7. California Retail Food Code (Refs & Annos)
        Chapter 1. General Provisions (Refs & Annos)
          → § 113700. Short title

These provisions shall be known, and may be cited, as the California Retail Food Code, hereafter referred to as "this part."

CREDIT(S)

(Added by Stats.2006, c. 23 (S.B.144), § 2, operative July 1, 2007.)

HISTORICAL AND STATUTORY NOTES

2008 Electronic Update

2006 Legislation

Sections 3 and 4 of Stats.2006, c. 23 (S.B.144), provide:

"SEC. 3. This act shall become operative on July 1, 2007.

" SEC. 4. No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution for certain costs that may be incurred by a local agency or school district because, in that regard, this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

"Moreover, no reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution for other costs, if any, mandated by this act because a local agency or school district has the authority to levy service charges, fees, or assessments sufficient to pay for the program or level of service mandated by this act, within the meaning of Section 17556 of the Government Code."

Governor Schwarzenegger issued the following signing message regarding Stats.2006, c. 23 (S.B.144):

"To the Members of the California State Senate:

"California foods are what make this state a great place to live and visit. Millions of people eat in California restaurants and food facilities every day - it is a thriving and important sector of our state's economy. Protecting the safety of California's retail food is critical to ensuring the health of consumers.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"SB 144 represents a multi-year effort by a coalition of stakeholders with over 100 representatives from the retail food industry, local regulatory agencies, the California Department of Education, the California Department of Health Services and the California Department of Aging. Working together, this new law was crafted to ensure that consumers are protected when they eat at retail food facilities.

"SB 144 will better protect consumers of California and I am pleased to sign this bill.

"Sincerely,

"Arnold Schwarzenegger"

Former § 113700, added by Stats.1995, c. 415 (S.B.1360), § 6, relating to the short title of Part 7, was repealed by Stats.2006, c. 23 (S.B.144), § 1, operative July 1, 2007. See this section.

**Derivation:** Former § 113700, added by Stats.1995, c. 415 (S.B.1360), § 6.

Former § 27500, added by Stats.1984, c. 256, § 1.

RESEARCH REFERENCES

Encyclopedias

CA Jur. 3d Hotels and Motels § 9, Restaurant or Other Public Eating Place.

Treatises and Practice Aids

2 Witkin Cal. Crim. L. 3d Crimes Against Peace Welf § 287, (S 287) Particular Foods and Businesses.

West's Ann. Cal. Health & Safety Code § 113700, CA HLTH & S § 113700
Current with urgency legislation through Ch. 22 of 2008 Reg.Sess. and Ch. 7 of 2007-2008 Third Ex.Sess., and Props. 98 and 99

(C) 2008 Thomson Reuters/West

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.