Scott A. Kronland (SBN 171693)
Barbara J. Chisholm (SBN 224656)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 360-8064
E-mail: skronland@altber.com
E-mail: bchisholm@altber.com

Robert Post (SBN 111917)
David Boies Professor of Law
YALE LAW SCHOOL
P.O. Box 208215
New Haven, CT 06520
Telephone: (203) 432-4946
Facsimile: (203) 432-1040
Email: Robert.Post@yale.edu

*Attorneys for* Amici Curiae *Robert Post,
Jennifer L. Pomeranz, and Kelly D. Brownell*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CALIFORNIA RESTAURANT ASSOCIATION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE CITY AND COUNTY OF SAN FRANCISCO and THE SAN FRANCISCO DEPARTMENT OF PUBLIC HEALTH,**<br><br>**Defendants.** | **Case No. CV-08-3247CW**<br><br>**BRIEF OF PROFESSOR ROBERT POST OF YALE UNIVERSITY LAW SCHOOL, AND JENNIFER L. POMERANZ AND KELLY D. BROWNELL OF THE RUDD CENTER FOR FOOD POLICY AND OBESITY AT YALE UNIVERSITY AS** *AMICI CURIAE* **IN SUPPORT OF DEFENDANTS AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND PRELIMINARY INJUNCTION**<br><br>**Date: September 4, 2008**<br>**Time: 9 a.m.**<br>**Judge: Claudia Wilken**<br>**Location: Courtroom 2** |

1

**TABLE OF CONTENTS**

2

TABLE OF AUTHORITIES……………………………………………………….......ii

3

STATEMENT OF INTEREST…………………………………………………………1

4

BACKGROUND……………………………………………………………………..2

5

ARGUMENT……………………………………………………………………...4

6

7
I.      Ordinance 40-08 Requires the Disclosure of Factual and Uncontroversial Commercial
        Information…………………………………………………………………4

8

9
II.     The First Amendment Standard for Commercial Disclosure Requirements of Factual and
        Uncontroversial Commercial Information is the Reasonable Relationship Test, Not
        Intermediate Scrutiny Under *Central Hudson*…………………………………………9

10

11
III.    Ordinance 40-08 Meets the Reasonable Relationship Test…………………………...15

12
        A. Ordinance 40-08 Reduces Consumer Confusion……………………………………15

13
        B. Ordinance 40-08 Improves Public Health by Reducing Obesity through Promoting
           Informed Consumer Decision-Making……………………………………………16

14

15
IV.     The Holding of *United Foods* is Inapplicable to Ordinance 40-08……………………...19

16
V.      The Reasonable Relationship Test Also Applies Under Article I of the California
        Constitution……………………………………………….………………………...20

17

18
CONCLUSION……………………………………………………………………..23

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3

*Board of Trustees v. Fox,*

4
       492 U.S. 469 (1989)……………………………………………………….. 17

5

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,*

6
       447 U.S. 557 (1980)………………………………………………… 9, 10, 21

7

*Environmental Defense Center v. EPA,*
       344 F.3d 832 (9th Cir. 2003)……………………………………….. *passim*

8

*First National Bank v. Bellotti,*

9
       435 U.S. 765 (1978)………………………………………………… 10

10

*In re Matter of Policies and Rules Concerning Interstate 900 Telecommunications Services,*

11
       6 F.C.C. Rcd. 6166 (Sept. 26, 1991)..…………………………………….. 8

12

*Johanns v. Livestock Marketing Association,*

13
       544 U.S. 550 (2005)……………………….…………………………... 1

14

*Lochner v. New York,*
       198 U.S. 45 (1905)………………………………………………… 17

15

*Meese v. Keene,*

16
       481 U.S. 465 (1987)…………………………...……………………… 5

17

*National Electrical Manufacturers Association v. Sorrell,*

18
       272 F.3d 104 (2d Cir. 2001)..…………………………………………… *passim*

19

*Pacific Gas & Electric Company v. Public Utilities Commission of California,*

20
       475 U.S. 1 (1986)………...……………………………………………… 5

21

*Pharmaceutical Care Management Association v. Rowe,*
       429 F.3d 294 (1st Cir. 2005)..………………………………………… 14

22

*Pruneyard Shopping Center v. Robins,*

23
       447 U.S. 74 (1980)………………………………………………… 5, 13

24

*Rubin v. Coors Brewing Co.,*

25
       514 U.S. 476 (1995)………………………………………………… 6

26

*United States Department of Agriculture v. United Foods,*
       533 U.S. 405 (2001) …………………………………………...…………….. 19

27

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*

28
       425 U.S. 748 (1976)……………………………………...………… 9, 10

*West Virginia State Board of Ed. v. Barnette,*
    319 U.S. 624 (1943)...…………………………………………………… 13

*Wooley v. Maynard,*
    430 U.S. 705 (1977)……………………………………………………… 5

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,*
    471 U.S. 626 (1985)……..…………………………………………… *passim*

### STATE CASES

*Baba v. Board of Supervisors,*
    124 Cal. App. 4th 504 (2004)……………………………...……...……...…… 21

*Environmental Law Foundation v. Laidlaw Transit Services,*
    Case No. 451832, 2008 WL 2157672 (Cal. Super. Jan. 8, 2008)……..……………...… 22

*Gerawan Farming, Inc. v. Lyons,*
    24 Cal. 4th 468 (2000)…………………………………………..…… 20

*Gerawan Farming, Inc. v. Kawamura,*
    33 Cal. 4th 1 (2004)……………………………...………………..…………… 21

*People v. Anderson,*
    235 Cal. App. 3d 586 (1991)………………………………...…………... 21, 23

*People v. Teresinski,*
    30 Cal. 3d 822 (1982)……………...……………………...…………... 21

*Perlman v. People,*
    99 Cal. App. 3d 568 (1979)...…………………………………..…….. 21

*U.D. Registry, Inc. v. State of California,*
    144 Cal. App. 4th 405 (2006) ………………………………...……….... 21

### FEDERAL STATUTES AND REGULATIONS

21 C.F.R. § 701.3……………………………………...…………………… 7

15 U.S.C. § 68, *et seq.* ……………………………………………… 6

15 U.S.C. §§ 69-69j…………………………………………...……………… 7

15 U.S.C. § 70, *et seq.* ...…………………………………...………………… 6

15 U.S.C. §§ 1333-1339...………………………………...…………………… 13

15 U.S.C. §§ 1667-1667f...…………………………………...……………….... 7

21 U.S.C. § 343…………...……………………....…………....…………………………..…. 7

27 U.S.C. § 205(e)(2) ………...…………………………....………………………... 7

### STATE STATUTES AND MUNICIPAL ORDINANCES

Cal. Bus. & Prof. Code §§ 1648.10-1648.20……………………….....…………………………... 13

Cal. Civ. Code § 1916.5(a)(6)...…………………....……………………….……. 7

Cal. Corp. Code § 12310(b)…………………....………………………….….. 7

Cal. Fin. Code § 22317.2……………....…………....…………………………… 21

Cal. Health & Safety Code § 110423 …………………………………………21

Cal. Health & Safety Code § 111170……………………………………….. 8, 21

Cal. Health & Safety Code § 25249.6……………....…………………………... 21

Cal. Health & Safety Code § 25250.25……………………………………….21

Cal. Pub. Res. Code § 15013(b)…..………………...………………………... 21

San Francisco Health Code § 468……………....…………………………….…… 2

San Francisco Health Code §§ 468.1-468.3(f)………...………………………….. *passim*

New York City Health Code § 81.50 (Jan. 22, 2008)……...………………….……….. 3

### MISCELLANEOUS

AMA House of Delegates, *Nutrition Labeling and Nutritionally Improved Menu Offerings in Fast-Food and Other Chain Restaurants*, Resolution: 419 (A-07) ……………………..18

A.S. Levy & B.M. Derby, Center for Food Safety and Applied Nutrition, Food and Drug Administration, *The Impact of NLEA on Consumers: Recent Findings from FDA's Food Label and Nutrition Tracking System* (1996)…..……...…………………………………….… 3

Centers for Disease Control and Prevention, National Center for Health Statistics, U.S. Dept. of Health and Human Servs., *Healthy People 2000 Final Review* (2001). …..……...…………….. 3

H.R. Rep. No. 538, 101st Cong., 2d Sess. 1990, *reprinted in* 1990 U.S.C.C.A.N. 3336 ……….16

J. Backstrand, M.G. Wootan, L.R. Young & J. Hurley, *Fat Chance*, Washington, DC: Center for Science in the Public Interest (1997)…..………...…………….…………………………….. 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
J.N. Variyam & J. Cawley, *Nutrition Labels and Obesity,* National Bureau of Economic Research, working paper 11956 (Jan. 2006)…..……..………………………….…………….. 17

3
M.G. Wootan & M. Osbord, *Availability of nutrition information from chain restaurants in the United States*, 30(2) American Journal of Preventative Medicine 266 (2006)……..……...…… 18

4
5
M.G. Wootan, M. Osborn & C.J. Malloy, *Availability of point-of-purchase nutrition information at a fast food restaurant*, 43 American Journal of Preventative Medicine 458 (2006)………... 18

6
7
Peter S. Murano, Understanding Food Science and Technology (Wadsworth/Thomson Learning 2003)…………………………..……..………………………………...…………………….. 6

8
9
Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics. Why Markets Fail: Incomplete Information* (Prentice Hall 1998)……......………..………………………………………..8

10
Robert Post, *The Constitutional Status of Commercial Speech*, 48 U.C.L.A. L. Rev. 1 (2000)……………………………………..……..………………………………………….. 11

11
12
13
S. Burton, E.H. Creyer, J. Kees & K. Huggins, *Attacking the obesity epidemic: the potential health benefits of providing nutrition information in restaurants*, 96 Am. J. Public Health 1669 (2006)…..…..……..………………………………….…………………………………….. 3

14
S. Saul, *Conflict on the Menu*, N.Y. Times, Feb. 16, 2008…..……...………………………..… 18

15
The Institute of Medicine, *Preventing childhood obesity health in the balance*, National Academies Press, Washington DC (2005)...……..…………………………………….. 18

16
17
18
19
20
21
22
23
24
25
26
27
28

1    Professor Robert Post of Yale University Law School, and Jennifer L. Pomeranz and

2    Kelly D. Brownell of the Rudd Center for Food Policy and Obesity at Yale University ("Rudd

3    Center") submit this brief in support of Defendants City and County of San Francisco and the

4    San Francisco Department of Public Health ("San Francisco") and in opposition to the Motion

5    for Declaratory Relief and a Preliminary Injunction filed by Plaintiff California Restaurant

6    Association ("CRA").

7    **<u>STATEMENT OF INTEREST</u>**

8    Robert Post, J.D., Ph.D., is the David Boies Professor of Law at Yale University Law

9    School.  He is one of the nation's preeminent First Amendment scholars and has contributed and

10    edited numerous books and authored over 80 law review articles, including: *Transparent and*

11    *Efficient Markets: Compelled Commercial Speech and Coerced Commercial Association in*

12    United Foods*, Zauderer*, *and* Abood, 40 Valparaiso Univ. Law Rev. 555 (2006); *Compelled*

13    *Subsidization of Speech: Johanns v. Livestock Marketing Association*, 2005 Supreme Court Rev.

14    195; and *The Constitutional Status of Commercial Speech*, 48 UCLA Law Rev. 1 (2000).

15    Amicus Post is a key advisor to the Rudd Center.

16    Jennifer L. Pomeranz, J.D., M.P.H., is the Director of Legal Initiatives at the Rudd Center

17    and has worked extensively on implementing, defending, and supporting menu labeling

18    legislation across the country.

19    Kelly D. Brownell, Ph.D., is the Director of the Rudd Center and is a professor in the

20    Department of Psychology at Yale University, where he also serves as Professor of

21    Epidemiology and Public Health.  Amicus Brownell has published 14 books and more than 300

22    scientific articles and chapters.

23    The mission of the Rudd Center is to improve the world's diet, prevent obesity, and

24    reduce weight stigma by connecting sound science with public policy.  The Rudd Center strives

25    to improve laws, practices, and policies related to nutrition and obesity.  It seeks to inform and

26    empower the public while encouraging global changes to allow individuals to maximize their

27    own health.  Based on the best scientific evidence available, the Rudd Center supports menu

28    labeling legislations in cities and states across the country as an effective method of addressing

the current epidemic of obesity.  San Francisco's adoption of Ordinance 40-08 amending San

Francisco Health Code Sections 468 through 468.8 (March 24, 2008), Menu Labeling at Chain

Restaurants ("Ordinance 40-08"), directly furthers the Rudd Center's mission.

Amici Post, Pomeranz and Brownell (collectively, "Amici") submit this brief in support

of San Francisco and against Plaintiff's motion.  Amici address the First Amendment issues

presented by the case.

## BACKGROUND

In San Francisco, 43% of the adults and 24% of school-age children are overweight or

obese.  See San Francisco Health Code ("Health Code") § 468.1.  The leading causes of death

and disability in San Francisco are due to diseases highly correlated with obesity:  heart disease,

diabetes, hypertension, and cancer.  *Id.*  The San Francisco Department of Public Health

estimates that the obesity epidemic costs San Francisco $192 million a year in medical expenses,

lost productivity and workers' compensation.  *Id.*  The estimated cost to the Department for

diabetes alone was $25 million in the year 2005.  *Id.*

In an effort to address these public health issues, San Francisco adopted Ordinance 40-08

in order to provide consumers with information about the nutritional components of the food

"prepared, purchased and eaten outside the home" to enable them to "make healthier choices."

Health Code §§ 468, 468.1.  Through this regulation, San Francisco requires that chain

restaurants disclose the total number of calories of menu items on menu boards and food tags (*id.*

§ 468.3(c) and (d)), and the total number of calories, saturated fat, carbohydrates and sodium on

menu boards.  *Id.* § 468.3(b).

Ordinance 40-08 advances San Francisco's interest in reducing obesity by preventing

consumer confusion and promoting informed consumer decision-making.  Sound scientific

evidence strongly supports this rationale.  Studies have found that 9 out of 10 people

underestimate the calorie content of less-healthy items by an average of more than 600 calories

1  (almost 50% less than the actual calorie content).[1]  One survey performed at the American

2  Dietetic Association's annual meeting shows that even professional nutritionists underestimate

3  the calorie content of restaurant foods by 220 to 680 calories.[2]  Studies show that consumers

4  routinely consult food labels when available,[3] and that as a result they change their food

5  purchasing habits.[4]  In one study, consumers presented with calorie content on the menu chose

6  high-calorie items one-third less frequently.[5]  Without this nutritional information, consumers

7  have no way of choosing items that fit their nutritional needs.  Polling data confirms that

8  consumers overwhelmingly want this information.  *See* Health Code § 468.1.

9         The consensus that consumers are unable to estimate the nutritional composition of

10  prepared foods and beverages, and that they would use the information about this composition to

11  make choices better suited for their nutritional needs, prompted New York City to enact a menu

12  label law earlier this year that is very similar to Ordinance 40-08.  Under New York City's

13  ordinance, covered food service establishments are required to disclose the calorie content of

14  their menu items on menu boards and food tags.  *See* New York City Health Code § 81.50 (Jan.

15  22, 2008).  The New York State Restaurant Association ("NYSRA") challenged the New York

16  City ordinance arguing the same federal deficiencies as CRA argues here.  Judge Howell of the

17  Southern District of New York found in favor of New York City on all counts.  *See New York*

18  *State Rest. Ass'n v. New York City Board of Health, et al.*, Case No: 1:08-cv-1000 (RJH), Mem.

19  Op. & Order of the U.S. District Court for the Southern District of New York (April 16, 2008)

20

21  ───────────────────

21  [1]  S. Burton, E.H. Creyer, J. Kees & K. Huggins, *Attacking the obesity epidemic: the potential*
22  *health benefits of providing nutrition information in restaurants*, 96 Am. J. Public Health 1669-
    75 (2006).
23  [2]  J. Backstrand, M.G. Wootan, L.R. Young & J. Hurley, *Fat Chance*, Washington, DC: Center
24  for Science in the Public Interest (1997).
    [3]  Centers for Disease Control and Prevention, National Center for Health Statistics, U.S. Dept.
25  of Health and Human Servs., *Healthy People 2000 Final Review* (2001).
    [4]  A.S. Levy & B.M. Derby, Center for Food Safety and Applied Nutrition, Food and Drug
26  Administration, *The Impact of NLEA on Consumers: Recent Findings from FDA's Food Label*
    *and Nutrition Tracking System* (1996).
27  [5]  Burton, *supra* note 1.

28

1   ("SDNY Opinion and Order").  Specifically, the court found that the federal Nutrition and

2   Labeling and Education Act of 1990 ("NLEA") does not preempt locales' ability to enact menu

3   labeling laws, and "that the required disclosure of calorie information is reasonably related to the

4   government's interest in providing consumers with accurate nutritional information and therefore

5   does not unduly infringe on the First Amendment rights of NYSRA members."  *Id*. at 2-3.

6   NYSRA appealed this decision to the Second Circuit and simultaneously sought a stay of

7   enforcement.  The District Court rejected the stay and the Second Circuit later denied NYSRA's

8   application to extend the period during which no fine will be imposed on covered establishments

9   that violate the ordinance.  A decision on the appeal is pending.

10          San Francisco's disclosure requirement implements sound public policy reflecting

11  information the public health community has known for years.  The regulation requires that

12  nutritional information be disclosed in the most effective possible way – at the point of purchase.

13  Similar disclosure requirements are common in federal and state regulatory programs designed to

14  promote consumer information and prevent potential consumer confusion.  Plaintiff argues that

15  Ordinance 40-08 compels speech in violation of the First Amendment of the United States

16  Constitution and Article I of the California Constitution.  *See* Mem. of Law in Support of Pl.'s

17  Mot. for Declaratory Relief & a Prelim. Injunction ("CRA Br.") at 22-34.  If Plaintiff's argument

18  is accepted, innumerable federal and state regulations requiring commercial actors to disclose

19  uncontroversial factual information will be rendered constitutionally suspect.  The regulatory

20  structure of consumer protection in California and the United States, which relies heavily on

21  promoting information transparency to encourage informed consumer decision-making, will be

22  jeopardized.  The government's ability to address the obesity epidemic through regulations

23  promoting informed consumer choice and personal responsibility would be derailed.

24                                    **ARGUMENT**

25  **I.      Ordinance 40-08 Requires the Disclosure of Factual and Uncontroversial**
            **Commercial Information**

26

27          Ordinance 40-08 requires that "chain restaurants" post the total number of calories,

28  saturated fat, carbohydrates, and sodium of each product "next to or beneath each Menu Item" on

1   the menu.  Health Code § 468.3(a), (b).  The ordinance also requires that federally recommended

2   daily limits of calories, saturated fat and sodium also be clearly posted on the menu.  *Id.*  The

3   ordinance mandates that chain restaurants using a menu board post the total number of calories

4   "next to or beneath each Menu Item on the Menu Board" (*id.* § 468.3(c)), and that restaurants

5   using food tags post the total number of calories "on the Food Tag."  *Id.* § 468.3(d).  The

6   ordinance expressly allows food service establishments to provide additional nutritional

7   information.  *See id.* § 468.3(a).  Restaurants are also free to post disclaimers indicating "that

8   there may be minimal variations in nutritional content values across servings based on slight

9   variations in serving size and quantities of ingredients, and based on special ordering."  *Id.* §

10  468.3(f).

11      Ordinance 40-08 does not require restaurants to state an opinion or belief.  *Cf. Wooley v.*

12  *Maynard*, 430 U.S. 705 (1977).  It does not require them to subsidize advertisements.  *Cf. United*

13  *States Dept. of Agriculture v. United Foods*, 533 U.S. 405 (2001).  It does not require them to

14  disclose controversial facts.  *Cf. Zauderer v. Office of Disciplinary Counsel of the Supreme*

15  *Court of Ohio*, 471 U.S. 626 (1985).  It does not force any CRA member to take a position in any

16  ongoing debate.  *Cf. Pacific Gas & Electric Co. v. Public Utilities Comm. of Cal.*, 475 U.S. 1, 14

17  (1986).  The ordinance does not prevent restaurants from announcing that they are disclosing

18  calorie content under legal compulsion or from disclosing any additional data they deem

19  necessary.  *See Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 87 (1980); *see also Meese v.*

20  *Keene*, 481 U.S. 465, 481 (1987); *Environmental Defense Center v. EPA*, 344 F.3d 832, 850 (9th

21  Cir. 2003).  Ordinance 40-08 does not preclude food service establishments from expressing

22  whatever additional information or opinions they wish.  Plaintiff is simply incorrect that

23  Ordinance 40-08 compels restaurants to voice a "message" or "government viewpoints."  CRA

24  Br. at 23-24.

25      The San Francisco ordinance compels the disclosure only of "purely factual and

26  uncontroversial" commercial information – the nutritional contents of restaurant menu items.

27  *Zauderer*, 471 U.S. at 651.  It requires the disclosure of the total number of calories.  Health

28  Code § 468.3(a)(1).  A calorie is the "[a]mount of heat needed to raise the temperature of 1 gram

1   of water by 1 degree Celsius."  Peter S. Murano, Understanding Food Science and Technology

2   G-3 (Wadsworth/Thomson Learning 2003).  It requires the disclosure of the total amount of

3   saturated fat.  Health Code § 468.3(a)(2).  Saturated fat is a "[f]atty acid chain that does not

4   contain any carbon-to-carbon double bonds."  Murano, *supra* at G-16.  It requires the disclosure

5   of the total amount of carbohydrates.  Health Code § 468.3(a)(3).  Carbohydrates "are composed

6   of the elements carbon (C), hydrogen (H), and oxygen (O)" and can be classified as

7   monosaccharides, disaccharides, or polysaccharides.  Murano, *supra* at 66-67.  And the

8   ordinance requires the disclosure of the total amount of sodium.  Health Code § 468.3(a)(4).

9   Sodium is a mineral, which is an inorganic substance listed on the periodic table of elements.

10  Murano, *supra* at 75, 77.  This is the same factual information that the NLEA requires food

11  producers to disclose.  *See* 21 U.S.C. § 343.  If CRA is correct that compelled disclosures

12  required by Ordinance 40-08 violate the First Amendment, so also does the NLEA.  Yet in this

13  Court CRA takes the position that the NLEA is constitutional and that it preempts Ordinance 40-

14  08.  *See* CRA Br. at 9-21.

15      Ordinance 40-08 is a commercial disclosure regulation indistinguishable from thousands

16  of analogous regulations routinely applied to transactions in the commercial marketplace to

17  provide consumers with information.  Courts uniformly have held that the compelled disclosure

18  of uncontroversial factual information in the context of the sale and purchase of goods is

19  compelled commercial speech.  *See*, *e.g.*, *Rubin v. Coors Brewing Co*., 514 U.S. 476, 483 (1995);

20  *Environmental Defense Center v. EPA*, 344 F.3d 832, 851, n.27 (9th Cir. 2003); *National*

21  *Electrical Manufacturers Ass'n v. Sorrell* ("*Sorrell*"), 272 F.3d 104, 113 (2d Cir. 2001);

22  *Environmental Law Foundation v. Laidlaw Transit Servs.*, Case No. 451832, 2008 WL 2157672

23  (Cal. Super. Jan. 8, 2008).  "Innumerable federal and state regulatory programs require the

24  disclosure of product and other commercial information."  *Sorrell*, 272 F.3d at 116.

25      Federal law, for example, requires that textile and wool products be labeled with their

26  fiber content, country of origin, and the identity of the business responsible for marketing or

27  handling the item.  *See* Textile Fiber Products Identification Act, 15 U.S.C. § 70, *et seq*.; Wool

28  Products Labeling Act of 1939, 15 U.S.C. § 68, *et seq.*  It requires that articles of apparel made

1  of fur be labeled, and that invoices and advertising for furs and fur products specify the true

2  English name of the animal from which the fur was taken, and whether the fur is dyed or

3  previously used. *See* Fur Products Labeling Act, 15 U.S.C. §§ 69-69j. It requires that for

4  personal property leases that exceed 4 months and that are made to consumers for personal use, a

5  written disclosure of lease costs, taxes, fees and terms be disclosed; and it also requires certain

6  disclosures be made in the lease advertising. *See* Consumer Leasing Act, 15 U.S.C. §§ 1667-

7  1667f, as amended. It requires that cosmetic products display an information panel which lists

8  ingredients. *See* 21 C.F.R. § 701.3. It requires that packaged food and beverages disclose their

9  ingredients (21 U.S.C. § 343(i)), the net weight of their contents (21 U.S.C. § 343(e)), and their

10 percentage of alcohol by volume (27 U.S.C. § 205(e)(2)). Foods regulated by the Food and Drug

11 Administration ("FDA") must be labeled with all ingredients that are derived from the eight most

12 common food allergens (milk, eggs, fish, crustacean shellfish, tree nuts, peanuts, wheat,

13 soybeans). *See* Food Allergen Labeling and Consumer Protection Act of 2004, Title II of Public

14 Law108-282 (Aug. 2, 2004).

15      California law requires lenders who give variable interest loans to provide consumers

16 with a statement "consisting of the following language: NOTICE TO BORROWER: THIS

17 DOCUMENT CONTAINS PROVISIONS FOR A VARIABLE INTEREST RATE." Cal. Civ.

18 Code § 1916.5(a)(6). It requires that cooperative corporations formed under California

19 Corporations Code include the following statement in their articles of incorporation: "This

20 corporation is a cooperative corporation organized under the Consumer Cooperative Corporation

21 Law. The purpose of this corporation is to engage in any lawful act or activity for which a

22 corporation may be organized under such law." Cal. Corp. Code § 12310(b). It requires that

23 products with removable or rechargeable batteries be conspicuously labeled with the following

24 statements: "NICKEL-CADMIUM BATTERY. MUST BE RECYCLED OR DISPOSED OF

25 PROPERLY." or "SEALED LEAD BATTERY. MUST BE RECYCLED OR DISPOSED OF

26 PROPERLY." Cal. Pub. Res. Code § 15013(b). It requires that "[e]ach container of bottled

27 water sold in this state, each water-vending machine, and each container provided by retail water

28 facilities located in this state shall be clearly labeled" to include the source of the bottled water, a

1    description of the treatment process or, if none, a statement to that effect, and the name and

2    contact information for the bottler, brand owner, or facility operator.  Cal. Health & Safety Code

3    § 111170.

4         Contrary to CRA's assertions (CRA Br. at 32), the government may require the

5    disclosure of noncontroversial, factual information in the context of commercial speech for many

6    reasons other than protecting consumers from deception or warning consumers about "inherently

7    dangerous" products.  Such disclosures are routinely required to protect public health and to

8    serve the general welfare.  Consumer protection law is based on the belief that the disclosure of

9    factual and uncontroversial information will promote knowledgeable consumer decision-making.

10   *See*, *e.g.*, 15 U.S.C. § 1451 (Congressional declaration of the policy for the Fair Packaging and

11   Labeling Act: "Informed consumers are essential to the fair and efficient functioning of a free

12   market economy.  Packages and their labels should enable consumers to obtain accurate

13   information as to the quantity of the contents and should facilitate value comparisons.").

14        Compelled disclosures also frequently reduce information costs and thereby increase

15   market efficiency.  *See* Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics. Why Markets*

16   *Fail: Incomplete Information* 612 (Prentice Hall 1998).  They reduce potential consumer

17   confusion.  *See*, *e.g.*, *In re Matter of Policies and Rules Concerning Interstate 900*

18   *Telecommunications Services*, 6 FCC Rcd. 6166, 6168 (Sept. 26, 1991) ("The preamble

19   [requirement] is designed to prevent deception and confusion by providing the consumer 'purely

20   factual and uncontroversial information about the terms under which [the] services will be

21   available,' thereby enabling the consumer to make an informed purchasing decision.").  They

22   enable consumers to make decisions that will best serve their own best interests, including their

23   own interests in health and safety. *See* 137 Cong. Rec. E 1165 (April 9, 1991) (Rep. John

24   Moakley:  NLEA authorizes the FDA to regulate food labels "to help consumers choose

25   healthful foods in the context of a total daily diet without the confusing and all-too-often

26   misleading information currently on many food labels.").

27        If CRA's constitutional arguments were accepted, none of these regulations would be

28   constitutionally permissible.

**II.    The First Amendment Standard for Commercial Disclosure Requirements of Factual and Uncontroversial Commercial Information is the Reasonable Relationship Test, Not Intermediate Scrutiny Under *Central Hudson***

Courts uniformly have held that the compelled disclosure of factual and uncontroversial commercial information is constitutional under the First Amendment if it is reasonably related to an appropriate state interest.  Although the general standard for restrictions on commercial speech is the test set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980), regulations that compel "purely factual and uncontroversial" commercial speech are "acceptable less restrictive alternatives to actual suppression of speech" and thus subject to more lenient review.  *Zauderer*, 471 U.S. at 651, n.14.

The asymmetry between the constitutional test applied to restrictions on commercial speech and the constitutional test applied to compelled disclosure of factual and uncontroversial commercial information follows directly from the justification announced by the Supreme Court for First Amendment protection of commercial speech.  The Court explained:

> Advertising . . . is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price.  So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions.  It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed.  To this end, the free flow of commercial information is indispensable. . . .  And if it is indispensable to the proper allocation of resources in a free enterprise system, it is also indispensable to the formation of intelligent opinions as to how that system ought to be regulated or altered.  Therefore, even if the First Amendment were thought to be primarily an instrument to enlighten public decisionmaking in a democracy, we could not say that the free flow of information does not serve that goal.

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976).

The Court explained that commercial speech merits constitutional protection because it conveys information necessary for "public decisionmaking," and it has repeatedly reaffirmed this conclusion:  "The First Amendment's concern for commercial speech is based on the informational function of advertising."  *Central Hudson*, 447 U.S. at 563.  "A commercial advertisement is constitutionally protected not so much because it pertains to the seller's business as because it furthers the societal interest in the 'free flow of commercial information.'"

1  *First National Bank v. Bellotti*, 435 U.S. 765, 783 (1978) (quoting *Virginia State Board of*

2  *Pharmacy*, 425 U.S. at 764).

3      Restrictions on commercial speech *interrupt* the flow of commercial information to the

4  public and thus interfere with the constitutional value of commercial speech.  They are therefore

5  subject to the intermediate scrutiny of the *Central Hudson* test.  By contrast, legislation that

6  requires commercial vendors to disclose factual and uncontroversial information increases the

7  flow of commercial information to consumers and thus serves the same constitutional purpose as

8  does the constitutional protection extended to commercial speech.  Moreover, CRA does not

9  argue, nor could it argue, that Ordinance 40-08 restricts the ability of its members to speak.

10  Because 40-08 does not suppress expression, it is not encompassed within the rationale of

11  *Central Hudson* and its progeny.

12      The Supreme Court in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court*

13  *of Ohio*, explicitly held that compelled disclosure of factual and uncontroversial commercial

14  information is constitutional if it bears a reasonable relationship to an appropriate state interest.

15  471 U.S. at 651.  In *Zauderer*, the Court considered a state requirement that attorney

16  advertisements for contingent-fee representation must disclose "whether percentages are

17  computed before or after deduction of court costs and expenses."  *Id.* at 633.  The Ohio Office of

18  Disciplinary Counsel filed a complaint against an attorney named Philip Q. Zauderer for not

19  complying with this disclosure requirement.

20      Zauderer argued that the Ohio disclosure requirement violated his First Amendment right

21  not to speak.  The Court disagreed:

22
23      The State has attempted only to prescribe what shall be orthodox in commercial
       advertising, and its prescription has taken the form of a requirement that plaintiff include
       in his advertising purely factual and uncontroversial information about the terms under
24     which his services will be available.

25  *Id.* at 651.  The Court explained that "the extension of First Amendment protection to

26  commercial speech is justified principally by the value to consumers of the information such

27  speech provides," and that therefore "plaintiff's constitutionally protected interest in *not*

28  providing any particular factual information in his advertising is minimal."  *Zauderer*, 471 U.S.

---

1    at 651 (emphasis in the original) (citing *Virginia State Pharmacy Board*, 425 U.S. 748).  Noting

2    the "material differences between disclosure requirements and outright prohibitions on speech"

3    (471 U.S. at 650), *Zauderer* unambiguously held that "the First Amendment interests implicated

4    by disclosure requirements are substantially weaker than those at stake when speech is actually

5    suppressed."  *Id.* at 651 n.14.

6         *Zauderer* thus stands for the general rule that "an advertiser's rights are adequately

7    protected as long as disclosure requirements are reasonably related to" a governmental interest.

8    *Id.* at 651.  In *Zauderer*, Ohio sought to require disclosure of factual and noncontroversial

9    commercial information about contingency fee agreements in order to prevent potential

10   consumer deception.  But nothing in the Court's reasoning limited the application of the

11   "reasonable relationship" test to the particular state interest of preventing consumer deception.

12   Instead, the Court's analysis rested on the understanding that the constitutional values served by

13   the commercial speech doctrine dictate that the constitutional review of "disclosure

14   requirements" be different than that of "outright prohibitions on speech."  *See* Robert Post, *The*

15   *Constitutional Status of Commercial Speech*, 48 U.C.L.A. L. Rev. 1, 26-28 (2000).

16        This is the interpretation of *Zauderer* adopted by all Circuit Courts that have considered

17   the question.  Plaintiff incorrectly asserts that the Second Circuit "dramatically extended

18   *Zauderer*" in *National Electrical Manufacturers Association v. Sorrell*, 272 F.3d 104 (2d Cir.

19   2001), and thus that the Southern District of New York should not have applied the reasonable

20   basis test in *NYSRA v. New York City*.  CRA Br. at 29-30.  But *Sorrell* properly understood and

21   applied the essential logic of *Zauderer*.

22        In *Sorrell*, the Second Circuit considered a First Amendment challenge by the National

23   Electrical Manufacturers Association to a Vermont statute requiring "manufacturers of some

24   mercury-containing products to label their products and packaging to inform consumers that the

25   products contain mercury and, on disposal, should be recycled or disposed of as hazardous

26   waste."  272 F.3d at 107.  The Second Circuit held that the compelled disclosure of factual and

27   uncontroversial commercial information is constitutional if there is "a rational connection

28   between the purpose of" the disclosure requirement and "the means employed to realize that

---

1    purpose." *Id*. at 115.  The court reasoned that "*Zauderer*, not *Central Hudson Gas & Electric*

2    *Corp*. . . . describes the relationship between means and ends demanded by the First Amendment

3    in compelled commercial disclosure cases." *Id*. (internal citations omitted).

4        The Second Circuit explained that the reasonable relationship test was the appropriate

5    standard of review for compelled disclosure of factual and uncontroversial commercial

6    information because such disclosure:

7        does not offend the core First Amendment values of promoting efficient exchange of
         information or protecting individual liberty interests.  Such disclosure furthers, rather
8        than hinders, the First Amendment goal of the discovery of truth and contributes to the
         efficiency of the "marketplace of ideas."  Protection of the robust and free flow of
9        accurate information is the principal First Amendment justification for protecting
         commercial speech, and requiring disclosure of truthful information promotes that goal.
10

11    *Id*. at 114.

12        In applying the "reasonable-relationship rule" of *Zauderer* to determine whether the

13    Vermont statute was constitutional, the Second Circuit identified the state interest served by the

14    statute as "protecting human health and the environment from mercury poisoning." *Id*. at 115.

15    Vermont expected that by "increasing consumer awareness of the presence of mercury in a

16    variety of products," it could "reduce the amount of mercury released into the environment." *Id*.

17    This goal has nothing to do with preventing consumer deception, and instead is based on the

18    expectation that better informing "consumers about the products they purchase" will lead to

19    more intelligent decision-making that will serve to protect human health. *Id*.[6]

20

21

22

23    [6]  California's Proposition 65 has a similar requirement which requires disclosure of the presence
      of toxic chemicals including mercury.  *See* Proposition 65, California's Safe Drinking Water and
24    Toxic Enforcement Act of 1986, Cal. Health & Saf. Code §§ 25249.5-25249.13.  Through this
      provision, dentists are required to disclose information about mercury content and toxicity for
25    dental materials.  Cal. Bus. & Prof. Code §§ 1648.10-1648.20.  One of the declared purposes of
      Proposition 65 is for the people of California "[t]o be informed about exposures to chemicals that
26    cause cancer, birth defects, or other reproductive harm."  Cal. Health & Saf. Code, Div. 20, Ch.
      6.6 Note § 1(b) (approved Nov. 4, 1986).  Like the requirement in *Sorrell*, California's
27    Proposition 65 was enacted to further the health and safety of the population through increased
      information.

28

1   The Ninth Circuit specifically relied on *Sorrell* to conclude that government can compel

2   the disclosure of noncontroversial, factual, commercial information.  In *Environmental Defense*

3   *Center v. EPA*, the Ninth Circuit responded to challenges to certain regulations promulgated by

4   the Environmental Protection Agency ("EPA") under sections of the Clean Water Act dealing

5   with pollution from stormwater runoff.  344 F.3d 832 (9th Cir. 2003).  One such regulation

6   compelled municipalities ("MS4s") to "distribute educational materials to the community" about

7   the impact of stormwater discharges and to "inform public employees, businesses, and the

8   general public of hazards associated with illegal discharges and improper disposal of waste."  *Id.*

9   at 848.  The purpose of the disclosure requirement was to inform the public how to dispose of

10  toxins, not to prevent consumer deception.  The regulation was enacted with the expectation that

11  better informed consumers will lead to better informed decision-making to protect public health.

12  The Ninth Circuit specifically invoked *Sorrell* to liken the disclosure requirement at issue to

13  other similar labeling requirements:

14      In deciding [a] similar question, . . . the Second Circuit held that "mandated disclosure of
        accurate, factual, commercial information does not offend the core First Amendment
15      values of promoting efficient exchange of information or protecting individual liberty
        interests."  *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001). . . .  We
16      think the policy considerations underlying the commercial speech treatment of labeling
        requirements, *see*, *e.g.*, the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§
17      1333-39, apply similarly in [this] context.

18

19  344 F.3d 832, 851 n.27 (9th Cir. 2003).  The Ninth Circuit thus held that the requirement ought

20  not to be subject to elevated First Amendment scrutiny:

21          As in *Zauderer v. Office of Disciplinary Counsel of the Sup*. Ct. of Ohio, 471 U.S.
        626 (1985), where the Supreme Court upheld certain disclosure requirements in attorney
22      advertising, "[t]he interests at stake in this case are not of the same order as those
        discussed in *Wooley* . . . and *Barnette* . . . ."  *Id.* at 651.  EPA has not attempted to
23      "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of
        opinion or force citizens to confess by word or act their faith therein."  *West Virginia*
24      *State Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943).

25          Informing the public about safe toxin disposal is non-ideological; it involves no
26      "compelled recitation of a message" and no "affirmation of belief."  *PruneYard Shopping*
        *Ctr. v. Robins*, 447 U.S. 74, 88 (1980). . . .  It does not prohibit the MS4 from stating its
27      own views about the proper means of managing toxic materials, or even about the Phase
        II Rule itself.  Nor is the MS4 prevented from identifying its dissemination of public

28

1    information as required by federal law, or from making available federally produced
2    informational materials on the subject and identifying them as such.

3    *Id*. at 849-50.

4         The First Circuit has likewise agreed with this interpretation of *Zauderer*.  In

5    *Pharmaceutical Care Management Association v. Rowe*, 429 F.3d 294 (1st Cir. 2005), the First

6    Circuit considered a challenge to a Maine statute requiring that pharmacy benefit managers

7    ("PBMs"), who act as intermediaries between pharmaceutical manufacturers and health benefit

8    providers, disclose to providers conflicts of interest and certain financial arrangements with third

9    parties.  429 F.3d at 299 (Op. of Torruella, J.).  The purpose of these disclosure requirements was

10   to place "Maine health benefit providers in a better position to determine whether PBMs are

11   acting against their interests, and correspondingly, to help control prescription drug costs and

12   increase access to prescription drugs."  *Id*. at 298-99.  The First Circuit applied *Zauderer* to

13   dismiss a First Amendment challenge to the statute:

14        [The] First Amendment claim is completely without merit.  So-called "compelled
15        speech" may under modern Supreme Court jurisprudence raise a serious First
         Amendment concern where it effects a forced association between the speaker and a
16        particular viewpoint. . . .

17        What is at stake here, by contrast, is simply routine disclosure of economically
         significant information designed to forward ordinary regulatory purposes-in this case,
18        protecting covered entities from questionable PBM business practices.  There are literally
         thousands of similar regulations on the books-such as product labeling laws,
19        environmental spill reporting, accident reports by common carriers, SEC reporting as to
         corporate losses and (most obviously) the requirement to file tax returns to government
20        units who use the information to the obvious disadvantage of the taxpayer.

21
         The idea that these thousands of routine regulations require an extensive First
22        Amendment analysis is mistaken.  *Zauderer v. Office of Disciplinary Counsel,* 471 U.S.
         626 (1985), makes clear "that an advertiser's rights are adequately protected as long as
23        disclosure requirements are reasonably related to the State's interest in preventing
         deception of consumers."  *Id*. at 651.  This is a test akin to the general rational basis test
24        governing all government regulations under the Due Process Clause.  The test is so
         obviously met in this case as to make elaboration pointless.
25

26
27   *Id*. at 316 (Op. of Boudin, C.J.); *see also id*. at 297-98 (*per curiam* holding that the joint

28   concurring opinion of Chief Justice Boudin and Judge Dyk represents the opinion of the court

     with respect to the First Amendment issues).

1   **III.    Ordinance 40-08 Meets the Reasonable Relationship Test**

2          San Francisco's ordinance meets the reasonable relationship test of *Zauderer*.  San

3   Francisco enacted Ordinance 40-08 (1) to reduce consumer confusion and deception; and (2) to

4   promote informed consumer decision-making so as to reduce obesity and the diseases associated

5   therewith.  The ordinance is reasonably related to these governmental interests.

6          **A.    Ordinance 40-08 Reduces Consumer Confusion**

7          San Francisco relied on studies and polls to conclude that "[w]ithout nutrition

8   information, consumers consistently underestimate the nutritional content of restaurant foods."

9   Health Code § 468.1.  It also found that, "the fact that chain restaurants' serving sizes are so

10  varied and large, and their prices are so low, can mislead and even deceive the public regarding

11  the amount of an actual serving size and how many calories a portion contains."  *Id.*  In enacting

12  Ordinance 40-08, San Francisco sought to correct the information disparity that currently harms

13  consumers.

14         CRA concedes that the reasonable relationship test of *Zauderer* applies to regulations that

15  compel disclosure of factual and uncontroversial commercial information in order to prevent

16  potential consumer deception.  CRA Br. at 29-30.  Ordinance 40-08 was enacted in part in order

17  to serve this purpose.  Thus, on this basis alone, Ordinance 40-08 should easily be upheld against

18  CRA's First Amendment challenge.

19         In enacting Ordinance 40-08, San Francisco relied on independent studies and found that

20  when "nutritional information is provided, consumers use it to make healthier choices."  Health

21  Code § 468.1.

22         This premise that providing consumers with factual and uncontroversial commercial

23  information will inform consumer decision-making and reduce the likelihood of consumer

24  deception, is the same premise that underlies federal legislation like the NLEA.  Congress

25  specifically recognized the elimination of consumer confusion as one of the purposes behind

26  enacting the NLEA:

27         The purpose of those amendments, known collectively as the NLEA, was: (1) To make
           available nutrition information that can assist consumers in selecting foods that can lead
28         to healthier diets, (2) *to eliminate consumer confusion* by establishing definitions for
           nutrient content claims that are consistent with the terms defined by the Secretary [of

1    Health and Human Services], and (3) to encourage product innovation through the
2    development and marketing of nutritionally improved foods.

3    H.R. Rep. No. 538, 101st Cong., 2d Sess. 8-10, *reprinted* in 1990 U.S.C.C.A.N. 3336, 3337-38

4    (emphasis added).  If this purpose suffices to establish the constitutionality of the compelled

5    disclosure required by the NLEA, it equally suffices to establish the constitutionality of the

6    disclosure required by Ordinance 40-08.

7          Empirical studies suggest that almost half of Americans report that nutrition information

8    provided on food labels has caused them to change their mind about purchasing particular

9    products.  Health Code § 468.1.  Because there is no reason to suppose that the nutrition

10   information which Ordinance 40-08 requires to be disclosed will be any less effective in

11   reducing the likelihood of consumer confusion and deception than the same information which

12   the NLEA requires to be disclosed, it follows that Ordinance 40-08 is reasonably related to a

13   proper state interest and that it therefore passes the test of *Zauderer*.  This is true regardless of

14   whether Ordinance 40-08 also serves the additional state interest of combating the current

15   epidemic of obesity.

16   **B.    Ordinance 40-08 Improves Public Health by Reducing Obesity through
           Promoting Informed Consumer Decision-Making**

17

18         Ordinance 40-08 seeks to promote public health by providing consumers with more

19   complete information about the nutritional content of the food that they eat.  San Francisco

20   specifically found that:

21         Consumers must have basic nutritional information readily available in order to make
           informed choices about the Food that they, and their children and dependants, eat.
22         These sections require Chain Restaurants to provide consumers with specific
           nutritional information . . . so that consumers may be better able to make nutritional
23         choices consistent with their health needs.  Furthermore, ensuring informed food
           choices supports societal public health goals of preventing obesity, diabetes, and
24         other avoidable nutrition-related diseases.

25

26   Health Code § 468.  Based on scientific studies, San Francisco concluded that the "increase in

27   per capita restaurants accounts for 65% of the increase in the percentage of those who are

28   obese."  Health Code § 468.1.  This is because restaurant foods are often served in large portions

---

and generally contain an excess of calories, saturated fat, trans-fat and sodium. *Id.* San Francisco concluded, and studies confirm, that there is "a positive association between eating out and higher caloric intakes and higher body weights." *Id.*

San Francisco's findings are supported by independent scientific research demonstrating that consumers routinely consult food labels and make positive changes to their food purchasing habits. Health Code § 468.1. In one study, consumers presented with calorie information on a restaurant menu chose high-calorie items one-third less frequently. *Id.* Economists from the National Bureau of Economic Research have estimated that the information required by the NLEA to be set forth in food labels has produced a decrease in body weight that over a 20-year period has generated a total monetary benefit of about $63-166 billion (in 1991 dollars). *See* J.N. Variyam & J. Cawley, *Nutrition Labels and Obesity*, National Bureau of Economic Research, working paper 11956 (Jan. 2006). This benefit flowed from the fact that two-thirds of adults at least sometimes read nutrition information about calories, fat, or cholesterol listed on a label when they buy a food item for the first time.

This record suffices to establish the rationality of Ordinance 40-08 under the reasonableness test of *Zauderer*. In its brief, Plaintiff states that Ordinance 40-08 may not in fact succeed in reducing obesity. CRA Br. at 4-5. This argument may have been significant in the constitutional universe of *Lochner v. New York*, 198 U.S. 45 (1905), but in the 21st century, it is well established that courts cannot strike down government regulations merely because the regulations may not achieve their goals, and that to do so would ultimately result in no government legislation at all. Under modern constitutional standards like those contained in *Zauderer*, 471 U.S. at 652-53, and even in *Central Hudson*, 447 U.S. at 570, it is sufficient for the state to advance regulations supported by rational and relevant evidence. *See also Board of Trustees v. Fox*, 492 U.S. 469, 480 (1989). Ordinance 40-08 easily passes this test. [7]

---

[7] It is noteworthy that the "evidence" on which Plaintiff relies to support its argument that Health Code 40-08 does not advance San Francisco's interest in preventing obesity is the Declaration of David B. Allison, which was submitted in the *NYSRA v. NYC* matter. *See* CRA
(continued…)

1        Ordinance 40-08 is consistent with the recommendation of leading public health

2    authorities.  There is virtual unanimity that requiring the effective communication of factual

3    nutritional information for food consumed away from home is necessary if consumers are to

4    make informed decisions.  *See* Health Code § 468.1.  Ordinance 40-08 provides this information

5    to consumers in a manner that public health professionals regard as most effective in promoting

6    informed consumer decision-making – at the point of purchase.[8]  Requiring nutritional disclosure

7    at the point of purchase ensures that consumers can utilize this information prior to purchase and

8    during decision-making.  San Francisco found that current methods used by restaurants to

9    communicate nutrition information to customers are inadequate.  See Health Code § 468.1.  This

10   conclusion is supported by independent studies.[9]

11       Ordinance 40-08 is reasonably related to the San Francisco's interest in reducing obesity

12   by promoting informed consumer decision-making.  It is accordingly constitutional under the test

13   of *Zauderer* regardless of whether it also serves the additional interest of reducing potential

14   consumer confusion.

---

Br. at 25-26.  As reported in the New York Times, Dr. Allison resigned from his position as incoming president of the Obesity Society in response to "criticism from some of the group's members after he wrote an affidavit as a paid consultant on behalf of the restaurant industry."  S. Saul, *Conflict on the Menu*, N.Y. Times, Feb. 16, 2008, Sec. C-1.  As the New York Times reported it: "Because Dr. Allison's position ran counter to the conventional thinking in his field, some critics contended that it illustrated the way industry money can influence scientific and medical debate."  *Id.*

[8]  *See* The Institute of Medicine, *Preventing childhood obesity health in the balance*, National Academies Press, Washington, DC (2005) at 165-66 (Recommending that "[f]ull-service and fast food restaurants should expand healthier food options and provide calorie content and general nutrition information at point of purchase."); AMA House of Delegates, *Nutrition Labeling and Nutritionally Improved Menu Offerings in Fast-Food and Other Chain Restaurants*, Resolution: 419 (A-07) at 2 ("Our American Medical Association support federal, state, and local policies to require fast-food and other chain restaurants . . . to provide consumers with nutrition information on menus and menu boards.").

[9]  *See*, *e.g.*, M.G. Wootan & M. Osbord, *Availability of nutrition information from chain restaurants in the United States*, 30(2) Am. J. of Preventative Med. 266-68 (2006); M.G. Wootan, M. Osborn & C.J. Malloy, *Availability of point-of-purchase nutrition information at a fast-food restaurant*, 43 Am. J. of Preventative Med. 458-59 (2006).

---

1    **IV.    The Holding of *United Foods* is Inapplicable to Ordinance 40-08**

2        Plaintiff characterizes Ordinance 40-08 as forcing "a private party to convey the

3    government's message as if it were the private party's message when the private party wishes to

4    convey a different message or no message at all." CRA Br. at 28. It similarly argues that

5    enforcement of Ordinance 40-08 will lead "consumers to mistakenly assume that the posting of

6    calories conveys the restaurants' own point of view," in violation of *United States Department of*

7    *Agriculture v. United Foods*, 533 U.S. 405 (2001). *Id*. This is simply an untenable

8    characterization of the ordinance.

9        Mandated disclosures of factual and uncontroversial commercial information are routine

10   and they are always understood as requiring simply the publication of relevant factual

11   information. If Plaintiff were correct that requiring disclosure of factual information somehow

12   meant that restaurants were required to espouse a particular "point of view" with which the

13   restaurants disagreed, than all compelled factual disclosure such as that mandated by the NLEA

14   would be constitutionally suspect. Indeed, if Plaintiff's argument were accepted, every such

15   statute would be transformed into compelled ideological speech that is constitutionally suspect.

16   But no court has interpreted the mandated disclosure of factual and noncontroversial commercial

17   information about a commercial actor's own products and services as requiring it to espouse a

18   particular point of view.

19       Plaintiff's flawed position rests on a misunderstanding of *United States Department of*

20   *Agriculture v. United Foods*, 533 U.S. 405 (2001). *See* SDNY Opinion and Order at 17

21   ("NYSRA's reliance on United Foods is misplaced."). *United Foods* involved a federal statute

22   authorizing a Mushroom Council to impose mandatory assessments upon handlers of mushrooms

23   for generic advertising. 533 U.S. at 408. One mushroom handler contended that the "forced

24   subsidy for generic advertising" violated its First Amendment right not to be "charged for a

25   message . . . that mushrooms are worth consuming whether or not they are branded," because it

26   wanted to "convey the message that its brand of mushrooms [were] superior to those grown by

27   other producers." *Id.* at 411. The Court held that the First Amendment was implicated because

28   the federal statute required "producers to subsidize speech with which they disagree." *Id*. at 411.

---

1    Ordinance 40-08, in contrast to the federal statute in *United Foods*, does not require

2    commercial speakers to subsidize speech with which they disagree. Ordinance 40-08 requires

3    only the disclosure of factual and uncontroversial commercial information about the nutrition

4    content of their foods and beverages. There is nothing subjective or ideological about this

5    information. Ordinance 40-08 does not require restaurants to disclose a point of view about the

6    meaning or significance of the nutritional information; to the contrary, it permits restaurants to

7    say about this requirement whatever they wish to communicate.

8    Plaintiff does not here contend that the disclosures required by Ordinance 40-08 are

9    inaccurate; thus, there is no basis for suggesting that Plaintiff somehow "disagrees" with the

10   content of the information that must be displayed pursuant to Ordinance 40-08. At most,

11   Plaintiff objects to the requirement that this factual information be disclosed. But this same

12   objection can be made to all legislation that requires disclosure of factual and noncontroversial

13   commercial information. This objection has nothing to do with the constitutional concern of

14   *United Foods*, which extended First Amendment protection to commercial speakers who were

15   compelled to subsidize messages that contained content with which they could in fact disagree.

16   *See* 533 U.S. at 411.

17   **V.    The Reasonable Relationship Test Also Applies Under Article I of the California Constitution**

18

19   The California Supreme Court has stated that the "free speech clause" of the California

20   Constitution "is at least as broad as the First Amendment's, and its right to freedom of speech is

21   at least as great." *Gerawan Farming, Inc. v. Lyons* ("*Gerawan I*"), 24 Cal. 4th 468, 490 (2000).

22   The California Supreme Court has held that decisions of the U.S. Supreme Court "are entitled to

23   respectful consideration and ought to be followed unless persuasive reasons are presented for

24   taking a different course." *People v. Teresinski*, 30 Cal. 3d 822, 836 (1982). California courts

25   do just that. Thus, for restrictions on commercial speech, California courts apply the *Central*

26   *Hudson* test. *See*, *e.g.*, *U.D. Registry, Inc. v. State of California*, 144 Cal. App. 4th 405, 424-25

27   (2006); *Baba v. Board of Supervisors*, 124 Cal. App. 4th 504, 518-21 (2004). Similarly, as

28   Plaintiff concedes (CRA Br. at 33), California courts rely on U.S. Supreme Court precedent for

     compelled subsidy of speech cases. *See Gerawan Farming, Inc. v. Kawamura* ("*Gerawan II*"),

1  33 Cal. 4th 1 (2004).  California courts likewise apply the reasonable relationship test to factual

2  commercial disclosure requirements.  *See*, *e.g.*, *People v. Anderson*, 235 Cal. App. 3d 586

3  (1991); *Perlman v. People*, 99 Cal. App. 3d 568 (1979).

4          Plaintiff cites *Gerawan I* for the proposition that "article I's right to freedom of speech,

5  without more, would *not* allow compelling one who engages in commercial speech to say

6  through advertising what he otherwise would not say, when his message is about a lawful

7  product or service and is not otherwise false or misleading."  CRA Br. at 33 (citing 24 Cal. 4th at

8  509).  *Gerawan I*, like *United Foods*, considered the constitutionality of a government regulation

9  that compelled the "funding of generic advertising."  *Gerawan I*, 24 Cal. 4th at 509.  Just as

10  *United Food*s does not state the applicable First Amendment test for the compelled disclosures of

11  noncontroversial, factual commercial information, so also *Gerawan I* does not state the

12  applicable test under the California Constitution for compelled disclosures of noncontroversial,

13  factual commercial information.  Any other conclusion would undermine the well-developed

14  legislative framework that presently protects consumers in California by requiring the disclosure

15  of uncontroversial, factual commercial information.  *See*, *e.g.*, Cal. & Health & Saf. Code §§

16  110423, 111170, 25250.25; Cal. Fin. Code § 22317.2; Cal. Pub. Res. Code § 15013(b).

17          Plaintiff's interpretation of *Gerawan I*, for example, would render constitutionally

18  suspect such foundational regulatory schemes as Proposition 65.  Proposition 65 provides: "No

19  person in the course of doing business shall knowingly and intentionally expose any individual to

20  a chemical known to the state to cause cancer or reproductive toxicity without first giving clear

21  and reasonable warning to such individual."  Cal. Health & Saf. Code § 25249.6 (2007).  It

22  compels the disclosure of this noncontroversial, factual commercial information in order to

23  ensure the citizens of California are "informed about exposures to chemicals that cause cancer,

24  birth defects, or other reproductive harm" in order to "protect themselves."  Cal. Health & Saf.

25  Code Div. 20, Ch. 6.6 Note §1 (2007).  The California Supreme Court has repeatedly affirmed

26  and enforced Proposition 65.  *See*, *e.g.*, *People ex rel. Lungren v. Superior Court*, 14 Cal. 4th 294

27  (1996).

28

1    As Plaintiff recognizes, few California cases address commercial disclosure requirements

2  (CRA Br. at 29), because few commercial actors challenge the state's authority to compel the

3  disclosure of purely factual commercial information in the context of the purchase and sale of

4  goods and services.  In a case on point, the Superior Court for the City of San Francisco

5  addressed a school bus company's challenge to Proposition 65's requirement that businesses

6  display a "safe harbor warning" advising the public of the presence of toxic substances in the

7  location.  *Environmental Law Foundation v. Laidlaw Transit Services*, 2008 WL 2157672 (Cal.

8  Super. Jan. 8, 2008).  Directly relying on the Second Circuit's reasoning in *Sorrell*, the court

9  rejected CRA's argument that a stricter form of scrutiny is required:

10       [T]he warning here falls under case law for labels and warnings, and easily meets the
         corresponding rational basis standard of scrutiny. "Regulations that compel 'purely
11       factual and uncontroversial' commercial speech are subject to more lenient review than
         regulations that restrict accurate commercial speech and will be sustained if they are
12       'reasonably related to the State's interest in preventing deception of consumers.'"

13

14  *Id*. at *2 (quoting *Sorrell*, 272 F.3d at 113).  The Superior Court recognized that Proposition 65

15  mandated the "disclosure of 'accurate, factual, commercial information' . . . for the benefit of the

16  consumers."  *Id*. at *2.  As such, the purpose of the requirement was to ensure that businesses

17  warn people before exposing them to toxins to promote the health and safety of the public, not to

18  prevent consumer deception.  *Id.* at *3.  The Superior Court found that the compelled disclosure

19  of uncontroversial factual commercial information was reasonably related to the state's purpose,

20  and was thus constitutional under the California Constitution.  *See id.*

21    The California Court of Appeals has also applied the reasonable relationship test of

22  *Zauderer* to uphold the mandated disclosure of noncontroversial commercial facts.  In *People v.*

23  *Anderson*, defendant objected to being compelled to disclose the name and address of the

24  manufacturer of any video or audiotape he offered for sale, as required by "anti-piracy"

25  legislation under the Penal Code.  235 Cal. App. 3d at 588.  The court found that the speech at

26  issue was commercial speech and the state's interest was a desire to protect the public and the

27  entertainment industry from financial "losses suffered as a result of the 'piracy and bootlegging'

28  of the industry's products."  *Id.* at 590-91.  The court relied on *Zauderer* and found that

1    California must only show a reasonable relationship between the statute and the state's interest.

2    *Id*. at 591.  Applying *Zauderer*, the court held the compelled disclosure constitutional, reasoning

3    that a commercial actor's "'constitutionally protected interest in *not* providing any particular

4    factual information in his advertising is minimal.'"  *Id*. (quoting *Zauderer*, 471 U.S. at 651)

5    (emphasis in original).

6           In sum, challenges to the compelled disclosure of noncontroversial factual commercial

7    information are constitutional under California's Constitution so long as they pass the same

8    reasonable relationship test that *Zauderer* uses to analyze the question of federal

9    constitutionality.

10                                        **<u>CONCLUSION</u>**

11          For the foregoing reasons, we urge the Court to deny Plaintiff's Motion for Declaratory

12   Relief and Preliminary Injunction, and uphold Ordinance 40-08.

13
     Dated: July 31, 2008                          Respectfully submitted,
14

15                                                   /s/ Barbara J. Chisholm

16                                                  Scott A. Kronland (SBN 171693)
                                                    Barbara J. Chisholm (SBN 224656)
17                                                  ALTSHULER BERZON LLP
                                                    177 Post Street, Suite 300
18                                                  San Francisco, CA 94108
                                                    Telephone: (415) 421-7151
19                                                  Facsimile: (415) 360-8064
                                                    E-mail: skronland@altber.com
20                                                  E-mail: bchisholm@altber.com

21
                                                    Robert Post (SBN 111917)
22                                                  David Boies Professor of Law
                                                    YALE LAW SCHOOL
23                                                  P.O. Box 208215
                                                    New Haven, CT 06520
24                                                  Telephone: (203) 432-4946
                                                    Facsimile: (203) 432-1040
25                                                  Email: Robert.Post@yale.edu

26
                                                    *Attorneys for* Amici Curiae *Robert Post, Jennifer L.*
27                                                  *Pomeranz, and Kelly D. Brownell*

28

---